# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **VALERIE S.**, parent of three minor children, **JENNIFER L.**, parent of three minor children, **CHRISTINA G.**, parent of two minor children, **NICOLE L.**, parent of three minor children, **ASHLEY B.**, parent of three minor children Individually and on behalf of all others similarly situated, *Plaintiffs*, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO.**___1:18-cv-10031___** *"For parents, by parents, united as one; protected by the U.S. Constitution, which represents life, liberty and justice for all"* Ilya Liviz J.D. M.Ed. |

v.

*JURYRIGHTSFORPARENTS.COM*
production

**CHARLIE BAKER**, in his official capacity as Governor of the Commonwealth of Massachusetts
**LINDA S. SPEARS**, in her official capacity as Commissioner of the Massachusetts Department of Children and Families,
**MARYLOU SUDDERS**, in her official capacity as Secretary of the Massachusetts Executive Office of Health & Human Services,
**ANTHONY J. BENEDETTI**, in his official capacity as Chief Counsel for the Committee for Public Counsel Services
**GENE RAUHALA**, **TAMEKA G. O'BRIEN** & **ALAN LEVINE** individually and on behalf of all others similarly situated
*Defendants*,

```
     ( _ )   ["Moo"] 1
     | o o |   /
 /--------( 0  0)  /
  / ||    ||
 *  ||------ ||
    ^^     ^^
```

) **CLASS ACTION COMPLAINT FOR**
) **VIOLATIONS OF U.S. CONSTITUTION**
) **AND FEDERAL ACTS WITH REQUEST**
) **FOR INJUNCTIVE RELIEF AND**
) **ESTABLISHMENT OF THE**
) **OFFICE OF THE PARENT ADVOCATE**[2]
) **AND OTHER REUNIFICATION RELIEF;**
) **REQUEST FOR A JURY TRIAL**
) **WITH SPECIAL VERDIT SLIP**

---

[1] Is this a cow or a bull; and should it matter if it can't produce milk to determine the animal's fitness? (A token of our constitutionally protected freedom of speech, expression, and right to petition for redress from this honorable court - our children are being taken from us; this is our cry and last resort, to ask for your desperately needed help.)

[2] DCF is extremely important and is in charge of a difficult balancing act of protecting children and serving parents' needs; conflicting interests which should not be handled by the same department. Parental rights and child safety interests have to be kept separate to prevent abuse of power. *See* Doctrine of Separation of Powers. [Proposed] Office of the Parent Advocate ("OPA"), *inter alia*, would expose system-wide lack of; services for parents, meaningful visits, reunification efforts; and most importantly direct legislative and regulatory changes necessary to advance parents' interests, *exempli gratia*, establishment of [Proposed] Department of Parents Services ("DPS").

# TABLE OF CONTENTS[3]

ABBREVIATIONS, ACRONYMS & ASSOCIATED CONCEPTS      .      .      6

SYNOPSIS      .      .      .      .      .      .      .      .      .      .      6

SUMMARY OF REAL NEWS      .      .      .      .      .      .      .      6

INTRODUCTION      .      .      .      .      .      .      .      .      .      7

LAW MISNOMER NOTICE .      .      .      .      .      .      .      .      10

ADOPTION BY REFERENCE NOTICE      .      .      .      .      .      .      10

JURISDICITON, VENUE AND ASSIGNMENT      .      .      .      .      .      11

STANDING      .      .      .      .      .      .      .      .      .      .      11

ABSTENTION DOCTRINE .      .      .      .      .      .      .      .      12

ABROGATION OF SOVEREIGN IMMUNITY      .      .      .      .      .      13

PARTIES.      .      .      .      .      .      .      .      .      .      .      15

    A.      Plaintiffs      .      .      .      .      .      .      .      .      15

    B.      Defendants      .      .      .      .      .      .      .      .      16

THE NAMED PLAINTIFFS .      .      .      .      .      .      .      .      17

    A.      Valerie S.      .      .      .      .      .      .      .      .      17

    B.      Jennifer L.      .      .      .      .      .      .      .      .      25

    C.      Christina G.      .      .      .      .      .      .      .      .      29

    D.      Nicole G.      .      .      .      .      .      .      .      .      34

    E.      Ashley B.      .      .      .      .      .      .      .      .      37

PLAINTIFFS COLLECTIVELY      .      .      .      .      .      .      .      38

DEFENDANTS COLLECTIVELY      .      .      .      .      .      .      .      39

---

[3] Chronological numbering is used from beginning to end (i.e. replaces typical introductory alphanumerical to numerical format) ; with the caption page of the complaint numbered as imaginary one (1).

CLASS ACTION GENERAL ALLEGATIONS & LANDSCAPE . . . 39

I.  OPPOSITION TO CONCURRENT FILLING
    OF CHILDRENS CLASS ACTION . . . . . . . 39

II.  GENERAL ALLEGATIONS . . . . . 44

III.  FEDERAL STATUTORY FRAMEWORK . . . . . 46

    A.  Adoption Assistance and Child Welfare Act of 1980 ("AACWA") . 46

    B.  Child Abuse Prevention and Treatment and
        Adoption Reform Act ("CAPTA") . . . . . 48

    C.  Social Security Act ("SSA") . . . . . 49

    D.  Adoption and Safe Families Act of 1997 ("ASFA") . . . 51

    E.  Rehabilitation Act of 1973 ("Section 504") . . . . 51

    F.  Americans with Disability Act of 1990 ("ADA") . . . 52

    G.  Helping Families Save Their Homes Act of 2009 . . . 53

    H.  Comprehensive Addition and Recovery Act of 2016 ("CARA") . 54

    I.  Protection and Advocacy for Individuals with Mental Illness Act . 55

    J.  Civil Rights Act of 1964 . . . . . . . 56

IV.  MASSACHUSETTS DCF LANDSCAPE . . . . . 56

    A.  Department of Children and Families ("DCF") . . . 56

    B.  Care and Protection Proceedings ("C&P") . . . . 59

    C.  Grandparent Visitation Rights . . . . . 65

    D.  Massachusetts Anti-Discrimination Laws and Regulations . . 67

    E.  Foster Care Review Unit . . . . . . 67

    F.  Other DCF Statistics . . . . . . . 71

V.  STATE AUDITOR'S OFFICIAL AUDIT REPORT . . . . 72

A.     DCF Does Not Effectively Identify and Investigate
Serious Bodily Injury to Children      .          .          .          .          .          73

B.     DCF Does Not Report All Critical Incidents To OCA          .          .          74

C.     DCF Does Not Report All Abuse, Neglect,
and Sexual Abuse to DA Offices          .          .          .          .          .          75

D.     DCF Does Not Timely Complete and Submit Fatality
Review Report to OCA          .          .          .          .          .          .          76

VI.     DCF VIOLATIONS CAUSE IRREPARABLE HARM TO PARENTS     .     76

A.     Child Welfare and Office of the Child Advocate Outcomes .     .     76

B.     DCF Misappropriates Federal Funding for Foster Care
and Other Services          .          .          .          .          .          .          .          78

C.     There Are Lack Of Services in Place To Prevent Child Removal     .     80

D.     DCF Discriminates Against Parents     .          .          .          .          .          82

E.     DCF violate Parents Privacy/HIPPA Rights     .          .          .          .          83

VII.     DEFENDANTS FAILED TO IMPLEMENT AND EXECUTE THEIR OWN
POLICIES & REGULATIONS          .          .          .          .          .          .          84

VIII     DCF SOCIAL WORKERS DO NOT ADVOCATE FOR PARENTS     .     88

A.     DCF Social Workers are Unsuitable to Help Parents .          .          .          88

B.     Parents are Separated From Their Children Unnecessarily     .     90

C.     DCF Utilizes Unconstitutional Supervised Parent Visit Centers     .     91

D.     DCF Required Therapists are Used Against Parents .          .          .          93

E.     DCF Does Not Offer Beneficial Services to Parents .          .          .          93

IX.     COMMONWEALTH IS NOT PROPERLY IMPLEMENTING
AND EXECUTING THEIR POLICY OF REUNIFICATION     .     .     94

X.     CPCS & ITS CAFL DIVISION DOES NOT IMPLEMENT AND EXECUTE
POLICY TO PROVIDE COMPETENT REPRESENTATION TO PARENTS     96

A.    Role of CAFL .    .    .    .    .    .    .    .    96

B.    CAFL Failed to Provide Competent Legal Representation for Parents    98

C.    Failed to Advocate for System improvements    .    .    .    101

D.    Deficient Appellate Efforts    .    .    .    .    .    .    104

E.    Adoption of Jenny (example) .    .    .    .    .    .    107

SUMMATION    .    .    .    .    .    .    .    .    110

FIRST CAUSE OF ACTION (Substantive Due Process Violation) .    .    .    110

SECOND CAUSE OF ACTION (Violation of AACWA, CAPTA, SSA & others) .    113

THIRD CAUSE OF ACTION (Violation of First, Ninth, Fourteenth Amendments)    114

FOURTH CAUSE OF ACTION (Violation of Rehabilitation Act & ADA).    .    115

FIFTH CAUSE OF ACTION (Procedural Due Process Violation).    .    .    .    116

SIXTH CAUSE OF ACTION (Deprivation of Equal Rights).    .    .    .    117

SEVENTH CAUSE OF ACTION (Violation of Recovery Act of 2016).    .    .    117

EIGHT CAUSE OF ACTION (Legal Mal Practice) .    .    .    .    .    119

NINTH CAUSE OF ACTION (Breach of Fiduciary Duty) .    .    .    .    119

TENTH CAUSE OF ACTION (Violation of 93A) .    .    .    .    .    120

ELEVENTH CAUSE OF ACTION (Gender Discrimination)    .    .    .    120

TWELFTH CAUSE OF ACTION (Poverty Discrimination)    .    .    .    121

PRAYER FOR RELIEF    .    .    .    .    .    .    .    .    121

ADDENDUM (Adoption of Jenny) .    .    .    .    .    .    .    125

# COMPLAINT

## ABBREVIATIONS, ACRONYMS & ASSOCIATED CONCEPTS

| | |
|---|---|
| AACWA | Adoption Assistance and Child Welfare Act of 1980 |
| C&P | Care and Protection Proceedings |
| CAFL | Children and Family Law division of CPCS |
| Commonwealth | Charlie Baker, Governor of the Commonwealth of Massachusetts |
| CPCS | Anthony J. Benedetti or Committee for Public Counsel Services |
| DCF | Linda S. Spears or Department of Children and Families |
| DHCD | Department of Housing and Community Development |
| DTA | Department of Transitional Assistance |
| DPS | [Proposed] Department for Parent Services |
| DV | Domestic Violence |
| EOHHS | Marylou Sudders or Executive Office of Health and Human Services |
| HHS | U.S. Department of Health and Human Services |
| Massachusetts | Commonwealth of Massachusetts |
| OCA | Office of the Child Advocate |
| OPA | [Proposed] Office of the Parent Advocate |
| Parents | Plaintiff Class of Massachusetts Parents |
| Reunification | Process of Reuniting Parents with Their Children |
| Reasonable Efforts | Combination of Services, Rehabilitative Efforts, and Assistance, Offered By DCF to Remedy the Condition That Initiated the C&P |
| SNAP | Supplemental Nutrition Assistance Program |

## SYNOPSIS

1.      DCF 's erroneous professional judgment, and lack of reasonable efforts for reuniting children with biological parents, result in state-wide misappropriation of federal funding by inappropriately boosting foster care funding, which in most cases can be easily avoided by reunification with in-home services, or other alternative reasonable efforts to keep familial unit intact.

## SUMMARY OF REAL NEWS

2.      There is a cultural difference between the people in power in DCF and the people that find themselves at their mercy (mostly parents from lower socioeconomic class); neither like each other, accept one holds all the power and the other is powerless.  DCF

employees confuse *strength* & *passion* of the lower socio-economic class, with *aggressiveness* & *dangerousness*; resulting in loss of right to parent on routine basis.  As the government increases in size and power, the number of children under their control continues to increase every year (In 2015,2016 & 2017 number of children in placement/foster care is the highest the State has ever seen); the shift of determining parental fitness has now moved away from "parental inaptness" and moved toward "character assassination", and it is all occurring behind closed doors (matters are impounded and hearings are not open to the public).  DCF has a stake and direct control of the outcome; by limiting visitations and requiring parents to complete services without assistance, parents are "set up" for failure; the system is broken and requires immediate attention from outside unbiased source.

## INTRODUCTION

3.        This is a violation of Federal Acts class action brought on behalf of all parents (hereinafter "Parents")  who are now or will be subjected to Care and Protection Proceedings (hereinafter "C&P ") by Massachusetts Department of Children and Families (hereinafter, "DCF") as a result of alleged abuse or neglect by Parents. The following Defendants, each sued in his or her, official capacity only, and not individually, are Charlie Baker, Governor of the;

4.        Charlie Baker, Governor of the Commonwealth of Massachusetts (hereinafter, "Commonwealth"); Linda S. Spears, Commissioner of DCF (hereinafter "DCF") Marylou Sudders, Secretary of the Massachusetts Executive Office of Health and Human Services ("EOHHS"); Anthony J. Benedetti, Chief Counsel for the Committee for Public Counsel (hereinafter "CPCS"), Children and Family Law Division of CPCS (hereinafter

"CAFL"); collectively are the Defendants in this violation of Federal Acts & Civil Rights Complaint (hereinafter, "Defendants").

5.      Plaintiff Parents, each of whom relies on DCF as liaison and provider, of guidance, support, and family reunification services, seek both declaratory and injunctive relief to remedy violations of their legal rights and to prevent Defendants, by their actions, or inactions, and their failure to act as lawfully required, from continuing to cause them harm; specifically Defendants are required to provide services and reasonable efforts for reunification.

6.      During the C&P, children of Plaintiff Parents, and their temporary care takers/foster parents, receive benefits from the federally funded foster care system operated by DCF, which under federal and state law, is responsible for investigating allegations of child abuse and neglect, for delivering in-home services to preserve families when safely possible, for providing temporary care and protection for children who cannot safely remain at home, for securing safe and stable families as soon as possible for children removed into state care, whether by reunification, adoption or legal guardianship.

7.      The Massachusetts foster care system, however, is utilizing federal funds to provide foster care for children for long period of time, that could otherwise be placed with Plaintiff Parents without delay.  The lack of reunification is against Federal and State regulations, and is causing physical and psychological harm to the Plaintiff Parents and their children, who DCF is mandated to protect.

8.      DCF's agents do not have adequate knowledge, training or supervision knowledge to handle children removal; most children are removed under emergency basis with no

actual risk of immediate harm present, which could be alternatively addressed with less drastic remedial services and continuous home visit monitoring.

9.      DCF formulates erroneous opinions of parental fitness, in part, based on age, sex, level of education, culture and financial stability, in violation of Federal and State laws.

10.     DCF quickly builds erroneous documentation of parental unfitness through social workers' findings who don't have full understanding, knowledge, and training, of even the basic definitions of neglect and parental fitness, as defined by State Law and regulation.

11.     Plaintiffs challenge certain unlawful policies and practices of the defendant officials concerning the operation of Commonwealth of Massachusetts's child welfare system.

12.     Specifically defendants failed to implement and execute their own policies and regulations designed to keep children safe and parents reunified with their children. Defendants constantly fail to place children in the least restrictive, most family-like settings and in settings which allow them to maintain sibling relationships, parent and grandparent visitations, their use of overcrowded and inadequately trained and supervised foster homes that do not conform to nationally-accepted standards, their failure to ensure that all children in care receive adequate medical and mental health assessments and treatment and adequate and consistent parenting and nurturance, and their failure to provide specialized substitute care placements for all children with special needs,

13.     Defendants failed to implement and execute own policy of appropriate case plans that will assure permanent placements for all children in their custody, either by providing services to families to enable the children to be returned home safely or by timely placement of the children into other permanent homes.

14.    Plaintiffs assert that Massachusetts's child welfare system endangers children it is charged to protect, causes harm to children it is charged to help, and has been allowed to deteriorate to a state of systemic, ongoing crisis. This crisis has caused irreparable harm to parents and irreparable injury to the thousands of children involved therein, that are ripped out of their homes unnecessarily and then bounced around from different homes even if they want to be reunified with their parents.

15.    Plaintiffs assert that defendants' actions and knowing inactions in the face of this crisis have deprived plaintiffs, and all others similarly situated, of their rights as guaranteed by the First, Ninth and Fourteenth Amendments to the United States Constitution, their rights under the federal Adoption Assistance and Child Welfare Act, and their rights under the federal Child Abuse Prevention and Treatment Act; requiring DCF to provide parents with services and reasonable efforts of reunification.  Plaintiffs seek declaratory and injunctive relief to remedy defendants' unconstitutional and illegal miss implementation of policies and practices.

**LAW MISNOMER NOTICE**

16.    Any Code/Statute/Act or other source referenced hereunder, by misnomer or oversight, should not be deemed as a waiver, limit or prevent plaintiff from subsequent amendments, supplements or changes thereto, with ability to relate back to the date of the original pleading.

**ADOPTION BY REFERENCE NOTICE**

17.    Documents produced by parties or third party entities, as referenced by footnotes or other means herein, and any subsequent documents attached hereto as amendment or

supplement, including submissions attached to Plaintiffs' opposition to Motion to

Dismiss, shall be adopted by reference as if stated fully herein, pursuant to Fed. Rules

Civ. Proc. Rule 10(c), and all of the allegations within this complaint, shall be deemed

restated and incorporated, under each and all numbered paragraph, as if fully stated

therein ; *exempli gratia*, class action constitutional infirmities are restated and

incorporated for each party, plaintiff and defendant, as stated therein and thereafter.

## JURISDICITON, VENUE AND ASSIGNMENT

18.        This action is brought pursuant to 42 U.S.C. § 1983 to redress violations of the

United States Constitution and federal statutes.  The Court has jurisdiction pursuant to 28

U.S.C. §§ 1331 and 1343(a)(3).

19.        A declaratory judgment is authorized pursuant to 28 U.S.C. §§2201 and 2201 and

by Rule 57 of the Federal Rules of Civil Procedure.  Injunctive relief is authorized by

Rule 65 of the Federal Rules of Civil Procedure.  An award of costs and attorneys' fees is

authorized by 42 U.S.C. §1988.

20.        Venue is proper pursuant to 28 U.S.C. § 1391(b).  The claims arise in this District.

21.        Assignment in the Eastern Division is proper pursuant to LR. 40.1(D)(1)(b)

because a majority of the Named Plaintiffs – Valerie S., Christina Garcia, – reside in the

Eastern Division:

## STANDING[4]

---

[4] *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992) (Article III of U.S. Constitution requires plaintiff to assert (1) an injury in fact that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the above injury and a defendant's conduct; and (3) a likelihood judicial relief will redress the injury). *See also City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) Showing of immediate threat of future injury is requisite for injunctive relief.

22.     Defendants', *inter alia*, have failed to provide reasonable efforts for reunification and effective assistance of counsel, to the Class Plaintiffs, leading to unnecessarily lengthy separation of children from fit parents, resulting in ongoing deprivation of the right to parent, and permanent harm to integrity of the familial unit.

23.     Judicial relief will provide redress to the above injury, by appropriately, as required by Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), require training and education to improve advocacy for families redirecting current policy to greater reunification efforts, which will limit separation injury, with the goal to limit future and ongoing violation of constitutionally protected right to parent, and limit future and ongoing deprivation of familial association between parents and their children.[5]

## ABSTENTION DOCTRINE

24.     *Younger* is inapplicable because this federal complaint focuses on the need for Commonwealth's Executive Office to create adequate training and oversight of its departments, to appropriately redirect DCF's & CPCS's, pursuant to AACWA, energy on keeping families in tact through reunification, and improve overall advocacy for the familial unit through retraining  of DCF or establishment of DPS, with fair and equal representation of all parties in the ongoing Care and Protection state proceedings, without any interference or challenge to; State laws, legislative process, the course of present and future judicial proceedings.[6]

---

[5] *See County of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) (Plaintiffs satisfied Article III's standing requirements because they alleged "a direct and current injury" resulting from an unlawful detention).
[6] *See Rossi v. Gemma*, 489 F. 3d 26, 35 (1st Cir. 2007) (observing that courts must first consider the "threshold issue of interference" before moving on to the *Younger v. Harris*, 401 U.S. 37 (1971) analysis, which is further refined in *Middlesex County Ethics Commission v. Garden State Bar Association*, 457 U.S. 423, 432 (1982). However, *Younger* does not apply to a state judicial proceeding reviewing legislative or executive action.  *See New Orleans Public Ser., Inc. v. Council of City of new Orleans*, 491 U.S. 350, 368 (1989).

## ABROGATION OF SOVEREIGN IMMUNITY

25.     The Supreme Court recognized a narrow exception for claims seeking prospective injunctive relief against state actors to conform future conduct to the requirements of federal law.[7]  As long as the state official "has some connection with the enforcement of the act," that official is an "appropriate defendant."[8]

26.     Defendant Charlie Baker is Governor of the Commonwealth of Massachusetts and is sued solely in his official capacity.  Pursuant to Part II, Chapter II, Section 1, Article 1 of the Constitution of the Commonwealth of Massachusetts, the executive power of the Commonwealth is vested in the governor, who has the ultimate authority to direct and control the operation of  EOHHS and DCF.[9]  Defendant Baker has direct supervisory authority over Defendant Marylou Sudders, the Secretary of the Massachusetts EOHHS, who develops and implements DCF policies and programs.[10]  Defendant Baker also approves the appointment of the DCF Commissioner, Defendant Linda Spears, who is vested with the duty to administer a comprehensive child welfare program for children and families.[11]  Defendant Baker also approves the appointment of the Office of the Child Advocate, who is charged with reviewing DCF's programs and procedures, and resolving complaints relative to the provision of services to children by an executive agency.[12]

27.     Alternatively, this action against the Commonwealth of Massachusetts, is sustained by the denial of basic constitutional guarantees, like fundamental right to rear a

---

[7] *See Ex Parte Young*, 209 U.S. 123 (1908)
[8] *See Shell Oil v. Noel*, 608 F.2d 208, 211 (1st Cir. 1979)
[9] *See* M.G.L.c. 6A, §§2 & 4
[10] *See* M.G.L.c. 6A, §§2,3 &16
[11] *See* M.G.L.c. 18B, §§1 &6
[12] *See* M.G.L.c. 18C, §5

child, which waives sovereign immunity, pursuant to intent of Congress's Americans with Disabilities Act's enforcement of fourteenth (14th) Amendment prohibition on irrational disability discrimination.[13]

28.    Alternatively, states waive their sovereign immunity under the Rehabilitation Act by accepting federal funds.[14]  Title VI, from which §504 of the Rehabilitation Act borrows its remedies, provides that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973."[15]

29.    Also, Massachusetts Torts Claims Act abrogates state immunity, [16] and the Act's exceptions do not protect public entities whose functions involve the implementation and execution of such governmental policy[17]

30.    Finally, and of last resort, we pray *Sue Suter, et al., v. Artist M. et al.*, be overturned, and pursuant to Honorable Justice Blackmun's & Honorable Justice Steven's dissent; "The Adoption Assistance and Child Welfare Act of 1980 (["AACWA"]) conditions federal funding for state child welfare, foster care, and adoption programs upon, *inter alia,* the State's express commitment to make, "in each case, reasonable

---

[13] *See e.g. 42 U.S.C.* §§12132 & 12202; *Tennesse v. Lane*, 541 U.S. 509, 522-23 (2004) (Infringement of basic constitutional guarantees is "subject to more searching judicial review").

[14] *See Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 127–29 (1st Cir. 2003)

[15] *See* e.g. 42 U.S.C. §2000d-7 (A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [29 U.S.C. 794], title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C. 6101 et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance)

[16] *See* M.G.L.c. 258 et seq. (counsel is mindful the Tort Act waives immunity if the claim is brought in State Court; however, waiver attaches if there are other valid Federal Claim/s).

[17] *See Shapiro v. City of Worcester*, 464 Mass. 261, 982 N.E.2d 516 (2013) upholding *Whitney* two-prong test in determining M.G.L.c. 258, §10(b) protection of immunity to public employers. *Whitney v. Worcester*, 373 Mass. 208, 217, 366 N.E.2d 1210 (1977) (*Whitney*); (dividing line should be between those functions that rest on the exercise of judgment and discretion and represent planning and policymaking [for which there would be governmental immunity] and those functions which involve the implementation and execution of such governmental policy or planning [for which there would be no governmental immunity].

efforts" to prevent the need for removing children from their homes and "reasonable efforts," where removal has occurred, to reunify the family."[18] (90-1488), 503 U.S. 347 (1992)(held that it does not confer its beneficiaries a private right enforceable in an action under §1983)

## PARTIES

A.    <u>Plaintiffs</u>

31.        Plaintiff Valerie S. ("Valerie") is a 29 year-old mother, a citizen of the Commonwealth of Massachusetts, had her three children stripped from her care by Lowell DCF, including most recently in 2015, her daughter Thailee was erroneously removed from her home under emergency basis; Thailee, who was previously striving in school, would be repeatedly subjected to sexual assault in foster care, develop behavioral issues, and the abuse she suffered at the care of DCF would not be reported to Valerie; Valerie is still fighting to regain her parental rights and is limited to seeing her daughter to only twice a month. Valerie was advised by her CPCS counsel to waive her 72-hour hearing, to stipulate, and to subsequently, give up her child for adoption because she would not be able to win against DCF.

32.        Plaintiff parent Jennifer L. ("Jennifer") is a 30 year-old mother, a citizen of the Commonwealth of Massachusetts, had her three children stripped from her care by Lowell DCF in 2016.

---

[18] *See* 42 U.S.C. § 671(a)(15)(B)(i) & (ii) ("...reasonable efforts shall be made to preserve and reunify families; (i) prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home; and (ii) to make it possible for a child to safely return to the child's home;")

33.     Plaintiff parent Christina G. ("Christina") is a 37 thirty-seven year old mother, a citizen of the Commonwealth of Massachusetts, had her three children stripped from her care by Lowell DCF in 2016.

34.     Plaintiff parent Nicole G. ("Nicole") is a 36 thirty-six year old mother, a citizen of the Commonwealth of Massachusetts, had her three children stripped from her care by Lowell DCF in 2015 and 2016.

35.     Plaintiff parent Ashley B. ("Ashley") is a 26 year-old mother, a citizen of the Commonwealth of Massachusetts, had her three children stripped from her care by Haverhill DCF in 2014.

B.     Defendants

36.     Defendant Charlie Baker is Governor of the Commonwealth of Massachusetts Commonwealth of Massachusetts ("Commonwealth") is sued solely in his official capacity, who currently maintains his principal office at the Massachusetts State House, Office of the Governor, Room 280, Boston, Massachusetts, 02133.

37.     Defendant Linda Spears, as the Commissioner of DCF ("DCF"), is the executive and administrative head of DCF, is sued solely in her official capacity, who currently maintains her principal office at 600 Washington St, Boston, MA 02111.

38.     Defendant Marylou Sudders, as the Secretary of the Massachusetts Executive Office of Health and Human Services ("EOHHS"), is sued solely in her official capacity, who currently maintains her principal office at One Ashburton Place, 11th Floor, Boston, Massachusetts 02108.

39.        Defendant Anthony J. Benedett[19], in his official capacity as Chief Counsel for the Committee for Public Counsel Services (hereinafter "CPCS") overseeing Children and Family Law division ("CAFL"), with the administrative office located at 44 Bromfield Street Boston, MA 02108

40.        Defendant Gene Rauhala, attorney admitted to practice law in Massachusetts since 1984, in his individual capacity as CPCS approved, appointed private counsel for Valerie S., with his primary office located at 370 Main St. No.1, West Townsend, MA 01474, and on behalf of all others similarly situated if such certification of class is allowed.

41.        Defendant Tameka Grantham O'Brien, is an attorney admitted to practice law in Massachusetts since 2010, in her individual capacity as CPCS approved, appointed private counsel for Jennifer L., with her primary office located at 5 Fletcher Street 2nd Floor, Suite D, Chelmsford, MA 01827.

42.        Defendant Alan I. Levine, attorney admitted to practice law in Massachusetts since 1974, in his individual capacity as CPCS approved, appointed private counsel for Jen B., with his registered with Massachusetts Board of Bar Overseers address as P.O. Box 2085, Andover, MA 01810, and on behalf of all others similarly situated if such certification of class is allowed.

### THE NAMED PLAINTIFFS[20]

A.    <u>Valerie S.</u>

---

[19] We commend Attorney Benedetti's efforts that led toward progressive reform of Massachusetts's criminal justice system; however, the Children and Family Law Division ("CAFL") of CPCS is in need of a lot of reform and requires immediate attention.

[20] In accordance with LR. 5.3, the identities of the minor Named Plaintiffs have been protected.  Because some of the Named Plaintiffs share common initials, minor changes to the name were made to avoid confusion.

43.        Valerie S. ("Valerie") was born in 1990 in Fresno CA and relocated to Lowell,

MA in 1997.  She attended Lowell High School till 12th grade, but had to leave her final

year because of unexpected pregnancy.  Because of her pregnancy, instead of focusing on

pursuing education and a career, she elected to become a stay-at-home parent.

44.        Valerie's first daughter, Thailee M. ("Thailee") was born on March 10th, 2009,

and is currently eight years old.  Valerie's second daughter, Naiyla S. ("Naiyla"), was

born February 14th, 2011, and is currently six years old.  Valerie's third child, Kaison L.

("Kaison") was born on November 30th, 2014, and is currently three years old.

45.        Valerie has been involved with DCF since she was approximately eight years old.

In the hospital when she was giving birth to Thailee, the staff offered her DCF's help,

which she accepted.    Dina was a social worker at DCF, who had similar Cambodian

background,  was very helpful and kind to Valerie. She showed Valerie how to get

Supplemental Nutrition Assistance Program (SNAP)[21], day care assistance, and voucher

for transportation assistance.  We praise the hard work and efforts, of Dina of DCF; and

offer her our thanks.

46.        Sometime in 2014, Valerie lacked financial resources and as a result; sought

temporary assistance from her family members.  Valerie's cousin cared for Thailee in

Fresno, CA and Naiyla's father cared for Naiyla in Lowell, MA.

47.        Thailee was situated in school in Fresno, CA, so the family made a decision to

have her come back to Lowell, MA, toward the end of the school year.  During the wait,

Valerie gave birth to Kaison.  Kaison was taken by DCF approximately four months after

he was born because, *inter alia*, Valerie told her therapist, whom she thought was there to

---

[21] Department of Transitional Assistance (DTA) administers SNAP benefits; commonly referred to as "food stamps".

help, that she was being abused by her boyfriend (Kaison's father).  As result of Valerie

seeking help from a therapist, a mandated reporter,[22] DCF came into her life and took

Kaison from her.  Even though Valerie has complied with DCF's service plan and

requests, based on her history of homelessness, erroneous concerns of having a mental

illness (she was prescribed "garden-variety" take as you need depression medicine) there

was no efforts made for reunification.

48.        Shortly after, approximately in  May 2015, Thailee finished school and returned

to Valerie from California because she missed being with her mother very much.  Fear of

having Thailee stripped from her care, she did not notify DCF she cared for Thailee in

hiding from the Government .  Thailee entered the local school system and was doing

exceptionally well.  On 10/02/2015, Thailee's excellent performance in school earned her

a "Stem Academy Gold Behavior Award"; she was a happy young child who was

thriving in school and at home.

49.        On 10/09/2015 Thailee, without Valerie's knowledge, brought a pocket folding

knife to school to show off.  DCF was notified via 51A report.

50.        On 10/09/2015 a 51B investigation was conducted. The investigation was

conducted by a social worker who took a course of less than 20 min on how to conduct

investigations.  Vallerie allowed the investigator into her home.  The investigator was

able to confirm Valerie and her daughter Thailee resided in a two bedroom apartment.

The apartment was clean.  There were no visible hazards noted.  The bed has clean sheets

and blankets. Thailee was separated from her mother and interrogated by the investigator.

Thailee confirmed that only her and Valerie lived in the apartment.  Thailee denied any

---

[22] *See* M.G.L.c. 51A

domestic violence ("DV") within the home or around her.  Thailee denied the presence or use of any drugs in the home or around her.  Thailee denied the presence or use of alcohol in the home or around her.

51.     Thailee was placed in a Foster Care with four other children.  In Foster Care there was another child who repeatedly sexually assaulted her; the child showed to her what her daddy used to do to her.  Thailee was repeatedly subjected to having her pants taken off and her genitalia being touched inappropriately.  Even though DCF had full knowledge of this, Valerie's social worker failed to disclose this to Valerie.  Even worse, after Thailee, in order to separate her from the perpetrator, was removed from this foster care, she was subsequently placed back in the same care with the same perpetrator.[23]
During the C&P trial on the merits in Juvenile Court, the social worker's only excuse was that she was "afraid to tell her"; however, *inter alia*, she could have communicated this to Valerie's attorney.  Valerie was not provided with any information as to the details of this matter; she had to find out from her daughter about half a year after it happened.

52.     Valerie complied with all of DCF's requests.  She went to therapy, met with her social worker, attended Domestic Violence (DV) group therapy classes, and successfully completed her Parenting Wisely Program.  She has also received letters of support from her therapists and acquired a state estheticians license.  Nevertheless, DCF would not place Thailee back with her mother due to her prior history of involvement with DCF, alleged domestic violence and erroneous allegation of mental illness.

53.     DCF and their social workers, would not help Valerie in any way.  She repeatedly asked for a social worker that has similar cultural background as her, or at the very least a

---

[23] *See infra* footnote 130 & 132

different social worker; her requests were denied.  It was clear to her that she doesn't get

along with her social worker; as hard as she tried, all of her efforts were futile.  DCF has

made up their mind that they did not see her as a fit parent and there was nothing she

could do about it.

54.    Valerie did not have money for an attorney, has no knowledge of the C&P

proceedings, was scared and had no one to go for help.

55.    At the beginning of the C&P, Valerie was appointed Gene Rauhala (hereinafter

"Gene"), of CPCS, in the ongoing C&P matter in Juvenile Court.  Gene told Valerie that

he knows what he is doing, and that she would have no chance of regaining custody of

her children.  He said that Valerie would never see her children again and that the only

way to be able to have some sort of future interaction (e.g. Christmas card and a phone

call on a birthday) is to agree to an open adoption.

56.    Gene notified House of Hope Inc.,[24] and disclosed to them that Valerie's child

was taken by DCF; as a result of this *questionable*[25] phone-call, Valerie's HomeBase[26]

benefits where terminated.  Valerie's rent immediately increased from $275 to $875.

57.    Valerie agreed to sign the documents for open adoption for Kaison, with the

understanding it is the only way she would have any possible contact with him.

However, she has not been able to have any contact or communication, with Kaison

again.

---

[24]The House of Hope is dedicated to assisting homeless families in Massachusetts. We provide services to families referred to us by the Department of Housing and Community Development (DHCD).

[25] Arguably the child could have been returned any day; more importantly this is a breach of attorney-client confidentiality.

[26] DHCD coordinates HomeBASE benefits, which can provide funds for first and last month's rent and security deposit in a new home, furniture (not to exceed $1,000), a monthly stipend to help pay rent for up to one year as well as utilities, travel costs, and many other expenses that would otherwise prevent a family from accessing a new home.

58.      Contrary to Gene's advices, with the "life experience" knowledge of what happened to her with Kaison, she decided to seek out private counsel to fight for Thailee. Attorney Ilya Liviz took over the C&P case and is concurrently filling this complaint.

59.      Valerie is currently employed as a nail technician, has stable home, lives alone, is not in a relationship, has no history of drug abuse and is drug free, has no history of criminal convictions, has no diagnosed mental illness, is seeing her primary medical provider who can confirm her health, continues to see her therapist (because she is required), and DCF is still not placing Valerie with her.

60.      DCF placed Thailee with Valerie's sister Nikky.  However, DCF did not know that Valerie would take over substantial care of Thailee without DCF's knowledge. Valerie acknowledges this was dishonest, but, as a mother who loves her child, and the child feels the same way, the only way they can be together was to keep it a secret from the Government.

61.      Thailee was doing good in school.  However, she did not want to be with the Nikky at all, and started to "act out".  Thailee, in hopes of being reunited with her mother, disclosed to DCF that Nikky was hitting her (51a was filed against Nikky), which turned for the worst.

62.      Sometime in August, 2017, DCF decided to take Thailee away from Nikky and place her in a Foster Home; this would mean Valerie would not be able to care for her daughter.  Valerie, in hopes of continuing to care for her daughter, disclosed to DCF that Thailee was just acting out because she wanted to stay with her mother, as she already has for months.  Even though Valerie has been the ongoing care-taker, this disclosure

would harm Valerie's already poor image with the DCF.  Her visits have been reduced

from four visits a month (one hour each), to only two visits a month (two hour each).

63.        DCF is claiming that Thailee has behavioral issues and requires specialized

attention.  Thailee developed these issues as a result of DCF taking Thilee from her mom,

against Thailee's wishes.  Thailee wants to return back to her mom but she is not old

enough for her voice to be heard.  Valerie has no voice in this decision making.  DCF is

harming both, Valerie and Thailee, by keeping them apart against their will.  Thailee is

very obedient in her mother's care; and has clearly expressed her wish to be with her

mother.

64.        There is no good reason to have Thailee separated from her mom.  Valerie has a

stable job, a stable apartment, is drug free, is mentally of sound mind, and has proof that

Thailee is capable of doing good in school, as proven when Thailee was under her care.

DCF is discriminating against her for perceived mental illness, history of DV and past

involvement with the Department.

65.        DCF is not doing anything to help reunite Thailee with her mom.  There has been

no movement or goal to increase visitation hours, or provide assistance to reunite the

family.  Money is being utilized for Foster Care placement even though there is an able

and willing, parent ready to take on care of Thailee and comply with any requests (e.g.

daily urine screens, phone call confirmations, in home visitations, family therapy, or

other services DCF determines to be necessary).

66.        DCF limits Valerie's involvement with Thailee.  Valerie cannot speak to Thailee

in Khmi, language used in Cambodia, because of concerns what she may be saying to

her, she can't discipline her, she can't communicate with her during the week, and is

literally limited to a closed room visitation where the interaction is very limited (i.e. you can do so much more at a playground).   This unjust forced separation opposes reunification efforts.

67.        Social worker's documentation of the visits is primarily focuses on observed issues and concerns, between the parent and the child; documentation is almost completely devoid of positive interactions.  For example, at the end of the visitation visit, Thailee always says she wants to go home with her mom.  When Valerie asked her social worker to make a notation of this, Valerie would be admonished and told; "don't make smart remarks".  In essence, Valerie getting her child back would be a "slap" in DCF's face for conducting themselves with erroneous professional judgment.

68.        Thailee is lacking clothes and other school supplies.  Valerie continues to supply these items.  Thailee is being exposed to violence in her foster care; she observed fights, police involvement, bullying and police officers making arrests in front of her.  She is the only girl in the foster care and is forced to continually defend herself.

69.        During Gene's representation, Valerie was not advised of the consequences of signing stipulations.  Valerie was not aware that stipulating to a waiver of 72 hour hearing can be seen as an admission of her being an unfit parent at that moment. Valerie was improperly advised to consent to adoption; she did not want to sign these and was erroneously told it was her only option.

70.        Throughout Valerie's DCF file she is painted with a broad brush of having mental illnesses.  Everyone refers to her as having mental illnesses.  She is perceived as someone as having mental illnesses.  However, she is not offered any accommodation for her

perceived services.  Furthermore, her FCR meetings never had the requisite three member

panel, and she was never afforded

71.      Valerie was separated from her daughter unjustly.  There would be no risk of any

kind to her daughter, if they were reunited, with continuous monitoring and, if necessary,

random check-ups.  Her FCR meetings never had the requisite three member panel.  She

was not allowed to switch social workers even though she made it clear there were

cultural issues.  Her worker could not come up with any good reason to support the

separation from her child, yet she continues to see her child for couple of hours every two

weeks.  The system has failed her and her daughter; both are subjected to ongoing harm;

Valerie's trial on the merits is ongoing, and she is still unable to switch her caseworker

who clearly does not want to help her.

B.    Jennifer L.

72.      Jennifer, born in April 1987, gave birth to Kyra (ten y.o.), Jayla (six y.o.),

Alexander (two y.o.), Jennifer has not seen her children in over six months; DCF is not

granting her visitation even though her parental rights have not been terminated by the

court.

73.      Jennifer, has social anxiety, depression, ADHD, bipolar mood disorder, and is

currently receives SSI benefits for her disabilities.  Because Kyra was picking on Jayla,

Jennifer asked DCF for help because she was told she was going to be offered services.

But, instead of helping Jennifer, they ended up taking her children.

74.      In July 2016, her children were running around the house at 6:00am and then hid

in a bush.  Because Jennifer couldn't find them she panicked and was running around

screaming their name.  A neighbor called the police.  When police came, the children

were already safe in the house.  However, because of the 51A report (police showing up due to yelling), and Jennifer exhibiting signs of anxiety and panic, DCF required her children to be removed.  All of the children were dressed with clean clothes, bathed, fed, and were healthy.  Nevertheless, Jennifer was told to have her sister take the children or they would be put in foster care.  This threat was unjustified as the children were not in immediate threat or danger of abuse; requiring emergency removal or transfer of custody was unconstitutional.  Jennifer went from being a full time mom to only seeing her children only for two hours a week

75.     Nevertheless Jennifer complied and placed her children with her sister, but the children were taken away from her sister two months later for non compliance; the sister now had six children total and could not meet all the necessary appointments.  They also stated that the house was dirty; it was not, it was simply cluttered because there were so many children. Once the children were removed from the sister, Jennifer's likelihood of reunification diminished.

76.     DCF judged Jennifer due to her disabilities and justified the removal of children from her custody by use of character assassination.  While the children were at Jennifer's house, the children were not in danger, were not subjected to neglect or abuse; however, they experienced recurrent abuse in foster care.  Multiple 51A reports were filed against the foster parents while Jennifer's children were in their care.

77.     Jennifer's children would experience abuse in foster care.  Kayla broke her elbow in foster care, and Jennifer was not informed of this.  Jayla told Jennifer that her head was forced under water and she couldn't breathe.  Alexander had huge bruise on his back and spine.  Jayla said the foster mom would spank and beat him, and that she tried to protect

him but was too little to do anything.  Alexander did not have the same upper strength

and he now wears a helmet and would move differently.  The children want their mom

back and DCF will not allow it.  Children are being harmed in foster care and are not

receiving motherly love and Jennifer can't do anything about it. After the abuse was

discovered, all of the children were removed and separated.  Currently Jayla is placed in a

family that does not speak English; she is confused and does not understand the culture.

78.       All the siblings are split up and do not see each other.  They are lucky to get one

visit per month.  When the children saw Jennifer, they thought that Jennifer doesn't care

about them.  They were upset that Jennifer would not see them, not knowing that she is

trying her hardest to see them and is not allowed.

79.       The initial reason of C&P had to do with DCF not understanding how to interpret

persons with disabilities even though her disability is controlled with medication. Jennifer

is receiving disability benefits for her social anxiety, claustrophobia, panic attacks and

depression; her demeanor and character is being stigmatized.  She is a ready and able

mother, who loves her children and can offer a much more safer and nurturing home than

the current foster home placement.

80.       Jennifer L. is currently attending Habit Optco Clinic in Lowell, MA where

medication are administrated by medical providers on a daily basis in the morning;  The

clinic conducts drug screen; failure to abide by their rules will result to being (kicked)

from the clinic.

81.       Jennifer lost her visitation rights based on accusation of drug use.  She was asked

to take a drug test and she did not have resources or access to transportation at the time to

do so.  Furthermore the social worker did not provide her with any resources to help acquire or gain access to a facility to get a urine test.

82.       Jennifer has a three bedroom apartment, has consistent income, and funds to provide for food, clothing and other necessities.

83.       Jennifer is being judged based on her not being as sharp as others, nevertheless she is a great cook, enjoys doing laundry and giving hugs and kisses to her children who she loves very much.

84.       Attorney Tameka Grantham  was appointed to represent Jennifer.  Jennifer was not able to get in touch with her.  Attorney Grantham did not offer Jennifer helpful advice or options that would meet her needs.  In fact, attorney Grantham advised Jennifer to give up her children to adoption or fire her.  Jennifer is alone, without her children, helpless and scared.

85.       Jennifer is drug free, she only takes her prescribed medicine.  DCF is not providing her with meaningful visits with her children.  DCF has made a decision to terminate her rights so they are not even making any efforts to have her interact with her children or even offer her any services.  Jennifer has completed her service plans and every time she finishes the list, there would be a new list made; it seems these lists keep being modified and she is not being given any chances of reunification.  Jennifer workers do not understand or know how to interpret people with disabilities; they are erroneously assuming that the person is an unfit parent when its further from the truth.  Jennifer can provide the children with all the necessities and more importantly with motherly love. She has a trial on the merits coming up this month (represented by this counsel), and she is still not able to switch caseworkers; no one is offering her any help.

C.    <u>Christina G.</u>

86.        Christiana has a history of using pain medication (Oxycodone and Percocet) and other illicit street drugs.  She has three children, Jayden (d.o.b. 12/11/2007) Maya (d.o.b. 11/30/2009), and Jayson (d.o.b. 09/29/2016)

87.        Father of Maya and Jayden Corey P.  Father of Jason is Ronald F.

88.        Her son Jason was born 09/30/2016, Christina G and Jason G both tested positive for traces of controlled substances for which you didn't her prescriptions.  Christina G. admits that it was mistake to take any substance to address her contraction pains.  Nevertheless neither Christina nor Jason, had any withdrawal symptoms.  After his birth Christina was willing to take urine screens any hour of the day, but that was not good enough, her child was taken away and placed in foster care.  Basically, because you had an existing C&P they automatically took custody of Jason.

89.        On 12/26/17, Christina was visiting Jason, however, she was not even allowed to hold her child.  When her child was starting to cry and Christina tried to comfort him, the child was taken away from her; Christina was not even allowed to comfort the child.  The visit did not have any value of bonding, it seemed it was done for purposes of checking the box (i.e. visit allowed per guideline) without actually having a real visit for purposes of bonding and interacting with the child.  The visit was cut short, and she would again not know when she can see her child or how much time she would get with him again.  The social worker and care taker already made the decision that she not be his mother and prevented any meaningful interaction or association.

90.        Fortier never hit the children.  Maya had "cold sore" recurrent wound in her lips that would reappear from time to time in her upper and lower lips.  The doctor had

difficulty diagnosing it.  Doctors prescribed Neosporin and other type of steroids to

control the wounds as they would appear, but the doctors could not really identify what

they were.  These areas would become sensitive and may easily become exposed to the

slightest touch.  Social workers would then erroneously interpret these wounds as

possible assault from Mr. Fortier which couldn't be further from the truth.  Christina

stated repeatedly that she nor does anyone else ever hit the children, but she would not be

listened to, the social workers, who lack medical training, would make their

documentations, and these documentation would "follow" Christina and used repeatedly

to discredit her and Mr.Fortier in subsequent DCF reports and evaluations.

91.      Maya, a young lady, was just being dramatic exaggerating the circumstances

without fully knowing the consequence thereof (i.e. trying to make it look like someone

was the cause of the bleeding to make them feel bad even though they were not the cause

of it).

92.      In October , 2016 you got in altercation with Ronald that involved both of you

picking up knives and Jayden was exposed to these burst of  (Jason dad)  They are

exaggerating.  Jayden would always ask for "daddy" Ronald, so it is very strange that it is

not mentioned, that they go to the part together, go on bike ride, and spend a lot of time

together; however, all of this is devoid from the record.

93.      Christina lives with her mother and is able to have her child/ren there or at other

friend's residence whom would me more than happy to give her a place to stay with her

child/ren.

94.      Jason was taken from Christina in the hospital, she was not given a chance and

Jason lost the opportunity to be breast fed.

95.    DCF on her service plan said that she needed to get engaged with therapy. However, she was not given a therapist or directed where to get such therapy. Christina had to figure out how to get help. Even worse, Christina was told to get drug screened, but she was not offered any money for it. Christina has MassHealth medical insurance which is not accepted for drug screens at most locations; her request for funding was denied. Christina, on her own, without help from DCF would do her best to find services. She was able to find services for drug addiction and Completed Detox, CSS (getting ready to go into TSS), TSS (transitional to get ready for half way house), and SOAP, the half way house would not help her,

96.    In other words, DCF is telling her she needs to do things, but they would tell her how to go about acquiring them. All of these things were new to her. DCF was focused on protecting the children and completely left the parent to fend for her own. Christina's recovery would be even harder because she had to do it without her children in her life, and the visits would be inhumane and really debilitating. For a recovering drug addict, being mistreated and having your kids used against you, makes it very difficult to pick yourself up; the thought of using drugs to take the pain away sometimes seems the only solution.

97.    DCF involvement has been nothing but a "punishment" in nature with no services given to assist improvement. Christina is consistently subjected to belittling, ridicule and feeling of worthlessness. It is obvious that she is seen in DCF's eyes as someone who should not be a mother, and they are just going through the motions (e.g. giving her a so-called visit) with no intentions or wants of reunification. Christina has separated herself from Ronald and has not been involved in any domestic relationship, and is willing to

take any and all drug tests.  However, DCF will not provide drug tests; DCF says she

needs to get her drug tests from the a drug rehab clinic.  However, drug rehab will not

allow her to be admitted unless she tests positive.  In other words she needs to test

positive to gain entry to address drug addiction.  Christina is unable to financially afford

to pay drug tests on  her own.  Right now, Christina would agree to take drug tests on a

daily basis, and not allow any man in the house, but DCF would not accept this option, it

seems the case is not progressing for reunification and Christina is set to have her rights

be terminated.

98.    It is natural that this whole experience is very taxing on the family, both Christina

and Joanne are continually find themselves bewildered and unable to communicate their

issues because there is no one to go for help.  There are no services that will help with

actual reunification, it seems that time is just passing, and the hope of reunification is

dwindling.  Christina is a willing and able parent, but no one is giving her a chance; it

seems the decision as already been made based on her past mistakes and she is no longer

seen as a parent; where does she go for help?

99.    The social worker are testifying for DCF with the goal of termination of her

rights.  She is desperately trying to save her right to parent but she has no one to turn to.

DCF has turned their back on her, she doesn't have money to go get resources, Attorney

Ilya Liviz is the only person that is advocating for her; she has nowhere to go.  She is in

desperate need of [proposed] Department of Parent Services to give her services and

assistance; she is willing to do whatever they ask, please give her services, she will take a

drug test every day, no one is helping her.

100.     Christina did great in half way house, she tried to help a friend out with a

Gabapentin[27], and as result of her trying to help someone, by passing someone else's

prescription to someone else, you got kicked out.  While you're in your halfway house

trying to complete recovery, you get the news that the goal is changed to adoption,

meaning DCF is not supporting reunification.  In half way house they looked through

Christina's phone, and based on information in the phone, she got kicked out of the

program, she didn't even get a chance to defend herself.

101.     CPCS, parent lawyers, said to Christina told her on the phone that there is nothing

she can do for her and that she lost her parental rights.  (Christina has anxiety and panic

attack) said that she would have no chance of getting the children back, and that she now

had to look into agreeing to adoption.   that made Christina extremely depressed, and hurt

her treatment for anxiety.  She would cry all day and would not be able to even go on

walks, literally the whole world turned on her.  There was no one for Christina to turn to.

She is able to clean, she is able to cook, she is able to give love and affection, she is able

to read children books and play children games, and she is willing to take drug tests and

comply with any request, no one is giving her chance, the door is shut and closed on her

being a parent.  Her trial on the merits is coming up soon, and she is just sitting at home,

hoping to see her children and talk to them, get visits from them, she feels beat down

with no hope, she has not seen her children since February, 2017, DCF has made a

decision to not allow her to see them, and without having an advocate on her behalf,

DCF's advocates words is the golden standard of what is correct. DCF has made a

decision to place the child with the paternal grandchildren, and the grandmother would

---

[27] Gabapentin is an anti-epileptic drug used to treat neuropathic pain, restless legs syndrome and seizures.

not allow her phone calls and ultimately terminated them; the C&P proceedings are used as a form of transferring custody, the two sides have custody issues.  Children can be inappropriately being filled with untruthful (opposing) information; their minds are filled with information that will make them resent the parent that "left" them.

102.    Lack of visitation creates a situation that pulling the children out of there placement maybe traumatic and thus setting up Christina for failure.   She has an upcoming trial on the merits (represented by this counsel), and she is unable to switch caseworker; she is not being helped to see or be reunified with her children.

D.    Nicole G.

103.    Nicole was born in June of 1981 (36 y.o) and is currently residing in Massachusetts.  She gave birth to two daughters; Paige G. (d.o.b. 07/20/2009  and Keira G. (d.o.b. 11/23/2014).  Both children have been adopted against her will, and she has not been able to have any contact since.

104.    Nicole, has a history of substance abuse, and has been in and out of mental health treatment.  Her need for mental treatment was increased due to emotional injury she sustained and is still struggling with, subsequent to the loss of her right to parent and denial to have any contact with her children.

105.    Nicole, is a parent, who has been receiving disability benefits, prior to, during, and after, the birth of her daughters.  Her disability benefits are based on PTSD, Anxiety, Depression and Agoraphobia[28].  These diagnoses were well documented, for which she receives treatment.  Nevertheless, she is unable to maintain a job and remains on same

---

[28] Agoraphobia, is an anxiety disorder characterized by symptoms of anxiety in situations where the person perceives the environment to be unsafe with no easy way to get away. These situations can include open spaces, public transit, shopping malls, or simply being outside the home.

disability benefits, which she was receiving prior to the birth of her children, to support herself.

106.    Although Nicole relies solely on disability benefits for income, she was a great stay-at-home mom.  She is able to cook, clean, do laundry, play and educationally interact with her children.

107.    When Keira was born, DCF automatically opened a case against Nicole because she was prescribed Methadone through HabitOpco.  DCF's service plan was to reunify Nicole with both of her children, but they wanted her to first get into a sober house and reduce her prescribed Xanax[29].  Per DCF's advise, Nicole sought out, and was accepted into the Phoenix Sober House where she was granted a bed and a place to stay.  However after her acceptance, DCF changed their plan from reunification to adoption.  Because Phoenix Sober House is for mothers who are in the process of reunification, Nicole's acceptance was revoked.  Nicole attempted to call her court appointed attorney, Alan Levine *Esq*., many times regarding this matter; her phone calls were ignored by everyone.

108.    Nicole, is a quite, calm, reserved, and soft spoken individual, that is unable to advocate for herself.  Her disability was erroneously treated as drug induced state, when in fact she is like that sober or not.  Her Agoraphobia makes it very difficult for her to get around (e.g. she experiences anxiety when she has to use public transportation) to visits, or to court dates.

109.    DCF told Nicole that she could not be on Benzodiazepine if she wanted to have her children.  Benzodiazepine, are anti anxiety medication that she needs to take as part

---

[29] Xanax (alprazolam), is a potent, short-acting benzodiazepine anxiolytic—a minor tranquilizer. It is commonly used for the treatment of anxiety disorders, especially of panic disorder, but also in the treatment of generalized anxiety disorder (GAD) or social anxiety disorder.

of her disability. Per DCF's and her attorney's advice, she decided to comply with DCF and stop taking them so that she can have a chance at reunification. Sometime around March, 2015 Nicole was not able to make her Trial on the Merits, because of the change in her medication, which resulted her unable to attend. Her attorney did not discuss with her about alternate solutions or possibility for accommodations. Her attorney, advised her that he would continue her trial on the matter; however, her rights were terminated and she would never see her children again. If Nicole knew, that her rights would be terminated (i.e. not continued as she was erroneously advised), she would have shown up, even if it was detrimental to her health.

110.    Nicole was never given a chance from the start. Because her toxicology screen came back positive for cocaine in the early months of pregnancy (Nicole was unaware she was pregnant) as soon as her daughter was born, DCF took her daughter with no intentions or efforts, for reunification. Her attorney felt the same way about her, and supported DCF's decision and didn't even tell her about it.

111.    Because of Nicole's disability, she was not treated fairly. DCF only focused on her substance abuse, not taking into account, that some of her behaviors are not drug related, but are disability related. DCF did not make any efforts to discern alleged issues caused by substance abuse, versus her reduced mental function that is caused by her disabilities. DCF, without fully investigating her disabilities, discriminated against her, and never gave her a fighting chance at reunification.

112.    Nicole had no money, lack of supportive family, and no access to competent professional help. She feels humanity has turned their back on her, and the only solace she has, is to check into mental treatment facilities that only temporarily dull the pain.

She was told the only way she could see her children was to sign the open adoption; she signed and has not seen her children since.

E.    <u>Ashley B</u>

113.        Ashley had her three children stripped from her care by Haverhill DCF in 2014. CPCS Counsel advised her to waive her 72-hour hearing, and to stipulate to granting DCF temporary custody of her children.  Although  Ashley completed all of her Service Plan tasks, reasonable efforts were not made by DCF to reunify her with her children.

114.        Ashley's court appointed counsel advised her along the way, including her stipulating to waiving her right to trial on the merits and grant DCF permanent custody of her children to avoid termination of her parental rights.  When this counsel spoke to Ashley, she did not know that she stipulated to waive her right to a trial on the merits; even if, *arguendo*, she was informed about her stipulation, she did not fully understand what she was doing.  She was scared and entrusted that her attorney was acting in her best interest.  Her subsequent Review and Redetermination hearings would be unsuccessful; DCF lack of reunification efforts is sealing her fate.

115.        Ashley recently had her fourth child, which she is happily raising with her fiancé. They have a three bedroom apartment, both are drug free and are a carrying family.  It seems that the reunification of her children she was promised was a lie; she wants her children back, but her children's attorney sees the children doing well in her courant placement and doesn't see it to be a good move to remove them from their current home. Had Ashley known this would have happened she would have demanded a trial.  The risk and possibility of this scenario was never discussed with her; she is devastated and bewildered.  She is stuck in limbo, her rights are not being terminated, but the children

are not being returned, and DCF is not facilitating visits (lack of option for visitation) and there are no reasonable efforts for reunification.  The children are becoming more distant everyday and there is nothing she can do about it.

116.    This counsel will be attempt the unlikely, and regain reunification by a motion for Review and Redetermination of the presently stipulated-to permanent custody with the DCF(a motion that has not failed several times).

## PLAINTIFF COLLECTIVELY

117.    Defendants' actions and inactions with respect to the Named Plaintiffs are part of a systemic pattern of conduct that has caused, and continues to cause, irreparable harm.  Defendants have violated and acted with deliberate indifference to and beyond the bounds of professi onal judgment regarding the Named Plaintiffs' constitutional and statutory right to parent and familial association with their children.

118.    Defendants' failed and continue to fail to:

    a.    provide necessary services and reasonable efforts for reunification;

    b.    make periodic comprehensive assessments of their needs and providing services consistent with those needs; make timely and meaningful casework contacts and monitor their progress in order to ensure timely reunification;

    c.    monitoring and services necessary to prevent the breakdown of the familial unit, and preserve the children's' well being, psychological and emotional state of mind, while in state custody;

    d.     support their family relationships, in particular by not providing child-parent and sibling visits;

e.        provide appropriate management and supervision while they have been in

DCF custody in accordance with their individual needs, best interests and

professional standards;

f.        by failing to provide case management and planning in accordance with

their individual needs, best interests and professional standards; and

g.        develop and implement a viable permanency plan that will allow them to

leave foster care and be reunified with their parents as mandated by Federal Acts.

**DEFENDANTS COLLECTIVELY**

119.        Charlie Baker, Governor of Commonwealth of Massachusetts ("Massachusetts");

Linda S. Spears, Commissioner of DCF ("DCF"); Marylou Sudders, Secretary of the

Massachusetts Executive Office of Health and Human Services ("EOHHS"); Anthony J.

Benedetti, Chief Counsel for the Committee for Public Counsel Services ("CPCS");

collectively are the Defendants in this Civil Rights Complaint ("Defendants").

120.        Attorney Gene Rauhala, Attorney Tameka Grantham O'brien, and Attorney Alan

I. Levine, in their individual capacity and [proposed] on behalf of all others similarly

situated, are the Defendants to the alleged State Claims of this Complaint.

**CLASS ACTION GENERAL ALLEGATIONS & LANDSCAPE**

**I.        OPPOSITION TO CONCURRENT FILLING OF**
**CHILDRENS CLASS ACTION**

121.        Parents can bring claims on behalf of their children.  However, while a child has

an interest in family integrity, it may also be in the child's best interests permanently to

terminate the parent's rights.[30]  Therefore, admittingly, Plaintiffs Collectively, may be

---

[30] *See In re Adoption of Nancy,* 443 Mass 512, 822 N.E.2d 1179 (2005)

bringing claims that may be conflicting with children's interests.  Thus, children, as appropriate, should be advocated by different representatives, with no relations to either the Plaintiffs nor the Defendants (e.g. guardian ad litem, next of friend, or other competent counsel appointed by the court to represent the interest of children class as a whole only).[31]

122.    However, it would be a huge disservice to the children to bring them into the class action litigation at this stage, such filling should be denied or stayed, for the following reasons;

a.    The court, try as it may, will not be able to represent the children's class without bias in the representation.  It is impossible to  prevent an interventor bringing their own bias into this lawsuit; unfortunately interventors' will naturally lean toward favoring the Plaintiff or the Defendant.

b.    Allowing the Children's Plaintiff Class to join at this stage will confuse the main thrust of this cases; there is a state-wide lack of policy implementation to provide reasonable efforts to reunify families (leading to misappropriation of federal funds). The children may or may not be striving in placements or foster care, and may or may not have a promising future there; however this is irrelevant (confuses the issue) and should not be considered in determining state-wide violations of parents constitutional right to parent and right to familial association, which for the most part has gone unnoticed. [32]

---

[31] *See In re Adoption of Meaghan*, 461 Mass. 1006, 961 N.E.2d 110 (2012) (Upholding lower court's determination there should be counsel appointed to both parent and child, due to possible conflicting interests.)

[32] *See* Executive Order No.494 (Establishing the Office of the Child Advocate); however, there is no such office for parents; https://www.mass.gov/executive-orders/no-494-establishing-the-office-of-the-child-advocate

c.      Outcome of this litigation will heavily affect children's positions.  It is very common that children's attorneys make a determination that the present foster care is providing "better" care than the parent would.  However, although such arguments work to persuade the Courts to rule in favor of Parent's position or DCF's position, it does not take away the constitutionally protected right for the biological parents to have reunification efforts and have services offered to them in accordance with the Federal Acts that fund them.[33]

d.      Most importantly, children's' constitutional infirmities, *inter alia*, focus on the abuse and neglect, at the hands of DCF and their agents, are primarily State claims, which are immune to suit.[34]

e.      The Office of the Child Advocate raises issues regarding 566 children in DCF care;  as reasoned in *Conor B*, while mistreatment of a children in State care, can lead to individual substantive due process violations, to hold the whole State accountable, Plaintiff Class will have to pass the "shock-the-conscience test";[35]  a very difficult task to do considering DCF has almost 52,000 children in its care during the time period audited. *See infra* State Auditor's Official Audit Report

f.      Children's claim of constitutional infirmities, will be on stronger ground if this  Plaintiff's Class Action lawsuit wins, *inter alia*, will have solid argument of a state-wide violation of familial association with their parents (i.e. state-wide lack

---

[33] *See* AACWA, CAPTA & SSA (Federal Acts contain reunification and goal of keeping familial unit in tact provisions).

[34] *See* M.G.L.c. 258, §§10(a)-(c) (revoking Mass Tort Act's exception to eleventh amendment State Immunity, *inter alia*, discretionary function and intentional torts of State Employees).

[35] *See Connor B.*, 771 F.Supp.2d 142 (Special relationship between foster children and state triggered Due Process Clause protection; however Class as a whole failed to show executive actions shocks-the-conscience) *see also Martínez v. Cui*, 608 F.3d 54, 64 (1st Cir.2010) ("[T]he shocks-the-conscience test ... governs *all* substantive due process claims based on executive, as opposed to legislative, action.") (citations omitted).

of reasonable efforts for reunification of parents with children).  In other words, once this Class Action law suit "wins", it will pave the way for the second Class Action law suit on behalf of the children.

123.    It is of note, statute of limitations for the children does not accrue till their eighteenths birthday, and as such should not intervene until parents' and state's rights are determined by this Class Action Complaint.[36]  Furthermore, *arguendo*, we don't actually know whether in fact state-wide lack of reasonable efforts to reunify is actually occurring (i.e. no Office of Parent Advocate to provide us such data); such state-wide claim will begin to accrue once this Lawsuit is proved.

124.    Finally, parties should be mindful M.G.L.c. 231, §60D statute of repose abrogates M.G.L.c. 260, §7 tolling of claims by minors; "[n]otwithstanding the provisions of section seven of chapter two hundred and sixty, any claim by a minor against a health care provider stemming from professional services or health care rendered, whether in contract or tort, based on an alleged act, omission or neglect shall be commenced within three years from the date the cause of action accrues, except that a minor under the full age of six years shall have until his ninth birthday in which the action may be commenced, but in no event shall any such action be commenced more than seven years after occurrence of the act or omission which is the alleged cause of the injury upon which such action is based except where the action is based upon the leaving of a foreign object in the body."[37]

---

[36] *See* M.G.L.c. 260, §7; *See Gore v. Daniel O'Connell's Sons, Inc.* (1984) 461 N.E.2d 256, 17 Mass. App .Ct. 645 (statute of limitations on a minor's claim for loss of parental society and emotional distress will not begin to run until the child reaches the age of majority)
[37] *See McGuiness v. Cotter*, 412 Mass. 617, 591 N.E.2d 659 (1992) (

125.    However, M.G.L.c. 231, §60D seven year statute of repose limitation does not

come into play in a Children's Class Action lawsuit because of the eleventh amendment.[38]

The Massachusetts Tort Claims Act which abrogates eleventh amendment's State's

immunity by allowing tort action against the employer, does not allow such action against

the employee.[39]  In other words, claims against the employee of the Commonwealth,

subject to M.G.l.c. 231, §60D, as it is considered in the Children's Class Action, are

invalid because the employee is immune from liability.[40]

126.    However, more appropriately, claims against the Commonwealth (employer),

*inter alia*, failing to implement policy, that relate to their direct control over their

healthcare providers (social workers), will not start to accrue till the minor turns eighteen

years old.[41]

127.    Moreover, M.G.L.c. 258, §2 "[f]inal judgment in an action brought against a

public employer under this chapter shall constitute a complete bar to any action by a

party to such judgment against such public employer or public employee by reason of the

same subject matter." does not apply to the minor children because, *inter alia*, statutes

that limit future fillings by procedural requirements have been struck down.[42]

---

[38] *See* M.G.L.c. 258, §10(a)-(c) (State employees are immune from claims based on their discretionary or intentional acts).

[39] *See* M.G.L.c. 258, §2 ("Notwistanding that a public employee shall not be liable for negligent or wrongful acts...")

[40] *See* also M.G.L.c. 258, §10(a)&(b) (any claim based upon an act or omission of a public employee when such employee is exercising due care in the execution of any statute or any regulation of a public employer; any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused)

[41] *Ibid*, ("The remedies provided by this chapter shall be exclusive of any other civil action or proceeding by reason of the same subject matter against the public employer or, the public employee or his estate whose negligent or wrongful act or omission gave rise to such claim, and no such public employee or the estate of such public employee shall be liable for any injury or loss of property or personal injury or death caused by his negligent or wrongful act or omission while acting within the scope of his office or employment"),

[42] *See e.g. Shapiro v. City of Worcester*, 464 Mass. 261, 982 N.E.2d 516 (2013)(Declining to extend pursuant to M.G.L.c. 258, §10 procedural requirement of presentment)

128.    In put it simply, filling Children's Class Action would look very similar to *Connor B*, which lost; 1) children harmed in foster care, 2) failing to register, list and forward perpetrators[43] to District Attorney[44], 3) failing to provide services for reunification, 4) failing to implement and execute their own policies and regulations etc...  Some of the claims are strong individually, however, will likely fail as a class, because of the same problem *Connor B* ran into, the number of actual children harmed, will not be enough to hold the Defendants liable for the entire Children's class.  However, if Parent Class wins, Children Class will be able to bring Class claim of deprivation of familial association, which presently, may be opposed by children (foster home may be "better" than the biologic home).  In other words while from parents view, it is universal that the reunification should occur whenever possible, from the children's view, there may be times when in fact it is of "no rush" because the child may be striving and doing better in foster care.  This opposing argument will no longer be viable, once parents prove, as a class, that they weren't offered requisite reasonable efforts of reunification, their constitutional right to parent, will trump, any counter argument the children class may offer.  Thus strategically, this parent class should be litigated first; Children Class Action thereafter.

## II.    GENERAL ALLEGATIONS

129.    The named plaintiffs bring this action as a class action pursuant to Rule 23(b)(1) and (2) of the Federal Rules of Civil Procedure.

---

[43] *See* 110 CMR 4.36 - 4.38
[44] *See* M.G.L.c. 119, §51B(k)

130.    Plaintiffs file this complaint on behalf of themselves and all other similarly situated children, seeking injunctive and declaratory relief from the unconstitutional and unlawful actions and inactions of defendants, as herein set forth.

131.    The named plaintiffs, are parents who had their children removed from their home unnecessarily, were not provided with services and reasonable efforts for reunification. The named plaintiffs have suffered the deprivations of rights claimed herein.

132.    The class plaintiffs seek to represent is composed of: 1) all parents who have, are, or will be exposed to DCF and their gauntlet of criticism and ridicule.

133.    Joinder of all members is impracticable as the class includes many thousands of parents at any one time and class membership fluctuates continuously.

134.    The questions of law and fact common to the members of the plaintiff class include: 1) whether defendants operate a child welfare system that conducts inadequate investigations as to offering parents services, failing to offer adequate services to children and their families to enable the children to remain safely in their homes, instead of entering foster care or other out-of-home placements; 2)whether there is a state-wide failure if implementing and executing State's own policies against discrimination; 3) whether defendants' actions and inactions violate plaintiffs' rights under the federal Adoption Assistance and Child Welfare Act of 1980; 5) whether defendants' actions and inactions violate plaintiffs' rights under the federal Child Abuse Prevention and Treatment Act; and 6) whether defendants' actions and inactions violate plaintiffs' rights under the First, Ninth, and Fourteenth Amendments to the United States Constitution.

135.     The claims of the representative parties are typical of those of the class *in that the* constitutional and statutory deprivations alleged by the named plaintiffs and caused by defendants are the same as those suffered by all other class members.

136.     The representative parties will fairly and adequately protect the interests of the class. The named plaintiffs have no interests antagonistic to those of the class. Further, plaintiffs are represented by an attorney who has a rare benefit of experiencing the intricacies of the system and its failures from both sides.[45]  Also, counsel is a former professor who have taught for over a decade, this experience of public speaking & teaching, helped him to easily transition and become a winning trial attorney.  This case will be presented to a jury of our peers.

137.     The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for defendants.

138.     Defendants have consistently acted and refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole.

## III.    FEDERAL STATUTORY FRAMEWORK

A.    Adoption Assistance and Child Welfare Act of 1980 ("AACWA")

139.     DCF receives substantial federal funds pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, codified as amended at 42 U.S.C. §§670-679 and 42 U.S.C. §§620-627.  This Act, and the State plans submitted to and approved by

---

[45] *See Ilya Liviz & another vs. Supreme Judicial Court of The Commonwealth of Massachusetts*, (2017), docket no. 1:17-cv-12345 (Of note: this counsel does not include any issues he has observed with the Juvenile Court System, so that he may not run into federalism issues).

the Secretary of the United States Department of Health and Human Services in order for DCF to obtain funding pursuant to this Act, confer various rights upon parents' children who are in foster care or other out-of home placements, or who are at risk of entering such placements.

140.    The federal Adoption Assistance and Child Welfare Act of 1980 requires that reasonable efforts be made by the defendants to provide services to enable children to remain with their families or to be returned to their families whenever possible; that all children in foster care be provided written case plans developed and reviewed within specified time periods; that these plans contain certain specified components; that appropriate services be provided to children, their parents, and their foster parents to address each child's needs and to assure each child's permanent placement; that each child receive proper care; that the homes or institutions in which children are placed conform to national standards and that foster care payments are appropriate; that children be placed in the least restrictive, most family-like setting; that children receive periodic judicial or administrative reviews; and that children receive dispositional reviews to determine their future status no later than eighteen months after placement.

141.    The federal Adoption Assistance and Child Welfare Act provides the State with foster care maintenance payments, include payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which

the child is enrolled at the time of placement, and reasonable costs of administration and operation of as necessarily required of the aforementioned.[46]

142.    The federal Adoption Assistance and Child Welfare Act requires state compliance with the federal Child Abuse Act.

B.    Child Abuse Prevention and Treatment and Adoption Reform Act ("CAPTA")

143.    DCF receives federal funding pursuant to the federal Child Abuse Prevention and Treatment and Adoption Reform Act.[47]

144.    The federal Child Abuse Act confers various rights upon children who, by virtue of reports of abuse or neglect, are or should be known to state agencies which receive funds pursuant to that Act.  The Act requires defendants to institute "prompt investigations' into all reports of known or suspected instances of child abuse and neglect to substantiate the accuracy of the report and, if substantiated, to take immediate steps to protect the child who is the subject of the substantiated referral, as well as all other children who are at risk by being under the care of the same custodians.  The Act also requires defendant Linda Spears to have administrative procedures, trained and qualified personnel, and facilities adequate to deal effectively with child abuse and neglect cases.

145.    Federal funding is granted to DCF for; "developing, operating, expanding, and enhancing community-based and prevention-focused programs and activities designed to strengthen and support families to prevent child abuse and neglect that are accessible, effective, culturally appropriate, and build upon existing strengths that; offer assistance to families; provide early, comprehensive support for parents; promote the development of

---

[46] *See* 42 U.S.C. §675(4)(A) Definition of the term "foster care maintenance payments"
[47] *See* 42 U.S.C. §§5101-5106, and §5116 et seq.

parenting skills, especially in young parents and parents with very young children;

increase family stability; improve family access to other formal and

informal resources and opportunities for assistance available within communities,

including access to such resources and opportunities for unaccompanied homeless youth;

support the additional needs of families with children with disabilities through respite

care and other services; demonstrate a commitment to involving parents in the planning

and program implementation of the lead agency and entities carrying out

local programs funded under this title, including involvement of parents of children with

disabilities, parents who are individuals with disabilities, racial and ethnic minorities, and

members of other underrepresented or underserved groups; and provide referrals to early

health and developmental services."[48]

146.    The Commonwealth has established written policies to implement the federal and

state statutory mandates for protective services investigations, which include specific

time periods within which investigations must be initiated and completed.

C.    Social Security Act ("SSA")

147.    DCF receives federal funding under Titles IV-B and IV-E of the Social Security

Act, as administered by the United States Department of Health and Human Services

("U.S. HHS").

---

[48] *See* 42 U.S.C. §5116(b)(1)(A)-(H) (alphanumeric characters omitted)

148.     Pursuant to Title II-A, of the Social Security Act Amendments of 1994, the

federal government requires States' accountability for placement of children in foster

care.[49]

149.     Pursuant to Title IV-B, Subpart 1, of the Social Security Act, the federal

government requires States' development and expansion of a coordinated child and

family services program that utilizes community-based agencies to support at-risk

families through services which allow children to remain safely with their families or

return to their families in a timely manner.[50]

150.     Pursuant to Title IV-B, Subpart 2, of the Social Security Act, the federal

government requires States to develop and establish, or expand, and to operate

coordinated programs of community-based family support services, family preservation

services, time-limited family reunification services with the objective to preserve intact

families, and encourage reunification in a safe and stable manner in accordance with the

Adoption and Safe Families Act of 1997 ("ASFA").[51]

151.     Pursuant to Title IV-E of the Social Security Act, the federal government provides

matching funds to all state-managed foster care systems to reimburse a portion of the

costs of maintaining abused and neglected children in foster care.[52]

152.     The Child and Family Services Reviews (CFSRs), authorized by the 1994

Amendments to the Social Security Act (SSA), are administered by the Children's

Bureau, Administration for Children and Families, U.S. Department of Health and

Human Services. The goals of the CFSR are to:  Ensure substantial conformity with title

---

[49] *See* Pub.L. 103-432
[50] *See* 42 U.S.C. §§621(3) & (5)
[51] *See* 42 U.S.C. §629(2) &(3)
[52] *See* 42 U.S.C. §§670 et seq.,

IV-B and IV-E child welfare requirements using a framework focused on assessing seven

safety, permanency, and well-being outcomes and seven systemic factors;  Determine

what is happening to children and families as they are engaged in child welfare services;

and  Assist states in helping children and families achieve positive outcomes.[53]

153.     Title XX of the Social Security Act provides states with block grants for social

services.[54] The DCF commissioner is mandated to coordinate the overall service planning

of the department with the planning under the Title XX of the Social Security Act.[55]

Federal assistance to the State is granted for purposes of encouraging the State to furnish

services directed at the goals of preserving, rehabilitating or reuniting families.[56]

D.     Adoption and Safe Families Act of 1997 ("ASFA")

154.     ASFA[57], was enacted in response to concerns that many children were remaining

in foster care for long periods or experiencing multiple placements.  This landmark

legislation requires timely permanency panning for children, clarifies meaning of

reasonable efforts by requiring child protective services agencies, *inter alia*, to return a

child to parents and provide services to prevent re-entry, for goals to be established in a

timely manner, assure child is placed close enough for a parent to have ongoing contact,

trial home visits and continuous exploration of family reunification.

E.     Rehabilitation Act of 1973 ("Section 504")

---

[53] *See* U.S. Department of Health and Human Services Administration for Children & Families
[54] *See* 42 U.S.C. §1397 et seq.
[55] *See* M.G.L.c. 18B, §7(g)
[56] *See* 42 U.S.C. §1397(3)
[57] *See* Pub. L. 105-89, Dec 22, 2017, H.R. 867: Adoption and Safe Families Act of 1997; 45 C.F.R. Parts 1355-1357

155.      Rehabilitation Act of 1973 ("Section 504") promulgates rules and regulations by

stating; "No otherwise qualified individual with a disability in the United States... shall,

solely by reason of her or his disability, be excluded from the participation in, be denied

the benefits of, or be subjected to discrimination under any program or activity receiving

Federal financial assistance or under any program or activity conducted by any Executive

agency or by the United States Postal Service. The head of each such agency shall

promulgate such regulations as may be necessary to carry out the amendments to this

section made by the Rehabilitation, Comprehensive Services, and Developmental

Disabilities Act of 1978."[58]

156.      "Program or activity, means all of the operations of a department, agency, special

purpose district, or other instrumentality of a State or of a local government; or the entity

of such State or local government that distributes such assistance and each such

department or agency (and each other State or local government entity) to which the

assistance is extended, in the case of assistance to a State or local government."[59]


F.    Americans with Disability Act of 1990 ("ADA")

157.      ADA[60], is a civil rights law that prohibits discrimination based on disability with

similar protections afforded by the Civil Rights Act.  ADA protects from discrimination,

individuals with physical or mental impairment that substantially limits one or more

major life activities of such individual; or there is documentation thereof;  or  individuals

that have been subjected to an action prohibited under this Act because of an actual or

---

[58] *See* 29 U.S. Code §794(a) - Nondiscrimination under Federal grants and programs
[59] *See* 29 U.S. Code §794(b)(1)(A)&(B)
[60] *See* 42 U.S.C. §12101 et seq.

perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.[61]

158.    ADA require the Department to render services that accommodate the parents' special needs through their services, program or activates.  However, Supreme Judicial Court of the Commonwealth of Massachusetts concluded that: (1) proceedings to terminate parental rights under G.L. c. 210, § 3, do not qualify as "services, programs, or activities" under the ADA, and thus, the ADA may not be raised as a defense to such proceedings; and (2) the ADA, as well as Massachusetts antidiscrimination laws, regulations, and its Constitution require the Department to render services that accommodate the parents' special needs prior to G.L. c. 210, § 3, proceedings.[62]

G.    Helping Families Save Their Homes Act of 2009

159.        The Helping Families Save Their Homes Act of 2009[63] incorporates provisions from the The Homeless Emergency Assistance and Rapid Transition to Housing Act of 2009 (HEARTH Act)[64], which amended the McKinney-Vento Homeless Assistance Act of 1987[65], with major revisions to what is now titled the Emergency Solutions Grant (ESG) program. The Emergency Solutions Grant assists homeless households and households at risk of homelessness by supporting the services necessary to help them quickly regain stable housing after experiencing a housing crisis and/or

---

[61] *See* 42 U.S.C. §§12102(1)(A)-(C), & (3)(A); 42 U.S.C. §12132

[62] *See In re Adoption of Gregory*, 434 Mass. 117, 747 N.E.2d 120, (2001)( "ADA, as well as Massachusetts anti-discrimination laws, regulations, and our Constitution all require the department to accommodate the parents' special needs in its provision of services *prior* to a G.L. c. 210, § 3, termination proceeding".); This ruling has been applied similarly to Juvenile Court C&P, as seen most recently in summary decision of Appeals Court in *Adoption of Yolane*,  92 Mass.App.Ct.1116 (2017) (Note: summary decisions, pursuant to Rule 1:28, are cited for persuasive value and are not binding precedent).  *See Chace v. Curran,* 71 Mass. App. Ct. 258, 260 n.4 (2008)

[63] *See* Pub. L. 111-22, May 20, 2009, S. 896: Helping Families Save Their Homes Act of 2009

[64] Provisions of the bill were incorporated into Helping Families Save Their Homes Act of 2009. *See Ibid*.

[65] *See* Pub. L. 100-77, July 22, 1987, 101 Stat. 482, 42 U.S.C. §11301 et seq.,

homelessness. Any person or family in need of emergency shelter is potentially eligible

for ESG funded shelter services. Massachusetts Department of Housing and Community

Development ("DHCD") administers the ESG program with funding received from the

U.S. Department of Housing and Urban Development (HUD). The federal ESG program

provides grant funding to (1) engage homeless individuals and families living on the

street, (2) rapidly re-house homeless individuals and families, (3) help operate and

provide essential services in emergency shelters for homeless individuals and families,

and (4) prevent individuals and families from becoming homeless.

H.    Comprehensive Addiction and Recovery Act of 2016

160.    United States Surgeon General's Report on Alcohol, Drugs, and Health of

November 2016, tackling drug addiction, we know that "[i]n 2015, over 27 million

people in the United States reported current use of illicit drugs or misuse of prescription

drugs" from which "[i]t is estimated that the yearly economic impact of substance misuse

and substance use disorders is ... $193 billion."[66]

161.    Congress overwhelmingly enacted the Comprehensive Addiction and Recovery

Act of 2016 ("Act of 2016"),[67] noting, among other things in doing so, that "[t]here were

more than 47,000 U.S. drug abuse fatalities in 2014 – double the death rate in 2000....The

bill authorizes $181 million in new spending [to deliver life-saving prevention and

treatment services], ... [a]t a time when drug overdoses claim 129 American lives every

day." [68]

---

[66] *See* Executive Summary at ES-1
[67] *See* Pub.L. 114-198, July 22, 2016
[68] *See* Associated Press, Congress Passes Opioid Abuse Bill, NBCNews.com (July 13, 2016
https://www.nbcnews.com/health/health-news/congress-passes-opioid-abuse-bill-n608946 (last visited Dec.
29, 2017)

162.    Act of 2016 amended the Public Health Act at several places, including, relevant to this case; Part D of title V of the Public Health Service Act, by incorporating at the end of §547 "<<NOTE: 42 USC 290ee-2>> BUILDING COMMUNITIES OF RECOVERY."[69]

163.    The 2016 Act, which is part of the Public Health Act, grants use of Federal funds, and directs the State to build connections between recovery networks, between recovery community organizations, and with other recovery support services, including child welfare agencies, reduce stigma associated with substance use disorder, and provide resources available to individuals struggling with addiction and to families with family member struggling with, or being treated for, addiction, and provide support services for family members with children.[70]

I.    Protection and Advocacy For Individuals with Mental Illness Act

164.    Subsequent to the determination that individuals with mental illnesses are vulnerable to abuse and serious injury, Congress enacted the Protection and Advocacy for Individuals with Mental Illnesses Act; to ensure that their rights are protected, and to assist States to establish and operate a protection and advocacy system for individuals with mental illness which will protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statues, and investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred.[71]

---

[69] *See* Pub. L. 114-198. Page 130 at STAT 720
[70] *Ibid.*
[71] *See* 42 USC §10801 et seq.,

165.    The term "individual with mental illness" means, except as provided in section 10804(d) of this title, an individual—

(A) who has a significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of the State; and

(B)(i)(I) who is an inpatient or resident in a facility rendering care or treatment, even if the whereabouts of such inpatient or resident are unknown;

(II) who is in the process of being admitted t o a facility rendering care or treatment, including persons being transported to such a facility; or"; [2]

(III) who is involuntarily confined in a municipal detention facility for reasons other than serving a sentence resulting from conviction for a criminal offense; or

(ii) who satisfies the requirements of subparagraph (A) and lives in a community setting, including their own home.[72]

J.    Civil Rights Act of 1964

166.    An act to enforce the constitutional right to vote, to confer jurisdiction upon the district courts of the United States of America to provide injunctive relief against discrimination in public accommodations, to authorize the Attorney General to institute suits to protect constitutional rights in public facilities and public education, to extend the Commission on Civil Rights, to prevent discrimination in federally assisted programs, to establish a Commission on Equal Employment Opportunity, and for other purposes.[73]

## IV.    MASSACHUSETTS DCF LANDSCAPE

A.    Department of Children and Families ("DCF")

---

[72] *See* 42 USC §10804
[73] *See* Pub.L. 88–352, 78 Stat. 241, enacted July 2, 1964

167.     DCF shall provide and administer a comprehensive child welfare program for

children and families, including the following services: (1) casework or counseling,

including services to families, foster families or individuals; (2) protective services for

children; (3) legal services for families, children or individuals who are clients of the

department; (4) adoption services; (5) information and referral services; (6) foster family

care for children and specialized foster family care for children with special needs; (7)

residential care for children with special needs who are not suited for foster family care

or specialized foster family care; (8) informal education and group activities; (9) training

in parenthood and home management for parents, foster parents and prospective parents;

(10) family services intended to prevent the need for foster care and services to children

in foster care; (11) temporary residential programs providing counseling and supportive

assistance for families in transition and their children who, because of domestic violence,

homelessness, or other situations, require temporary shelter and assistance; (12) camping

services; (13) information and referral services; (14) services for families and individuals

in emergency and transitional housing; (15) comprehensive youth development services;

(16) access to and coordination of medical, dental and mental health services for children

in foster care whose families are receiving services from other state agencies; and (17)

child care placements for children whose families have an open case with the

department.[74]

168.     It is hereby declared to be the policy of this commonwealth to direct its efforts,

first, to the strengthening and encouragement of family life for the care and protection of

children; to assist and encourage the use by any family of all available resources to this

---

[74] *See* M.G.L.c. 18B, §2, Services enumerated.

end; and to provide substitute care of children only when the family itself or the resources available to the family are unable to provide the necessary care and protection to insure the rights of any child to sound health and normal physical, mental, spiritual and moral development.[75]

169.    To fulfill this public policy, DCF recognize that substitute care is a temporary solution, and require the Department and the parent(s) to direct their efforts toward reunification of children and parents. The Department recognizes that it operates not in isolation but in partnership with families. The Department seeks to assist parents in meeting their parental responsibilities, among which are: to maintain meaningful contact with the children; to seek and utilize appropriate services to assist family reunification and to make good faith efforts to participate with the Department in developing and implementing a service plan. [76]

170.    Foster children in custody of DCF, as result of care and protection adjudication, have property interest protected under Due Process Clause, in right to early and periodic screening, diagnostic, and treatment standards, individualized health care plans, medical passports, private family placement, sibling visitation, and placement with relatives, other adult persons who played significant positive roles in children's lives, and any minor siblings or half-siblings, as set forth in Massachusetts laws mandating DCF's compliance, even though laws conditioned several rights on DCF's determination that action was in children's best interests, since laws limited DCF's discretion so that property interests were legitimate claims of entitlement rather than abstract needs or desires.[77]

---

[75] *See* M.G.L.c. 119, §1, Declaration of policy; *See also* 110 CMR 1.01, Statement of Philosophy.
[76] *See* 110 CMR 1.02(4)-(7).
[77] *See Connor B. ex rel. Vigurs v. Patrick*, D.Mass.2011, 771 F.Supp.2d 142,

171.    DCF maintains Four regional offices that oversee day-to-day operations at 29

Area Offices located throughout the state.  Leadership and administrative duties for DCF

are guided by its Central Office, located in Boston.

B.    Care and Protection Proceedings ("C&P")

172.    State Courts, pursuant to M.G.L.c. 119 et seq. , have authority to hear petitions for

a child requiring assistance (formerly child-in-need-of-services "CHINS"), and

termination-of-parental-rights ("TPR") cases.[78]  However, it is important to keep in mind

that this litigation focuses on erroneous removal of children (which is done by DCF

without a prior court order) and failure to provide parents with meaningful services for

reunification subsequent State Courts' temporary transfer of custody to DCF.[79]

173.    In statutory context, care and protection proceedings refer to those proceedings

commenced in the Juvenile Court Department, or in the juvenile sessions of the District

Court Department,[1] the purpose of which is to ensure that a child under the age of

eighteen is protected against physical, mental or emotional injury resulting from absence,

neglect, or abuse on the part of the person who is responsible for the child's welfare, or

resulting from the inability of that person to provide the parental upbringing necessary for

the normal physical, mental and moral development of the child.[80]

174.    The object of Care and Protection proceedings, is to determine whether a child is

in need of care and protection and, if so, to enter an appropriate order for the care and

---

[78] Analogous to Petition for Adoption in Probate and Family Court.  *See* M.G.L.c. 210, §3
[79] *See* M.G.L.c. 119, §§1, 24-26
[80] *See* M.G.L.c. 119, §§1, 24-26

custody of the child.[81]  State intervention in the form of a care and protection proceeding

is justified when a child is "endangered".[82]

175.    DCF initiates Care and Protection by filling a petition with the Juvenile Court

alleging that a child: "(*a* ) is without necessary and proper physical or educational care

and discipline; (*b* ) is growing up under conditions or circumstances damaging to the

child's sound character development; (*c* ) lacks proper attention of the parent, guardian

with care and custody or custodian; or (*d* ) has a parent, guardian or custodian who is

unwilling, incompetent or unavailable to provide any such care, discipline or

attention...."[83]

176.    The Department of Children and Families (department) may take a child into

immediate temporary custody in the absence of a care and protection proceeding

provided that the department has reasonable cause to believe that the removal is

necessary to protect the child from abuse or neglect. In such cases, the department shall

make a written report stating the reasons for such removal and shall file a care and

protection petition the next court day." [84]

177.    DCF may seek *ex parte* order from the Court for emergency removal by show of

reasonable cause to believe the child is suffering from abuse or neglect; however, there

---

[81] *See Care and Protection of Benjamin*, 403 Mass. 24, 25, 525 N.E.2d 418, 419 (1988).

[82] *See Custody of a Minor*, 389 Mass. 755, 766, 452 N.E.2d 483, 490 (1983)("'It is not the quality or character of parental conduct per se that justifies State intervention on behalf of an abused, neglected, or otherwise endangered child. Rather, it is the fact of the endangerment itself. As parens patriae the State does not act to punish misbehaving parents; rather it acts to protect endangered children'"); *Custody of a Minor*, 383 Mass. 595, 600, 421 N.E.2d 63, 66 (1981) (same); *Custody of a Minor* (No. 2), 378 Mass. 712, 722, 393 N.E.2d 379, 385 (1979) ("… The crucial questions are: From what shortcomings or handicaps does the parent suffer that would endanger the wellbeing of this child if exposed, and has the necessity of permanently removing the child from its parent persuasively been shown?").

[83] *See* M.G.L.c. 119, §24

[84] *See* M.G.L. c. 119, § 51B(*c*).  *See also* C.P. Kindregan, Jr., & M.L. Inker, Family Law and Practice § 65:1, at 294 (3d ed. 2002).

has to be a 72-hour hearing held thereafter to contemplate temporary transfer of custody to DCF, which will require a heightened showing by fair preponderance of the evidence that the child is suffering from abuse or neglect.[85]

178.    DCF will retain temporary custody until trial on the merits, during which the department bears the burden of proving, by clear and convincing evidence, that a parent is currently unfit to further the best interests of a child and, therefore, the child is in need of care and protection.[86] DCF will need to make a showing that continuation of the child in his home is contrary to his best interests and the department has made reasonable efforts prior to the placement of a child with the department to prevent or eliminate the need for removal from the home.[87]

179.    Trial on the Merits is very frightening for parents.  If the Judge rules in DCF's favor, the parent may go from one day a visit, to never being able to see their child again.  Thus, pursuant to the advice of their CPCS attorney, many parents will waive their right to a trial on the merits and enter into a permanency agreement, with the right to future Review and Redetermination hearings.[88]

180.    Unless the court enters written findings setting forth specific extraordinary circumstances that require continued intervention by the court, the court shall enter a final order of adjudication and permanent disposition, not later than 15 months after the date the case was first filed in court.  The date by which a final order of adjudication and

---

[85] *See In re Lilian*, 445 Mass. 333, 837 N.E.2d 269, (2005). *See also* M.G.L.c. 119, §24
[86] *See Care & Protection of Stephen*, 401 Mass. 144, 150–151, 514 N.E.2d 1087 (1987) *See Santosky v. Kramer*; 455 U.S. 745 (termination of parental rights requires allegations proven by at least clear and convincing evidence).
[87] M.G.L.c. 119, §29C
[88] *See Care and Protection of Erin*, 443 Mass. 567, (2005);

permanent disposition shall be entered may be extended once for a period not to exceed 3 months [89]

181.       The State's ability to assemble its case dwarfs the parents' ability to mount a defense because the child is already in agency custody.  The State even has the power to shape the historical events that form the basis for termination of parental rights.

182.       Every 12 months, DCF prepares a permanency plan which shall address whether and, if applicable, when: (i) the child will be returned to the parent; (ii) the child will be placed for adoption and the steps the department will take to free the child for adoption; (iii) the child will be referred for legal guardianship; (iv) the child will be placed in permanent care with relatives; or (v) the child will be placed in another permanent planned living arrangement. The department shall file a permanency plan prior to a permanency hearing held in Juvenile Court.[90]   The hearing is used to review DCF's permanency plan and determine whether the department or its agent, has made reasonable efforts to safely return the child to his parents or guardian.[91]

183.             The department shall file a petition or a motion to amend a petition to dispense with parental consent to adoption, custody, guardianship or other disposition of the child if the child has been in foster care in the custody of the state for 15 of the immediately preceding 22 months.[92]   However, DCF has authority, based on their determination of best interest of the child or other compelling reasons, to extend the Permanency plan.[93]

---

[89] *See* M.G.L.c. 119, §26(c)
[90] *See* M.G.L.c. 119, §29B
[91] *See* M.G.L.c. 119, §29C
[92] *See* M.G.L.c. 119, §26(b)(4)(iii)
[93] *See* M.G.L.c. 119, §26(b)(4)

184.            To dispense with the need for parental consent to adoption, DCF will

need to show by clear and convincing evidence that the natural parent is currently unfit to

further the welfare and best interest of the child.[94]

185.            Parental unfitness, as developed in the case law, means more than

ineptitude, handicap, character flaw, conviction of a crime, unusual life style, or inability

to do as good a job as the child's foster parent. Rather, the idea of "parental unfitness"

means "grievous shortcomings or handicaps" that put the child's welfare "much at

hazard.[95]

186.            Care and protection proceedings in Juvenile Court closely resemble

Probate and Family Court proceedings to dispense with the need for consent to adoption.

[96] They are both concerned with parental unfitness and the best interests of the child.[97]

187.            At the core of the inquiry is the question of what is in the best interests of

the child, although the answer to that question in any given case is bound up with the

determination of unfitness. The child's best interests may bear on how much parental

deficiency is tolerable, or, conversely, the degree of parental deficiency may determine

the child's best interests.[98]

---

[94] *See Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. 573, ——
, Mass.Adv.Sh. (1981) 1157, 1174, 421 N.E.2d 28,

[95] *See Adoption of Katharine*, 42 Mass.App.Ct.25, 674 N.E.2d 256 (1997).

[96] *See* M.G.L.A. c. 210, § 3 (1993 amendment extends to District and Juvenile Court judges the power to hold these proceedings).

[97] *See Adoption of Gregory*, 23 Mass. App. Ct. 948, 954, 501 N.E.2d 1179, 1184 (1986).

[98] *See Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption,* 367 Mass.
631, 646, 328 N.E.2d 854 (1975) ("the tests are not separate and distinct but cognate and connected").

188.         DCF's failure to timely provide reasonable efforts for reunification leads

to longer separation time and reduced likelihood of reunification because the child

becomes accustomed to his placement home.[99]

189.         If parental consent to; adoption, custody or guardianship, has not been

terminated parents can readjudicate the custody order via Motion for Review &

Redetermination every six months.[100]  In review and redetermination hearings, Juvenile

Court will build on findings established in the preceding stages.[101]  Stipulations at all

stages, including stipulations to being unavailable to parent a child, are valid admissions

of parental unfitness, even if there were no finding of fact of being unfit to parent.[102]

190.         Although the ultimate question of parental unfitness has to be shown by

clear and convincing evidence, the judge's subsidiary findings need only be supported by

a preponderance of the evidence.[103]

191.         DCF creates services plans that are difficult for parents to accomplish.

Service plans require parents to complete tasks that are not necessary for parents to be fit

caretakers.  Nevertheless, unless these tasks are complete parents will be denied the

ability to see their children and their failure to comply with the service plan can be used

to terminate their parental rights.[104]

---

[99] *See In re Care and Protection of Amalie*, 69 Mass. App. Ct. 813, 872 N.E.2d 741 (2007), review denied, 450 Mass. 1101, 875 N.E.2d 862 (2007) (expert evidence that showed removal of child from preadoptive family would have a traumatizing effect on the child, was used as one of the reasons to support termination of parental rights)
[100] *See* M.G.L.c. 119, §26(c)
[101] *See Custody of a Minor (No. 2),* 22 Mass.App.Ct. 91, 94, 491 N.E.2d 283 (1986).
[102] *See In Re Erin*, 443 Mass. 567, 823 N.E.2d 356 (2005)
[103] *See Care and Protection of Laura*, 414 Mass. 788, 793, 610 N.E.2d 934, 937 (1993).
[104] *See In re Adoption of Nancy*, 443 Mass. 512, 516, 822 N.E.2d 1179, 1182 (2005) (affirming termination of parental rights where detailed and specific findings concerning father unable/unwilling to attend alcohol treatment shows current and future unfitness even though court did not state specific reasons; termination in best interest of children).

192.         Although parents have options to appeal DCF's decision at any stage,[105]

social workers play paramount role in progression of reunification; they create

documentation subsequent to visits that will ultimately be used for or against the parents.

DCF does not comply with parents' request for change of social worker.  Seeking

administrative appeal or judicial review (a lengthy endeavor in itself) naturally creates

discontent between the social worker and the parent; a risk that may jeopardize , the

progression  and likelihood of reunification.

C.    Grandparent Visitation Rights

193.         Massachusetts has two grandparent visitation statutes that grant visitation rights to

grandparents in Massachusetts.[106] Many parents involved with DCF rely on the assistance

of their parents (grandparents); however, if a child is taken from a parent and placed with

the grandparent, the grandparent will be prohibited from allowing their children (parent)

to see the grandchildren, creating a divide in the family.

194.         Whenever a child is placed in family foster care, the court and the department

shall ensure that a grandparent of a child who is in the department's care or is the subject

of a petition under this chapter shall, upon that grandparent's request, have access to

reasonable visitation and that the department establish a schedule for that visitation,

unless it is determined by the court or the department that grandparent visitation is not in

the child's best interests.  In determining the best interests of the child, the court or the

---

[105] *See* M.G.L.c. 231, §118 (Appeals Court Single Justice review); *See* M.G.L.c. 231,
[106] *See* G.L. c. 119, § 26B (*a* ); the other is codified at G.L. c. 119, § 39D.  *See Blixt v. Blixt,* 437 Mass. 649, 650–
651, 774 N.E.2d 1052 (2002) cert. denied, 537 U.S. 1189, 123 S.Ct. 1259, 154 L.Ed.2d 1022 (2003)( *Blixt* ),
addresses the latter provision.

department shall consider the goal of the service plan and the relationship between the grandparent and the child's parents or legal guardian.[107]

195.    Grandparents have visitation rights in Massachusetts pursuant to the so-called grandparent visitation statute, which provides, in part: "[i]f the parents of an unmarried minor child are divorced, married but living apart, under a temporary order or judgment of separate support, or if either or both parents are deceased, or if said unmarried minor child was born out of wedlock whose paternity has been adjudicated by a court of competent jurisdiction or whose father has signed an acknowledgement of paternity, and the parents do not reside together, the grandparents of such minor child may be granted reasonable visitation rights to the minor child during his minority by the probate and family court department of the trial court upon a written finding that such visitation rights would be in the best interest of the said minor child." [108]

196.    Parental decisions about the propriety of visitation between children and their grandparents must be afforded a presumption of validity; to rebut this presumption, a grandparent seeking visitation with their grandchildren must demonstrate, by a preponderance of the credible evidence, that a denial of visitation will cause the grandchild significant harm. However, presumption of validity afforded parents' judgments as to the best interests of their children with respect to grandparent visitation does not apply to C&P; grandparents need to only demonstrate by a fair preponderance of the evidence that visitation would serve the best interest of the child in question.[109] (Of

---

[107] *See* M.G.L.c. 119, §26B(a) (governs grandparents visitation)
[108] *See* M.G.L.c. 119, § 39D, as appearing in St.1991, c. 292
[109] *See In re Jamison* (2014) 4 N.E.3d 889, 467 Mass. 269; (judge correctly declined to require a showing that a denial of visitation would harm the children, and correctly required a child petitioning for sibling visitation  to

note: typically presumption of validity is applied to cases where there is disagreement between the parent and the grandparent on issue of visitation. In the this class action, Christina fully supports Joanne's request for visitation; DCF is completely disregarding that Joanne has played a significant role in raising the children)

D.    Massachusetts Anti-Discrimination Laws and Regulations

197.    Prior to any termination of parental rights proceedings, Massachusetts anti-discrimination laws, regulations and Constitution, require that DCF accommodate the parents' special needs in its provision of services.[110]

198.    The Department is required to make reasonable accommodations to ensure that its services are accessible to all handicapped persons. The Department shall be responsive to issues of handicapping conditions by utilizing social workers who are attuned to the special needs of handicapped persons.[111]

199.    No applicant for or recipient of Department services shall, on the ground of disability be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination in connection with any service, program, or activity administered or provided by the Department.[112]

E.    Foster Care Review Unit

200.        The Foster Care Review Unit (FCRU) is an independent unit within the Department of Children and Families. The FCRU conducts case reviews for families within six months after a child is placed out of the home and every six months thereafter

---

demonstrate by a fair preponderance of the evidence that visitation would serve the best interests of the three siblings in question) See G.L. c. 119, § 26B(*b*) (governs sibling visitation)

[110] *See supra* note 42. (*In re Adoption of Gregory*, 434 Mass. 117, 747 N.E.2d 120, (2001)).

[111] *See* 110 CMR 1.08

[112] *See* 110 CMR 1.09 *See also* art. 114 of the Amendments to the Massachusetts Constitution

when a child, up to age 22, remains out of the home and in the care of the Department. A Foster Care Review (FCR) is conducted by a three member panel consisting of a case reviewer from the FCRU who convenes the meeting, a manager or supervisor from the DCF area office who is not directly responsible for the case under review, and a volunteer case reviewer from the community who is trained by the FCRU.  The statewide FCR unit is currently staffed with 38 case reviewers, who are configured into seven teams, and four volunteer coordinators, who supervise the FCR volunteer case reviewers. There were 18,253 children in the care of the department or its agents during the previous fiscal year; 13,584 children who were in its care for more than 6 months. The FCRU is currently updating policy and procedures as it prepares to transition to iFamilynet.[113]

201.        Fair Hearings at the Department of Children and Families provide an opportunity for consumers to appeal certain decisions made by the agency. The process is governed by M.G.L. c. 30A, similar to administrative appeals within other state agencies, and also by 110 CMR 10.00 et. seq. of the Department's regulations.

202.        A Fair Hearing must be held by an impartial hearing officer within 60 days of an applicant or other eligible individual's request for a review of a determination made by the Commission unless informal resolution or a mediation agreement is achieved prior to the 60th day or both parties agree to a specific extension of time.  *See* 107 CMR 1.03(1),

---

[113] *See* Annual Report on Foster Care Review, pursuant to M.G.L.c. 18B, §6A (February 2017); http://www.mass.gov/eohhs/docs/dcf/legislative-reports/fy2017-foster-care-review-annual-report.pdf

203.          The number of Fair Hearing requests filed on an annual basis increased

significantly from 1,344 in 2013, to 1,947 in 2014, and continues to remain elevated;

1,984 in 2016.  67% of the Fair Hearings are overdue.[114]

204.          Family Resource Centers (FRCs) provide a wide variety of services,

support and programs to children, adults and families in their local communities;

individual & family support, CRA-related services, school supports & liaison, housing

services, equipment & materials.  Families with children/youth with CRA-related issues

might be referred by courts, schools, or other agencies as a prevention or early

intervention effort.  FRCs are community-based, culturally competent programs that offer

a wide array of services to children and families, ranging from evidence-based parent

education, parent and youth mutual self-help support groups, information and referral,

grandparent support groups, mentoring, and educational support to cultural and arts-

related events and other opportunities. The purpose of the FRCs is to support families so

that their children may continue residing at home and attending their community schools,

"strengthen the relationships between children and their families," and "provide

coordinated, comprehensive, community-based services for children who are at risk of

dropping out of school, committing delinquent acts or otherwise engaging in behaviors

that may reduce their chances of leading healthy, productive lives."[115] Providing services

and supports to families with a child or children designated as a Child Requiring

---

[114] *See* Legislative Report on Fair Hearings in the Department of Children and Families (January 2017);
http://www.mass.gov/eohhs/docs/dcf/legislative-reports/fy2017-report-on-fair-hearings.pdf
[115] *See* Chapter 240 of the Acts of 2012 as codified at Mass. General Laws Ch. 6A, §16U (2012)

Assistance (CRA)[116] or potentially at risk of being a CRA, is a significant component of
FRC activities.[117]

205.        The FRCs are operated by community-based social service agencies
across the state and are overseen by the Massachusetts Department of Children and
Families (DCF). FRCs began operation in early 2015; there are a total of 18 FRCs, with
at least one in each of Massachusetts' 14 counties. There are two distinct FRC program
models: Full-service Family Resource Centers (n=12) and Micro Family Resource
Centers (n=6). Full-service FRCs provide all mandated services, including, but not
limited to, information and referral, evidence-based parenting groups, grandparent
support groups, assessment, service planning, and mentoring. Full-service FRCs are
located in Amherst, Barnstable, Boston, Brockton, Greenfield, Lawrence, Lowell, New
Bedford, Pittsfield, Quincy, Springfield, and Worcester. Micro-FRCs also provide all
mandated services, but at a reduced staffing and service delivery level. Micro FRCs
operate in Fall River, Fitchburg, Lynn, Martha's Vineyard, Nantucket, and North
Adams.[118]

206.        In 2016, FRCs provided services to 7,504 families, including over 6,700
new families. From January to December 2016, FRCs provided services to over 12,000

---

[116] A "Child Requiring Assistance," is a child between the ages of 6 and 18 who: (i) repeatedly runs away from the
home of the child's parent, legal guardian or custodian; (ii) repeatedly fails to obey the lawful and reasonable
commands of the child's parent, legal guardian or custodian, thereby interfering with their ability to adequately care
for and protect the child; (iii) repeatedly fails to obey the lawful and reasonable regulations of the child's school; (iv)
is habitually truant; or (v) is a sexually exploited child. *See Ibid.*
[117] *See* Family Resource Center Program Evaluation Report (March 2017);
http://www.mass.gov/eohhs/docs/dcf/legislative-reports/fy2016-family-resource-center-annual-report.pdf
[118] *Ibid.* at p.6

individuals; 59% of those served were adults and 41% were children.  Most (87%) were

birth or adoptive parents.   Only 19% of the referrals came from DCF.[119]

F.    Other DCF Statistics

207.    DCF administered its services from a central office in Boston and four regional

offices administered by regional directors who oversee 29 local area offices. In fiscal

years 2014 and 2015, DCF served an average of 44,919 and 51,822 children under 18

years old each month, respectively. DCF had an annual appropriation of approximately

$827 million for fiscal year 2015 and an annual appropriation of approximately $908

million for fiscal year 2016.[120]

208.    Breakdown of Massachusetts 2017 Demographic shows population makeup of

predominantly 81.8% White, 11.5% Hispanic/Latino, and 8.6% Black.[121]

209.    As of, 06/3/2017, it was reported that out of 47,414 DCF cases, there were 9,597

children, were in foster care or congregate care placement (more than 20% increase from

2015).  Sixty percent of those children have been in continuous placement for over a

year; thirty-three percent beyond two years (25% increase since 2014).   Of which 3704

(39%) children had a goal of reunification.  The demographic of children were

disproportionate to Massachusetts's demographics, with 43% white, 28%

Hispanic/Latino, and 14% Black (a significant disparity from Massachusetts

Demographic). [122]

[119] *Ibid,* at p.22
[120] *See* Suzanne M. Bump, Office of the State Auditor Audit No. 2016-1058-3S (December 7, 2017);
https://www.mass.gov/files/documents/2017/12/07/201610583s.pdf.pdf
[121] *See* U.S. Department of Commerce, Census Bureau, Quick Facts of Massachusetts (2016);
https://www.census.gov/quickfacts/fact/table/MA/PST045216
[122] *See* Statewide Area Profile For Year 2017 Fourth Quarter; https://www.mass.gov/lists/dcf-commonly-requested-documents

210.        Through the Title IV-E Waiver Demonstration, the Commonwealth of Massachusetts Executive Office of Health and Human Services (EOHHS), the Department of Children and Families (DCF) and the Department of Mental Health (DMH) embarked on a joint undertaking to create an integrated service delivery system for children and families. Caring Together (CT), the Title IV-E Waiver Demonstration, is a joint purchasing model for congregate care and community based services system that offers children, young adults and families continuity of services, care and treatment teams, regardless of whether youth receive congregate care or community-based services. Caring Together services are designed to support youth during transitions in and out of the community and to strengthen child and caretaker capacity, thereby enabling more youth to remain in the community through increased home-based services.[123]

211.        However, the target population for the Massachusetts Title IV-E Waiver study consists of youth at risk of or in congregate care placement in DCF's child welfare system; children are not included.[124]

212.        DCF employs or contracts  29.4 Medical and Psychiatric Personnel (e.g., 1.4 MD, 7 RN,  9 MSW, LiCSW, and 11 MSW, LCSW) and  a total of 3,258 Social Workers; of which 2,973 are licensed by the state (146 LICSW, 459 LCSW, 676 LSW, 1,692 LSWA).[125]

## V.    STATUE AUDITOR'S OFFICIAL AUDIT REPORT OF 2017

---

[123] *See* Child Welfare Title IV-E Waiver Demonstration Interim Evaluation Report Executive Summary
[124] *Id*.
[125] *See* Annual Report on Staffing (March 2017); http://www.mass.gov/eohhs/docs/dcf/legislative-reports/annual-report-on-staffing-march-2017.pdf

213.    The Office of the State Auditor has conducted a performance audit of the

Department of Children and Families (DCF) for the period January 1, 2014 through

December 31, 2015.[126]

214.    We commend Suzanne M. Bump, Auditor of the Commonwealth , and her staff,

for their  efforts in compiling December 7, 2017, performance audit of the Department of

Children and Families; it partially unmasks the propaganda perpetuated by DCF.[127]

215.    However, the report completely failed to acknowledge, or even attempt to collect

any data, on the ongoing mistreatment and violations of constitutional rights parents are

exposed to on a daily basis; a state-wide crisis that needs immediate recourse to prevent

further permanent damage to the familial unit.  It is also of note; the current system in

place has sky rocketed, as supported by the numbers, of erroneous parent-child

separations and erroneous lack of efforts for reunification.   It is now not uncommon

place, in Massachusetts, to have professionals, such as medical providers, attorneys, law

enforcement agents, and many others, have their children erroneously removed, under the

guise of alleged "best interest of the children"; new generation of children are raised

without the biological parents' love, and grow up with PTSD and other related mental and

behavior issues, subsequent to lengthy separation.

A.    DCF Does Not Effectively Identify and Investigate Serious Bodily Injury to Children

216.    The Department of Children and Families (DCF) does not ensure that it is aware

of all incidents of abuse, neglect, and injury involving children that it serves. If DCF does

---

[126] *See* M.G.L.c. 11, §12 (grants state auditor to inspect, review or audit; programs, departments, commissions, institutions, officers, employees, accounts, funds, books, vouchers, records, activities, and all functions related directly or indirectly to the aforementioned)

[127] *See* Suzanne M. Bump, Office of the State Auditor Audit No. 2016-1058-3S (December 7, 2017); https://www.mass.gov/files/documents/2017/12/07/201610583s.pdf.pdf

not effectively monitor the medical services provided to children in its care, unreported critical incidents may go undetected. This can put children at risk of further abuse, neglect, and bodily injury.[128]

217.    A sample of 566 children in DCF care had their medical records analyzed for serious bodily injury; 617 occurrences were found, for which 260 of these occurrences DCF had no record of it ever being reported.  Examples of these occurrences include a 15-year-old with brain damage from a firearm injury, a 1-year-old with first- and second-degree burns on multiple body parts, and a 12-year-old with multiple head contusions that the treating physician determined were a result of an assault.[129]

218.    When a child in the care of the Department of Children and Families (DCF) is involved in an incident with another child in DCF care, DCF typically only documents the incident in the victim's i-FamilyNet case file, not the perpetrator's.  Thus DCF is not maintaining a complete and accurate record of each perpetrator's behavior. That may limit its ability to effectively assess the risk associated with placing children in the same residence as a perpetrator, whether within DCF or in programs run by other agencies.[130]

219.    Not only are parents in C&P not notified of such incidents, but DCF is also oblivious to this ongoing neglect & abuse in their care.

B.    DCF Does Not Report All Critical Incidents To OCA

---

[128] *Ibid*, at p.13
[129] *Ibid*,
[130] *Ibid*, at p.22 (Explains why Class Plaintiff Valerie's daughter Thilee was placed again with the same perpetrator.)

220.    DCF does not always report critical incidents to the Office of the Child Advocate (OCA).  Without proper reporting by DCF, OCA cannot perform its oversight function to ensure that children receiving DCF services are appropriately cared for.[131]

221.    DCF does not consider sexual abuse to rise to the level of a critical incident and therefore did not report to the Office of the Child Advocate (OCA) any of the 118 validated9 cases of sexual abuse that affected children in DCF care during the audit period. These instances included two male employees at different DCF-contracted residential facilities who sexually abused three girls each; a 10-year-old who was raped by his father; a 4-year-old who was sexually abused by her mother; and a 17-year-old who was gang-raped by five assailants. In one case, a male who had sexually abused one child abused the child's sibling less than one year later. The Office of the State Auditor (OSA) believes that the lack of notification to OCA significantly inhibits OCA's ability to advocate effectively for children in DCF care.[132]

222.    Unnoticed serious bodily injury such as sexual abuse, suicide attempts, and physical assaults, will affect the outcome of visitations with parents, and erroneously interpreted by social workers as lack of bonding, leading to negative notations of the visit.

C.    DCF Does Not Report All Abuse, Neglect, and Sexual Abuse to DA Offices

223.    During our audit period, 19 incidents of sexual abuse, physical abuse, and/or neglect that DCF determined had happened to children in its care were not formally reported to and received by district attorneys (DAs). A number of DAs told us that they would have performed detailed investigations of many of the unreported cases if DCF

---

[131] *Ibid*, at p.16
[132] *Ibid*, at p.22 (explains why Class Plaintiff Valerie's daughter Thilee did not receive adequate treatment.)

had properly reported them to the DAs' offices. These 19 incidents affected 22 children and included forcible rape, sexual abuse by a DCF-contracted employee at a residential facility, multiple sexual abuses of children by family members, and various assaults on children. By not ensuring that all substantiated cases of sexual abuse are reported to the appropriate DA's office, DCF may be preventing alleged abusers from being prosecuted.[133]

D.     DCF Does Not Timely Complete and Submit Fatality Review Report to OCA

224.     Of the 73 fatality investigations performed by DCF during our audit period, none was completed and submitted to OCA within the established 30-day or 60-day timeframe. Specifically, the reports for 68 of these 73 investigations had not been completed and submitted to OCA; 31 (46%) of the 68 were instances where DCF had been aware of a child's death for more than 365 days. Two of the remaining five reports were completed an average of 316 days late. 8 These five reports were ultimately submitted to OCA for review.[134]

## VI.     DCF VIOLATION CAUSE IRREPARABLE HARM TO PARENTS

A.     Child Welfare and Office of the Child Advocate Outcomes

225.     In 2016 the number of children in out-of-home placements, residential placement, group care placement, foster care has increased. [135] the number of children served by Supervised Visitation Centers has increased from prior years.[136] Kinship Guardianships accounted for more than 80% of all Guardianship Subsidies in 2015. Kinship

---

[133] *Ibid*, at p.19
[134] *Ibid*, at p.20
[135] *See* Caseload Report Fiscal Year 2016 Quarter 2, (March 2016), at p.1-4
http://www.mass.gov/eohhs/docs/dcf/legislative-reports/2016-caseload-report-fy2016-q2.pdf
[136] *Ibid*, at p.5

Guardianship Subsidy Title IV-E Claiming for accounts for Federal Share of half of

Gross Expenditures Claimed.  Federal Share for the first two quarters in 2016 was

$1,960,274 compared to $589,483 of the first two quarters in 2014.[137]

226.        The Children's Bureau of the HHS issued Child Welfare outcomes

between 2010 and 2014, *inter alia*, confirmed there was a decline in performance on the

measure related to timeliness of reunification without increasing reentry.[138]

227.        In 2016, The total complaints made to the Office of the Child Advocate

(OCA) has increased by 290% since 2015.

228.        The Office of the Child Advocate (OCA) represents the commitment of the

Governor and the members of the Legislature to improve services provided by state

agencies to children and families in Massachusetts. Originally created by Executive

Order 494, the OCA is an independent office that reports directly to the Governor. A law

establishing the responsibilities of the OCA was passed by the Legislature in 2008 and

appears in the Massachusetts General Laws as Chapter 18C. The mission of OCA is to

ensure all children in the Commonwealth receive appropriate, timely and quality services

with full respect for their human rights. Through collaboration with public and private

stakeholders, the OCA examines services to children to identify gaps and trends, and

makes recommendations to improve the quality of those services. The OCA also serves

as a resource for families who are receiving, or are eligible to receive, services from the

Commonwealth.[139]

---

[137] *Ibid.*
[138] *See* Child Welfare outcomes 2010-2014, Report by Children's Bureau of HHS to Congress;
https://www.acf.hhs.gov/sites/default/files/cb/cwo10_14.pdf
[139] *See* M.G.L.c. 18C, & Office of the Child Advocate Annual Report Fiscal Year 2016;
http://www.mass.gov/childadvocate/docs/office-of-the-child-advocate-annual-report-fy16.pdf

229.     The total complaints made to OCA has drastically increased; in 2016 it had more complaints than 2014 and 2015 combined.[140]     Most of the complaints were made by biological parents and grandparents, with specific concerns of: failure to place a child with a relative or sibling when a child is taken into state custody; perceived lack of responsiveness by DCF social workers to calls from biological parents regarding reunification planning; objections to the removal of children from parents or relatives.[141] These complaints were primarily caused due to issues with DCF case practice & Placement.[142]

230.     OCA reported 829 supported allegations of neglect and abuse, of which sexual abuse represents 5%.[143]

B.     DCF Misappropriates Federal Funding for Foster Care and Other Services

231.     States that receive Federal Funding must abide by their requirements, *inter alia*, to provide reasonable efforts of reunification and preservation of the familial unit.

232.     DCF, by failing to provide necessary services and reasonable efforts for familial reunification, keeps children in Foster Care and other services for longer than necessary time.  Federal finding is being drained for care that could otherwise be provided by biological parents.

233.     DCF erroneously utilizes social workers that lack the necessary training and professional judgment in position of emergency removals and investigative functions.

---

[140] *See* Office of the Child Advocate Annual Report (2016), at p. 14;
http://www.mass.gov/childadvocate/docs/office-of-the-child-advocate-annual-report-fy16.pdf
[141] *Ibid*, at p.16
[142] *Ibid*, at p. 17
[143] *Ibid*, at p. 19

Some of the DCF social workers responsible for removing children under emergency basis do not know DCF's policies, regulations and basic definitions.

234.    Neglect means failure by a caretaker, either deliberately or through negligence or inability, to take those actions necessary to provide a child with minimally adequate food, clothing, shelter, medical care, supervision, emotional stability and growth, or other essential care; provided, however, that such inability is not due solely to inadequate economic resources or solely to the existence of a handicapping condition. This definition is not dependent upon location (i.e., neglect can occur while the child is in an out-of home or in-home setting.)[144]

235.    Emotional Injury means an impairment to or disorder of the intellectual or psychological capacity of a child as evidenced by observable and substantial reduction in the child's ability to function within a normal range of performance and behavior.

236.    Physical Injury means (a) death; or (b) fracture of a bone, a subdural hematoma, burns, impairment of any organ, and any other such nontrivial injury; or (c) soft tissue swelling or skin bruising depending upon such factors as the child's age, circumstances under which the injury occurred, and the number and location of bruises; or (d) addiction to drug at birth; or (e) failure to thrive.[145]

237.    Emergency means a situation where the failure to take immediate action would place a family and/or child at substantial risk of serious and imminent family disruption, or death, or serious emotional or physical injury. [146]  Children are being removed under erroneous emergency basis without prior court approval, and are placed in immediate

---

[144] *See* 110 CMR 2.00; *See* M.G.L.c. 18B et seq.
[145] *Id.*
[146] *Id.*

Foster Care supported by Federal Funding.  Such actions are in violation of AACWA, CAPTA & SSA acts' reunification and goal of keeping familial unit in tact provisions.

C.    <u>There Are Lack Of Services in Place To Prevent Child Removal</u>

238.    In Massachusetts, there is no specialized training for DCF Social Workers or their agent to become "investigators".  DCF social workers with no graduate training, and no actual training in investigative function, are able to investigate alleged 51A reports, issue their own 51B reports, and take children under emergency basis with no prior court approval.[147]

239.    Social worker responsible for taking Valerie's daughter, Thailee, out of her home under emergency basis did not have any specialized training and could not come up with any valid reason that she could justify why the child was taken upon cross examination in the pending Care and Protection matter in Lowell Juvenile Court.[148]

240.    DCF erroneously utilizes social workers for emergency removals and investigative functions; this services require special attention to detail and training as to collecting, analyzing and processing relevant and irrelevant evidence at the scene.  Even if such action is overturned by subsequent court hearing or administrative appeal, the damage has already been done.  Current untrained DCF Social Workers functioning as "investigators" can remove children which result in permanent damages.[149]

---

[147] *See* M.G.L.c. 51A (state requiring certain professionals to report suspected neglect or abuse to DCF); *See* M.G.L.c. 51B(upon receipt of a 51A report DCF is required to investigate and file a formal 51B report).

[148] *See In Re: Care & Protection of Thailee*, Docket NO. 15CP0107LO

[149] *See Care and Protection of Walt*, 478 Mass. 212, 84 N.E.3d 803 (2017)(It took seventeen (17) months for parents to prove in Court, that DCF erroneously took custody of their child under emergency basis in the first place, this case did not help them because by this time the decision of this case came out, to be able to see their child, parents agreed to a guardianship decree; it is also of note, the father who attempted to "protest" such erroneous emergency

241.       Redress through State Courts, although can result in vindication, can take time

and results in parents choosing between opposing DCF and wining down the road, or

complying with DCF by stipulations and being reunited with their children.  In essence a

lot of the erroneous child removal by DCF goes unnoticed because it is never gets "far"

enough in the Court system to be addressed.  Parents separated from their children are

desperate to sign any paper or document, including waiver of their rights, simply to be

reunited with their child.[150]

242.       The "untrained" social worker that takes on the investigative functions harms

parents in other ways as well because their 51B reports become admissible at all stages of

Court proceedings.  Procedurally, it may be financially impossible to properly oppose

51B reports, which can quickly add up.  The State has superior funding to quickly create

thick files against parents which neither do they nor the single appointed attorney has the

resources to fight against.[151]  It is also of note, opposition to social workers leads to

discontent which then results in negative reports incorporated in 51B reports; parents

don't have social workers to advocate for them.

243.       Once a child is taken, reunification in Massachusetts takes the longest amount of

time for reunification.  Although this works great for parents who truly do need

---

[150] taking of his child in the first place, and attempted to save his child from being placed in foster care by attempting to flee down the stairs with him, prior to exiting the building he was told by the government child is now with the department and if he didn't comply he would be arrested for parental kidnapping, this almost became another "Amber Alert" situation) DCF is taking children from fit parents of lower socioeconomic class, and forces them to comply with their requests or in the alternative be separated from their child great lengths of time; **please help us!** *Id*.

[151] While 51 A reports are admitted only to set the stage, 51B reports are admissible for the purpose of providing background information and primary facts. *See* Mass. G. Evid. § 1115(b)(2)(A) & (B) (2016). Hearsay statements contained in a 51B report may be admitted substantively if they are statements of primary fact. *See Adoption of George*, 27 Mass. App. Ct. 265, 274 (1989),  Mass. G. Evid. § 1115(b)(2)(B) Note, at 441 (2016).

additional time to rehabilitate, for most parents, this "one approach fits all" call of action, leads to unnecessarily prolonged separations.

D.    DCF Discriminates Against Parents with Disabilities and Prior Involvements

244.    DCF focuses on "protecting children", and parents come second.  There is lack of services or accommodations for parents.  It is very common that 51A and 51B reports are filled with allegations, *inter alia*, behavioral and mental illnesses.

245.    "The Department recognizes the special needs of handicapped clients. The Department shall make reasonable accommodations to ensure that its services, facilities, communications, and meetings are accessible to all handicapped persons. The Department shall make reasonable accommodations to clients who have impaired sensory (i.e. visual, auditory) skills, including but not limited to sign language, Braille, large print type, and TTD (telephonic telecommunication device). The Department shall be responsive to issues of handicapping conditions by utilizing social workers who are attuned to the special needs of handicapped persons."[152]

246.    However, for purposes of accommodation, DCF has no adequate policy or procedure for requesting verification of disability or handicap.  In other words, already confused, afraid and bewildered parents, are left to fend for themselves to raise such issues.  When parents raise these issues, DCF fails to provide any services or accommodations.  DCF does not communicate with other departments on this issues.

247.    Valerie was perceived to have mental illness from the beginning of her Care and Protection of Thailee; this places DCF on notice.  However no ever asked for verification of her mental illnesses or even bothered what, if any, services can be offered to

---

[152] *See* 110 CMR 1.08

accommodate her to help reunification.  Presently DCF attempted to terminate Valerie's parental rights; this counsel was able to show at trial on the merits that such decision is based on arbitrary, capricious and whimsical evidence; Valerie is another example of In Re Care and Protection of Walt, except Valerie was not even given a chance based on perceived mental illness disability and her daughter was repeatedly sexually assaulted under DCF's care.

248.     DCF also discriminate against parents that had prior involvement with DCF.  As previously described, 51A and 51B reports can quickly add up, and the file quickly becomes very thick.  Once a case comes in of alleged abuse or neglect, prior DCF involvement with other children is used unfairly to determine present parental fitness. DCF has no adequate policy or regulation, that allows it to properly rule in or rule out prior involvement with DCF.  Valerie's prior involvement was used erroneously in DCF's erroneous determination of her present parental unfitness.

249.     Once DCF makes a decision to place the child with one or other side of the family (maternal vs. paternal), it will be easier for DCF to pick that side to advocate and ultimately favor throughout the Care and Protection proceedings.  Initial placement of the child usually determines the outcome of the case; all the more reasons the 51B investigator should be better trained.

E.     DCF violate Parents Privacy/HIPPA Rights

250.     DCF is consistently interacting with health professionals within the hospital, medical clinic and other health related settings.  Because of such professional relationship, DCF is able to access parents' medical records without their consent or a court order.  Although such action is not criminal in nature, it is a breach of parent's right

to privacy and can be used erroneously without having opposing side being able to provide a reason or other explanation relating to such records.

251.    Commonwealth currently does not have an adequate policy or regulations, that creates a record from a third (3rd) party, such as DCF gains access to parents medical records.

252.    Medical information acquired via phone, from third parties is routinely used as justification for parent-child separation without any firsthand knowledge of alleged medical information or written confirmation thereof (e.g. by fax or email).

253.    Parents are routinely forced, *exempli gratia*, vitro injection[153] as their choice of treatment for parents with alleged alcohol issues.

254.    Parents with history of alleged alcohol abuse, prior to being able to see their children for more than one hour supervised visit per week, are forced to subject themselves to chemical treatment (Vivitrol intramuscular injection).  This can easily be avoided, inter alia, taking a daily urine screen, or installing a breathalyzer apparatus as seen in OUI cases; however, no such services are available.


## VII.    DEFENDANTS FAILED TO IMPLEMENT AND EXECUTE THEIR OWN POLICIES & REGULATIONS

255.    DCF Policies and Code of Massachusetts Regulations, are well written; however, they are not being implement or executed in accordance with their provisions.

256.    DCF does not offer minorities with different cultural backgrounds an option to switch case workers.  Valerie consistently requested a different case worker and she was

---

[153] Vivitrol (Naltrexone) has recently been approved by the U.S. Food & Drug Administration for use in treatment of alcohol dependence.  *See* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2006/021897_toc_Vivitrol.cfm

not provided with any options.  This is a clear violation of DCF's special provision relating to linguistic and cultural minorities.  Furthermore, DCF does not implement or execute special provisions relating to; handicapping conditions, nondiscrimination, homeless families, and others. [154]

257.    DCF consistently violates their own Statement of Philosophy and Agency policy by not providing parent services and reasonable efforts for reunification. It is state-wide norm to place parents, from which there was an emergency removal of a child, in a one hour supervised visit per week.  Even when the parent states (if it is alcohol or drug related) that they will subject themselves to daily drug screens, DCF does not accept such terms and does not offer reunification efforts; parents are subjected to unnecessarily prolonged separation when there are other, less expansive, solutions available (another example, for domestic violence cases can have random visits to home to monitor on the alleged victim).

258.    Foster Care Reviews (FCR) consistently lack the required quorum of three-member panel.[155]  Named plaintiffs did not have all three members present at her FCR reviews, and the volunteer was either missing or not properly advised of their role in the hearing.[156] Valerie who is culturally different from her case worker, has a chance to be vindicated by a volunteer, *inter alia*, should represent her racial and ethnic Cambodian background, such volunteer was absent.[157]  Similarly, other Named Plaintiffs did not have access to such volunteer that is designed to advice the review panel where they have

---

[154] *See* 110 CMR 1.06 & 1.08-1.11
[155] *See* 110 CMR 6.10(3)(FCR shall be conducted by a three member panel.)
[156] *See* 110 CMR 6.10(3)(c) (1)-(6)
[157] *See* 110 CMR 6.10(3)(c)(1)([T]he volunteer shall represent to the maximum extent feasible the various socio-economic, racial and ethnic groups served by the panel.)

made a misstep or error in their evaluation. Again, the policy and regulations are well written, but they are not being implemented or executed.

259.    Most of the volunteers, are from "higher" socioeconomic class that "look down" on people from poverty. It is human nature to know which socioeconomic class you get along with and which you do not. In some of the hearings, volunteers did not even speak, take any part in the review, and did not participate in any meaningful way. For most Named Plaintiffs, the director would run the show and make his/her decision prior to even making an inquiry from the volunteer.

260.    Fair Hearing and Grievance Procedure, designed to review administrative decisions rarely get a different result. They simply review the same erroneous facts and see if they fit the standard of "neglect" or "abuse" to support or unsupported the decisions. In other words, there is no way to actually discredit or review the findings of the social worker or other agent, involved in collecting the data collected (i.e. 51B report is reviewed to see if the findings support alleged neglect or abuse, however, there is really no way to challenge the investigator's perceived "facts").

261.    Unfortunately DCF agents do not know even the basic definitions of; neglect, abuse, parental fitness, etc.[158] During Valerie's trial on the merits, the investigator that erroneously removed Thailee out of her home under emergency basis could not properly define even the most basic terms such as neglect.

262.    DCF continuously discriminates against the parents based on their past indiscretions, and fails to apply the Courts' directed standard of "present finesses" in determining placement of children. Parents that are presently fit to parent, are still denied

---

[158] *See* 110 CMR 2.00 (Glossary provides meaning of terms as used throughout 110 CMR)

reunification because there is lack of policy to look at parents ability to parent in the present sense.

263.    DCF fails to abide with its own policy of keeping the family unit intact.  Once the family is separated, the likelihood of reunification is very unlikely.  Typically the child is reshuffled to a different family member's household or alternatively, parents sign some sort of an agreement or stipulation, with DCF through the Court, to end C&P in violation of Parental Rights.

264.    There is a huge discrepancy between the socioeconomic class of DCF agents and the parents they tend to interact with.  Parents involved with DCF are usually minorities and/or parents that come from lower socioeconomic backgrounds that DCF agents don't fully understand.  This includes also the way and manner the group communicates.  Although some of the lower socioeconomic class's' communication may seem crass, nevertheless it is a form of expression that is protected by the first amendment and DCF illegally encroaches on it.

265.    Furthermore, there is a difference in the way and manner different cultures communicate.  Some cultures may "seem" like there is yelling and fighting involved when it is nothing more than the accustomed form of communication.

266.    DCF is in violation of their own policies and regulations, by failing to either implement or execute provision relating to linguistic and cultural minorities; "[t]he Department shall be responsive to issues of ethnic and cultural diversity by utilizing social workers who are attuned to ethnic and cultural values and traditions. The Department shall ensure that both the services it provides directly and those it provides through providers or contracts are culturally sensitive to the various minority groups in

the client population. In addition, the Department shall make all reasonable efforts to ensure that communications with every client, whether written or oral, are made in a language, or in a manner, that the client can understand."[159]

267.    Valerie asked for a social worker that can either speak her language or is culturally similar so that she can be better understood.  When her requests were not complied with, she asked for just a different social worker, her request was again denied. Moreover, the social worker whom she tried to replace, became resentful and reunification became even more difficult.

268.    DCF, in violation of their own policies, does not offer in home services.  More shockingly, DCF routinely requires Parents to complete tasks but does not offer assistance in completing them.  For example, DCF will ask parents to do drug tests, sometimes even on demand.  However, DCF does not offer such drug test.  Plaintiffs have gone to take the drug tests at medical facilities and were denied because MassHealth doesn't pay for them.  Parents, who are already financially strapped, cannot afford to pay for these tests.  Thus, such requests are used as a "set up" that will result with non compliance and loss of parent rights (i.e. if you pay money out of your pocket you will not be able to pay rent , without a home you won't have a right to parent child, but if you don't pay for such services, you will be non compliant and will also not have the right to parent your child).  DCF fails to document such requests and record what if any actions were done pursuant to their own policies and regulations.[160]

## VIII.    DCF SOCIAL WORKERS DO NOT ADVOCATE FOR PARENTS

A.    <u>DCF Social Workers are Unsuitable to Help Parents</u>

---

[159] *See* 110 CMR 1.06
[160] *See* 110 CMR 3.02

269.        DCF social workers directly, as agents, represent DCF's interests.  By the fact that

parents enter C&P, DCF social workers are opposing parties to them.  Thus, DCF social

workers are unsuitable to work with parents, and ultimately harm and not help parents.

270.        Every parent has good qualities and bad qualities, DCF social workers focus on

the bad qualities in hopes of "eradicated" such qualities to offer a child a "better" home.

There is a lot of character assassination; parents are required to keep their natural

tendency in check in hopes of having their parental rights returned.

271.        A lot of families hide a lot of things from DCF for fear of being punished by

having children removed.  Named grandparents had their children removed simply

because they allowed the "unfit" parent into their home without DCF'S permission.

272.        Valerie's daughter Thailee was placed with Valerie's sister, however, the sister

allowed Valerie to take her daughter without DCF's knowledge because they knew if they

would tell their social worker Thailee would be taken away.  When DCF found out that

Valerie has been providing care to Thailee "behind their back", DCF took Thailee from

both Valerie and her sister.  Thailee was placed in foster care where she has been exposed

to violence, police, and other inappropriate behavior she has never seen before.

273.        DCF social workers do not follow social workers' core values.  They do not offer

assistance or emotional support that a social worker should.  Massachusetts parents fear

DCF social workers; the social worker is perceived as a DCF enforcer vs. a helper.  As

soon as parents find themselves in C&P, they will immediately be talked down to and

treated as if they are bad people.  Parents are told that they need to be able to have a job

and income to provide for their children, but at the same time they will have to complete

services that they have very little control over and these services will interfere with seeking gainful employment.

274.    DCF social workers do not comply with the state granted license requirements. Valerie's social worker did not have the requisite hours of oversight. Because they are overworked and understaffed, they don't have the necessary supervision; their work goes unchecked.

275.    DCF social workers also do not offer transportation vouchers, financial support to parents or other services that would help reunification; most of the emphasis goes to providing for children and foster care parents (who get weekly allowances and vouchers).

B.    Parents are Separated From Their Children Unnecessarily

276.    DCF social workers have direct control of how long to keep parents separated from their children, and are unnecessarily keeping them separated. Most current cases, reunification can occur without risk for children with simple application of daily urine screening. Similarly, if under emergency screening, there are concern of drug abuse, requiring to take random drug screening would work better for keeping familial unit intact versus ripping the child (who is well fed, bathed, cared for, without any marks) out of the home.

277.    DCF Social workers fail to advocate for reunification. Reunification decisions occur at specific times surrounding either Foster Care Review or Trial dates, with very little reunification in the interim. Moreover, they are free to modify the service plan indefinitely simply because they don't like the parent or "nit-picking" about parent's character; such dislike which can be personal in nature, will result in FCR finding of insufficient thereby halting efforts for reunification. For example, if they don't like your

behavior (e.g. your expression of concern, dislike, or unhappiness with the process), they

can order drug test even though, *arguendo*, the whole C&P was initiated for DV and no

involvement of drugs (i.e. service plan can be modified to anything they like simply on

basis of suspicion or dislike of the parent; an indefinite taking of the child).

278.    DCF Social workers uses prolonged separation as a form of punishment or

coercive tactic to force parents into submission or get the parents to comply to their every

request even if such request is unwarranted.

279.    DCF does not utilize alternative services prior to separation (e.g. daily urine

screen, random home-visits, ankle bracelet to track parents that are suspected of domestic

violence to their partners).

280.    It is an unfortunate side-effect, that long separation times lead to a less likelihood

of reunification, thus unless a quick reunification is established, there will probably be a

change of custody or other decree entered by the parents who face the possibility losing

all ties to their children. Furthermore, parents are no longer perceived as "parents" by

both children and DCF social workers involved.

281.    Long separation times, that may be also affected by distance from the parent, will

not have to deal with a new hurdle of having to re-implant a child to a new school,

providers, and other resources that the child has become accustomed to.


C.    <u>DCF Utilizes Unconstitutional Supervised Parenting</u>

282.    Supervised Parenting services allow parents to see their children for one hour a

week in a small room will limited things that parents can do there.  Parents are not

allowed to speak to their children in their foreign language (Valerie was not allowed to

speak to Thailee in Khmi[161]).  Parents are not allowed to say anything about the possibility of reunification (Named Plaintiffs were told not to talk about the future), parents could not discipline their children, parents could not talk to children in way in manner they wanted to.

283.    These supervised visits deprive parents of meaningful contact.  This services creates a situation where the children lose touch with parents, develop resentment, change in personality, and sometimes act out against the parents.  Such evidence, which is created by this service being implemented, will be used against parents to be used favorably in supporting termination, substantial departure from accepted professional judgment as to ability to provide minimally necessary parental environment and "character assassination"

284.    These type of supervised parenting services are a one solution fits all approach; parents which have their children taken under emergency basis will find themselves in these type of sessions that could otherwise be avoided.  During these sessions, social workers tend to focus on negative versus positive interactions; documentation of such visits are typically filled with character assassinating descriptions. Moreover, the environment is usually very unnatural and confusing to both children and parents; it is hard for them to act normal.

285.    Parents that would otherwise be willing to be weekend parents (probate and family equitable powers usually awards one parent full physical custody and the other parent weekends), are forced to appear for one hour mid week which directly conflicts with their work schedule.  Parents are routinely faced to chose losing their job or losing

---

[161] Khmi is the dialect spoken in Cambodia.

their right to be a parent.  Moreover, parents have to comply with very strict

requirements, such as confirming the prior day

286.    DCF and their agents greatly deviate from professional judgment to keep parents

in such settings that are otherwise not dangerous to children, and can independently take

the children, *exempli gratia*, to the park or social outings.

D.    DCF Required Therapists are Used Against Parents

287.    Valerie spoke to the DCF therapist in hopes of getting help.  However, her

disclosure of being hit by her child's father led to her child being taken from her.

Thereafter Valerie was scared to speak to future medical providers.

288.    DCF required therapists, who are supposed to help, during C&P will help DCF to

build their case against Parents.  Parents are not advised of the repercussions of full

disclosure to therapists.  DCF collects negative communications and fails to

counterbalance with positive communications.

289.    DCF required therapists, because of their mandated requirement to report back to

DCF prior "neglect" and "abuse", are counteractive to treatment and only make things

worse for parents.  DCF thus uses the therapists against parents instead of using them for

their benefit in hopes of "addressing" issues.

E.    DCF Does Not Offer Beneficial Services to Parents

290.    DCF does not actually offer services that will improve parenting.  Although

parents complete third-party parenting classes, these are general parenting classes.  For

example, there is no services to actually teach parents how to do laundry, cook, change

dippers, and deal with children.

291.     DCF does not offer parent child psychology classes.  Parents are told to not be

abusive, but there are no classes to actually teach parents how to actual deal with children

alternatively.  Furthermore, while there may be some classes, there are actually no in-

home services to actually show some of these techniques in a home setting.  Parents, after

doing what DCF requires them to do, simply become more careful from having the

Government find out what is going on in their household.

292.     DCF does not have Parent Advocates.  Parents do not have access to social

workers that actually will help them in achieving reunification.

293.     DCF does not allow grandparents visitation that are not otherwise foster parents

or caretakers of children during C&P.  Furthermore, grandparents are not allowed to let

their children see their children; DCF builds a "rift" between parents and grandparents

without just cause.  DCF does not comply with State's Grandparents Visitation Rights.

## IX.    COMMONWEALTH IS NOT PROPERLY IMPLEMENTING AND EXECUTING THEIR POLICY OF REUNIFICATION

294.     There is insufficient amount of Juvenile Court Judges to handle the current case

load.  The state would save substantially more money currently being allocated

unnecessarily to foster care, by instead appointing more Juvenile Court Judges who

would be able to assist in resolving the current high case load

295.     Juvenile Court Judges now have authority to be more involved in C&P and direct

DCF to comply with their own policies and regulations.[162]

296.     Parents who are primarily of lower socioeconomic class, are completely ignored

by the executive government of Massachusetts.  The growing state-wide crisis of parents

---

[162] *See Care and Protection of Walt*, 478 Mass. 212, 84 N.E.3d 803 (2017)(Promulgating, by case law, authority to Juvenile Court Judges and Single Justices of Appeals Court, inter alia, to order DCF to provide parents with services, financial help, and other accommodations necessary for reunification).

being abused and treated unconstitutionally by DCF is put a side simply because it is a class the "Commonwealth" has no incentive to protect.  Most of these parents, because of their criminal background, disabilities, or other ailments, are not suitable for employment or partake in voting; thus becoming an unrepresented class that is easily abused with no recourse; this class of parents do not have funds to hire attorneys or the necessary level of education to formulate any formidable advocacy against the State who hold all the power.[163]

297.    Executive branch has failed to provide any Executive Order or other assistance to help investigate the mistreatment parents are being subjected to.  Including the current state-wide crisis of lack of reunification efforts; parents are literally waiting on the sidelines to be reunified with their children. Executive branch continues to favor allocating funds to foster care instead of in-home services designed to keep children with their parents.

298.    Executive branch has failed to provide necessary resources to facilitate proper implementation and execution of state-wide DCF policies and regulations.  Children are kept in temporary placement longer than necessary.  As a result, federal funding is being utilized unnecessarily for foster care when there are biologic parents that ready and able to resume caretaking functions.

299.    DCF is primarily focused with protecting children; parents' rights are violated routinely.  Executive branch failed to see the abuse of power (geared to protecting children) targeting the parents unfairly.  Parents need their own department with their

---

[163] Counsel had his child taken by DCF, his constitutional rights stripped, and his right to be a parent taken away; it is not about the money; we are ready, able, and looking forward to taking this to a jury trial of our peers.  We may not be rich, but we now have numbers on our side.  Steve Y., keep them checks coming.

own social workers.  The policy of reunification cannot be executed without a real

support group for the parents.

 implement execute


## X.    CPCS AND ITS CAFL DIVISION DOES NOT IMPLEMENT AND EXECUTE POLICY TO PROVIDE COMPETENT REPRESENTATION TO PARENTS

A.    Role of CPCS

300.    Committee for Public Counsel Services ("CPCS" or "Committee") is a statutorily

established  statewide agency.[164]  CPCS provides legal representation in Massachusetts

for those unable to afford an attorney in all matters in which the law requires the

appointment of counsel. This includes representation in criminal, delinquency, youthful

offender, child welfare, mental health, sexually dangerous person and sex offender

registry cases, as well as related appeals and post-conviction matters.

301.    CPCS's Children and Family Law division ("CAFL") is statutorily established

statewide agency that provides attorneys to represent children and parents in C&P.[165]

CAFL also provides lawyers to children and parents in child requiring assistance

("CRA") cases (e.g. parents asking the Juvenile Court for help with; challenges at home,

children who are truant from school, or children who are run-away from home ).  CAFL

also represent children and parents in contested guardianship cases.  However, majority

of the representation occurs in C&P cases in Juvenile Court.


---

[164] *See* M.G.L.c. 211D, §1
[165] *See* M.G.L.c. 211D, §§6A, 12

302.    Most CAFL lawyers are private attorneys, and as part of their appointment to the

CAFL trial panel, must submit a CPCS Attorney Certification Form[166] and proof of

professional liability insurance with minimum limits of $100,000/$300,000 or

$250,000/$250,000 and with a maximum deductible of $10,000.[167]

303.    CPCS is statutorily responsible with establishing standards for the public defender

division and the private counsel division which shall include but not limited to:

(a) "vertical or continuous representation at the pre-trial and trial stages by the

attorney either assigned or appointed, whenever possible;

(b) required participation by each attorney in an approved course of training in the

fundamentals of criminal trial practice, unless the attorney has a level of ability

which makes such participation unnecessary;

(c) specified caseload limitation levels;

(d) investigative services;

(e) a method for the provision of social services or social service referrals;

(f) availability of expert witnesses to participating counsel;

(g) clerical assistance, interview facilities, and the availability of a law library and

model forms to participating counsel; and

(h) adequate supervision provided by experienced attorneys who shall be

available to less experienced attorneys.

---

[166] Application titled Attorney Certification Form, *inter alia*, lists Current Certifications and prior experience of being a panel member. *See* https://www.publiccounsel.net/cfo/wp-content/uploads/sites/8/2014/10/Attorney-Certification-Form.pdf
[167] *See* https://www.publiccounsel.net/cfo/wp-content/uploads/sites/8/2014/10/Liability-Insurance-Letter.pdf

(i) qualifications for vendors for the services provided in clauses (d), (e) and (f) and a range of rates payable for said services, taking into consideration the rates, qualifications and history of performance;"[168]

304.    "The [C]committee shall monitor and evaluate compliance with the standards and the performance of counsel in its divisions in order to insure competent representation of defendants in all courts of the commonwealth and shall establish a procedure for the review and disposition of client complaints. The committee shall also establish procedures whereby comments on the standard of performance of counsel in its divisions may be submitted by the justice hearing a particular matter.[169]

305.    "CAFL's legal advocacy plays a critical role in cases that affect families.  For a parent involved in a C&P case, having a skilled CAFL lawyer may mean the difference between the family's reunification and the termination of parental rights – the *death penalty of family law*."[170]

B.    CAFL Failed to Provide Competent Legal Representation for Parents

306.    CAFL has failed to identify and acknowledge the prevalence of "culture" within the Juvenile Court that is biased toward parents.  Termination of parental rights has become so common, that attorneys are forcing their clients to stipulate and sign their rights away without a fight.

307.    Because there are privacy interests that belong to the children involved, court proceedings are not open to the public.  This is a huge problem, because without outside scrutiny and input, the "culture" can deviate substantially from what the population at

---

[168] *See* M.G.L.c. 211D, §9
[169] *See* M.G.L.c. 211D, §10
[170] *See* https://www.publiccounsel.net/cafl/

large would agree with.  Moreover, the same attorneys represent both parents and children, and the same attorneys represent DCF (who calls all the shots), there is a lot of negotiating going on behind closed doors without actual advocacy for the parents.  It has become a non-adversarial system of justice.  As a result of lack of a "adversary" and zealous advocacy that opposes DCF, a lot of the underlying issues go unnoticed (e.g. social worker's competence is not questioned).[171]

308.     C&P, as written in the policy and regulations, is the stage which provides, inter alia, rehabilitative services to parents and there should be reasonable efforts for reunification; this is farther from the truth.  Both, appointed attorneys and DCF are very much against the parents; parents are treated as criminals.  As a reminder, some parents have handicaps, disabilities, lack of training, education and experience, to be parents.

309.     CAFL attorneys do not listen to parents.  Parents' opinions and their position on the type of care they have been providing, is irrelevant; attorney's advise parents to do specific things, even if parents don't agree with them, and to "put up and shut up" pursuant to DCF's request or lose rights to their children. Service plans, which have all the elements as required by regulations, are rarely contested of necessity of the tasks there in.[172]  For example, Valerie is a "loud mouth", and she had to interact with a social worker who is on the opposite end of the spectrum when it comes to communication (e.g. different in education, socioeconomic class, the addition of "ghetto" talk to the conversation etc.), she was required to continue to see domestic violence groups and

---

[171] The Judges and attorneys were consistently shocked the line of questioning this counsel posed to DCF agents, even though they are common questions seen in Superior Court (e.g. asking social workers about their education, training, knowledge of the material, what if any areas of expertise, their views on how the particular case was handled, their criminal background, personal experience with children, etc.)  The court was insulted that I "tore apart" Valerie's social worker and made sure to go out of her way to thank the social worker for her appearance (with all due respect Valerie's social worker should be retrained, what she is doing is inhumane).
[172] *See* 10 CMR 6:00 et seq. (regulation of service plans)

other requirements to address past concerns that are no longer applicable. Valerie is

required to take services beyond what is necessary simply because she is "ghetto"

compared to the social worker. Her attorney not only failed to advocate for her on this

matter. but he told her that she needed to sign her parental rights away and agree to an

open adoption so that she can at least have some sort of contact with her daughter (this is

analogous to an innocent man/woman taking a bad plea deal that involves pleading

guilty).

310.     72-hour hearings are rarely held; parents are advised to waive their right to a

hearing. However, this hearing can be used to discredit DCF's initial determination, and

show how the parent has provided adequate parenting in other ways, and can continue to

do so with in-home services. A waiver (stipulation) is an admission of present parental

unfitness. Valerie was not advised of her 72-hour hearing rights and the consequences of

stipulating. More importantly, this counsel was successful in having her parental rights

saved (not terminated), with simple questions, that would only take a one hour course to

teach.

311.     Parents are not given an opportunity to make their own decisions. Parents are

afraid, bewildered, and are forced, by their own attorneys, to comply. Valerie did not

know she could have had a 72-hour hearing and regain custody of her daughter

immediately. Nicole G. could not even access her attorney. Ashley was not aware that

she stipulated to DCF having permanent custody and she was not properly informed of

the repercussions and deleterious effects of time working against her (child's attorney did

not recommend pulling the child out of his current placement during review and

redetermination hearing). Christina's attorney advised her to agree to open adoption

because there was nothing that can be done for her.  Culture directs parents, by their attorneys who were appointed to represent them, to agree to a decree to guardianship, open adoption or permanency plan; rarely maters are taken to trial on the merits.

C.    Failed to Advocate for System improvements

312.    There has to be a separation of power.  It is clear, based on the vulnerability of the children class, everyone veers toward defending the children; parents are left fighting for themselves.  CAFL should have separate attorneys for parents and children, parents are not provided with adequate representation.  Even if the parent is a "bad parent", they still need, analogous to criminal court, competent and zealous defense.

313.    CAFL failed to realize that the Judges have become accustomed to accepting DCF's (social workers') finding and it is a hard task to discredit.  A right to a jury trial should have been invoked long time ago to help swing the "fairness" pendulum back toward the parents side; presently parents do not have access to Jury Trial in C&P[173].  It "takes a village to raise a child"; but, I never heard of villages banishing parents, *inter alia*, because they can't wake up in the morning and consistently yell at their significant partners.[174]

314.    CAFL does not advocate for continuous trials.  The child is continually developing, with needs that can change from week to week.  New issues arise at

---

[173] *See Care and Protection of Minor*, 476 Mass. 1015 (2017) (Petition titled "petition for jury trials" not answered.) *See Ilya Liviz v. Supreme Judicial Court of the Commonwealth of Massachusetts et al.,* 1:17-cv-12345 (2017) (Alleging, *inter alia*, court does not want to "promulgate" access to jury trials in an already burdened by high case-load Juvenile Court system), *See In Re: Care & Protection of Child,* docket SJC-12403, SJ-2017-0103.  *See also In Re: Care & Protection of Thailee*, docket No. SJ-2017-0379 (Petition for Jury Trial, pursuant to M.G.L.c. 211, §3 to Single Justice of Supreme Judicial Court Suffolk County denied); *See also In Re Care and Protection of Jayden & others*, docket No. SJ-2017-0400 (Petition for Jury trial, pursuant to M.G.L.c. 211, §3 to Single Justice of Supreme Judicial Court Suffolk County denied).  Aforementioned filling were drafted by this counsel.

[174] Missing school, and exposing a child to domestic violence, is harmful to their well being; however, once the parents are separated, why would the parent have to be in a one hour supervised visit for undetermined amount of time that can last a year (such is the case in Massachusetts).

subsequent court dates; there has to be advocacy to continuity of trial. CAFL also failed at advocating for speedy trials (lack of motion for speedy trials). Time, unfortunately works against parents, children become accustomed to their placement, and now the courts will have to consider the effect on the child to have to rip them out from their placement home to a new home (possibility of additional PTSD).

315.    CAFL does not, by way of petition or complaint, advocate for grandparents' visitation rights (rights that typically the parent is asking to help enforce; the current standard is to file a motion for abuse of discretion (i.e. there should be some sort of advocacy to establish, pursuant to state law, grandparents rights to be a party to the hearing (currently they are not a party to C&P at any stage, unless DCF or the Court places the child in their temporary care (foster parent like rights).

316.    CAFL failed to advocate to gain access to CORI of the social workers (not permitted at the moment), ability to make inquiries as to their personal family and children background (not permitted at the moment). CAFL instead of focusing on how to comply with all of the DCF requests, should refocus on discrediting the highly untrained and unskilled DCF staff.

317.    There is lack of advocacy for sanctions against DCF. DCF always has to make reasonable efforts, and failure to do so should warrant sanctions; not only should CAFL focus on advocating for the parent, it should also be mindful to improve the system for parents as a whole.

318.    It is shocking that DCF can request parents to submit to random drug screens, but DCF does not provide such services. Failure to comply with DCF to do the screen will result in possible termination of parental rights. MassHealth does not cover these tests,

and parents are struggling to get to visitation centers that are usually scheduled during work week hours. Parents need CAFL to better advocate on the lack of services to parents (a prerequisite for reasonable efforts).

319.    CAFL failed to address the constitutionality of the supervised one hour visits per week. Such visitations, which take many months, are deprivations of rights and in most cases are simply unjustified.

320.    CAFL should add-on to their current policies the necessity of attacking the veracity of DCF agents and advocating for parents and children, when beneficial, including the children's wishes. Parents should have more avenues to advocate for themselves, including bringing as much as possible to the Court's attention to facilitate a favorable ruling.[175]

321.    All CAFL attorneys should have a compiled list of proposed alternative services they can reference to. Services in this list, should be those that are not offered by DCF; but these services are excellent alternative options that can address parents' condition without separating the family. This list of alternative services is a great way to easily discredit DCF, who at trial on the merits, by clear and convincing evidence, must make a showing of DCF has provided parents with reasonable efforts. In other words, DCF does not offer reasonable efforts for reunification; there are many less destructive options to families that DCF simply does not employ (examples to follow).

---

[175] *See In re Adoption of Nancy*, 443 Mass. 512, 822 N.E. 2d 1179 (2005) ("There is nothing in the Committee for Public Counsel Services (CPCS) standards, or in our cases, recommending that children be asked to express an opinion on what is in their best interests, as that is essentially a legal judgment.. The failure of the girls' trial counsel to elicit, or the failure of the judge to make a precise finding on, the girls' views with respect to the termination decrees was not error.")

322.    Parents with issues of substance abuse, instead of being separated from their

children, could have in-home services to monitor their sobriety; it could be something

simple as a daily urine test or, as seen for repeat OUI offenders, analogous to the ignition

interlock device, use of handheld breath-alcohol monitoring device or other electronic

detection system placed within their home (a lot cheaper than paying for Foster Care).

323.     For parents with issues of domestic violence with their partners/significant

others, a bracelet monitoring can be placed on both of them to make sure, through GPS

monitoring, they don't come into contact (also, a lot cheaper than paying for Foster Care).

324.    Parents that are unable to get their kids to school resulting in many unexcused

absences, a phone call reminder system may be put in place, working to both, alert the

parent of an important appointment and to also monitor confirmation thereof (again, a lot

cheaper than paying for Foster Care).

325.    The Public Defender Division of CPCS who represent criminal defendants, have

plethora of recourses on how to effectively advocate their clients through trial; however

CAFL division, while competently teaches the "ins and outs" of the C&P, do not offer

adequate, training, tools or resources, for their attorneys to become competent trial

advocates.

D.    Deficient Appellate Efforts

326.    Across the board, CAFL fails to argue ineffective assistance of counsel; it is

rarely discussed or effectively argued.  As a result of this failure to advocate for parents

by pointing out flaws in legal representation, there is lack of adequate case law on the

topic in C&P.  Appeals are basically looking at the facts and seeing if they are applied

correctly; there is really no adequate way of "testing" the credibility and accuracy of the facts. Ineffective assistance of counsel, may lead to new arguments in favor of *de novo* review, with possible opportunity to supplement the record with additional or new evidence.

327.    There is lack of appellate advocacy (which can lead to promulgation of helpful court rules) on issues of "unfair trials" and the huge advantage DCF has as the party that controls the design of the service plan and the timely completion thereof. The social worker that the parent is supposed to "work" with, is the same worker that will end up testifying against the parent. Statements and observations made through out, will now be used against the parent; parents need their own social workers to help them have a fair chance.

328.    There is lack of advocacy on questioning the DCF procedure, *exempli gratia*, whether removal of the child from a home should be avoided even if there is perpetuating abuse or neglect; *arguendo*, it may be more harmful to the child to be ripped out of their home and bounced around until permanent home is found, than to just leave him in a neglectful home filled with domestic violence (obviously in-home services should be initiated immediately).

329.    There is lack of advocacy (at all stages) of pointing out how to expose "lack of services" which is necessary to show by clear and convincing evidence "reasonable efforts" were made. For example, there will be a discussion that the parent is late, but no one ever asked if they tried a different type of alarm clock; house would be a mess, but no one would inquire if the parent knows how to vacuum, or clean dishes; there will be discussion that the child is not clean and smelled like urine, but there will be no

discussion if an inquiry was made to determine if the parent knows how to change and properly put on a diaper, and knows how to properly bathe the child.

330.    A lot of parent rights are terminated based on "character assassination" and not actual lack of ability to parent (i.e. they can learn these lacking parental techniques and requirements, that DCF never teaches them (e.g. importance of having rhythmic schedule for the child, how to communicate to a child effectively, how to handle a child that will not listen, importance of being a nurturing and loving parent, etc.).

331.    CAFL Appellate advocacy fails to address counsels' (ineffective assistance) lack of attack on proponents credibility, veracity, knowledge, experience and consistently relying on multiple hearsay pole when the evidence was not acquired by direct observation or impression.  Example, for a 51B report, DCF investigator will speak to a nurse over the phone regarding a parent; nurse will pull a chart and release concerns of mental illnesses (parent may have been acting out during or after child birth, as did Valerie when she gave birth and as a result had a 51A/51B written up on her), this now will develop into a huge "mental illness" snowball that never should have even started (i.e. a concern is not an actual diagnosis or proof thereof.[176]  Finally, parents conduct outside of their children's' presence does not paint their conduct that occurs in their presence; a loud and belligerent parent may be very loving and helpful to their child's development when they are alone together (classic example of this is how people's attitude and demeanor changes when their significant other steps into the room).

---

[176] Counsel was not allowed to make inquiries whether the workers have experienced parenting or child birth of their own; but, it is very relevant, because only a trained person or someone going through child birth themselves, would know that there may be "temporary insanity" during child birth that plays no role on their true character.

E.    <u>Adoption of Jenny</u>[177]

332.    In reviewing the appeal cases, it seems similar arguments are missed or not made; however, specific appeal case that was bothersome to this counsel that I will use as an example to better picture of the state-wide crisis.  A mother, who's child suffers from seizures, on the way to the hospital in the ambulance with her child would not allow the emergency personnel to buckle her or the child; "During the ride, the mother did not have a firm hold on the child due to her constant turning around to yell at the paramedic, and the other paramedic had to repeatedly ask the mother to pay attention to the child. At one point the mother became upset and "tossed" the child away from her, forcing the paramedic to catch her before she hit the floor or any equipment. As a result of this incident, the mother was later arrested and charged with assault and battery on the child." [178] This incident was utilized, inter alia, to paint the mother as unfit parent.  But, let look into the Memorandum and Order further.

333.    First, the mother "lived in Honduras until her early adult years."  Honduras is located in Central America and it remains one of the poorest countries in the western hemisphere, with GDP (PPP) of $5,492 per capita, and GDP (nominal) of $2,623 per capita.[179]  They don't use seatbelts there because motorized vehicles are not a common mean of transportation.  Moreover, the level of education is substantially lower than here; I am confident the mother did not know the safety concerns surrounding lack of seatbelt use (people from third world countries don't know the potential of injury and reduction thereof by use of a "seatbelt" safety belt).  Counsel should have addressed this issue!

---

[177] *See Adoption of Jenny*, 477 Mass. 1108, 91 Mass. App.Ct.1128, 86 N.E.3d 511 (Table)(2017)(Supreme Judicial Court appellate review denied)
[178] *Ibid.*
[179] *See* "Honduras", International Monetary Fund (2017)

334.     Moreover, her primary language is Spanish, which means her "arguing" could have easily been "miscommunication". She is in a different "world" (country), with different culture and means of communication; she just observed her child suffer from a "seizure" and is in a state of panic. She, as a good parent would, appropriately called 911. She may have not fully understood that the emergency personal were trying to help. In all likely hood, seeing her child in a state of seizure elevated her concerns. But, if we look closer, the most important part of the ambulance ride is; "During the ambulance ride, the mother held the child on her lap in order to comfort her, rather than having the child restrained." Again, while the court is focusing on her not having her child restrained, (something that no one asked if she knew the importance of), she was holding her child on her lap to comfort her. Having a motherly loving instinct is difficult to teach (it is something that is genetically ingrained in us), but teaching the value of seatbelts for safety is something that can be taught. This would be very different if DCF, *exempli gratia*, attempted to teach her the value and importance of using the safety belt and she failed to understand and incorporate such American policy. There is no such mention of it because it is never done. DCF, as they in most of the cases, observes facts that do not "comport" to a fit parent, documents the facts, and uses the facts to take custody of the child. It is further shocking that "The mother dos not contend that any of these findings of fact lack support in the evidence that was before the judge". The facts are being convoluted (I recall from my art class in college, my fellow students looked at the same painting; one saw a stormy ocean and another saw stormy clouds, all in the same painting). These facts as entered into evidence are erroneous; what should have been argued is that DCF failed to provide services (teaching her the American way, or the

benefits of using seatbelts) and no reasonable efforts were made to see if she can learn to

abide by these requirements. Of most importance to the interest of the child;

> "When the child was approximately two years old, she was diagnosed with
> nephrotic syndrome, which is a chronic kidney condition characterized by relapse
> and remission, and requires constant monitoring. Left untreated, nephrotic
> syndrome can cause severe harm to the kidneys and can, in certain cases, become
> fatal. Caring for a child with nephrotic syndrome requires close attention to her
> symptoms, as well as "dipstick" testing of urine to monitor protein levels. The
> dipstick testing must be carefully done and charted to ensure accurate monitoring
> of the child's condition. If a caregiver misses signs of relapse, it will take longer to
> achieve remission, and could require a hospital stay. Thus, a caregiver needs to be
> vigilant to any signs of illness, be able to administer medications correctly, and be
> able to schedule multiple medical appointments with medical professionals."[180]

Memorandum identifies the child suffering from a medical condition that requires

special care.  There are no allegations that the mother was inapt or unable to provide the

child with this care! It sounds to me like she KNEW VERY WELL what her child's

needs were, and it is possible, that the emergency personnel, without their fault, did not

know how to possibly handle the child, and the mom being under state of emergency was

trying to communicate in the best way she knows how; primary language is Spanish, she

comes from a different cultural background, and the emergency personnel could have

been handling the child in a manner that could have caused more injury without their

knowledge as the mother perceived).  Did she hit anyone, or spit at anyone, or use an

inanimate object to strike someone (no)? She just observed her child have a severe

enough seizure that cause bleeding around the face (confirmed in Memorandum); the

mother is in the state of panic; unlike the emergency personnel she is not accustomed to

seeing  injuries, let alone injury to her child.  What reasonable efforts were made to fix

any of the alleged issues?  The old saying is; "if you want your employee out, start

---

[180] *Ibid supra* footnote 176

documenting" (soon enough you will have enough document to fire your employee without worry of a lawsuit). You just crushed the soul of this poor mother; shame on you.

## SUMMATION

335.    The State has failed to follow professional recommendations to address various issues with state-wide foster care crisis. It has failed to implement and execute state-wide policies to achieve the Federals Acts' mandated reasonable efforts for reunification requirements. The knowing actions and inactions of the defendant officials of the State of Massachusetts, as herein set forth, are causing Massachusetts's most vulnerable citizens, the children, who are unnecessarily separated from their parents and bounced around for long periods of time, continue to suffer irreparable injury for which there is no adequate remedy at law. Bad and imperfect parents, still have constitutionally protected right to parent.

## FIRST CAUSE OF ACTION

(Substantive Due Process Violation under the U.S. Constitution)
((Asserted by all Named Plaintiffs and Plaintiff Parent Class)

336.    Plaintiffs have a fundamental right to parent. A state that takes temporary custody of parents children assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect that interest by providing parents with necessary services for timely reunification and reasonable efforts to maintain the familial unit intact. Every moment of separation both the parent and the children are permanently harmed.

337.    The foregoing actions and inactions of Defendants Charlie Baker, Linda Spears, Marylou Sudders, and Anthony J. Benedetti, in their official capacities, constitute a failure to meet their affirmative duty to protect from harm all Named Plaintiffs, which is a substantial factor leading to, and proximate cause of, the violation of the constitutionally protected liberty and privacy interests of all Named Plaintiffs.

338.    The forgoing actions and inactions of Defendants Charlie Baker, Linda Spears, Marylou Sudders, and Anthony J. Benedetti, in their official capacities, constitute a policy, pattern, practice or custom that is inconsistent with the exercise of professional judgment and amounts to deliberate indifference to the constitutionally-protected rights and liberty and privacy interests of all Named Plaintiffs and class members.

339.    As a result, all Named Plaintiffs and class members have been, and are at risk of being, deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution.

340.    These substantive due process rights include, but are not limited to:

> a. the right to protection from unnecessary ridicule, coercive tactics, oppressive requests, and treatment of parents by DCF that is psychologically and emotionally damaging
>
> b. the right to protection from unreasonable, unnecessary or impossible requests;
>
> c. the right to services necessary to prevent prolonged separation, including but not limited to; providing drug screens at DCF's expense

when such tests are requested, appropriate monitoring and supervision, appropriate planning and services directed toward goal of reunification, offer services to cater to parents' specific needs and have alternative services as options for parents to chose from, assistance with transportation,.

d. the right to having a service plan be consistent with the purpose of the assumption of custody by DCF;

e. the right to not have children be maintained in custody longer than is necessary to accomplish the purposes to be served by taking the child into custody;

f. the right to receive care, treatment and services determined and provided through the exercise of accepted professional judgment;

g. the right to have immediate determination of the "threat" of abuse or neglect of the child can be cured or controlled by any means; and

h. the right to have children be placed in the least restrictive placement according to the ongoing need of protecting the child, with option of immediate or shortly thereafter placement of child back with the parents during the ongoing C&P if the posed "threat" of abuse or neglect to the child can be controlled;

i. the right to have meaningful visitation with their children; and

j. the right to have a social worker that will provide services to parents in accordance with the established social worker core values.

## SECOND CAUSE OF ACTION

(Violations of AACWA, CAPTA, SSA and other Acts' Requirement
for Reunification and Keeping Familial Units Intact)
(Asserted by all Named Plaintiffs and Plaintiff Parent Class)

341.    Defendants' actions and knowing inactions have deprived plaintiffs and the

members of their class of the rights conferred upon them by the Federal Acts; AACWA,

CAPTA, SSA & others, including their rights to:

a. DCF providing reasonable efforts to prevent plaintiffs' children removal

from their homes and to prevent unnecessary separation from their

parents;

b. DCF provide services to parents necessary for prompt reunification;

c. DCF provide timely and appropriate services to prevent and remedy

neglect, abuse, and dependency which may result in out-of home

placement;

d. DCF provide individualized written case plans accordance with

reasonable professional judgment developed in that contain specified

elements; timely and complete implementation of said plans by the

provision of necessary and appropriate services; and timely and complete

review of those plans; that is reunification goal centered; without reliance

on time costly appeal thereof;

e. placement in foster homes or other out-of-home placements which are

appropriate for plaintiffs' needs and which conform to nationally-

recommended standards, and appropriate foster care payments;

f. appropriate services for plaintiffs, their parents, and their foster parents to address each child's needs and to assure each child's permanent placement;

g. placements in the least restrictive, most family like settings;

h. proper care and treatment;

i. periodic judicial or administrative reviews;

j. dispositional reviews to determine future status within eighteen months after placement, and periodically thereafter;

k. services in a child welfare system with an adequate information system;

1. defendants' compliance with the AACWA, CAPTA, SSA & other Acts.

### THIRD CAUSE OF ACTION

(First, Ninth, and Fourteenth Amendments to the United States Constitution -
Right to Freedom of Association and to Family Integrity)
(Asserted by all Named Plaintiffs and Plaintiff Parent Class)

342.    Each of the foregoing allegations is incorporate as if fully set forth herein.

343.    Defendants have denied plaintiffs and members of their class their rights to freedom of association and to family integrity as guaranteed to them by the First, Ninth, and Fourteenth Amendments to the United States Constitution by: failing to place children in DCF care in close proximity to their parents; failing to provide services necessary to enable children in DCF care to remain together or to be reunified whenever appropriate; failing to place siblings in need of out- home placements in the same placements; and failing to facilitate visitation between children and parents, and children and their siblings and Grandparents.

344.    The foregoing actions and inactions of the Defendants Charlie Baker, Linda Spears, Marylou Sudders, and Anthony J. Benedetti, in their official capacities, amount to a policy, pattern, practice, or custom of failure to exercise professional judgment and of deliberate indifference to Plaintiffs' constitutional rights, and are the cause of the violation of such rights. As a result of Defendants' conduct, all Named Plaintiffs have been, and are at further risk of being, harmed and deprived of the liberty interests, privacy interests and associational rights conferred on them by the First, Ninth, and Fourteenth Amendments to the United States Constitution.

### FOURTH CAUSE OF ACTION

(Violation of Rehabilitation Act and the Americans with Disability Act)
(Asserted by all Named Plaintiffs and Plaintiff Parent Class)

345.    Each of the foregoing allegations is incorporate as if fully set forth herein.

346.    Parents with disabilities, perceived disabilities or handicaps, or other qualified individuals, are not given the same services, access to some of the DCF's services, and lack of offered options for reunification..

347.    Most parents that find themselves involved with DCF are from lower socioeconomic class express themselves with tone and speech them seems crass to the higher socioeconomic class.  Parents from such class may be less educated, present themselves as loud, rude, and even perceived as individuals with mental illness.

348.    Defendants have failed to implement and execute their own governmental policy on addressing needs of the handicap or disabled.  The plaintiff class is subjected to

ongoing discrimination with no services in place to address their special needs; absence of such services results in lack of reasonable efforts.

349.    DCF erroneous evaluations for this group of parents results in their parental rights terminated simply based on reasons of how they are perceived as individuals even though they are able to provide the basic necessities to their children as required for parental fitness.

350.    DCF fails to acknowledge that ""qualified individuals" under the ADA include those individuals: who have been successfully rehabilitated and who are no longer engaged in the illegal use of drugs; who are currently participating in a rehabilitation program and are no longer engaging in the illegal use of drugs; and who are regarded, erroneously, as illegally using drugs.  Moreover, a former *drug addict* may be protected under the ADA because the addiction may be considered a substantially limiting impairment.

351.    There is state-wide lack of accommodations and state-wide discrimination against parents who have or are perceived to have, disabilities.  State's own policy on disabilities are not being implemented and executed.  Parents do not fit the "norm", have a much higher chance of having their parental rights terminated or limited simply because they are "different".

## FIFTH CAUSE OF ACTION

(Procedural Due Process Violation under the U.S. Constitution)
(Asserted by all Named Plaintiffs and Plaintiff Parent Class)

352.    Each of the foregoing allegations is incorporate as if fully set forth herein.

353.     Defendants' actions and inactions have resulted and are continuing to result in the deprivation of the following state-law entitlements to which each Plaintiff Parent has a constitutionally protected interest, without offering the Plaintiff Parent adequate and meaningful opportunity to be heard:

      a.      The right to a jury trial;

      b.      The right to a speedy trial;

      c.      The right to a fair trial;

      d.      The right to a trial open to the public (pseudonym to be used for children); and

      e.      The right to a competent attorney if they can't afford one.

## SIXTH CAUSE OF ACTION

(Deprivation of Equal Rights Under the Law)
(Asserted by all Named Plaintiffs and Plaintiff Parent Class)

354.     Each of the foregoing allegations is incorporate as if fully set forth herein

355.     Defendants discriminated against parents, on the basis of their disability and/or perceived disabilities, and denied them in the full and equal enjoyment of its services, facilities, privileges, advantages, and accommodations, in violation of 42. U.S. code § 1981.

356.     Defendants also discriminated against parents, on the basis of their history or association, with substance abuse and denied them in the full and equal enjoyment of its services, facilities, privileges, advantages, and accommodations, in violation of 42. U.S. code §

## SEVENTH CAUSE OF ACTION

(Violation of Comprehensive Addiction and Recovery Act of 2016)

(Asserted by all Named Plaintiffs and Plaintiff Parent Class)

357.     Each of the foregoing allegations is incorporate as if fully set forth herein.

358.     DCF failed to provide reasonable efforts to parents with addiction issues, and discriminated against them based on their past or current drug use.

359.     Addicts represents a specific group of people that fall into a recognizable class, which right now has been declared by the President as part of a growing epidemic that requires attention from everyone in position to help within the State and Federal System; and has also recently been accepted as a form of disability.

360.     Parents with history of addictions warrant protection.  By their persona, mannerism, and/or symptomatology of drug seeking behavior, have been discriminated against, either by being compared to a "group" of addicts or erroneously being stigmatized as being part of that "group", even when they can provide a clean urine at any time.

361.     Such discrimination leads to preconceived judgment without giving parents with history of addiction an opportunity for a fresh start and reasonable efforts for reunification.

362.     Defendants have failed to utilize the benefit of the Comprehensive Addiction and Recovery Act, including and not limited to improving treatment for pregnant and postpartum women, building communities of recovery, and state-wide lack of inquiry if parents are family members of veterans who would have additional benefits under the act.

363.     Defendants have failed to utilize funds available though the Act of 2016, to help parents have access to statewide recovery support services that specifically address substance abuse and other services available through the act.

**EIGHT CAUSE OF ACTION**

(Legal Mal Practice Against Gene Rauhala, Tameka Grantham O'brien & Alan Levine individually and Anthony J. Benedetti on Behalf of All Others Similarly Situated)

364.     Each of the foregoing allegations is incorporate as if fully set forth herein.

365.     Defendants, (and each of them if such Class shall become feasible), had a duty to use such skill, prudence, and diligence as members of the legal profession commonly possess and exercise, in providing legal services to Plaintiffs herein.

366.     Defended erroneously advised his client, Valerie to stipulate to open adoption for her son.  As result of his advice, she has lost her parental rights and has not been able to see her son since.

367.     Defendant failed to discuss all of the options available to Valerie.  There were no discussions as to possible motions that can be filed on her behalf, nor the availability of interlocutory appeals.

368.     Gene again advised Valerie that she should stipulate to adoption as to Valerie and that she will most likely have her rights terminated if she did not stipulate.  Lowell Juvenile Court has ruled in favor of Valerie; this counsel was able to prevent her rights from being terminated.  There is lack of advocacy and competent representation for Parents' interests in Juvenile Court that is a state-wide crisis.

**NINTH CAUSE OF ACTION**

(Legal Mal Practice Against Gene Rauhala, Tameka Grantham O'brien & Alan Levine individually and Anthony J. Benedetti on Behalf of All Others Similarly Situated)

369.     Each of the foregoing allegations is incorporate as if fully set forth herein.

370.    Gene was put in charge representing Valerie who lacks higher education or the finances to seek out other representation.  Gene represented to her that she should rely on his opinion and failed to offer other possible options that are available to Valerie.

371.    Gene used his position, to coerce Valerie in making decisions that are not in her best interests.  It would have been more appropriate to refer her to another attorney if he felt that he was not competent to handle such matter in the manner that protected Valerie's interest.

## TENTH CAUSE OF ACTION

(Legal Mal Practice Against Gene Rauhala, Tameka Grantham O'brien & Alan Levine individually and Anthony J. Benedetti on Behalf of All Others Similarly Situated)

372.    Each of the foregoing allegations is incorporate as if fully set forth herein.

373.    Gene is a business in the State of Massachusetts, offering consumers legal services.  As a business he is in violation of the Consumer Protection Laws, *inter alia*, make it a violation to conduct a business unfairly or with deception.

374.    Gene failed to disclose all of the options available to Valerie, including options for motions and other interlocutory appeal efforts, that would be time costly to Gene, but possibly very valuable to Valerie.  Lack of disclosure of these options is deceptive and is a consumer violation.

## ELEVENTH CAUSE OF ACTION

(Gender Discrimination - Reserved for Discovery)

375.    Each of the foregoing allegations is incorporate as if fully set forth herein.

376.      Defendants treat fathers differently than mothers.  Fathers are not given the same

opportunity of reunifications. Placement of children with mothers are substantially

favored over fathers.

377.      When there are allegations of domestic abuse, defendants automatically see

fathers as  perpetrators of abuse; fathers have to "climb a hill" to overcome such

erroneous perception.

## TWELFTH CAUSE OF ACTION

(Discrimination Against Parents in Poverty - Reserved for Appeal)[181]

378.      Each of the foregoing allegations is incorporate as if fully set forth herein.

379.      Defendants treat addicts differently than mothers.  Fathers are not given the same

opportunity of reunifications. Placement of children with mothers are substantially

favored over fathers.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Parents respectfully request that this Honorable Court:

a. Assert jurisdiction over this action;

b. Order that Plaintiff Parents may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

c. Declare unconstitutional and unlawful pursuant to Rule 57 of the Federal Rules of Civil Procedure:

i. Defendants' violation of Plaintiff Parents' substantive right to be free from harm under the due process clause of the Fourteenth Amendment to the United States Constitution;

ii. Defendants' violation of Plaintiff Parents' rights under the First, Ninth, and Fourteenth Amendments to the United States Constitution;

---

[181] A class that is not recognized, but should be, as the discrimination against the poor (lower socioeconomic class) is real and prevalent.

iii. Defendants' violation of Plaintiff Parents' rights under the AACWA, CAPTA, SSA & others; and

iv. Defendants' violation of Plaintiff Parents' right for equal protection under the law

d. Permanently enjoin Defendants from subjecting Plaintiff Parents to practices that violate their rights.

e. Order appropriate remedial relief to ensure Defendants' future compliance with their legal obligations to Plaintiff Parents, including, but not limited to, the following:

i. **Escrow Account**. Establishment of Commonwealth Funded Escrow Account, maintained by Court Appointed Receiver

ii. **Separation of Power**. Executive branch shall issue an order immediately establishing the Office of the Parent Advocate ("OPA"), which shall be placed in charge of collecting data on behalf of the parents, including establishing an online intake system for parents to file complaints. Executive branch shall also establish Department of Parents Services ("DPS"). This department shall train and make available parent social workers, whose primary goal is to help and advocate for parents.

iii. **Education/Training.** DCF shall develop and implement educational qualifications and a mandatory comprehensive pre-service and in-service training program for caseworkers and supervisors based on standards for acceptable management of a  child welfare system with amendments reflecting the new data collected by OPA.

iv. **Availability of Necessary Resources for the Placement of Children and Services for Children and Parents.** An assessment shall be conducted by qualified professionals to determine the need for additional services for parents to facilitate goal of reunification, including the need for family preservation services (including in-home services to helps parents with disabilities or other mental or behavioral needs), wraparound services, reunification services, and independent living services. Defendants shall take the steps necessary to develop these services and placements according to the assessment and the time frames it provides;

iv. **Implement Reunification Efforts** DCF workers shall visit parents frequently in their home, and make on the spot decisions whether the child can immediately be placed with the parent to avoid prolonged separation (analogous to emergency removal), and initiate in-home services to prevent future separation.

v. **Child-Parent, Grandparent and Sibling Visitation.** DCF shall develop and

implement policies providing for adequate visitation between parents and children, grandparents and children, and siblings of children whom have been removed into foster care; Defendants shall develop and implement policies, which adequately track reasonable efforts made to preserve visitation rights intact.

vi. **Case and Service Planning.** DCF shall take necessary action to provide adequate and timely case plans parents, with the goal to be refocused on reunification.

vii. **Quality Assurance/Data.** DCF shall ensure that it has a quality assurance ("QA") system consistent with the standards of the COA and CWLA that is capable of measuring the quality of services provided to parents that have children in DCF custody;

viii. **Contract Monitoring and Performance-Based Monitoring.** DCF shall ensure that an adequately staffed and trained contract monitoring unit is created within the state's central office for purposes of overseeing and managing the purchased services for parents until DPA is established; DCF shall develop and implement a performance-based contracting scheme with its private vendors to ensure necessary services are being provided to parents in line with reunification goals;

ix. **Monitoring/Enforcement.** The provisions of the Court order entered pursuant to Fed. R. Civ. P. 65(d) shall be monitored by a neutral expert monitor appointed by the Court. In addition, the Court shall have continuing jurisdiction to oversee compliance with that order.

f. Award to Plaintiff Parents the reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees,
pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988, and Federal Rules of Civil Procedure 23(e) and (h); and

g. Grant such other and/or further equitable relief as the Court deems just, necessary and proper to protect Plaintiff Parents from further harm by

Respectfully Submitted,
By:

_____

Ilya Liviz, *Esq.*
JURYRIGHTSFORPARENTS.com
200 Central St., No.1
Lowell, MA 01852

Dated: 01/10/2018

*Valerie S., et al. v. Charlie Baker, et al.* (2018), Page. **123** of **125**

1-(978)-606-5326
ilya.liviz@gmail.com
B.B.O.# 686409

**"Dedicated to my mom, Anna Liviz M.D., D.D.S.; love you mom!"**

**ADDENDUM**

*Adoption of Jenny*, 477 Mass. 1108, 91 Mass. App.Ct.1128, 86 N.E.3d 511
(Table)(2017)(Supreme Judicial Court Appellate Review Denied)

91 Mass.App.Ct. 1128
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
Appeals Court of Massachusetts.

ADOPTION OF JENNY.[1]

16-P-1330
|
Entered: June 16, 2017.

By the Court (Agnes, Massing & Lemire, JJ.[2])

MEMORANDUM AND ORDER PURSUANT TO RULE 1:28

**\*1**  The mother appeals from a decision by a judge of the Juvenile Court, which found her unfit to parent the subject child and terminated her parental rights.[3] Specifically, the mother contends that the trial judge's findings do not support his conclusion of parental unfitness, and that the termination of the mother's parental rights was not in the child's best interests. We affirm.

Background. After trial, the judge issued 724 individual findings of fact, and an additional 121 findings after a subsequent hearing. The mother does not contend that any of these findings of fact lack support in the evidence that was before the judge. Here, we summarize and relate only those facts pertinent to the mother's claims, reserving certain facts for further discussion below.

1. The mother. The mother was born in Florida and lived in Honduras until her early adult years. She moved to Massachusetts sometime in 2004. She primarily speaks Spanish and has a limited understanding of English. She has been married once previously but is now divorced. She currently resides in Somerville.

The mother has been diagnosed with a number of mental health problems, including major depressive disorder, borderline personality disorder, and posttraumatic stress disorder. She was hospitalized at least three times in relation to these conditions. At least twice, the hospitalizations occurred after the mother had undergone a period of stress.[4]

The mother also has a history of relationships involving severe conflict, including domestic violence, with the people in her life. She has had at least five restraining orders issued against her, two of which were still in effect at the time of the trial. Several of these restraining orders were obtained by persons who the mother was initially friends with, until the friendships soured.[5] One such incident occurred when the mother and a friend attempted to follow the father after he left the mother's apartment. The mother brought the child, who was seven months old at the time, in the friend's car without a car seat. A physical fight ensued between the mother and the friend, in the child's presence, until the mother took the child and exited the car. See note 4, supra.

**\*2**  2. The child. The child was born in 2010. Shortly after her birth, the child began to have seizures. She was initially diagnosed with a seizure disorder and prescribed medication. When the child was approximately two years old, she was diagnosed with nephrotic syndrome, which is a chronic kidney condition characterized by relapse and remission, and requires constant monitoring. Left untreated, nephrotic syndrome can cause severe harm to the kidneys and can, in

certain cases, become fatal. Caring for a child with nephrotic syndrome requires close attention to her symptoms, as well as "dipstick" testing of urine to monitor protein levels. The dipstick testing must be carefully done and charted to ensure accurate monitoring of the child's condition. If a caregiver misses signs of relapse, it will take longer to achieve remission, and could require a hospital stay. Thus, a caregiver needs to be vigilant to any signs of illness, be able to administer medications correctly, and be able to schedule multiple medical appointments with medical professionals.

3. Involvement of Department of Children and Families (DCF). There have been approximately sixteen G. L. c. 119, § 51A, reports (51A reports) filed since 2010 with respect to the mother and the child, twelve of which were screened-in by DCF. Two of the 51A reports were filed in response to the incident detailed above, when the mother brought the child into a car without a proper car seat and fought with the driver. Most of the remaining reports were filed either as a result of reports of loud arguing between the mother and the father at the mother's apartment, or in response to the mother calling the police or 911 in relation to the child's medical condition.

Two 51A reports were also filed in response to an incident that occurred in April, 2011. An ambulance and paramedics were dispatched to the mother's apartment in response to the mother's 911 call that the child was not breathing. Upon arriving, a paramedic observed the child with blood on her face and shirt, and exhibiting what the paramedic believed to be postseizure symptoms. The mother was very angry, yelling at the paramedics and refusing to allow them to examine the child. The mother continued to yell and swear at the paramedics as she accompanied the child into the ambulance. During the ambulance ride, the mother held the child on her lap in order to comfort her, rather than having the child restrained. The mother continued to argue with one of the paramedics, apparently over the decision to transport the child to Massachusetts General Hospital in Boston instead of a hospital in Everett. During the ride, the mother did not have a firm hold on the child due to her constant turning around to yell at the paramedic, and the other paramedic had to repeatedly ask the mother to pay attention to the child. At one point the mother became upset and "tossed" the child away from her, forcing the paramedic to catch her before she hit the floor or any equipment. As a result of this incident, the mother was later arrested and charged with assault and battery on the child.

The child has been removed from the mother's care by DCF three times: the first time in May, 2010; the second time in March, 2011; and the third time in April, 2011, after the ambulance incident. The child has remained in DCF custody since April, 2011, and first lived with a foster parent before being placed with the preadoptive parents.

Discussion. We review the decision of the trial judge to determine whether there was any abuse of discretion or error of law. Adoption of Hugo, 428 Mass. 219, 225 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999). We also review findings of fact under the familiar "clearly erroneous" standard. See Adoption of Adam, 23 Mass. App. Ct. 922, 924 (1986). In doing so, we grant substantial deference to the judge's decision, because a "judge who hears the evidence, observes the parties, and is most familiar with the circumstances remains in the best position to make the judgment [regarding fitness]." Guardianship of Estelle, 70 Mass. App. Ct. 575, 579 (2007).

*3  1. Unfitness. "The interest of parents in their relationship with their children is fundamental, and constitutionally protected." Petition of the Dept. of Public Welfare to Dispense with Consent to Adoption, 383 Mass. 573, 587 (1981) (Department of Pub. Welfare). A State's intervention into a family is only justified if the parents "have grievous shortcomings or handicaps that would put the child's welfare in the family milieu much at hazard." Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 646 (1975) (New England Home).

"[T]he term 'unfitness' signifies something more than a standard by which we measure the limits of acceptable parental conduct"; it is a standard that we use "to measure the circumstances within a family as [those circumstances] affect the child's welfare." Department of Pub. Welfare, supra at 589. It requires careful consideration, reflecting the unique facts present in each case, of the capacity of the parents to care for the child. See Freeman v. Chaplic, 388 Mass. 398, 404-405

(1983). DCF has the burden of proving parental unfitness by clear and convincing evidence.[6] Adoption of Lorna, 46 Mass. App. Ct. 134, 139 (1999).

The welfare of the child is the most important consideration when determining parental fitness. Department of Pub. Welfare, supra. "[T]he critical question is whether the [biological] parents are currently fit to further the welfare and best interests of the child." Bezio v. Patenaude, 381 Mass. 563, 576 (1980). The parental unfitness test and the best interests of the child test are not mutually exclusive, but rather "reflect different degrees of emphasis on the same factors." New England Home, supra at 641.

"A mental disorder is relevant where 'it affects the parents' capacity to assume parental responsibility, and ability to deal with a child's special needs.' " Adoption of Rhona, 63 Mass. App. Ct. 117, 125 (2005), quoting from Adoption of Frederick, 405 Mass. 1, 9 (1989). Consideration of a parent's mental condition is also a statutory factor in termination cases. See G. L. c. 210, § 3(c)(xii). A parent's mental illness may support a finding of unfitness when there is evidence that the mental illness interferes with the parent's ability to provide care for the child. See Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption, 392 Mass. 696, 701 (1984); Adoption of Eduardo, 57 Mass. App. Ct. 278, 282-283 (2003).

The mother maintains that the judge's findings of fact do not support his determination that she is unfit,[7] and that the judge's determination that her mental illness created a significant risk of harm to the child was not sufficient to support a determination of unfitness. Specifically, the judge found that "[t]here is no dispute that [the mother] suffers from a serious, long-standing mental disorder" that "interferes with her ability to keep [the child] safe and to work with professionals who provide necessary services to [the child]." He found that uncontrolled, the mother's mental illness led to "impulsive, unnecessary confrontations, including confrontations with persons who are involved in caring for [the child] or who respond to requests for assistance, such as her DCF caseworkers, emergency medical technicians, police officers, and medical providers." Specifically, the judge concluded that the mother's mental illness and the attendant confrontations led to a serious risk of harm to the child on two occasions: the 2010 incident where the child was placed in a car without a proper car seat and was present when the mother engaged in a physical confrontation with the driver, and the 2011 ambulance ride where the mother failed to pay proper attention to the child, failed to securely hold the child in her lap, and "either recklessly or intentionally caused [the child] to be tossed away from her."

**\*4** The judge also determined that the mother's mental illness "caused her to have grave problems in her personal life." These problems included "highly dysfunctional" personal relationships, multiple restraining orders filed against her, multiple arrests and incarcerations, and multiple hospital stays. The judge initially believed that with proper diagnosis and treatment, the mother's mental condition would improve to a point where she would be able to effectively parent the child. However, after being treated for nearly a year, the judge found that despite some improvement, the mother continued to exhibit the same tendencies as she had before her treatment changed. This led the judge to conclude that the mother's mental illness caused her to be unfit and unable to care for the child. We discern no error in this conclusion.

Contrary to the mother's assertions, the record is replete with findings that support the judge's unfitness determination. The judge's findings are detailed, thorough, and show that he gave the case his close attention.[8] See Custody of a Minor (No. 1), 377 Mass. 876, 886 (1979). The mother's argument that the judge's findings are insufficient to support his conclusions is belied by the record and is largely based on the fact that the mother weighs the judge's findings differently than the judge did. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Care & Protection of Olga, 57 Mass. App. Ct. 821, 824 n.3 (2003), quoting from Anderson v. Bessemer City, 470 U.S. 564, 573-574 (1985). The judge is not required to view the evidence from the mother's perspective.[9] See Care & Protection of Three Minors, 392 Mass. 704, 711 (1984).

2. <u>Termination</u>. After a finding of unfitness, a "judge must determine whether the parent's unfitness is such that it would be in the child's best interests to end all legal relations between parent and child." <u>Adoption of Nancy</u>, 443 Mass. 512, 515 (2005). In order to dispense with a parent's consent to adoption, the unfitness element must be so probative and persuasive that it can serve as a predicate for finding that the unfitness will continue undiminished into the future, affecting the welfare of the child. See <u>Adoption of Carlos</u>, 413 Mass. 339, 350 (1992). While consideration of the reasonable likelihood that a parent's unfitness at the time of trial may only be temporary is appropriate, such a prediction must rely "upon credible evidence rather than mere hypothesis or faint hope." <u>Adoption of Serge</u>, 52 Mass. App. Ct. 1, 7 (2001) (quotation omitted). See <u>Adoption of Carlos</u>, <u>supra</u>.

**\*5** As noted above, the judge found that the evidence presented during the original trial clearly and convincingly supported the determination that the mother was currently unfit. At the subsequent hearing, the judge found that despite a revised diagnosis and further treatment, the mother "continues to struggle unsuccessfully to control her mental disorder." The judge noted the similarities between the mother's 2012 psychiatric hospitalization and her most recent hospitalization in 2014, and concluded that "despite ongoing treatment [the mother] has not stabilized to the point that [the child] safely may be returned to her care and custody." Based on this finding, the judge determined that the mother remains unfit to care for the child and that her unfitness is likely to continue indefinitely into the future. There was no error in the judge's conclusions.

In this case, the record contains numerous findings in which the mother's mental illness presented a substantial risk of harm to the child, especially when the mother was under severe stress. The supplemental findings of fact demonstrate clearly and convincingly that that risk has not abated despite the mother's further treatment. In addition, the judge noted in his findings that the preadoptive parents have managed the child's medical condition well enough to the point where her condition is monitored largely via electronic mail messages with the child's doctor. The judge found that the mother was not capable of such organization and management, which risked disruption to the child's life, as poor management of her condition would lead to frequent medical appointments, emergency room visits, and hospitalizations. It has now been more than six years since the child was placed in DCF custody. At some point, the judge must say "enough," and act in the best interests of the child. <u>Adoption of Carlos</u>, <u>supra</u> at 242. See <u>Adoption of Ilona</u>, 459 Mass. 53, 60 (2011) ("Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period"). Therefore, there was no error in the termination of the mother's parental rights. [10]

<u>Decree affirmed.</u>

**All Citations**

91 Mass.App.Ct. 1128, 86 N.E.3d 511 (Table), 2017 WL 2605616

**Footnotes**

1    A pseudonym.
2    The panelists are listed in order of seniority.
3    The father has not appealed from the termination of his parental rights.
4    In 2012, the mother alleged that she was "locked in a basement" and that the child's foster parents were trying to kill the child; however, the hospital's admission notes stated that "[i]t is possible that [the mother's] distress and degree of delusion is worsening, possibly in relation to the approaching date at which her daughter may become available for adoption." In 2014, the mother was hospitalized to undergo a competency evaluation prior to a trial for criminal charges related to incidents with the father, and made similar claims about being kidnapped and raped before her hospitalization.
5    The mother's friendship with a former roommate deteriorated when the mother accused her of wanting to buy the child from the mother and sell the child. A physical altercation later occurred in the friend's car that led to criminal charges against the mother.

6    Clear and convincing evidence is evidence that is "strong, positive and free from doubt." <u>Stone</u> v. <u>Essex County Newspapers</u>, 367 Mass. 849, 871 (1975) (quotation omitted).

7    Despite the moral overtones of the statutory term "unfit," the judge's decision is not a moral judgment; nor is it a determination that the mother does not love the child. The question for the judge is "whether the parent's deficiencies 'place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child.' " <u>Adoption of Olivette</u>, 79 Mass. App. Ct. 141, 157 (2011), quoting from <u>Care & Protection of Bruce</u>, 44 Mass. App. Ct. 758, 761 (1998).

8    Indeed, the judge is to be commended not only for his effort in producing the lengthy and detailed decisions, which included some 845 findings of fact and extensive rulings of law, but also for his willingness to provide the mother with additional time to correct her issues and an additional opportunity to be heard prior to his ultimate determination that the mother is unfit.

9    Nor it is erroneous, as the mother contends, for the judge to find that she was generally able to meet the child's medical needs while also concluding that she was unable to provide proper care for the child when her mental condition deteriorated. The record demonstrates that the mother, while able to provide adequate care for the child during stress-free periods, would quickly deteriorate in stressful situations, and it was then that the judge found the child was at the greatest risk of harm. This finding is supported by the evidence. In addition, the child's nephrotic syndrome was diagnosed after her removal from the mother's care, and the judge found that the mother was not organized or attentive enough to manage the child's medical condition without significant disruption to the child's life.

10   In a footnote to her brief, the child asks us to remand this matter in order for the judge's visitation order to be reviewed, pursuant to the adoptive parents' motion to intervene. As no appeal was taken from the denial of that motion, the issue is not properly before us, and we make no determination on it here. To the extent that the child and the adoptive parents take issue with the judge's visitation order, that matter is best revisited in the Juvenile Court in the future.

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.