## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**VALERIE S**., parent of three children,    )      CASE NO. <u>1:18-cv-10031-LTS</u>
**MICHAEL & CARLIE**, husband and wife, )
and parents of three children,       )
**CHRISTINA G**., parent of three children,  )
**JENNIFER L**., parent of three children,  )
**NICOLE L**., parent of three children,   )
individually & on behalf of all others    )
similarly situated,    *Plaintiffs*,    )
v.                     )
**CHARLIE BAKER**, in his official     )
capacity as Governor of the        )
Commonwealth of Massachusetts,    )
**LINDA S. SPEARS**, in her official    )
capacity as Commissioner of the     )
Massachusetts Department of       )
Children and Families,         )
**MARYLOU SUDDERS**, in her     )
official capacity as Secretary of the   )
Massachusetts Executive Office of   )
Health & Human Services,       )
**ANTHONY J. BENEDETTI**, in his   )
official capacity as Chief Counsel for  )
the Committee for Public Counsel Services )
**GENE RAUHALA, TAMEKA**    )
**GRANTHAM O'BRIEN** & **ALAN**  )
**LEVINE** individually & on behalf of all )
others similarly situated,  *Defendants*. )

*"For parents, by parents, united as one;*
*protected by the* **U.S. Constitution**, *which*
*represents life, liberty and justice for all!"*
                  *-Ilya Liviz J.D. M.Ed.*

a JURYRIGHTSFORPARENTS.COM
            production

```
      ( _ )   ["Moo"] 1
      | o o |   /
    /--------( 0  0) /
   / ||      ||
  * ||------ ||
   ^^      ^^
```

**[AMENDED]**
**CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF U.S. CONSTITUTION**
**AND FEDERAL LAWS WITH REQUEST**
**FOR INJUNCTIVE RELIEF AND ORDER**
**REQUIRING ESTABLISHMENT OF THE**
**OFFICE OF THE PARENT ADVOCATE**[2]
**AND OTHER REUNIFICATION RELIEF**
**WITH REQUEST FOR A <u>JURY TRIAL</u>**

---

[1] Is this a cow or a bull; and should it matter if it can't produce milk to determine the animal's fitness? A token of our constitutionally protected freedom of speech, expression, and right to petition for redress to this Honorable Court, to enforce our constitutionally protected fundamental right to be "not-so-perfect" parents.

[2] DCF is very important and we thank them for their hard efforts. They are consistently faced with having to choose between protecting a child or encroaching on parent's fundamental right to rear their children; a difficult balancing act that they lack the ability to make because of inherent conflict of interests. Parental rights and interests concerning child's safety should be kept separate to prevent abuse of power. *See* Doctrine of Separation of Power (division of government helps to minimize abuse of power). SOLUTION: Establishment of [Proposed] Office of the Parent Advocate ("OPA") to access, *inter alia*, state-wide deficiency in; services for parents, timely & meaningful visitations, reasonable reunification efforts, and most importantly data to direct legislative and regulatory changes to advance parents' interests, *exempli gratia*, support promulgation of [Proposed] Department of Parents Services ("DPS") to help with reunification efforts, less wasting of State and Federal financial resources, and promote public confidence by eliminating conflict of interests & unintended abuse of power that comes with it.

"On behalf of my community, we thank members of congress and the president for their saving efforts to enact into law the Family First Prevention Services Act, by promulgation of Bipartisan Budget Act of 2018, *inter alia*, a blatant reminder to the states' child welfare services of their duty to protect our most sacred right, by directing them to provide services necessary for stabilization and preservation of our society's most basic unit; *family*!"

*-Ilya Liviz J.D. M.Ed.*

## TABLE OF CONTENTS AND AUTHORITIES

ABBREVIATIONS, ACRONYMS & ASSOCIATED CONCEPTS ......................................... 14

SYNOPSIS.................................................................................................................... 14

SUMMARY OF REAL NEWS ...................................................................................... 15

SUMMARY OF SOLUTION ......................................................................................... 17

LAW MISNOMER NOTICE ......................................................................................... 23

ADOPTION BY REFERENCE NOTICE ....................................................................... 23

JURISDICITON, VENUE AND ASSIGNMENT ........................................................... 23

STANDING ................................................................................................................... 24

ABSTENTION DOCTRINE .......................................................................................... 25

ABROGATION OF SOVEREIGN IMMUNITY ............................................................ 25

PARENTS HAVE PRIVATE RIGHTS ENFORCEABLE UNDER § 1983 FOR VIOLATIONS
OF FEDERAL LAW ..................................................................................................... 28

PRESENTMENT OF NOVEL CLAIMS OF FIRST IMPRESSION ............................... 30

    A.    DCF Scope of Duty Violates "Fundamental Fairness" of Due Process Clause .. 30

    B.    DCF Violates Parents' Right to Privacy ................................................. 32

    C.    Care and Protection Proceedings Quasi Criminal Nature Implicate Fifth
Amendment  Protection Against Self-Incrimination........................................ 34

    D.    [Proposed] Valerie Warning for Right Against Compelled Self-Incrimination.. 35

    E.    [Proposed] Department of Parents Services ("DPS") Offers Quick Solution ..... 36

    F.    72-Hour Hearings Should Be Mandatory.......................................................... 37

PARTIES ...................................................................................................................... 38

    A.    Plaintiffs ...................................................................................... 38

    B.    Defendants................................................................................... 39

THE NAMED PLAINTIFFS ...................................................................... 41

    A.    Valerie S. ................................................................................. 41

    B.    Michael & Carly. ..................................................................... 50

    C.    Christina G. ............................................................................. 58

    D.    Jennifer L. .............................................................................. 64

    E.    Nicole G. ................................................................................ 68

PLAINTIFF COLLECTIVELY ............................................................... 72

DEFENDANTS COLLECTIVELY ........................................................... 73

CLASS ACTION GENERAL ALLEGATIONS & LANDSCAPE .............. 74

I.      OPPOSITION TO CONCURENT FILLING OF CHILDRENS CLASS ACTION 74

II.     GENERAL ALLEGATIONS ........................................................ 79

III.    FEDERAL STATUTORY FRAMEWORK ...................................... 81

    A.    Bipartisan Budget Act of 2018 ("BBA") ................................... 81

    B.    Family First Prevention Services Act ("FFPSA") ...................... 82

    C.    Child and Family Services Improvement and Innovation Act of 2011 ("CFSA") 84

    D.    Fostering Connections to Success and Increasing Adoptions Act of 2008 (" FCSAA") ............................................................................ 85

    E.    Adoption Assistance and Child Welfare Act of 1980 ("AACWA") .................. 87

    F.    Child Abuse Prevention and Treatment and Adoption Reform Act ("CAPTA") 89

    G.    Social Security Act ("SSA") .................................................... 91

    H.    Adoption and Safe Families Act of 1997 ("ASFA") ................... 93

    I.    Rehabilitation Act of 1973 ("Section 504") .............................. 93

J.    Americans with Disability Act of 1990 ("ADA") ................................................ 94

K.    Helping Families Save Their Homes Act of 2009 ............................................... 95

L.    Comprehensive Addiction and Recovery Act of 2016........................................ 96

M.    Protection and Advocacy For Individuals with Mental Illness Act ................... 97

N.    Civil Rights Act of 1964 .................................................................................... 98

IV.   MASSACHUSETTS DCF LANDSCAPE ..................................................... 99

A.    Department of Children and Families ("DCF")................................................. 99

B.    Care and Protection Proceedings ("C&P")..................................................... 101

C.    Grandparent Visitation Rights........................................................................ 108

D.    Massachusetts Anti-Discrimination Laws and Regulations............................ 110

E.    Foster Care Review Unit ................................................................................ 110

F.    Other DCF Statistics....................................................................................... 113

V.    STATUE AUDITOR'S OFFICIAL AUDIT REPORT OF 2017............................ 115

A.    DCF Does Not Effectively Identify and Investigate Serious Bodily Injury to

Children ................................................................................................................... 116

B.    DCF Does Not Report All Critical Incidents To OCA ..................................... 117

C.    DCF Does Not Report All Abuse, Neglect, and Sexual Abuse to DA Offices. 118

D.    DCF Does Not Timely Complete and Submit Fatality Review Report to OCA119

VI.   DCF VIOLATION CAUSE IRREPARABLE HARM TO PARENTS ................. 119

A.    Child Welfare and Office of the Child Advocate Outcomes............................ 119

B.    DCF Misappropriates Federal Funding for Foster Care and Other Services .... 121

C.    There Are Lack Of Services in Place To Prevent Child Removal ................... 123

D.    DCF Discriminates Against Parents with Disabilities and Prior Involvements 125

E.    DCF violate Parents Privacy/HIPPA Rights ...................................... 127

**VII.    DEFENDANTS FAILED TO IMPLEMENT AND EXECUTE THEIR OWN POLICIES & REGULATIONS** ............................................. 128

**VIII.    DCF SOCIAL WORKERS DO NOT ADVOCATE FOR PARENTS** ................... 133

A.    DCF Social Workers are Unsuitable to Help Parents ......................... 133

B.    Parents are Separated From Their Children Unnecessarily ............... 135

C.    DCF Utilizes Unconstitutional Supervised Parenting ....................... 136

D.    DCF Required Therapists are Used Against Parents ......................... 138

E.    DCF Does Not Offer Beneficial Services to Parents ........................ 139

**IX.    COMMONWEALTH IS NOT PROPERLY IMPLEMENTING AND EXECUTING THEIR POLICY OF REUNIFICATION** ............................. 140

**X.    CPCS AND ITS CAFL DIVISION DOES NOT IMPLEMENT AND EXECUTE POLICY TO PROVIDE COMPETENT REPRESENTATION TO PARENTS** .............. 142

A.    Role of CPCS ........................................................................ 142

B.    CAFL Failed to Provide Competent Legal Representation for Parents ............ 145

C.    Failed to Advocate for System improvements ................................ 147

D.    Deficient Appellate Efforts ..................................................... 151

E.    Adoption of Jenny ................................................................ 154

**SUMMATION** .................................................................... 157

**FIRST CAUSE OF ACTION** ..................................................... 158

**SECOND CAUSE OF ACTION** .................................................. 160

**THIRD CAUSE OF ACTION** .................................................... 162

**FOURTH CAUSE OF ACTION** .................................................. 163

**FIFTH CAUSE OF ACTION** ..................................................... 164

**SIXTH CAUSE OF ACTION** ..................................................... 165

**SEVENTH CAUSE OF ACTION** ........................................................................ 166

**EIGHT CAUSE OF ACTION** ............................................................................ 167

**NINTH CAUSE OF ACTION** ............................................................................ 168

**TENTH CAUSE OF ACTION** ........................................................................... 169

**ELEVENTH CAUSE OF ACTION** .................................................................... 171

**TWELFTH CAUSE OF ACTION** ..................................................................... 172

**THIRTEENTH CAUSE OF ACTION** ............................................................... 172

**FOURTEENTH CAUSE OF ACTION** .............................................................. 173

**FIVTEENTH CAUSE OF ACTION** .................................................................. 174

**SIXTEENTH CAUSE OF ACTION** ................................................................... 174

**SEVENTEENTH CAUSE OF ACTION** ............................................................ 175

**EIGHTTEENTH CAUSE OF ACTION** ............................................................ 176

**PRAYER FOR RELIEF** .................................................................................... 177

**ADDENDUM** ..................................................................................................... 181

# **AUTHORITIES**

## Cases

*Adoption of George*, 27 Mass. App. Ct. 265, 274 (1989) ........................................................ 125

*Adoption of Gregory*, 23 Mass. App. Ct. 948, 501 N.E.2d 1179 (1986) .................................. 105

*Adoption of Jenny*, 477 Mass. 1108, 91 Mass.App.Ct.1128, 86 N.E.3d 511 (Table)(2017) ..... 154

*Adoption of Jenny*, at note 176, 91 Mass.App.Ct.1128, 86 N.E.3d 511 (2017)........................ 156

*Adoption of Katharine*, 42 Mass.App.Ct.25, 674 N.E.2d 256 (1997) ....................................... 105

*Adoption of Yolane*, 92 Mass.App.Ct.1116 (2017)................................................................... 95

*Blixt v. Blixt*, 437 Mass. 649, 774 N.E.2d 1052 (2002) ............................................................ 108

*Care & Protection of Stephen*, 401 Mass. 144, 514 N.E.2d 1087 (1987) ................................. 103

*Care and Protection of Benjamin*, 403 Mass. 24, 25, 525 N.E.2d 418, 419 (1988).................. 102

*Care and Protection of Erin*, 443 Mass. 567, 823 N.E.2d 356 at 362 (2005) ........................... 104

*Care and Protection of Laura*, 414 Mass. 788, 610 N.E.2d 934, (1993) .................................. 107

*Care and Protection of Minor*, 476 Mass. 1015 (2017) ............................................................ 148

*Care and Protection of Walt*, 478 Mass. 212, 84 N.E.3d 803 (2017)................................ 124, 141

*Chace v. Curran*, 71 Mass. App. Ct. 258, 260 n.4 (2008) ......................................................... 95

*City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ............................................................. 24

*Connor B. ex rel. Vigurs v. Patrick*, D.Mass.2011, 771 F.Supp.2d 142.................................... 101

*Connor B. v. Patrick*, 771 F.Supp.2d at 172 (D. Mass. 2011) ................................................... 29

*County of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991)...................................................... 25

*Custody of a Minor* (No. 2), 378 Mass. 712, 722, 393 N.E.2d 379, 385 (1979) ....................... 102

*Custody of a Minor*, 383 Mass. 595, 600, 421 N.E.2d 63, 66 (1981) ....................................... 102

*Custody of a Minor*, 389 Mass. 755, 766, 452 N.E.2d 483, 490 (1983)..................................... 102

*Ex Parte Young*, 209 U.S. 123 (1908) ....................................................................................... 26

*Gonzaga University v. Doe*, 536 U.S. 273 (2002) ...................................................................... 28

*Gore v. Daniel O'Connell's Sons, Inc.*, 461 N.E.2d 256, 17 Mass. App .Ct. 645 (1984)............. 76

*Ilya Liviz & another vs. Supreme Judicial Court of The Commonwealth of Massachusetts*, CA
   1:17-cv-12345 (D. Mass. 2017) ......................................................................................... 81

*In re Adoption of Gregory*, 434 Mass. 117, 747 N.E.2d 120, (2001) ................................... 95, 110

*In re Adoption of Meaghan*, 461 Mass. 1006, 961 N.E.2d 110 (2012)....................................... 74

In re Adoption of Nancy, 443 Mass 512, 822 N.E.2d 1179 (2005).............................................. 74

*In re Adoption of Nancy*, 443 Mass. 512, 822 N.E. 2d 1179 (2005) .......................................... 150

*In re Care and Protection of Amalie*, 69 Mass. App. Ct. 813, 872 N.E.2d 741 (2007), review
   denied,450 Mass. 1101, 875 N.E.2d 862 (2007)............................................................... 106

*In Re Care and Protection of Jayden & others*, docket No. SJ-2017-0400............................... 148

*In Re Erin*, 443 Mass. 567, N.E.2d 356 (2005) ...................................................................... 106

*In re Jamison*, 4 N.E.3d 889, 467 Mass. 269 (2014) ............................................................... 109

*In re Lilian*, 445 Mass. 333, 837 N.E.2d 269, (2005)............................................................... 103

*In Re: Care & Protection of Child*, docket SJC-12403 & SJ-2017-0103................................... 148

*In Re: Care & Protection of Thailee*, Docket No. 15CP0107LO ................................................ 123

*In Re: Care & Protection of Thailee*, docket No. SJ-2017-0379 ................................................ 148

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992) ...................................................... 24

*McGuiness v. Cotter*, 412 Mass. 617, 591 N.E.2d 659 (1992) ...................................................... 77

*Middlesex County Ethics Commission v. Garden State Bar Association*, 457 U.S. 423, 432 (1982) ................................................................................................................................... 25

*New Orleans Public Ser., Inc. v. Council of City of new Orleans*, 491 U.S. 350, 368 (1989) ..... 25

*Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 127–29 (1st Cir. 2003) ...................................... 27

*of a Minor (No. 2)*, 22 Mass.App.Ct. 91, 491 N.E.2d 283 (1986) ............................................ 106

*Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 421 N.E.2d 28 (1981) ..................................................................................................................... 105

*Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 328 N.E.2d 854 (1975) ................................................................................. 106

*Rossi v. Gemma*, 489 F. 3d 26, 35 (1st Cir. 2007) ...................................................................... 25

*Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599, at note 7 (1982) ............... 31

*Santosky v. Kramer*; 455 U.S. 745 (1982) ................................................................................ 103

*Shapiro v. City of Worcester*, 464 Mass. 261, 982 N.E.2d 516 (2013) ................................. 27, 78

*Shell Oil v. Noel*, 608 F.2d 208, 211 (1st Cir. 1979) .................................................................... 26

*Sutton v. United Air Lines, Inc*., 527 U.S. 471 (1999) ............................................................... 175

*Tennesse v. Lane*, 541 U.S. 509, 522-23 (2004) ........................................................................ 27

*Whitney v. Worcester*, 373 Mass. 208, 217, 366 N.E.2d 1210 (1977) ........................................ 27

*Youngberg v. Romeo*, 457 U.S. 307, 102, S.Ct. 2452, 73 L.Ed.2d 28 (1982) ............................. 29

*Younger v. Harris*, 401 U.S. 37 (1971) ...................................................................................... 25

## Statutes

22 U.S.C. §§ 622(b)(8)(A)(iii)(I) & (A)(iv) ................................................................................ 29

28 U.S.C. § 1391(b) ................................................................................................................ 24

28 U.S.C. § 1920 ................................................................................................................... 179

28 U.S.C. §§ 1331 ................................................................................................................... 23

28 U.S.C. §§ 2201 & 2201 ....................................................................................................... 23

29 U.S. C. § 794(b)(1)(A) & (B) ............................................................................................... 94

29 U.S.C. § 794(a) ................................................................................................................... 94

42 U.S.C. § 10801 et seq.......................................................................................................... 98

42 U.S.C. § 10804 ................................................................................................................... 98

42 U.S.C. § 11301 et seq.......................................................................................................... 95

42 U.S.C. § 12101 et seq.......................................................................................................... 94

42 U.S.C. § 12132 ............................................................................................................ 27, 175

42 U.S.C. § 12202 ................................................................................................................... 27

42 U.S.C. § 1397 et seq........................................................................................................... 92

42 U.S.C. § 1397(3) ................................................................................................................ 92

42 U.S.C. § 1981 .................................................................................................... 168

42 U.S.C. § 1983 ................................................................................................. 23, 28

42 U.S.C. § 1988 ................................................................................................. 24, 179

42 U.S.C. § 2000d-7 .................................................................................................. 27

42 U.S.C. § 290ee-2 .................................................................................................. 97

42 U.S.C. § 290ee-2(d)(1) .......................................................................................... 97

42 U.S.C. § 622(b) ..................................................................................................... 84

42 U.S.C. § 622(b)(15)(A)(ii) ............................................................................... 84, 162

42 U.S.C. § 622(b)(15)(A)(v) ..................................................................................... 84

42 U.S.C. § 625 ........................................................................................................ 84

42 U.S.C. § 629a(a) ................................................................................................... 84

42 U.S.C. § 629a(a)(2) ........................................................................................... 55, 85

42 U.S.C. § 629a(a)(7) ............................................................................................... 83

42 U.S.C. § 629a(a)(7)(B) .......................................................................................... 85

42 U.S.C. § 629f(a) ................................................................................................... 84

42 U.S.C. § 629g(f) ................................................................................................... 83

42 U.S.C. § 671(a) .................................................................................................... 87

42 U.S.C. § 671(a)(15)(B) ......................................................................................... 86

42 U.S.C. § 671(a)(15)(B)(i)-(ii). ............................................................................... 93

42 U.S.C. § 671(a)(15)(D)(iii) ................................................................................... 86

42 U.S.C. § 671(a)(31) .............................................................................................. 87

42 U.S.C. § 674(4)(B)(ii) ........................................................................................... 86

42 U.S.C. § 675(4)(A) ........................................................................................... 86, 89

42 U.S.C. § 675(6), .................................................................................................. 86

42 U.S.C. §§ 12102 (1)-(3 ........................................................................................ 175

42 U.S.C. §§ 12102(1)(A)-(C) & (3)(A) ..................................................................... 94

42 U.S.C. §§ 301-1397mm ........................................................................................ 91

42 U.S.C. §§ 5101-5106 ............................................................................................ 89

42 U.S.C. §§ 5116 et seq. .......................................................................................... 89

42 U.S.C. §§ 5116(b)(1)(A)-(H) ................................................................................ 90

42 U.S.C. §§ 620-627 ............................................................................................... 87

42 U.S.C. §§ 621(3) & (5) ......................................................................................... 91

42 U.S.C. §§ 629(2) & (3) ......................................................................................... 92

42 U.S.C. §§ 670 et seq. ............................................................................................ 92

42 U.S.C. §§ 670-679 ............................................................................................... 87

42 U.S.C. §§ 671 et seq. ............................................................................................ 82

42 U.S.C. §§ 671(a)(15)(B)(i) & (ii). ......................................................................... 28

42 U.S.C. §12132 ..................................................................................................... 94

42 U.S.C. 12101 et seq. ............................................................................................ 175

M.G.L. c. 119, § 26B (a) ........................................................................................... 108
M.G.L. c. 119, § 26B(b) ............................................................................................ 109
M.G.L. c. 119, § 51B(c) ............................................................................................ 103
M.G.L. c. 18B, § 6A ..................................................................................................... 48
M.G.L. c. 210, § 3 ........................................................................................................ 95
M.G.L. c. 30A ............................................................................................................. 111
M.G.L.c. 119 et seq. ................................................................................................... 101
M.G.L.c. 119, § 1 ....................................................................................................... 100
M.G.L.c. 119, § 24 ............................................................................................ 102, 103
M.G.L.c. 119, § 26(b)(4) ........................................................................................... 105
M.G.L.c. 119, § 26(b)(4)(iii) ..................................................................................... 105
M.G.L.c. 119, § 26(c) ....................................................................................... 104, 106
M.G.L.c. 119, § 26B(a) .............................................................................................. 108
M.G.L.c. 119, § 29B ................................................................................................... 104
M.G.L.c. 119, § 39D ................................................................................................... 109
M.G.L.c. 119, § 51A ..................................................................................................... 32
M.G.L.c. 119, §§ 1, 24-26 ................................................................................. 101, 102
M.G.L.c. 119, §51B(k) ................................................................................................. 78
M.G.L.c. 18B et seq. ................................................................................................... 122
M.G.L.c. 18B, § 1 ......................................................................................................... 26
M.G.L.c. 18B, § 6 ......................................................................................................... 26
M.G.L.c. 18B, § 7(g) ..................................................................................................... 92
M.G.L.c. 18B, §6A ...................................................................................................... 111
M.G.L.c. 18B, 2 .......................................................................................................... 100
M.G.L.c. 18C ............................................................................................................... 120
M.G.L.c. 18C, §5 .......................................................................................................... 26
M.G.L.c. 210, § 3 .............................................................................................. 101, 105
M.G.L.c. 211, § 3 ....................................................................................................... 148
M.G.L.c. 211, §3 ........................................................................................................ 148
M.G.L.c. 211D, § 1 .................................................................................................... 142
M.G.L.c. 211D, § 10 .................................................................................................. 144
M.G.L.c. 211D, § 9 .................................................................................................... 144
M.G.L.c. 211D, §§ 6A, & 12 ..................................................................................... 143
M.G.L.c. 231, § 118 ................................................................................................... 107
M.G.L.c. 231, § 60D ............................................................................................. 76, 77
M.G.L.c. 231, §118 .................................................................................................... 170
M.G.L.c. 258 et seq. ..................................................................................................... 27
M.G.L.c. 258, § 2 .......................................................................................................... 78
M.G.L.c. 258, §§10(a)&(b) .......................................................................................... 77

M.G.L.c. 258, §§10(a)-(c) ............................................................................................ 75
M.G.L.c. 258, §10 ........................................................................................................ 78
M.G.L.c. 258, §10(a)-(c) .............................................................................................. 77
M.G.L.c. 258, §2 .......................................................................................................... 77
M.G.L.c. 260, § 7 ......................................................................................................... 76
M.G.L.c. 260, §7 .......................................................................................................... 76
M.G.L.c. 51A ........................................................................................................ 42, 123
M.G.L.c. 6A, §§2 & 4 .................................................................................................. 26
M.G.L.c. 6A, §§2,3 &16 .............................................................................................. 26
M.G.L.c. 93A ............................................................................................................. 172


Other Authorities

"Honduras", International Monetary Fund (2017) .................................................... 155
2nd Quarter Fiscal Report (Mar. 2016) .................................................................... 119
A. Case and C. Paxson, "Parental Behavior and Child Health" *Health Affairs* 21, no.2 (2002)
   164-178 ................................................................................................................. 139
Annual Report on Foster Care Review (2017) ........................................................ 111
art. 114 .................................................................................................................... 110
Associated Press, Congress Passes Opioid Abuse Bill, NBCNews.com (July 13, 2016) ............ 96
C.P. Kindregan, Jr., & M.L. Inker, Family Law and Practice § 65:1, at 294 (3d ed. 2002) ....... 103
Child Welfare Outcomes Congress Report (2010-2014) ......................................... 120
Civil Rights Act of 1964, Pub. L. 88–352, 78 Stat. 241, (1964) ................................ 99
Executive Order No.494 (Establishing the Office of the Child Advocate) ................ 75
Legislative Report on DCF Fair Hearings (Jan. 2017) ............................................. 111
Mass. G. Evid. § 1115(b)(2)(A) & (B) (2016) .......................................................... 125
Mass. G. Evid. § 1115(b)(2)(B) Note, at 441 (2016) ............................................... 125
Office of the Child Advocate Annual Report (2016) ............................................... 121
Office of the State Auditor Audit Report (Dec. 2017) ............................................. 116
Pub. L. 100-77 ........................................................................................................... 95
Pub. L. 103-432 ......................................................................................................... 91
Pub. L. 105-89 ........................................................................................................... 93
Pub. L. 110-351 ......................................................................................................... 85
Pub. L. 111-22 ........................................................................................................... 95
Pub. L. 112-34 ........................................................................................................... 84
Pub. L. 113-183 ......................................................................................................... 87
Pub. L. 114-198 ......................................................................................................... 96
Pub. L. 115-123, at § 50702 ...................................................................................... 82
Pub. L. 95-266 ........................................................................................................... 89
Pub. L. 96-272 ........................................................................................................... 87

Susan c. Saegert, *Task Force on Socioeconomic Status,* APA  (2006) (Report) at pg. 26 ........... 16

## Rules

Fed. R. Civ. P. Rule 23(b)(2). .............................................................. 177
Fed. R. Civ. P. Rule 5.2 ...................................................................... 41
Fed. R. Civ. P. Rule 57 ...................................................................... 177
Fed. R. Civ. P. Rule 65(d) .................................................................. 179
LR. 40.1(D)(1)(b) .............................................................................. 24
LR. 5.3 ........................................................................................... 41

## Regulations

10 CMR 6:00 et seq. .......................................................................... 146
107 CMR 1.03(1) .............................................................................. 111
110 CMR 1.02(4)-(7) .......................................................................... 100
110 CMR 1.06. ................................................................................ 131
110 CMR 1.06 & 1.08-1.11 .................................................................. 128
110 CMR 1.08. ........................................................................... 110, 125
110 CMR 1.09. ................................................................................ 110
110 CMR 10.00 et seq ........................................................................ 111
110 CMR 10.00 et. seq. ...................................................................... 111
110 CMR 2.00. .......................................................................... 122, 130
110 CMR 3.02. ................................................................................ 132
110 CMR 4.36 - 4.38 .......................................................................... 78
110 CMR 6. ..................................................................................... 48
110 CMR 6.10(3) .............................................................................. 129
110 CMR 6.10(3)(c) (1)-(6) .................................................................. 129
110 CMR 6.10(3)(c)(1) ........................................................................ 129
Pub. L. 114-198. Page 130 at Stat. 720 ..................................................... 97

# CIVIL ACTION COMPLAINT

## ABBREVIATIONS, ACRONYMS & ASSOCIATED CONCEPTS

| | |
|---|---|
| AACWA | Adoption Assistance and Child Welfare Act of 1980 |
| Act of 2016 | Comprehensive Addiction and Recovery Act of 2016 |
| ADA | Americans with Disability Act of 1990 |
| ASFA | Adoption and Safe Families Act of 1997 |
| BBA | Bipartisan Budget Act of 2018 |
| C&P | Care and Protection Proceedings |
| CAFL | Children and Family Law division of CPCS |
| CAPTA | Child Abuse Prevention and Treatment and Adoption Reform Act |
| CFSA | Child and Family Services Improvement and Innovation Act of 2011 |
| CPCS | Committee for Public Counsel Services |
| DCF | Department of Children and Families |
| DHCD | Department of Housing and Community Development |
| DTA | Department of Transitional Assistance |
| DPS | [Proposed] Department for Parent Services |
| DV | Domestic Violence |
| EOHHS | Executive Office of Health and Human Services |
| FCSAA | Fostering Connections to Success and Increasing Adoptions Act of 2008 |
| FFPSA | Family First Prevention Services Act (enacted by BBA) |
| HHS | U.S. Department of Health and Human Services |
| Lower SES | Lower Socio-Economic Class made up of Low Income Parents |
| OCA | Office of the Child Advocate |
| OPA | [Proposed] Office of the Parent Advocate |
| Parents | Plaintiff Class of Massachusetts Parents |
| Reunification | Process of Reuniting Parents with Their Children |
| Reasonable Efforts | Combination of Services, Rehabilitative Efforts, and Assistance, Offered By DCF to Remedy the Condition That Initiated The C&P |
| Sec. 504 | Rehabilitation Act of 1973 |
| SNAP | Supplemental Nutrition Assistance Program |
| SSA | Social Security Act |
| UUU | An Action That is Unjustified, Unconstitutional, and Unlawful |

## SYNOPSIS

1.        This Class Action Civil Complaint focuses on state-wide child welfare system deficiencies.  Implementation of state-wide reunification efforts as mandated by the

Federal Law; however, parents are not receiving services, and have to abide by service

plans that set them up for failure.  Moreover, the State's Department in charge of

overseeing the court-appointed legal representation for the parents has failed to recognize

the ongoing deficiencies in legal representation and failed to provide necessary training to

achieve more favorable positions for parents within the juvenile courts.    Ultimately,

there is a state-wide crisis due to lack of in-home services prior to removal, and

reasonable efforts for reuniting biological parents with their children subsequent to

removal, which results in state-wide misappropriation of federal funding by

inappropriately boosting foster care funding.  State's failure to provide in-home services

to avoid removing children from families and  reasonable efforts of quick reunifications

in cases where children have been removed, has resulted in unnecessary  broken homes

and families. Children and parents involved will forever have to mentally cope with

separation issues; mental and emotional injury that in many cases is far more greater than

the suspected injury they were being protected from by the initial removal.  (i.e. Leaving

the children in their home would have resulted in better outcome even in the presence of

the alleged abuse or neglect.)


### SUMMARY OF REAL NEWS


2.          There is a cultural difference between the people in power in DCF and the people

that find themselves at their mercy (mostly parents from lower socioeconomic class);

neither like each other, accept one holds all the power and the other is powerless.  Most

DCF employees have an education and an occupation that offers consistent pay check; a

socio-economic class that does not fully understand nor has the training to fully

comprehend the typical "cultural" behaviors of low income parents.  These "low-income" parents usually lack education, struggle day-to-day to make ends meet, and fall into the lower socio-economic class ("Lower SES").[3]  From the outside, Lower SES are routinely perceived as uneducated, crass, vulgar and "bottom of the barrel walks of life".  Their behavior and method of communication, can easily be misunderstood; *strength & passion* misinterpreted for *aggressiveness & dangerousness*; a cultural difference that results in unjust and unwarranted service plans.  As the government increases in size and power, the number of children under their control continues to increase every year (In 2015, 2016 & 2017 number of children in placement/foster care is the highest the State has ever seen); the shift of determining parental fitness has now moved away from "parental inaptness" and moved toward "character assassination", and it is all occurring behind closed doors (matters are impounded and hearings are not open to the public).  DCF has a stake and direct control of the outcome; by limiting visitations and requiring parents to complete services without assistance, parents are "set up" for failure.  We are not blaming the individuals involved; they don't know any better.  The system is broken and lacks the necessary safe-guards that warrant the Federal Court's immediate assertion of

---

[3] "[D]eep-rooted belief in the 'American creed,' or the promise that equal rights and equal opportunity will allow people of merit to succeed and prosper. The lack of attention to and devaluing of the realities of low-income people's lives lead even well-intentioned scholars and policy analysts to perpetuate these derogatory stereotypes in programs designed to remedy supposed deficits in character, development, and behavior by creating "middle class" opportunities for the poor. When the opportunities provided do not eliminate disparities in development and well-being, public opinion tends to attribute the failure to the attitudes, behaviors, and abilities of the poor." *See* Susan c. Saegert, *Task Force on Socioeconomic Status,* APA  (2006) (Report) at pg. 26.  (Material and structural conditions, substantially contribute to disparities in health, well-being, and human development rates across socioeconomic groups, *exampli gratia*, access to education, unemployment and underemployment, unsafe and inadequate housing, stigma and discrimination; resulting in poorly understood classism.)

jurisdiction.  DCF, Parents, and Children, all want the same thing, to protect and maintain our families, strengthen our communities, and facilitate growth of the next generation to fill our shoes after we are gone.

## SUMMARY OF SOLUTION

3.        While it may seem natural to "attack" the persons responsible for mistreating parents, or not implementing the responsible efforts requirements as mandated by the Federal Acts; in reality, as our education directs us, it is the system's fault. *See* Stanford Prison Experiment (1971) (People's behavior is controlled by their situation they are placed in, rather than their individual characteristic driven personalities.) ("SPE")  Thus, to have a person be put in the middle of two conflicting and competing interests (protecting a child or encroaching on parent's fundamental right to rear their children) is a remedy destined for failure; DCF rightfully errs on the side of caution by swinging the pendulum toward protecting the children side.  Separation of powers, has been proven to work in areas such as government by preventing abuse of power, and most importantly for this department, help to alleviate potential conflict of interest.  Moreover, separation of powers, also functions analogous to the Ford T assembly line invention.  By limiting the scope of duty, you get better quality of work and higher production.  Similarly, by having a separate department focusing on individual areas, they will be more streamlined to focusing on one area, becoming better at it and more productive; thereby limiting amount of error.  Finally, once DCF takes on the position that the parent is unfit or requests termination of parental rights, the same social worker remains; the parent should not have to work with a social worker whose position (mind) has already been decided.

Without a social worker for parents, parental rights are going to be terminated in court; even if good representation is provided and the parent is proven to be fit, due to care and protection juvenile court proceedings length of time, a *de facto* parent, will place limitations on future parental rights even if the parent shall become fit.  Thus, there is huge justification in limited time a child spends in foster care, which is better avoided not by termination of parental rights followed by quick adoption, but by preventing removal by use of in-home services or quick reunification if removal is necessary.  Separate Department of Parent Services ("DPS") will place individuals in a *situation* that will allow workers to naturally and fairly address parental issues/deficiency (i.e. place the workers in the right situation pursuant to the SFE).  Also, like an assembly line innovated by Henry Ford, there is a benefit to splitting up responsibilities among individuals; it will result in increased overall efficiency and production (case processing).[4]  Ultimately reducing the state's reliance on foster care and use of social workers, and subsequently judicial economy.  Finally, the current one hour supervised visit for up to a year, that is

---

[4] This is a combination of two concepts; 1) separation of powers doctrine with 2) assembly line innovation.  Look at how our criminal system has evolved, and ask yourself how affective the prosecutor (or defense attorney) would be if they were asked to "jump" on a daily basis between roles of defending and prosecuting defendants.  This is exactly what is happening with a social worker that is in charge of making decisions that deal with conflicting interests in child welfare cases; a situation that can be easily resolved without attacking the individuals involved.  Creation of DPS will address abuse of power by utilizing the separation of powers internally as our constitution has very effectively done with the branches of government; and by utilizing in essence the assembly line innovation (specializing in specific area increases proficiency and efficiency). While at afar it may seem like an added expense, it will in fact lower state costs and raise state's morale; streamlining duties and responsibilities, will result in state-wide improvement of accuracy (i.e. decision making by people in charge) and duration of case processing (i.e. quicker reunification or adoption).

utilized state-wide for all cases where parental rights have been temporarily transferred to DCF should be declared a Triple U ("UUU")[5].

4.          This is a violation of Federal Acts class action brought on behalf of all parents (hereinafter "Parents")  who are now or will be subjected to Care and Protection Proceedings (hereinafter "C&P ") by Massachusetts Department of Children and Families (hereinafter, "DCF") as a result of alleged abuse or neglect by Parents.

5.          The following Defendants, each sued in his or her, official capacity only, and not individually, are Charlie Baker, Governor of the Commonwealth of Massachusetts (hereinafter, "Commonwealth"); Linda S. Spears, Commissioner of DCF (hereinafter "DCF") Marylou Sudders, Secretary of the Massachusetts Executive Office of Health and Human Services ("EOHHS"); Anthony J. Benedetti, Chief Counsel for the Committee for Public Counsel (hereinafter "CPCS"), Children and Family Law Division of CPCS (hereinafter "CAFL"); collectively are the Defendants in this violation of Federal Acts & Civil Rights Complaint (hereinafter, "Defendants").

6.          The following Defendants, each sued in his or her, individual capacity, are Gene Rauhala, Tameka Grantham O'Brien, and Alan I. Levine, who were approved by CPCS and appointed as private counsel for some of the listed Plaintiffs.  They are also sued on behalf of all others similarly situated if such certification of class is allowed (counsel is mindful of obstacles in such certification and through discovery, *inter alia*, will be able to

---

[5] U.U.U. is an action that is unjustified, unconstitutional, and unlawful; lead counsel will be filling separate motion moving this Honorable Court to declare certain state actions to be unlawful subsequent to full evidentiary hearing, and presentment of expert testimony/evidence thereon.

show there is a state-wide ongoing waiver of 72-hour hearing that has become common practice).

7.          Plaintiff Parents, each of whom relies on DCF as liaison and provider, of guidance, support, and family reunification services, seek both declaratory and injunctive relief to remedy violations of their legal rights and to prevent Defendants, by their actions, or inactions, and their failure to act as lawfully required, from continuing to cause them harm; specifically Defendants are required to provide services and reasonable efforts for reunification.

8.          During the C&P, children of Plaintiff Parents, and their temporary care takers/foster parents, receive benefits from the federally funded foster care system operated by DCF, which under federal and state law, is responsible for investigating allegations of child abuse and neglect, for delivering in-home services to preserve families when safely possible, for providing temporary care and protection for children who cannot safely remain at home, for securing safe and stable families as soon as possible for children removed into state care, whether by reunification, adoption or legal guardianship.

9.          The Massachusetts foster care system, however, is utilizing federal funds to provide foster care for children for long period of time, that could otherwise be placed with Plaintiff Parents without delay.  The lack of reunification is against Federal and State regulations, and is causing physical and psychological harm to the Plaintiff Parents and their children, who DCF is mandated to protect; arguably more families are harmed than helped, by DCF's involvement based on the current system's lack of reasonable efforts for reunification in place.

10.        DCF's agents do not have adequate knowledge, training or supervision knowledge to handle children removal; most children are removed under emergency basis with no actual risk of immediate harm present, which could be alternatively addressed with less drastic remedial in-home services and continuous home visit monitoring.

11.        DCF formulates erroneous opinions of parental fitness, in part, based on age, sex, level of education, culture and financial stability, in violation of Federal and State laws.

12.        DCF quickly builds erroneous documentation of parental unfitness through social workers' findings who don't have full understanding, knowledge, and training, of even the basic definitions of neglect and parental fitness, as defined by State Law and regulation.

13.        The quick pile up of erroneous statements, which are repeated throughout the case-notes and subsequent mandated G.L.c. 51A & 51B reports, make it financially almost impossible for a single attorney, with a typical CPCS case-load to address each and every erroneous statement, which unfortunately will come into evidence under the current juvenile court state law.  *See infra*.

14.        Plaintiffs challenge certain unlawful policies and practices of the defendant officials concerning the operation of Commonwealth of Massachusetts's child welfare system.

15.        Specifically defendants failed to implement and execute their own policies and regulations designed to keep children safe and parents reunified with their children. Defendants constantly fail to place children in the least restrictive, most family-like settings and in settings which allow them to maintain sibling relationships, parent and grandparent visitations, their use of overcrowded and inadequately trained and supervised foster homes that do not conform to nationally-accepted standards, their failure to ensure

that all children in care receive adequate medical and mental health assessments and treatment and adequate and consistent parenting and nurturance, and their failure to provide specialized substitute care placements for all children with special needs,

16.        Defendants failed to implement and execute own policy of appropriate case plans that will assure permanent placements for all children in their custody, either by providing services to families to enable the children to be returned home safely or by timely placement of the children into other permanent homes.

17.        Plaintiffs assert that Massachusetts's child welfare system endangers children it is charged to protect, causes harm to children it is charged to help, and has been allowed to deteriorate to a state of systemic, ongoing crisis. This crisis has caused irreparable harm to parents and irreparable injury to the thousands of children involved therein, that are ripped out of their homes unnecessarily and then bounced around from different homes even if they want to be reunified with their parents.

18.        Plaintiffs assert that defendants' actions and knowing inactions in the face of this crisis have deprived plaintiffs, and all others similarly situated, of their rights as guaranteed by the First, Ninth and Fourteenth Amendments to the United States Constitution, their rights under the federal Adoption Assistance and Child Welfare Act, and their rights under the federal Child Abuse Prevention and Treatment Act; requiring DCF to provide parents with services and reasonable efforts of reunification.  Plaintiffs seek declaratory and injunctive relief to remedy defendants' unconstitutional and illegal miss implementation of policies and practices.

## LAW MISNOMER NOTICE

19.         Any Code/Statute/Act or other source referenced hereunder, by misnomer or

oversight, should not be deemed as a waiver, limit or prevent plaintiff from subsequent

amendments, supplements or changes thereto, with ability to relate back to the date of the

original pleading.


## ADOPTION BY REFERENCE NOTICE

20.         Documents produced by parties or third party entities, as referenced by footnotes

or other means herein, and any subsequent documents attached hereto as amendment or

supplement, including submissions attached to Plaintiffs' opposition to Motion to

Dismiss, shall be adopted by reference as if stated fully herein, pursuant to Fed. Rules

Civ. Proc. Rule 10(c), and all of the allegations within this complaint, shall be deemed

restated and incorporated, under each and all numbered paragraph, as if fully stated

therein ; *exempli gratia*, class action constitutional infirmities are restated and

incorporated for each party, plaintiff and defendant, as stated therein and thereafter.


## JURISDICITON, VENUE AND ASSIGNMENT

21.         This action is brought pursuant to 42 U.S.C. § 1983 to redress violations of the

United States Constitution and federal statutes.  The Court has jurisdiction pursuant to 28

U.S.C. §§ 1331 and 1343(a)(3).

22.         A declaratory judgment is authorized pursuant to 28 U.S.C. §§ 2201 & 2201 and

by Rule 57 of the Federal Rules of Civil Procedure.  Injunctive relief is authorized by

Rule 65 of the Federal Rules of Civil Procedure.  An award of costs and attorneys' fees is authorized by 42 U.S.C. § 1988.

23.         Venue is proper pursuant to 28 U.S.C. § 1391(b).  The claims arise in this District.

24.         Assignment in the Eastern Division is proper pursuant to LR. 40.1(D)(1)(b) because a majority of the Named Plaintiffs – Valerie S., Christina Garcia, – reside in the Eastern Division:

## STANDING[6]

25.         Defendants', *inter alia*, have failed to provide reasonable efforts for reunification and effective assistance of counsel, to the Class Plaintiffs, leading to unnecessarily lengthy separation of children from fit parents, resulting in ongoing deprivation of the right to parent, and permanent harm to integrity of the familial unit.

26.         Judicial relief will provide redress to the above injury, by appropriately, as required by Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), require training and education to improve advocacy for families redirecting current policy to greater reunification efforts, which will limit separation injury, with the goal to limit

---

[6] *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992) (Article III of U.S. Constitution requires plaintiff to assert (1) an injury in fact that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the above injury and a defendant's conduct; and (3) a likelihood judicial relief will redress the injury). *See also City of Los Angeles v. Lyons,* 461 U.S. 95, 111 (1983) Showing of immediate threat of future injury is requisite for injunctive relief.

future and ongoing violation of constitutionally protected right to parent, and limit future and ongoing deprivation of familial association between parents and their children.[7]

## ABSTENTION DOCTRINE

27.     *Younger* is inapplicable because this federal complaint focuses on the need for Commonwealth's Executive Office to create adequate training and oversight of its departments, to appropriately redirect DCF's & CPCS's, pursuant to AACWA, energy on keeping families in tact through reunification, and improve overall advocacy for the familial unit through retraining  of DCF or establishment of DPS, with fair and equal representation of all parties in the ongoing Care and Protection state proceedings, without any interference or challenge to; State laws, legislative process, the course of present and future judicial proceedings.[8]

## ABROGATION OF SOVEREIGN IMMUNITY

28.     The Supreme Court recognized a narrow exception for claims seeking prospective injunctive relief against state actors to conform future conduct to the requirements of

---

[7] *See County of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) (Plaintiffs satisfied Article III's standing requirements because they alleged "a direct and current injury" resulting from an unlawful detention).

[8] *See Rossi v. Gemma*, 489 F. 3d 26, 35 (1st Cir. 2007) (observing that courts must first consider the "threshold issue of interference" before moving on to the *Younger v. Harris*, 401 U.S. 37 (1971) analysis, which is further refined in *Middlesex County Ethics Commission v. Garden State Bar Association*, 457 U.S. 423, 432 (1982). However, *Younger* does not apply to a state judicial proceeding reviewing legislative or executive action. *See New Orleans Public Ser., Inc. v. Council of City of new Orleans*, 491 U.S. 350, 368 (1989).

federal law.[9]  As long as the state official "has some connection with the enforcement of
the act," that official is an "appropriate defendant."[10]

29.        Defendant Charlie Baker is Governor of the Commonwealth of Massachusetts and
is sued solely in his official capacity.  Pursuant to Part II, Chapter II, Section 1, Article 1
of the Constitution of the Commonwealth of Massachusetts, the executive power of the
Commonwealth is vested in the governor, who has the ultimate authority to direct and
control the operation of  EOHHS and DCF.[11]  Defendant Baker has direct supervisory
authority over Defendant Marylou Sudders, the Secretary of the Massachusetts EOHHS,
who develops and implements DCF policies and programs.[12]  Defendant Baker also
approves the appointment of the DCF Commissioner, Defendant Linda Spears, who is
vested with the duty to administer a comprehensive child welfare program for children
and families.[13]  Defendant Baker also approves the appointment of the Office of the
Child Advocate, who is charged with reviewing DCF's programs and procedures, and
resolving complaints relative to the provision of services to children by an executive
agency.[14]

30.        Alternatively, this action against the Commonwealth of Massachusetts, is
sustained by the denial of basic constitutional guarantees, like fundamental right to rear a
child, which waives sovereign immunity, pursuant to intent of Congress's Americans with

---

[9] *See Ex Parte Young*, 209 U.S. 123 (1908)
[10] *See Shell Oil v. Noel*, 608 F.2d 208, 211 (1st Cir. 1979)
[11] *See* M.G.L.c. 6A, §§ 2 & 4
[12] *See* M.G.L.c. 6A, §§ 2,3 &16
[13] *See* M.G.L.c. 18B, §§ 1 &6
[14] *See* M.G.L.c. 18C, § 5

Disabilities Act's enforcement of fourteenth (14th) Amendment prohibition on irrational disability discrimination.[15]

31.        Alternatively, states waive their sovereign immunity under the Rehabilitation Act by accepting federal funds.[16] Title VI, from which §504 of the Rehabilitation Act borrows its remedies, provides that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973."[17]

32.        Also, Massachusetts Torts Claims Act abrogates state immunity,[18] and the Act's exceptions do not protect public entities whose functions involve the implementation and execution of such governmental policy[19]

33.        Finally, and of last resort, we pray *Sue Suter, et al., v. Artist M. et al.*, be overturned, and pursuant to Honorable Justice Blackmun's & Honorable Justice Steven's dissent; "The Adoption Assistance and Child Welfare Act of 1980 (["AACWA"])

---

[15] *See e.g.* 42 U.S.C. §§ 12132 & 12202 ; *Tennessee v. Lane*, 541 U.S. 509, 522-23 (2004) (Infringement of basic constitutional guarantees is "subject to more searching judicial review").
[16] *See Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 127–29 (1st Cir. 2003)
[17] *See e.g.* 42 U.S.C. § 2000d-7 (A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [29 U.S.C. 794], title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C. 6101 et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance)
[18] *See* M.G.L.c. 258 et seq. (counsel is mindful the Tort Act waives immunity if the claim is brought in State Court; however, waiver attaches if there are other valid Federal Claim/s).
[19] *See Shapiro v. City of Worcester*, 464 Mass. 261, 982 N.E.2d 516 (2013) upholding *Whitney* two-prong test in determining M.G.L.c. 258, § 10(b) protection of immunity to public employers. *Whitney v. Worcester*, 373 Mass. 208, 217, 366 N.E.2d 1210 (1977) (*Whitney*); (dividing line should be between those functions that rest on the exercise of judgment and discretion and represent planning and policymaking [for which there would be governmental immunity] and those functions which involve the implementation and execution of such governmental policy or planning [for which there would be no governmental immunity].

conditions federal funding for state child welfare, foster care, and adoption programs upon, *inter alia,* the State's express commitment to make, "in each case, reasonable efforts" to prevent the need for removing children from their homes and "reasonable efforts," where removal has occurred, to reunify the family."[20] 503 U.S. 347 (1992)(Held that it does not confer its beneficiaries a private right enforceable in an action under §1983.)

## PARENTS HAVE PRIVATE RIGHTS ENFORCEABLE UNDER § 1983 FOR VIOLATIONS OF FEDERAL LAW

34.        42 U.S.C. § 1983 ("§ 1983") provides a remedy for the deprivation of rights established by the Federal Constitution and Law, and not the broader or vaguer, benefits or interests, that may be enforced thereunder.[21] "Although the question whether a statutory violation may be enforced through § 1983 is a different inquiry from that involved in determining whether a private right of action can be implied from a particular statute, the inquiries overlap in one meaningful respect—in either case it must first be determined whether Congress *intended to create a federal right.* For a statute to create private rights, its text must be phrased in terms of the persons benefited. Once the plaintiff demonstrates that the statute confers rights on a particular class of persons,  the right is presumptively enforceable by § 1983."[22].  "[U]nless Congress 'speak[s] with a

---

[20] *See* 42 U.S.C. §§ 671(a)(15)(B)(i) & (ii) ("...reasonable efforts shall be made to preserve and reunify families; (i) prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home; and (ii) to make it possible for a child to safely return to the child's home;")

[21] *See Gonzaga University v. Doe*, 536 U.S. 273, 282, 122 S.Ct.2268, 2275, 153 L.Ed.2d 309 (2002)

[22] *Id*. (Internal citations omitted.)

clear voice,' and manifests an 'unambiguous' intent to create individual enforceable rights, federal funding provisions provide no basis for private enforcement by § 1983."[23]

35.         "[A]pplication of the *Gonzaga* factors makes it clear that Congress intended to create privately enforceable rights to individualized case plans and foster care maintenance payments under the AACWA."[24] Part of the plan is the children's' due process right to be loved by their parents and maintenance of intact familial unit through reunification efforts,[25] which is directed and shaped by the state, creating a "special relationship" between the Parents and the State that trigger Due Process Clause protections.[26]

36.         Moreover, Family First Prevention Services Act, was recently enacted into law by the promulgation of Bipartisan Budget Act of 2018, which establishes private right to parents. *See infra*. Although, the state is given transition time, to avoid being penalized, parents still have a right to seek declaratory and injunctive relief, *inter alia*, issues of reunification efforts and maintenance of intact familial unit.

---

[23] *Id.,*536 U.S. at 280, 122 S.Ct. at 2273, 153 L.Ed.2d 309.
[24] *See Connor B. v. Patrick*, 771 F.Supp.2d at 172 (D. Mass. 2011) (Finding Congress intended to grant children private right to pursue under § 1983.)
[25] *See e.g*. 22 U.S.C. §§ 622(b)(8)(A)(iii)(I) & (A)(iv) (Similar language used to support private right to pursue under § 1983 in *Connor B.*)
[26] *See Youngberg v. Romeo*, 457 U.S. 307, 102, S.Ct. 2452, 73 L.Ed.2d 28 (1982) (Although Due Process Clause generally confers no affirmative right to governmental aid, a narrow exception exists for situations involving a "special relationship" between a plaintiff and the state, when the State's affirmative act of restraining the individual's freedom to act on his own behalf through; incarceration, institutionalization, or other similar restrain of personal liberty, which is the type of "deprivation of liberty" that triggers the protections of the Due Process Clause.)

PRESENTMENT OF NOVEL CLAIMS OF FIRST IMPRESSION

A.    DCF Scope of Duty Violates "Fundamental Fairness" of Due Process Clause

37.        Presently it is state-wide practice for DCF to first make a determination that a

parents parental rights are going to be terminated and then file a notice with the court

thereafter.  There is considerable amount of time before the juvenile court will make a

determination on this (sometimes taking up to a year or more); during this time, parents

can only receive reunification efforts from the same party (DCF Social Worker) who will

sit in court and argue in support of terminating parents parental rights.  It is a Due Process

Clause violation to not have an independent (or other) social worker assigned by the State

to continue to work with the parent on providing/offering suitable services and other

reunification efforts, prior to the court's determination on the issue; violation which

creates private right to enforce under § 1983.

38.        Moreover, because parenting is a fundamental right, when the state affects this

liberty by their own affirmative action, a "special relationship" is created, which requires

the State to continue to protect parents' parental rights until a court determines

otherwise.[27]  Such duty cannot be fairly performed by the moving party (DCF social

worker which will argue to terminate parental rights in court) because of the conflict of

interest.[28]

---

[27] *Id.*

[28] In court this counsel observed statements made by the social worker during trial on the merits, and it was obvious that there is an inherent conflict of interest that make it impossible for the same social worker to provide fair services and reasonable efforts of reunification to the parent. In essence, once the parent is deemed to be unfit by the Department, even if parents' counsel gets an order from the court to require reasonable efforts of reunification, the result of those efforts, will still lead to a "unfit parent" determination by the same party (more to be explained in open

39.         "The fact that important liberty interests of the child and its foster parents may also be affected by a permanent neglect proceeding does not justify denying the *natural parents* constitutionally adequate procedures. Nor can the State refuse to provide natural parents adequate procedural safeguards on the ground that the family unit already has broken down; that is the very issue the permanent neglect proceeding is meant to decide."[29]

40.         As soon as DCF removes a child from the home, an immediate conflict of interest forms; DCF social workers are not able to adequately assist parents in reasonable efforts of reunification, because part of their decision making involves protection of children, consideration of which are directly in conflict with parents needs. In other words, from day one, when DCF initiates care and protection proceedings (e.g. removing a child from their home), DCF is an opposing party (i.e. DCF-*plaintiff* v. Parent-*defendant*) which cannot ethically represent/advocate for parents. In the real world, the same social worker that was supposed to "help you", is the same social worker that will help to terminate your parental rights, using the statements you made to them against you. This "fundamental fairness" issue can easily be resolved by establishing DPS.

---

court). Thus, this "Due Process Violation" (based on inherent conflict of interest) is fixed by the [Proposed] Department of Parents Services ("DPS"), which will eliminate the conflict of interest by the separation of powers. This is analogous to having the same attorney representing both mom and dad in termination proceedings; an inherent conflict of interest, that even if the parties are married, require individual counsel. Turning back to Parents' aforementioned argument, it is literally analogous to a "plaintiff" representing "defendant" to prove "plaintiff" is wrong in their assessment. In other words, no amount of training, can prepare a DCF social worker to be able to provide any meaningful help to parents, once the decision to terminate has been made. Moreover, once the decision has been made to "remove", is the first point, for which this Due Process Clause applies (needing establishment of DPS).

[29] *See Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599, at note 7 (1982).

41.         Simpler way to say, the system is broken.  Every commonwealth employee is now

mandated to file a M.G.L.c. 119, § 51A ("51A") report anytime a child is around any type

of disturbance, or suspicion of neglect (child is sick from unexplained flew), this 51A

report ("police report"), even if not supported, will be submitted to DCF for investigating

and policing the Commonwealth for Abuse and Neglect of Children ("Sheriff"), the 51A

report become part of the record ("Board of Probation Record"); the same

department/social worker, will bring ("prosecute") allegations of neglect ("charges"), by

filling with the juvenile court a petition for care and protection of a child ("complaint"),

and then the same party will be responsible for overseeing the conduct of the parents

("probation"), and any statements during this "probationary period", can and will be used

against you at trial on the merits which will determine you parental rights ("guilty or

innocent" of being an unfit parent) and failing to make these statements, which will be

used against you at trial, which results in non compliance ("violation of probation"), and

quicker termination of parental rights. The "probationary period", to avoid pitfalls of

conflict of interest, as protected by the "fundamental fairness" of Due Process Clause,

require a separate department to work with the parent.  *See* [Proposed] Department of

Parental Services ("DPS").


B.      DCF Violates Parents' Right to Privacy

42.         Defendants have denied plaintiffs and members of their class their rights to

privacy of the person and possession as guaranteed to them by the of First, Fourth, Fifth

and Ninth, Eleventh, and Fourteenth Amendment to the United States Constitution by:

failing place necessary safe guards to protect parents privacy and parenting rights.

43.        As soon there is a 51A report filed, DCF sends out an investigator pursuant to

M.G.L.c. 119 § 51B which will intrude in all areas of parents' lives, including having

access to parents' homes; failing to comply usually results in emergency court order for

transfer of custody of child to the state.

44.        Once a child is removed (for any reason), Parents immediately lose their right to

parents and all rights to privacy. Defendant are able to look at all aspects of parents lives,

even areas which were completely unrelated to the initiation of care and protection,

thereby allowing Defendants to create allegation stacking (finding new reasons to stack

upon prior reasons to substantiate parental unfitness) subjecting parents to character

assassination.  Failure to comply will usually result in termination of parental rights or

lack of reunification due to resistance/retaliation to any opposition.

45.        Parents were never informed, *exampli gratia*, their statements to social workers

and therapists, would be used against them to terminate their parental rights; it is

common practice state-wide to use parents own statements to justify termination of

parental rights.

46.        DCF requires parents state-wide to see a therapist; statements that are made to

therapists would later be used to build a case against parents justifying limited efforts of

reunification and creation of allegation stacking that results in termination of parental

rights.   Most parents are completely oblivious to this result, and many regret confiding to

their therapist (e.g. Valerie confided to her therapist about issues with Domestic Violence

in her home which resulted in new allegation of abuse and significant contribution to her

loss to parent her child).  The same people that were supposed to help them, are the same

people that are used by DCF to build cases against parents.

47.        There is also a persuasive public policy argument to support against privacy

violations because citizens of the Commonwealth are afraid to speak to health providers,

and even afraid to raise their voices in their own home, for fear of having their children

removed from their home.[30]

48.         Even if the state has a compelling reason for such privacy intrusion, parents

should be forewarned and fully informed on consequences of divulging private

information, and how it may impact their right to parent.


C.     Care and Protection Proceedings Quasi Criminal Nature Implicate Fifth Amendment
       Protection Against Self-Incrimination

49.        Ilya Liviz Sr.'s, ("Father") Memorandum of Law, titled; "Plaintiffs [Proposed]

Verified Consolidated Memorandum in Opposition to Defendants' Motion to Dismiss

with Support for Father's Motion for; Temporary Injunction, Preliminary Injunction,

Declaratory Relief, Show Cause Hearing for Writ of [Habeas] Corpus, Motion for

Hearing Scheduling and Case Management Order; and Motion to Issue Subpoenas to

Court Officials pursuant to Fed. R. Civ. P. 45", is incorporated and restated, as if fully

written herein. *See Liviz & another, v. Supreme Judicial Court of The Commonwealth of

Massachusetts, et al.,* Civil Action NO 1:17-cv-12345-DJC, Doc. 34-1.

---

[30] Real News; come to my hood, and speak to my folk, and you will be surprised to learn how they truly feel; my people are scared of their own government. (Was the federal funding not given to the state child welfare system to offer help, support and give hope to families; shouldn't we be able to contact the state to help with parenting, substance abuse, domestic violence or any other issues requiring support?) Citizens do not call DCF for help; but, DCF is routinely used as a tool by citizen against each other to retaliate or punish the other when there is a break-down in relationships with full knowledge their involvement will result in harm to the reported party. Again, it is not the individual people in DCF that are at fault, but the state-wide lack of safeguards within the system to prevent it from getting to this point, where presently abuse of power against parents is rampant.

50.         Fourth and Fifth Amendment applies to care and protection termination

proceedings because they are quasi-criminal in nature.  *Ibid* at p.59, IV.D.1, "Termination

Proceedings are Quasi-Criminal in Nature".

51.         Defendants have denied plaintiffs and members of their class their rights to Fifth

Amendment to the United States Constitution protections against compulsory self-

incrimination.  Parents who chose to not answer DCF's questions will have a negative-

inference that can be used as justification of parental rights termination.


D.       [Proposed] Valerie Warning for Right Against Compelled Self-Incrimination

52.         If Defendants are able to persuade this Honorable Court of a compelling state

interest which provides a narrow and least restrictive of parents' constitutionally protected

right to privacy and/or right from self incrimination (e.g. protection of children) that

overcomes the heightened strict scrutiny, Parents rights were still violated because they

were not given any warning of the consequence of their statements to social workers and

other health providers, in violation of Due Process Clause and/or Privacy Rights of First,

Fourth, Fifth and Ninth, Eleventh, and Fourteenth Amendments, and/or Fifth Amendment

right from self-incrimination.

53.         Parents, should receive a "Miranda" like warning that fully informed them of the

consequences of their statements prior to any inquiry by 51B DCF investigator in

response to 51A allegation or any other inquiry made by Defendants during their state

investigation in which the purpose of the inquiry is to determine whether to seek

temporary termination of Parents' parental rights.

54.        [Proposed] Valerie Warning," You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to have an attorney. If you cannot afford one, one will be appointed to you by the court. With these rights in mind, are you still willing to talk with me about the allegations of neglect or abuse, raised in connection to child/ren under your custody or care?" [31]

E.        [Proposed] Department of Parents Services ("DPS") Offers Quick Solution

55.        DCF is consistently faced with having to choose between protecting a child or encroaching on parent's fundamental right to rear their children; a difficult balancing act that they lack the ability to make because of inherent conflict of interests. Parental rights and interests concerning child's safety should be kept separate to prevent abuse of power. *See* Doctrine of Separation of Powers (division of government helps to minimize abuse of power).  SOLUTION: Establishment of  [Proposed] Office of the Parent Advocate ("OPA") to access, *inter alia*, state-wide deficiency in; services for parents, timely & meaningful visitations, reasonable reunification efforts, and most importantly data to direct legislative and regulatory changes to advance parents' interests, *exempli gratia*, support promulgation of [Proposed] Department of Parents Services ("DPS") to help parents with rehabilitation and reunification efforts; a process that will result in quicker reunifications and adoptions, less wasting of State and Federal financial resources, and natural  compliance with; Title VI- Child and Family Services and Supports Extenders, Title VII-Family First Prevention Services Act, and Title VIII-Supporting Social Impact

---

[31] Dedicated to the first listed Class Action Parent Representative, Valerie S., a strong mother who would not give up and continued to pursue her parental rights even when the deck of cards was stacked against her; my hat comes off to you in recognition of your strength to persevere in the face of adversity; you go girl!

Partnerships to Pay for Results, as promulgated recently by Bipartisan Budget Act of 2018.  *See* Pub. L. 115-123

56.         DPS would be able to immediately fix any issues with conflict of interest, and offer the missing support in juvenile courts.  Presently, indigent (majority) parents get court appointed counsel, these attorneys can not testify on their behalf in court, and are limited by what they can say to the social worker assigned to the case (social worker is a party to a court proceeding represented by counsel).  Thus, once there is a break-down in relations between the parent and the ongoing social worker (which is automatic when the state seeks to limit or terminate parental rights), parents need an advocate from a different department which can "help" to represent parents interests (seeking services and reunification efforts) which will be conflicting with DCF's position.


F.       72-Hour Hearings Should Be Mandatory

57.         Defendants are required to provide parents reasonable efforts and services necessary for maintenance of intact familial unit.  It should be declared that Due Process Clause requires the moving party to show at the 72-hour hearing, by fair preponderance of the evidence, that; 1) parent/s are unfit to continue to rear their child, and 2) reasonable efforts were made to rectify the parental deficiency by offering services, support or other reunification efforts to maintain intact familial unit prior to removal of the child/ren.

58.         Because stipulation of waiver of such hearing is en essence admission of "parental unfitness", which could be used negatively against them, parents should not be allowed to waive this hearing (analogous to automatic "not guilty" entered for criminal defendants).

59.         Parental fitness is determined as present fitness on the day of determination, warranting waiver/continuance, to give parent time, exempli gratia, to complete drug rehabilitation program, and return to court as a "fit" parent ready to take on the role of being parent again.  Nevertheless, this taints the parent's record, and substantially increases  likelihood of parental rights termination for subsequent care and protection matters.  Moreover, the 72-hour hearing can be used to clarify the record, and more importantly, as a discovery tool to better understand the extent of the allegations and issues that need to be addressed in preparation for trial on the merits.  (Explained in detailed *infra*.)

60.         Presently, 72-hour hearings, are practically non-existent (sparse) in state juvenile courts.  All Class Parent representatives were coerced/advised to waive their 72-hour hearings.

## PARTIES

A.    Plaintiffs

61.          Plaintiff Valerie S. ("Valerie") is a 29 year-old mother, a citizen of the Commonwealth of Massachusetts, had her three children stripped from her care by Lowell DCF, including most recently in 2015, her daughter T.M. was erroneously removed from her home under  emergency basis; T.M., who was previously striving in school, would be repeatedly subjected to sexual assault in foster care, develop behavioral issues, and the abuse she suffered at the care of DCF would not be reported to Valerie; Valerie is still fighting to regain her parental rights and is limited to seeing her daughter to only twice a month.  Valerie was advised by her CPCS counsel to waive her 72-hour

hearing, to stipulate, and to subsequently, give up her child for adoption because she would not be able to win against DCF.

62.         Plaintiff Parents, husband, Michael ("Mike") is a forty-seven (47) year old father, and wife Carly ("Carly"), citizens of the Commonwealth of Massachusetts, had their three children removed from his care by Cambridge DCF on February 6th, 2018.

63.         Plaintiff parent Christina G. ("Christina") is a 37 thirty-seven year old mother, a citizen of the Commonwealth of Massachusetts, had her three children stripped from her care by Lowell DCF in 2016.

64.         Plaintiff parent Jennifer L. ("Jennifer") is a 30 year-old mother, a citizen of the Commonwealth of Massachusetts, had her three children stripped from her care by Lowell DCF in 2016.

65.         Plaintiff parent Nicole G. ("Nicole") is a 36 thirty-six year old mother, a citizen of the Commonwealth of Massachusetts, had her two children stripped from her care by Lowell DCF in 2015 and 2016.

B.     <u>Defendants</u>

66.         Defendant Charlie Baker is Governor of the Commonwealth of Massachusetts Commonwealth of Massachusetts ("Commonwealth") is sued solely in his official capacity, who currently maintains his principal office at the Massachusetts State House, Office of the Governor, Room 280, Boston, Massachusetts, 02133.

67.         Defendant Linda Spears, as the Commissioner of DCF ("DCF"), is the executive and administrative head of DCF, is sued solely in her official capacity, who currently maintains her principal office at 600 Washington St, Boston, MA 02111.

68.        Defendant Marylou Sudders, as the Secretary of the Massachusetts Executive
Office of Health and Human Services ("EOHHS"), is sued solely in her official capacity,
who currently maintains her principal office at One Ashburton Place, 11th Floor, Boston,
Massachusetts 02108.

69.        Defendant Anthony J. Benedett[32], in his official capacity as Chief Counsel for the
Committee for Public Counsel Services (hereinafter "CPCS") overseeing Children and
Family Law division ("CAFL"), with the administrative office located at 44 Bromfield
Street Boston, MA 02108

70.        Defendant Gene Rauhala, attorney admitted to practice law in Massachusetts
since 1984, in his individual capacity as CPCS approved, appointed private counsel for
Valerie S., with his primary office located at 370 Main St. No.1, West Townsend, MA
01474, and on behalf of all others similarly situated if such certification of class is
allowed.

71.        Defendant Tameka Grantham O'Brien, is an attorney admitted to practice law in
Massachusetts since 2010, in her individual capacity as CPCS approved, appointed
private counsel for Jennifer L., with her primary office located at 5 Fletcher Street 2nd
Floor, Suite D, Chelmsford, MA 01827.

72.        Defendant Alan I. Levine, attorney admitted to practice law in Massachusetts
since 1974, in his individual capacity as CPCS approved, appointed private counsel for
Jen B., with his registered with Massachusetts Board of Bar Overseers address as P.O.

---

[32] We commend Attorney Benedetti's efforts that led toward progressive reform of
Massachusetts's criminal justice system; however, the Children and Family Law Division
("CAFL") of CPCS is in need of a lot of reform and requires immediate attention.

Box 2085, Andover, MA 01810, and on behalf of all others similarly situated if such certification of class is allowed.

## THE NAMED PLAINTIFFS[33]

A.   <u>Valerie S.</u>

73.        Valerie S. ("Valerie") was born in 1990 in Fresno CA and relocated to Lowell, MA in 1997.  She attended Lowell High School till 12th grade, but had to leave her final year because of unexpected pregnancy.  Because of her pregnancy, instead of focusing on pursuing education and a career, she elected to become a stay-at-home parent.

74.        Valerie's first daughter, T.M.("T.M."), was born in 2009, and is currently eight years old.  Valerie's second daughter, N.S. ("N.S."), was born in 2011, and is currently six years old.  Valerie's third child, K.L. ("K.L."), was born in 2014, and is currently three years old.

75.        Valerie has been involved with DCF since she was approximately eight years old. In the hospital when she was giving birth to T.M., the staff offered her DCF's help, which she accepted.    Dina was a social worker at DCF, who had similar Cambodian background,  was very helpful and kind to Valerie. She showed Valerie how to get Supplemental Nutrition Assistance Program (SNAP)[34], day care assistance, and voucher for transportation assistance.  We praise the hard work and efforts, of Dina of DCF; and offer her our thanks.

---

[33] In accordance with LR. 5.3 and Fed. R. Civ. P. Rule 5.2 the identities of the minor Named Plaintiffs have been protected.  Because some of the Named Plaintiffs share common initials, minor changes to the name were made to avoid confusion.
[34] Department of Transitional Assistance (DTA) administers SNAP benefits; commonly referred to as "food stamps".

76.        Sometime in 2014, Valerie lacked financial resources and as a result; sought temporary assistance from her family members.  Valerie's cousin cared for T.M. in Fresno, CA and N.S.'s father cared for N.S. in Lowell, MA.

77.        T.M. was situated in school in Fresno, CA, so the family made a decision to have her come back to Lowell, MA, toward the end of the school year.  During the wait, Valerie gave birth to K.L..  K.L. was taken by DCF approximately four months after he was born because, *inter alia*, Valerie told her therapist, whom she thought was there to help, that she was being abused by her boyfriend (K.L.'s father).  As result of Valerie seeking help from a therapist, a mandated reporter,[35] DCF came into her life and took K.L. from her.  Even though Valerie has complied with DCF's service plan and requests, based on her history of homelessness, erroneous concerns of having a mental illness (she was prescribed "garden-variety" take as you need depression medicine) there was no efforts made for reunification.

78.        Shortly after, approximately in  May 2015, T.M. finished school and returned to Valerie from California because she missed being with her mother very much.  Fear of having T.M. stripped from her care, she did not notify DCF she cared for T.M. in hiding from the Government .  T.M. entered the local school system and was doing exceptionally well.  On 10/02/2015, T.M.'s excellent performance in school earned her a "Stem Academy Gold Behavior Award"; she was a happy young child who was thriving in school and at home.

79.        On 10/09/2015 T.M., without Valerie's knowledge, brought a pocket folding knife to school to show off.  DCF was notified via 51A report.

---

[35] *See* M.G.L.c. 51A

80.         On 10/09/2015 a 51B investigation was conducted. The investigation was

conducted by a social worker who took a course of less than 20 min on how to conduct

investigations.  Vallerie allowed the investigator into her home.  The investigator was

able to confirm Valerie and her daughter T.M. resided in a two bedroom apartment.  The

apartment was clean.  There were no visible hazards noted.  The bed has clean sheets and

blankets. T.M. was separated from her mother and interrogated by the investigator.  T.M.

confirmed that only her and Valerie lived in the apartment.  T.M. denied any domestic

violence ("DV") within the home or around her.  T.M. denied the presence or use of any

drugs in the home or around her.  T.M. denied the presence or use of alcohol in the home

or around her.

81.         T.M. was placed in a Foster Care with four other children.  In Foster Care there

was another child who repeatedly sexually assaulted her; the child showed to her what

her daddy used to do to her.  T.M. was repeatedly subjected to having her pants taken off

and her genitalia being touched inappropriately.  Even though DCF had full knowledge of

this, Valerie's social worker failed to disclose this to Valerie.  Even worse, after T.M., in

order to separate her from the perpetrator, was removed from this foster care, she was

subsequently placed back in the same care with the same perpetrator.[36]  During the C&P

trial on the merits in Juvenile Court, the social worker's only excuse was that she was

"afraid to tell her"; however, *inter alia*, she could have communicated this to Valerie's

attorney.  Valerie was not provided with any information as to the details of this matter;

she had to find out from her daughter about half a year after it happened.

---

[36] *See infra* footnote 130 & 132

82.      Valerie complied with all of DCF's requests.  She went to therapy, met with her social worker, attended Domestic Violence (DV) group therapy classes, and successfully completed her Parenting Wisely Program.  She has also received letters of support from her therapists and acquired a state estheticians license.  Nevertheless, DCF would not place T.M. back with her mother due to her prior history of involvement with DCF, alleged domestic violence and erroneous allegation of mental illness.

83.      DCF and their social workers, would not help Valerie in any way.  She repeatedly asked for a social worker that has similar cultural background as her, or at the very least a different social worker; her requests were denied.  It was clear to her that she doesn't get along with her social worker; as hard as she tried, all of her efforts were futile.  DCF has made up their mind that they did not see her as a fit parent and there was nothing she could do about it.

84.      Valerie did not have money for an attorney, has no knowledge of the C&P proceedings, was scared and had no one to go for help.

85.      At the beginning of the C&P, Valerie was appointed Gene Rauhala (hereinafter "Gene"), of CPCS, in the ongoing C&P matter in Juvenile Court.  Gene told Valerie that he knows what he is doing, and that she would have no chance of regaining custody of her children.  He said that Valerie would never see her children again and that the only way to be able to have some sort of future interaction (e.g. Christmas card and a phone call on a birthday) is to agree to an open adoption.

86.         Gene notified House of Hope Inc.,[37] and disclosed to them that Valerie's child was taken by DCF; as a result of this *questionable*[38] phone-call, Valerie's HomeBase[39] benefits where terminated.  Valerie's rent immediately increased from $275 to $875.

87.         Valerie agreed to sign the documents for open adoption for K.L., with the understanding it is the only way she would have any possible contact with him. However, she has not been able to have any contact or communication, with K.L. again.

88.         Contrary to Gene's advices, with the "life experience" knowledge of what happened to her with K.L., she decided to seek out private counsel to fight for T.M.. Attorney Ilya Liviz took over the C&P case and is concurrently filling this complaint.

89.         Valerie is currently employed as a nail technician, has stable home, lives alone, is not in a relationship, has no history of drug abuse and is drug free, has no history of criminal convictions, has no diagnosed mental illness, is seeing her primary medical provider who can confirm her health, continues to see her therapist (because she is required), and DCF is still not placing Valerie with her.

90.         DCF placed T.M. with Valerie's sister Nikky.  However, DCF did not know that Valerie would take over substantial care of T.M. without DCF's knowledge.  Valerie acknowledges this was dishonest, but, as a mother who loves her child, and the child feels

---

[37]The House of Hope is dedicated to assisting homeless families in Massachusetts. We provide services to families referred to us by the Department of Housing and Community Development (DHCD).

[38] Arguably the child could have been returned any day; more importantly this is a breach of attorney-client confidentiality.

[39] DHCD coordinates HomeBASE benefits, which can provide funds for first and last month's rent and security deposit in a new home, furniture (not to exceed $1,000), a monthly stipend to help pay rent for up to one year as well as utilities, travel costs, and many other expenses that would otherwise prevent a family from accessing a new home.

the same way, the only way they can be together was to keep it a secret from the Government.

91.      T.M. was doing good in school.  However, she did not want to be with the Nikky at all, and started to "act out".  T.M., in hopes of being reunited with her mother, disclosed to DCF that Nikky was hitting her (51a was filed against Nikky), which turned for the worst.

92.      Sometime in August, 2017, DCF decided to take T.M. away from Nikky and place her in a Foster Home; this would mean Valerie would not be able to care for her daughter.  Valerie, in hopes of continuing to care for her daughter, disclosed to DCF that T.M. was just acting out because she wanted to stay with her mother, as she already has for months.  Even though Valerie has been the ongoing care-taker, this disclosure would harm Valerie's already poor image with the DCF.  Her visits have been reduced from four visits a month (one hour each), to only two visits a month (two hour each).

93.      DCF is claiming that T.M. has behavioral issues and requires specialized attention.  T.M. developed these issues as a result of DCF taking T.M. from her mom, against T.M.'s wishes.  T.M. wants to return back to her mom but she is not old enough for her voice to be heard.  Valerie has no voice in this decision making.  DCF is harming both, Valerie and T.M., by keeping them apart against their will.  T.M. is very obedient in her mother's care; and has clearly expressed her wish to be with her mother.

94.      There is no good reason to have T.M. separated from her mom.  Valerie has a stable job, a stable apartment, is drug free, is mentally of sound mind, and has proof that T.M. is capable of doing good in school, as proven when T.M. was under her care.  DCF

is discriminating against her for perceived mental illness, history of DV and past involvement with the Department.

95.         DCF is not doing anything to help reunite T.M. with her mom.  There has been no movement or goal to increase visitation hours, or provide assistance to reunite the family. Money is being utilized for Foster Care placement even though there is an able and willing, parent ready to take on care of T.M. and comply with any requests (e.g. daily urine screens, phone call confirmations, in home visitations, family therapy, or other services DCF determines to be necessary).

96.         DCF limits Valerie's involvement with T.M..  Valerie cannot speak to T.M. in Khmi, language used in Cambodia, because of concerns what she may be saying to her, she can't discipline her, she can't communicate with her during the week, and is literally limited to a closed room visitation where the interaction is very limited (i.e. you can do so much more at a playground).   This unjust forced separation opposes reunification efforts.

97.         Social worker's documentation of the visits is primarily focuses on observed issues and concerns, between the parent and the child; documentation is almost completely devoid of positive interactions.  For example, at the end of the visitation visit, T.M. always says she wants to go home with her mom.  When Valerie asked her social worker to make a notation of this, Valerie would be admonished and told; "don't make smart remarks".  In essence, Valerie getting her child back would be a "slap" in DCF's face for conducting themselves with erroneous professional judgment.

98.         T.M. is lacking clothes and other school supplies.  Valerie continues to supply these items.  T.M. is being exposed to violence in her foster care; she observed fights,

police involvement, bullying and police officers making arrests in front of her.  She is the only girl in the foster care and is forced to continually defend herself.

99.         During Gene's representation, Valerie was not advised of the consequences of signing stipulations.  Valerie was not aware that stipulating to a waiver of 72 hour hearing can be seen as an admission of her being an unfit parent at that moment. Valerie was improperly advised to consent to adoption; she did not want to sign these and was erroneously told it was her only option.

100.        Throughout Valerie's DCF file she is painted with a broad brush of having mental illnesses.  Everyone refers to her as having mental illnesses.  She is perceived as someone as having mental illnesses.  However, she is not offered any accommodation for her perceived services.  Furthermore, her FCR hearings,  never had the requisite three member panel, and she was not afforded the benefit of a non-employee volunteer; completely violating their own State law (M.G.L. c. 18B, § 6A) and DCF's own code of regulation (110 CMR 6).  Valerie had no "voice" in the hearing, the voting system was unfair, there was lack of structure, she was not able to adequately challenge or review DCF's decisions, the hearing did not give her a fair and meaningful opportunity to present her version of the fact or adequately challenge DCF, the DCF's own director was in control; this was by no means any type of appeal or review, it was simply an opportunity to meet with DCF to hear the same things she has been hearing before, which were erroneous allegations that she could not oppose (i.e. this is a hearing DCF tells parents what they have done or haven't done based on their service plant without actually considering, *exempli gratia*, if the service plan was correct in the first place.)

101.         Valerie was separated from her daughter unjustly.  There would be no risk of any

kind to her daughter, if they were reunited, with continuous monitoring and, if necessary,

random check-ups.  Her FCR did not offer a meaningful opportunity to reconsider or

even review, the conduct of the agents, the requirements of the service plan, the

underlying issues or allegations, or an opportunity to be able to cross examine or make

inquiries of people involved.  She was not allowed to switch social workers even though

she made it clear there were cultural issues.  Her worker could not come up with any

good reason to support the separation from her child, yet she continues to see her child

for couple of hours every two weeks.  The system has failed her and her daughter; both

are subjected to ongoing harm; Valerie's trial on the merits is ongoing, and she is still

unable to switch her caseworker who clearly does not want to help her.

102.         Valerie's parental rights (in reference to other children) have never been

involuntarily terminated.  Presently the current juvenile court judge has stated that she

cannot terminate Valerie's parental rights as to T.M. and asked that DCF consider

changing their opinion to permanency placement.  Even with these words from the Court,

DCF has failed to make any efforts necessary for reunification.  Most recently Valerie's

supervised visit was canceled due to Weather Storm, and when Valerie rescheduled it to

this Monday (03/19/2018) to celebrate her daughter's birthday, the social worker failed to

make the necessary arrangements; T.M. was not transported to the supervised visit.

103.         There is no real reason for Valerie to be limited to supervised visits.  Clearly the

social worker and Valerie "clash" heads because they have different character and

temperament; however, this difference in character has nothing to do with parental

fitness.  Valerie is able to take over T.M.'s care full time today.  T.M. has been acting out

in foster care because she wants to come home; her behavior resulted in DCF pulling her out of foster care and placing her in the STAR Program[40] where she has been since last year (violation of Federal Law). There is absolutely no risk of abuse or neglect, to T.M., if she was placed with Valerie today; in fact, it is highly abusive toward both parent and child, to not reunite them immediately; Please Help Us!

B.    Michael & Carly. [41]

104.        Michael D. ("Mike") was born in 1970 (47 y.o) and his wife Carly D., ("Carly") was born in 1975 (42 y.o), have been married for eighteen (18) years, have lived in Woburn in Middlesex County in Massachusetts since August 2010.   Mike is the five children, three of which were given birth by Carly, and resided with them under their care; thirteen (13) year-old L.D. ("L.D.") (born in March of 2004); ten (10) year-old Madilyn G. ("Madilyn") (born in August of 2007); four (4) year-old T.D. ("T.D.") (born in October of 2013).

105.        On December 1st, 2017, Mike and Carlie of eighteen (18) years, together relocated to Winchendon, of Worcester County in Massachusetts.

106.        On 02/08/2018, Mike and his wife, had a 72-hour hearing at Leominster Juvenile Court of Worcester County; during which time the attorneys recommended that they do what is accepted practice by CAFL's attorneys and waive their right to a hearing.  They were erroneously advised it was the fastest way to be reunified with their children.  Mike

---

[40] STARR (Short Term, Assessment, and Rapid Reintegration), is typically a few days to in some cases 45 day residential program, with goal of placing a child with a family in the shortest time possible.
[41] Counsel has taken the necessary steps to protect both husband and wife (who have an ongoing care and protection matter in juvenile court), to assure no conflict of interest will occur during their concurrent representation in this Civil Action; surname initial removed for privacy reasons.

and Carly, pursuant to their attorneys' recommendation stipulated to a waiver in hopes of

being quickly reunited with their children; however, no reunification efforts were seen.

107.        The medic neglect was based on the children having scabies for six months

allegedly without any medical treatment.  On 02/08/2018, Mike brought to court proof of

doctor notes that the children were misdiagnosed with other medical conditions (medical

diagnosis), also he brought receipts for chemicals that had to be purchased to spray the

house; Mike and Carly tried really hard to cure their children, and never denied their

children any medical attention. However, they were told by the lawyers that it would be

easier and faster to get their children back if they continued their hearing and worked

with DCF.

108.        DCF seemed to be upset that the parents left Middlesex County and moved to

Worcester County, in what they perceived to be a form of "escaping" them.  Although the

matter was being heard in Leominster Juvenile Court (where the family now resides),

DCF from Cambridge, asserted its jurisdiction "internally" and wanted to continue to

handle the case out of Cambridge.

109.        The Judge in Leominster Juvenile Court, correctly ordered DCF to transfer the

case from Cambridge to Leominster.  However, three weeks later, they still have failed to

do comply.

110.        As a result of Cambridge DCF maintaining their control of the ongoing case, the

children are placed within the Cambridge's territory, thus making it very difficult for

parents to visit their children.  DCF could have easily placed Mike's children within the

Leominster territory to reduce travel time and costs.  It is making it almost impossible for

Mike to visit his children and maintain his job to provide for his family, which now also involves additional legal fees.

111.        Mike and Carly are allowed to have only one hour of supervised visit per week in Cambridge DCF center.  DCF refused to give more than one hour and the visitation site is not being moved to Leominster; the commute is hour and a half, which results in loss of a whole work day.  Mike, because of the limitations of his work, is not able to make this particular time and DCF does not accommodate his job schedule.  If he doesn't maintain his relationship with his wife, he stands to lose parental rights to his children.

112.        DCF's social worker Akiana Fleurantin ("Akiana") and supervisor Michael McLaughlin ("Michael")  has not been communicating with Mike.  Mike attempted to reach Akiana regarding issues with his children being subjected to abuse by their foster care parent; he would not get any response.  However, Carly (Mike's wife) would have no problems getting in contacts with the social worker or supervisor.  DCF has made it clear that they prefer to speak to his wife and not him.  DCF keeps raising issues of domestic abuse between Mike and his wife (false allegations), and if Mike is using money as a means of control.  They have repeatedly attempted to get his wife to admit to DCF that Mike is abusive and that she needs protection from his abusive behaviors.  Mike is being labeled as perpetrator of abuse and because of it is not able to adequately communicate with DCF. Mike has been questioning DCF's process and procedures, which resulted in him getting less help or support for reunification with his children.

113.        DCF was educating Carly of different types of abuse. After Carly denied any forms of abuse, DCF was still pushing her to acknowledge the ongoing alleged domestic abuse.  Of interest, Carly was never asked any of these questions, nor was it a concern,

prior to the removal of their children. The questions were now being asked to corroborate their case of alleged neglect, because the initial 51A was found to be unsupported.

114.        Madilyn and T.D. were staying together with a foster parent in Hyde Park. The foster parent was verbally abusive toward the children. The children would be grabbed with force and dragged from room to room by their arm. Foster parent erroneously attempted several times to forcefully shower Madilyn free of her scabies, even after Madilyn has just finished showering; her clothes would be forcefully removed and she was forced back into the shower and scrubbed. Foster parent would verbally abuse Madilyn by telling her that it was her fault that she had scabies because she would not shower appropriately. Foster parent would not allow Madilyn to show affection to her brother, or even hold his hand. Foster parent would mimic her crying and say things like "don't think that your parents are crying for you back home". T.D. just had a haircut and the foster parent shaved his head to help get rid of scabies. The manner in which she did it was very insulting, blaming the children for what the foster parent perceived disease and blamed the children for it.

115.        Presently, as of 03/12/2018, L.D. is in a specialized group home, T.D. is in a foster home, and Madilyn (after significant struggles) was finally placed with Carlie's Aunt Barbara. Carly's sister resides in Malden; however, because she filed a restraining order against her x-boyfriend four years ago, she is not being approved as a foster placement home. Carly's Aunt and Uncle, who live in Lowell, were approved as a foster placement home by the Lowell DCF, but Cambridge decided not to place them there, without providing an explanation to Mike or Carly.

116.     L.D. suffers from Encopresis, which results in painful cramping and soiling of self.  As a result of this condition, she has missed school and DCF is having difficulty in placing her in a home.  Wilmington boys and girls home for children with anxiety.  She is surrounded with children who misbehave and is exposed to behaviors that she has not been exposed off.   The staff in Wilmington group home had to be educated by Carly on how to address her medical needs.  There is no private bathrooms; which makes it very embarrassing for her because of her medical condition.  L.D. recently reported that another child is storing make-shift weapon composed of needles stored under her mattress; she is scared and wants to go home.

117.     The next scheduled court date is in June of 2018, until that day, Mike and Carly's children are under DCF's control.  Because there are several parties and attorneys involved, scheduled a court date to be heard on the matter will take considerable time, during which Mike and Carly will not be able to see their children.  No telephone time, face-time or any other electronic means of communication made available to the parents.

118.     Because of the alleged abuse in the foster home, Madilyn and T.D. were removed on 02/22/2018 and placed in different homes.  There is very little information that is being provided to Mike and Carly regarding the status of their children; the children want to come home and are not allowed to do so.   The children, who were removed from loving homes, were placed into less habitable environments, and their welfare is much at risk.

119.     Mike and Carly came to a new town in hopes of strengthening his marriage and their family.  DCF has intruded into the new schools, and would use leading intimidation tactics to get teachers to agree with their allegations.  For example, they would say; "they

are bad parents", "they sent their children to school with scabies", statements that would defame their character within the new schools and small community.  Mike and Carly are ostracized from their new community; for example, they attempted to contact the middle school and elementary school, and have not had their calls returned.

120.          During the time of emergency removal of Mike's children, the police on site confirmed that the residence has all the necessities, was in clean and safe condition.  The veteran officer who reported to the scene told Mike he could not understand what was going on and he would be happy to come in at a future hearing to testify on his behalf that they did not see anything out of the ordinary that would have alerted him.

121.          Mike is being discriminated against simply because he is a male and the difference in treatment is very obvious.  DCF keeps pushing Carly to admit that he is abusive simply because he is expressing his feelings and thoughts, of the ongoing unfairness.  It seems that his family would be served better if they told DCF what they wanted to hear, and have Mike and Carly separate from each other, because reunification seems more likely if Carly was to live alone and comply with DCF.[42]

122.          On 03/01/2018 Mike had his first supervised visit with his children and it was incredible emotional.  The visit was from 4:10pm to 4:40 pm.  The brief time was very difficult for the children to process and there was no preparation or any protection in place to protect the children or parents.  No one addressed how it will be difficult for the children to see their father for first time after being separated for this length of time, and

---

[42] A violation of Family First Preservation Services Act which amends the Social Security Act (42 U.S.C. § 629a(a)(2)) as promulgated by the Bipartisan act of 2018 (Congress's response and reminder, that familial unit stability also includes marriage as an important factor for child welfare services to consider and protect).

the difficult experience of having to see him for such a short period of time going

forward. At 4:35pm Michael walked up to the doorway of the visiting room to say "visit

time is over" with T.D.'s jacket in his hand.  T.D. immediately began to cry and say "No,

I miss my mom, I miss my daddy. I don't want to go."  This was done without warning to

the parents, and without giving the parents an opportunity to prepare their children for

their departure.  It was very cold, ill considerate, and abuse toward the familial unit.

123.        Neither Akian or Michael answered any of Mike's questions or concerns.  He still

does not know what is expected of him, and he does not know what is going to happen

with his children.  We are approaching a month, and he still does not have a service plan,

nor any idea as to when he may be reunified with his family.  Carly confirmed that

Michael's demeanor toward Mike looked threatening, cold and unwelcoming.  The whole

experience seemed like a form of punishment to the parents and to the children.

124.        Even worse, all of his children were not placed with the maternal aunt.  The aunt

Leah D. ("Leah"), is raising four children (12, 9, 7 and 5), has five bedroom apartment

with a kitchen, living room, dining room, a three season porch, and a large backyard in

which the children can play.  She has civil engineering training and worked as technician

drafting bridges for Transystems Corporation; a job that she maintained for thirteen

years.  Her children have not missed medical appointments, and are all medically up to

date.  There has been no substance abuse issues.  She does not have criminal history and

never been arrested.  She has close relationship with the family and support Carlie's

position.   In May of 2014 she was a victim of domestic violence ("DV") with the father

of her children, and she subsequently maintained a restraining order against him.  This

history of DV, for which Leah responded appropriately, is being erroneously used to

deny Lily's placement with Leah; she is left presently in a program with children that are abusing her and overall are a very negative influence.

125.     On 03/08/2018 Mike sent an email to the Lead Counsel, "Good morning listen my daughter Lily is starting to really lose her [mind] in this program she's not getting any peace at school she's being picked on she's being picked on at the program which is part of the reason that we moved her in the first place she likes little ponies and dolls and all these kids are into drugs and alcohol and boys and close so she's not getting any piece at all and they are now picking on her music what she wears they're going to cause my daughter to commit suicide or hurt herself she needs to come home I don't care how we need to get in front of a judge she's more than happy to testify about all of this"

126.     Both husband and wife, are feeling lost, confused, and depressed.  All of their children have been taken, their home is completely empty, and administrative or judicial review of these matters may take indefinite time to resolve, during which time L.D. continues to suffer. L.D. is turning 14 years-old this month, and there has been no preparation or movement of any kind to provide her with information or support, to advocate for herself pursuant to Federal Law.  There is complete lack of compliance with the Federal Law (*see infra*)which authorizes 14 y.o. children in Foster Care to assemble their own panel to access her service plan, contribute to her service plan, provide their own recommendation for placement, and have access to documents.

C.    Christina G.

127.         Christiana G. has a history of using pain medication (Oxycodone and Percocet) and other illicit street drugs.  She has three children, J.P.(y.o.b. 2007) M.P.(y.o.b. 2009), and J.G. (y.o.b. 2016)

128.         Corey P is the father of M.P.and Jayden.  Because M.P.and J.P.are staying with Corey P.'s mother, he has access to them readily.  Ronald F. is the father of J.G.; he also has very limit access to his child.

129.         Christina G. and J.G. both tested positive for traces of controlled substances for which they didn't have a prescriptions.  Christina G. admits that it was mistake to take any substance to address her contraction pains.  Nevertheless neither Christina nor Jason, had any withdrawal symptoms.  After his birth Christina was willing to take urine screens any hour of the day, but that was not good enough, her child was taken away and placed in foster care.  Basically, because she had an existing C&P DCF automatically took custody of J.G. without ever giving her a chance.

130.         On 12/26/17, Christina was visiting Jason, however, she was not allowed to even hold her child.  When her child was starting to cry and Christina tried to comfort him, the child was taken away from her; Christina was not allowed to even comfort her own child (this is a mother who already raised two children).  The visit did not have any value of bonding, it seemed it was done for purposes of checking the box (i.e. visit allowed per guideline) without actually having a real visit for purposes of bonding and interacting with the child.  The visit was cut short, and she would again not know when she can see her child or how much time she would get with him again.  The social worker and care

taker already made the decision that she would not be the child's mother and prevented any meaningful interaction or association.

131.    Fortier never hit the children.  M.P.had "cold sore" recurrent wound in her lips that would reappear from time to time in her upper and lower lips, which make it look like she was hit in the lip, but it was swelling from the cold sore.  The doctor had difficulty diagnosing it.  Doctors prescribed Neosporin and other type of steroids to control the wounds as they would appear, but the doctors could not really identify what they were (there are many strands of "cold sores" and they exhibit themselves in various diverse forms).  These areas would become sensitive and may easily become exposed to the slightest touch.  Social workers would then erroneously interpret these wounds as possible assault from Mr. Fortier which couldn't be further from the truth.  Christina stated repeatedly that she nor does anyone else ever hit the children, but she would not be listened to, the social workers, who lack medical training, would make their documentations, and these documentation would "follow" Christina and used repeatedly to discredit her and Mr. Fortier in subsequent DCF reports and evaluations.

132.    Maya, a young lady, was just being dramatic exaggerating the circumstances without fully knowing the consequence thereof (i.e. trying to make it look like someone was the cause of the bleeding to make them feel bad even though they were not the cause of it).

133.    In October, 2016 you got in altercation with Ronald that involved both of you picking up knives and J.P. was exposed to these burst of  (Jason dad)  They are exaggerating.  J.P. would always ask for "daddy" Ronald, so it is very strange that it is

not mentioned, that they go to the part together, go on bike ride, and spend a lot of time together; however, all of this is devoid from the record.

134.      Christina lives with her mother and is able to have her children there or at other friend's residence whom would me more than happy to give her a place to stay with her children.

135.      Jason was taken from Christina in the hospital, she was not given a chance and Jason lost the opportunity to be breast fed.

136.      DCF on her service plan said that she needed to get engaged with therapy. However, she was not given a therapist or directed where to get such therapy.  Christina had to figure out how to get help.  Even worse, Christina was told to get drug screened, but she was not provided with any financial assistance or even directed where she would be able to get such screening at a cost she could afford.  Christina has MassHealth medical insurance which is not accepted for drug screens at most locations; her request for funding was denied.  Christina, on her own, without help from DCF would do her best to find services.  She was able to find services for drug addiction and Completed Detox, CSS (getting ready to go into TSS), TSS (transitional to get ready for half way house), and SOAP, the half way house would not help her.  Surprisingly, because she was "clean", she could not get into programs because Parent would have to provide a "dirty" urine screen to have access to some of the services.

137.      In other words, DCF is telling her she needs to do things, but they would tell her how to go about acquiring them.  All of these things were new to her.  DCF was focused on protecting the children and completely left the parent to fend for her own.  Christina's recovery would be even harder because she had to do it without her children in her life,

and the visits would be inhumane and really debilitating.  For a recovering drug addict, being mistreated and having your kids used against you, makes it very difficult to pick yourself up; the thought of using drugs to take the pain away sometimes seems the only solution.

138.　　　DCF involvement has been nothing but a "punishment" in nature with no services given to assist improvement.  Christina is consistently subjected to belittling, ridicule and feeling of worthlessness.  It is obvious that she is seen in DCF's eyes as someone who should not be a mother, and they are just going through the motions (e.g. giving her a so-called visit) with no intentions or wants of reunification.  Christina has separated herself from Ronald and has not been involved in any domestic relationship, and is willing to take any and all drug tests.  However, DCF will not provide drug tests; DCF says she needs to get her drug tests from the a drug rehab clinic.  However, drug rehab will not allow her to be admitted unless she tests positive.  In other words she needs to test positive to gain entry to address drug addiction.  Christina is unable to financially afford to pay drug tests on  her own.  Right now, Christina would agree to take drug tests on a daily basis, and not allow any man in the house, but DCF would not accept this option, it seems the case is not progressing for reunification and Christina is set to have her rights be terminated.

139.　　　It is natural that this whole experience is very taxing on the family, both Christina and Joanne are continually find themselves bewildered and unable to communicate their issues because there is no one to go for help.  There are no services that will help with actual reunification, it seems that time is just passing, and the hope of reunification is dwindling.  Christina is a willing and able parent, but no one is giving her a chance; it

seems the decision as already been made based on her past mistakes and she is no longer seen as a parent; where does she go for help?

140.         The social worker are testifying for DCF with the goal of termination of her rights. She is desperately trying to save her right to parent but she has no one to turn to. DCF has turned their back on her, she doesn't have money to go get resources, Attorney Ilya Liviz is the only person that is advocating for her; she has nowhere to go.  She is in desperate need of [proposed] Department of Parent Services to give her services and assistance; she is willing to do whatever they ask, please give her services, she will take a drug test every day, no one is helping her.

141.         Christina did great in half way house, she tried to help a friend out with a Gabapentin[43], and as result of her trying to help someone, by passing someone else's prescription to someone else, you got kicked out.  While you're in your halfway house trying to complete recovery, you get the news that the goal is changed to adoption, meaning DCF is not supporting reunification.  In half way house they looked through Christina's phone, and based on information in the phone, she got kicked out of the program, she didn't even get a chance to defend herself.

142.         CPCS, parent lawyers, said to Christina told her on the phone that there is nothing she can do for her and that she lost her parental rights.  (Christina has anxiety and panic attack) said that she would have no chance of getting the children back, and that she now had to look into agreeing to adoption.   that made Christina extremely depressed, and hurt her treatment for anxiety.  She would cry all day and would not be able to even go on

---

[43] Gabapentin is an anti-epileptic drug used to treat neuropathic pain, restless legs syndrome and seizures.

walks, literally the whole world turned on her.  There was no one for Christina to turn to. She is able to clean, she is able to cook, she is able to give love and affection, she is able to read children books and play children games, and she is willing to take drug tests and comply with any request, no one is giving her chance, the door is shut and closed on her being a parent.  Her trial on the merits is coming up soon, and she is just sitting at home, hoping to see her children and talk to them, get visits from them, she feels beat down with no hope, she has not seen her children since February, 2017, DCF has made a decision to not allow her to see them, and without having an advocate on her behalf, DCF's advocates words is the golden standard of what is correct. DCF has made a decision to place the child with the paternal grandchildren, and the grandmother would not allow her phone calls and ultimately terminated them; the C&P proceedings are used as a form of transferring custody, the two sides have custody issues.  Children can be inappropriately being filled with untruthful (opposing) information; their minds are filled with information that will make them resent the parent that "left" them.

143.	Lack of visitation creates a situation that pulling the children out of there placement maybe traumatic and thus setting up Christina for failure.   She has an upcoming trial on the merits (represented by this counsel), and she is unable to switch caseworker; she is not being helped to see or be reunified with her children.   Her service plan was designed for her to fail, and even if such service plan was changed, the damage has already been done; her two oldest children are adopting to a new home, and the children are not allowed to hear about any possibility of reunification with the mother.

D.    Jennifer L.

144.        Jennifer, born in April 1987, gave birth to K.L.(ten y.o.), J.L. (six y.o.), A.L. (two

y.o.).  When Jennifer was fourteen (14) y.o a CHINS was placed on her, a few years later

she was committed by the same Judge to DYS that is now presiding over her C&P in

Juvenile Court.  Jennifer has not seen her children in over six months; DCF is not

granting her visitation even though her parental rights have not been terminated by the

court.

145.        Jennifer, has social anxiety, depression, ADHD, bipolar mood disorder, and is

currently receives SSI benefits for her disabilities.  Because K.L. was picking on J.L.,

Jennifer asked DCF for help because she was told she was going to be offered services.

But, instead of helping Jennifer, they ended up taking her children.

146.        In July 2016, her children were running around the house at 6:00 am and then hid

in a bush.  Because Jennifer couldn't find them she panicked and was running around

screaming their name.  A neighbor called the police.  When police came, the children

were already safe in the house.  However, because of the 51A report (police showing up

due to yelling), and Jennifer exhibiting signs of anxiety and panic, DCF required her

children to be removed.  All of the children were dressed with clean clothes, bathed, fed,

and were healthy.  Nevertheless, Jennifer was told to have her sister take the children or

they would be put in foster care.  This threat was unjustified as the children were not in

immediate threat or danger of abuse; requiring emergency removal or transfer of custody

was unconstitutional.  Jennifer went from being a full time mom to only seeing her

children only for two hours a week

147.        Nevertheless Jennifer complied and placed her children with her sister, but the children were taken away from her sister two months later for non compliance; the sister now had six children total and could not meet all the necessary appointments.  They also stated that the house was dirty; it was not, it was simply cluttered because there were so many children. Once the children were removed from the sister, Jennifer's likelihood of reunification diminished.

148.        DCF judged Jennifer due to her disabilities and justified the removal of children from her custody by use of character assassination.  While the children were at Jennifer's house, the children were not in danger, were not subjected to neglect or abuse; however, they experienced recurrent abuse in foster care.  Multiple 51A reports were filed against the foster parents while Jennifer's children were in their care.

149.        Jennifer's children would experience abuse in foster care.  Kayla broke her elbow in foster care, and Jennifer was not informed of this.  J.L. told Jennifer that her head was forced under water and she couldn't breathe.  A.L. had huge bruise on his back and spine. J.L. said the foster mom would spank and beat him, and that she tried to protect him but was too little to do anything.  A.L. did not have the same upper strength and he now wears a helmet and would move differently.  The children want their mom back and DCF will not allow it.  Children are being harmed in foster care and are not receiving motherly love and Jennifer can't do anything about it. After the abuse was discovered, all of the children were removed and separated.  Currently J.L. is placed in a family that does not speak English; she is confused and does not understand the culture.

150.        All the siblings are split up and do not see each other.  They are lucky to get one visit per month.  When the children saw Jennifer, they thought that Jennifer doesn't care

about them. They were upset that Jennifer would not see them, not knowing that she is trying her hardest to see them and is not allowed. There were many times Jennifer was late a few times and the visit was canceled even though she called ahead to let them know there was traffic. Sometime in middle of 2017 Jennifer arrived for her supervised visitation at the foster home K.L. was staying; she was ten (10) minutes late and the visit was canceled; she still recalls as she was at the steps watching K.L. being dragged away as K.L. was looking back at her, crying, saying she loves her mom and wants to see her, and against her will she was dragged away. This visit, like many others, was canceled, and case dictation notes only reflected that she missed the visit; the fact that the child missed her mother, loves her mother, and was devastated when she was being dragged away, was not mentioned.

151.     The initial reason of C&P had to do with DCF not understanding how to interpret persons with disabilities even though her disability is controlled with medication. Jennifer is receiving disability benefits for her social anxiety, claustrophobia, panic attacks and depression; her demeanor and character is being stigmatized. She is a ready and able mother, who loves her children and can offer a much more safer and nurturing home than the current foster home placement.

152.     Jennifer L. is currently attending Habit Optco Clinic in Lowell, MA where medication are administrated by medical providers on a daily basis in the morning; The clinic conducts drug screen; failure to abide by their rules will result to being (kicked) from the clinic.

153.     Jennifer lost her visitation rights based on accusation of drug use. She was asked to take a drug test and she did not have resources or access to transportation at the time to

do so.  Furthermore the social worker did not provide her with any resources to help acquire or gain access to a facility to get a urine test.

154.        Jennifer has a three bedroom apartment, has consistent income, and funds to provide for food, clothing and other necessities.

155.        Jennifer is being judged based on her not being as sharp as others, nevertheless she is a great cook, enjoys doing laundry and giving hugs and kisses to her children who she loves very much.

156.        Attorney Tameka Grantham ("Tameka") was appointed to represent Jennifer. Jennifer was not able to get in touch with her.  Attorney Grantham did not offer Jennifer helpful advice or options that would meet her needs.  In fact, attorney Grantham advised Jennifer to give up her children for adoption.  Jennifer is alone, without her children, helpless and scared.

157.        On 01/29/2018, Tameka, believing that Jennifer has no chance at trial, showed up to her trial unprepared.  When Jennifer was not allowed to have another attorney represent her interests by the juvenile court judge, Tameka attempted to continue the matter because she was unprepared at all.  Judge instructed the trial to go forward. Jennifer was unprepared and did not have anyone in the courtroom to support her.  Her family or friends were not allowed to be in the courtroom, and her own attorney was telling her that she was completely wrong for doing this.  She was by herself, without education, without support; termination was already determined.

158.        This counsel spoke to both Tameka, and her children's counsel, and they justified lack of visits due to Jennifer not taking drug tests.  However, Jennifer repeatedly asked

for drug tests and DCF does not provide them; parents are left to their own to try to find financial means to pay for these expensive tests, which MassHealth does not cover.

159.         Jennifer is drug free, she only takes her prescribed medicine.  DCF is not providing her with meaningful visits with her children.  DCF has made a decision to terminate her rights so they are not even making any efforts to have her interact with her children or even offer her any services.  Jennifer has completed her service plans and every time she finishes the list, there would be a new list made; it seems these lists keep being modified and she is not being given any chances of reunification.  Jennifer workers do not understand or know how to interpret people with disabilities; they are erroneously assuming that the person is an unfit parent when its further from the truth.  Jennifer can provide the children with all the necessities and more importantly with motherly love.

160.         Jennifer's court appointed CAFL attorney showed up to trial on the merits without any preparation.  This counsel is not aware of any interlocutory appeals or other south out appellate remedies.  Jennifer was never given a shot, there were no motions for abuse of discretion filed addressing lack of reunification efforts.  DCF terminated her visits, and did not list services in her service plan necessary for reunification; DCF plan was to terminate her rights and even her own attorney never gave her a chance to be reunified with her children again.

E.      Nicole G.

161.         Nicole was born in June of 1981 (36 y.o) and is currently residing in Massachusetts.  She gave birth to two daughters; P.G. (y.o.b. 2009)  and K.G. (y.o.b.

2014).  Both children have been adopted against her will, and she has not been able to have any contact since.

162.        Nicole, has a history of substance abuse, and has been in and out of mental health treatment.  Her need for mental treatment was increased due to emotional injury she sustained and is still struggling with, subsequent to the loss of her right to parent and denial to have any contact with her children.

163.        Nicole, is a parent, who has been receiving disability benefits, prior to, during, and after, the birth of her daughters.  Her disability benefits are based on PTSD, Anxiety, Depression and Agoraphobia[44].  These diagnoses were well documented, for which she receives treatment.  Nevertheless, she is unable to maintain a job and remains on same disability benefits, which she was receiving prior to the birth of her children, to support herself.

164.        Although Nicole relies solely on disability benefits for income, she was a great stay-at-home mom.  She is able to cook, clean, do laundry, play and educationally interact with her children.

165.        When K.G. was born, DCF automatically opened a case against Nicole because she was prescribed Methadone through HabitOpco.  DCF's service plan was to reunify Nicole with both of her children, but they wanted her to first get into a sober house and

---

[44] Agoraphobia, is an anxiety disorder characterized by symptoms of anxiety in situations where the person perceives the environment to be unsafe with no easy way to get away. These situations can include open spaces, public transit, shopping malls, or simply being outside the home.

reduce her prescribed Xanax[45]. Per DCF's advise, Nicole sought out, and was accepted

into the Phoenix Sober House where she was granted a bed and a place to stay.  However

after her acceptance, DCF changed their plan from reunification to adoption.  Because

Phoenix Sober House is for mothers who are in the process of reunification, Nicole's

acceptance was revoked.  Nicole attempted to call her court appointed attorney, Alan

Levine *Esq*., many times regarding this matter; her phone calls were ignored by everyone.

166.        Nicole, is a quite, calm, reserved, and soft spoken individual, that is unable to

advocate for herself.  Her disability was erroneously treated as drug induced state, when

in fact she is like that sober or not.  Her Agoraphobia makes it very difficult for her to get

around (e.g. she experiences anxiety when she has to use public transportation) to visits,

or attend court dates.

167.        DCF told Nicole that she could not be on Benzodiazepine if she wanted to have

her children.  Benzodiazepine, are anti anxiety medication that she needs to take as part

of her disability.  Per DCF's and her attorney's advice, she decided to comply with DCF

and stop taking them so that she can have a chance at reunification.  Sometime around

March, 2015 Nicole was not able to make her Trial on the Merits, because of the change

in her medication, which resulted her unable to attend.  Her attorney did not discuss with

her about alternate solutions or possibility for accommodations.  Her attorney, advised

her that he would continue her trial on the matter; however, her rights were terminated

and she would never see her children again.  If Nicole knew, that her rights would be

---

[45] Xanax (alprazolam), is a potent, short-acting benzodiazepine anxiolytic—a minor tranquilizer.
It is commonly used for the treatment of anxiety disorders, especially of panic disorder, but also
in the treatment of generalized anxiety disorder (GAD) or social anxiety disorder.

terminated (i.e. not continued as she was erroneously advised), she would have shown up, even if it was detrimental to her health.

168.         Nicole was never given a chance from the start.  Because her toxicology screen came back positive for cocaine in the early months of pregnancy (Nicole was unaware she was pregnant) as soon as her daughter was born, DCF took her daughter with no intentions or efforts, for reunification.  Her attorney felt the same way about her, and supported DCF's decision and didn't even tell her about it.  Her service plan did not contain services for reasonable efforts of reunification; there was no home parenting aid offered or any other parenting assistance offered of any type. There was no assistance for visitations; she was not provided with any financial assistance for visitations or travel accommodations based on distance of separation from children.  She was left to figure how she was going to see her children on her own.  DCF made their decision that she was not a fit parent prior to court's approval; her fate as a parent was decided by DCF well in advance of trial on the merits.

169.         Because of Nicole's disability, she was not treated fairly.  DCF only focused on her substance abuse, not taking into account, that some of her behaviors are not drug related, but are disability related.  DCF did not make any efforts to discern alleged issues caused by substance abuse, versus her reduced mental function that is caused by her disabilities.  DCF, without fully investigating her disabilities, discriminated against her, and never gave her a fighting chance at reunification.

170.         Nicole had no money, lack of supportive family, and no access to competent professional help.  She feels humanity has turned their back on her, and the only solace she has, is to check into mental treatment facilities that only temporarily dull the pain.

Her children were given up for adoption without her even having a say in this.  She now understands that her children have acclimated to their new homes, and wishes to be able to have at least single contact a year so that the children know of her existence, which is in line with the public policy (most children when they become adults always are seeking to find their biological parent).

171.      Her appointed attorney, nor CAFL, offer her any appeal options.  She has contacted several attorneys and no one is able to help her.  She contacted the DCF adoption social worker in November 2016, and was told she is not allowed to have any contact with her children.  She only wants to be able to, at least, send a card once a year on Christmas or New Years.

## PLAINTIFF COLLECTIVELY

172.      Defendants' actions and inactions with respect to the Named Plaintiffs are part of a systemic pattern of conduct that has caused, and continues to cause, irreparable harm.  Defendants have violated and acted with deliberate indifference to and beyond the bounds of professional judgment regarding the Named Plaintiffs' constitutional and statutory right to parent and familial association with their children.

173.      Defendants' failed and continue to fail to:

     a.      provide necessary services and reasonable efforts for reunification;

     b.      make periodic comprehensive assessments of their needs and providing services consistent with those needs; make timely and meaningful casework contacts and monitor their progress in order to ensure timely reunification;

c.      monitoring and services necessary to prevent the breakdown of the familial unit, and preserve the children's' well being, psychological and emotional state of mind, while in state custody;

d.      support their family relationships, in particular by not providing child-parent and sibling visits;

e.      provide appropriate management and supervision while they have been in DCF custody in accordance with their individual needs, best interests and professional standards;

f.      by failing to provide case management and planning in accordance with their individual needs, best interests and professional standards; and

g.      develop and implement a viable permanency plan that will allow them to leave foster care and be reunified with their parents as mandated by Federal Acts.

## DEFENDANTS COLLECTIVELY

174.      Charlie Baker, Governor of Commonwealth of Massachusetts ("Massachusetts"); Linda S. Spears, Commissioner of DCF ("DCF"); Marylou Sudders, Secretary of the Massachusetts Executive Office of Health and Human Services ("EOHHS"); Anthony J. Benedetti, Chief Counsel for the Committee for Public Counsel Services ("CPCS"); collectively are the Defendants in this Civil Rights Complaint ("Defendants").

175.      Attorney Gene Rauhala, Attorney Tameka Grantham O'brien, and Attorney Alan I. Levine, in their individual capacity and [proposed] on behalf of all others similarly situated, are the Defendants to the alleged State Claims of this Complaint.

CLASS ACTION GENERAL ALLEGATIONS & LANDSCAPE

## I.        OPPOSITION TO CONCURENT FILLING OF CHILDRENS CLASS ACTION

176.        Parents can bring claims on behalf of their children.  However, while a child has

an interest in family integrity, it may also be in the child's best interests permanently to

terminate the parent's rights.[46]  Therefore, admittingly, Plaintiffs Collectively, may be

bringing claims that may be conflicting with children's interests.  Thus, children, as

appropriate, should be advocated by different representatives, with no relations to either

the Plaintiffs nor the Defendants (e.g. guardian ad litem, next of friend, or other

competent counsel appointed by the court to represent the interest of children class as a

whole only).[47]

177.        However, it would be a huge disservice to the children to bring them into the class

action litigation at this stage, such filling should be denied or stayed, for the following

reasons;

        a.        The court, try as it may, will not be able to represent the children's class

        without bias in the representation.  It is impossible to  prevent an interventor

        bringing their own bias into this lawsuit; unfortunately interventors' will naturally

        lean toward favoring the Plaintiff or the Defendant.

        b.        Allowing the Children's Plaintiff Class to join at this stage will confuse the

        main thrust of this cases; there is a state-wide lack of policy implementation to

---

[46] *See In re Adoption of Nancy,* 443 Mass 512, 822 N.E.2d 1179 (2005)
[47] *See In re Adoption of Meaghan*, 461 Mass. 1006, 961 N.E.2d 110 (2012) (Upholding lower court's determination there should be counsel appointed to both parent and child, due to possible conflicting interests.)

provide reasonable efforts to reunify families (leading to misappropriation of federal funds). The children may or may not be striving in placements or foster care, and may or may not have a promising future there; however this is irrelevant (confuses the issue) and should not be considered in determining state-wide violations of parents constitutional right to parent and right to familial association, which for the most part has gone unnoticed. [48]

c.      Outcome of this litigation will heavily affect children's positions.  It is very common that children's attorneys make a determination that the present foster care is providing "better" care than the parent would.  However, although such arguments work to persuade the Courts to rule in favor of Parent's position or DCF's position, it does not take away the constitutionally protected right for the biological parents to have reunification efforts and have services offered to them in accordance with the Federal Acts that fund them.[49]

d.      Most importantly, children's' constitutional infirmities, *inter alia*, focus on the abuse and neglect, at the hands of DCF and their agents, are primarily State claims, which are immune to suit.[50]

e.      The Office of the Child Advocate raises issues regarding 566 children in DCF care;  as reasoned in *Conor B*, while mistreatment of a children in State care, can lead to individual substantive due process violations, to hold the whole State

---

[48] *See* Executive Order No.494 (Establishing the Office of the Child Advocate); however, there is no such office for parents; https://www.mass.gov/executive-orders/no-494-establishing-the-office-of-the-child-advocate
[49] *See* AACWA, CAPTA & SSA (Federal Acts contain reunification and goal of keeping familial unit in tact provisions).
[50] *See* M.G.L.c. 258, §§10(a)-(c) (revoking Mass Tort Act's exception to eleventh amendment State Immunity, *inter alia*, discretionary function and intentional torts of State Employees).

accountable, Plaintiff Class will have to pass the "shock-the-conscience test";[51]  a

very difficult task to do considering DCF has almost 52,000 children in its care

during the time period audited. *See infra* State Auditor's Official Audit Report

f.      Children's claim of constitutional infirmities, will be on stronger ground if

this  Plaintiff's Class Action lawsuit wins, *inter alia*, will have solid argument of a

state-wide violation of familial association with their parents (i.e. state-wide lack

of reasonable efforts for reunification of parents with children).  In other words,

once this Class Action law suit "wins", it will pave the way for the second Class

Action law suit on behalf of the children.

178.        It is of note, statute of limitations for the children does not accrue till their

eighteenths birthday, and as such should not intervene until parents' and state's rights are

determined by this Class Action Complaint.[52]  Furthermore, *arguendo*, we don't actually

know whether in fact state-wide lack of reasonable efforts to reunify is actually occurring

(i.e. no Office of Parent Advocate to provide us such data); such state-wide claim will

begin to accrue once this Lawsuit is proved.

179.        Finally, parties should be mindful M.G.L.c. 231, § 60D statute of repose

abrogates M.G.L.c. 260, § 7 tolling of claims by minors; "[n]otwithstanding the

provisions of section seven of chapter two hundred and sixty, any claim by a minor

---

[51] *See Connor B.,* 771 F.Supp.2d 142 (Special relationship between foster children and state triggered Due Process Clause protection; however Class as a whole failed to show executive actions shocks-the-conscience) *see also Martínez v. Cui,* 608 F.3d 54, 64 (1st Cir.2010) ("[T]he shocks-the-conscience test ... governs *all* substantive due process claims based on executive, as opposed to legislative, action.") (citations omitted).
[52] *See* M.G.L.c. 260, §7; *See Gore v. Daniel O'Connell's Sons, Inc.,* 461 N.E.2d 256, 17 Mass. App .Ct. 645 (1984) (statute of limitations on a minor's claim for loss of parental society and emotional distress will not begin to run until the child reaches the age of majority)

against a health care provider stemming from professional services or health care

rendered, whether in contract or tort, based on an alleged act, omission or neglect shall be

commenced within three years from the date the cause of action accrues, except that a

minor under the full age of six years shall have until his ninth birthday in which the

action may be commenced, but in no event shall any such action be commenced more

than seven years after occurrence of the act or omission which is the alleged cause of the

injury upon which such action is based except where the action is based upon the leaving

of a foreign object in the body."[53]

180.        However, M.G.L.c. 231, § 60D seven year statute of repose limitation does not

come into play in a Children's Class Action lawsuit because of the eleventh amendment.[54]

The Massachusetts Tort Claims Act which abrogates eleventh amendment's State's

immunity by allowing tort action against the employer, does not allow such action against

the employee.[55]  In other words, claims against the employee of the Commonwealth,

subject to M.G.L.c. 231, § 60D, as it is considered in the Children's Class Action, are

invalid because the employee is immune from liability.[56]

181.        However, more appropriately, claims against the Commonwealth (employer),

*inter alia*, failing to implement policy, that relate to their direct control over their

---

[53] *See McGuiness v. Cotter*, 412 Mass. 617, 591 N.E.2d 659 (1992)
[54] *See* M.G.L.c. 258, §10(a)-(c) (State employees are immune from claims based on their discretionary or intentional acts).
[55] *See* M.G.L.c. 258, §2 ("Notwistanding that a public employee shall not be liable for negligent or wrongful acts...")
[56] *See also* M.G.L.c. 258, §§10(a)&(b) (any claim based upon an act or omission of a public employee when such employee is exercising due care in the execution of any statute or any regulation of a public employer; any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused)

healthcare providers (social workers), will not start to accrue till the minor turns eighteen years old.[57]

182.        Moreover, M.G.L.c. 258, § 2 "[f]inal judgment in an action brought against a public employer under this chapter shall constitute a complete bar to any action by a party to such judgment against such public employer or public employee by reason of the same subject matter." does not apply to the minor children because, *inter alia*, statutes that limit future fillings by procedural requirements have been struck down.[58]

183.        In put it simply, filling Children's Class Action would look very similar to *Connor B*, which lost; 1) children harmed in foster care, 2) failing to register, list and forward perpetrators[59] to District Attorney[60], 3) failing to provide services for reunification, 4) failing to implement and execute their own policies and regulations etc... Some of the claims are strong individually, however, will likely fail as a class, because of the same problem *Connor B* ran into, the number of actual children harmed, will not be enough to hold the Defendants liable for the entire Children's class. However, if Parent Class wins, Children Class will be able to bring Class claim of deprivation of familial association, which presently, may be opposed by children (foster home may be "better" than the biologic home). In other words while from parents view, it is universal that the

---

[57] *Ibid*, ("The remedies provided by this chapter shall be exclusive of any other civil action or proceeding by reason of the same subject matter against the public employer or, the public employee or his estate whose negligent or wrongful act or omission gave rise to such claim, and no such public employee or the estate of such public employee shall be liable for any injury or loss of property or personal injury or death caused by his negligent or wrongful act or omission while acting within the scope of his office or employment"),

[58] *See e.g. Shapiro v. City of Worcester*, 464 Mass. 261, 982 N.E.2d 516 (2013) (Declining to extend pursuant to M.G.L.c. 258, §10 procedural requirement of presentment)

[59] *See* 110 CMR 4.36 - 4.38

[60] *See* M.G.L.c. 119, §51B(k)

reunification should occur whenever possible, from the children's view, there may be times when in fact it is of "no rush" because the child may be striving and doing better in foster care.  This opposing argument will no longer be viable, once parents prove, as a class, that they weren't offered requisite reasonable efforts of reunification, their constitutional right to parent, will trump, any counter argument the children class may offer.  Thus strategically, this parent class should be litigated first; Children Class Action thereafter.

## II.  GENERAL ALLEGATIONS

184.     The named plaintiffs bring this action as a class action pursuant to Rule 23(b)(1) and (2) of the Federal Rules of Civil Procedure.

185.     Plaintiffs file this complaint on behalf of themselves and all other similarly situated children, seeking injunctive and declaratory relief from the unconstitutional and unlawful actions and inactions of defendants, as herein set forth.

186.     The named plaintiffs, are parents who had their children removed from their home unnecessarily, were not provided with services and reasonable efforts for reunification. The named plaintiffs have suffered the deprivations of rights claimed herein.

187.     The class plaintiffs seek to represent is composed of: 1) all parents who have, are, or will be exposed to DCF and their gauntlet of criticism and ridicule.

188.     Joinder of all members is impracticable as the class includes many thousands of parents at any one time and class membership fluctuates continuously.

189.        The questions of law and fact common to the members of the plaintiff class

include: 1) whether defendants operate a child welfare system that conducts inadequate

investigations as to offering parents services, failing to offer adequate services to children

and their families to enable the children to remain safely in their homes, instead of

entering foster care or other out-of-home placements; 2)whether there is a state-wide

failure if implementing and executing State's own policies against discrimination; 3)

whether defendants' actions and inactions violate plaintiffs' rights under Child and Family

Services Improvement and Innovation Act of 2011 (with amendments); 4) whether

defendants' actions and inactions violate plaintiffs' rights under the Fostering Connections

to Success and Adoptions Act of 2008; 5)whether defendants' actions and inactions

violate plaintiffs' rights under the federal Adoption Assistance and Child Welfare Act of

1980; 6) whether defendants' actions and inactions violate plaintiffs' rights under the

federal Child Abuse Prevention and Treatment Act; 7) whether defendants' actions and

inactions violate plaintiffs' rights under the federal Social Security Act with amendments,

(e.g. Family First Prevention Services Act as amended by Bipartisan 2018 Act); and 8)

whether defendants' actions and inactions violate plaintiffs' rights under the First, Ninth,

and Fourteenth Amendments to the United States Constitution. 9) whether defendants'

actions and inactions violate plaintiffs' right under other federal acts or state law.

190.        The claims of the representative parties are typical of those of the class *in* that the

constitutional and statutory deprivations alleged by the named plaintiffs and caused by

defendants are the same as those suffered by all other class members.

191.        The representative parties will fairly and adequately protect the interests of the

class. The named plaintiffs have no interests antagonistic to those of the class. Further,

plaintiffs are represented by an attorney who has a rare benefit of experiencing the

intricacies of the system and its failures from both sides.[61]  Also, counsel is a former

professor who have taught for over a decade, this experience of public speaking &

teaching, helped him to easily transition and become a winning trial attorney.  This case

will be presented to a jury of our peers.

192.        The prosecution of separate actions by individual members of the class would

create a risk of inconsistent or varying adjudications with respect to individual members

of the class which would establish incompatible standards of conduct for defendants.

193.        Defendants have consistently acted and refused to act on grounds generally

applicable to the class, thereby making appropriate final injunctive and declaratory relief

with respect to the class as a whole.


### III.     FEDERAL STATUTORY FRAMEWORK


A.     Bipartisan Budget Act of 2018 ("BBA")

194.        The Bipartisan Budget Act of 2018 (aka Honoring Hometown Heroes Act) is a

federal statute concerning spending and the budget in the United States, that was signed

into law by President Donald Trump on February 9, 2018.[62]  The following Titles of

BBA pertinent to this case; Title VI (Child and Family Services and Supports Extenders),

Title VII (Family First Prevention Services Act) and Title VIII (Supporting Social Impact

---

[61] *See Ilya Liviz & another vs. Supreme Judicial Court of The Commonwealth of Massachusetts*,
CA 1:17-cv-12345 (D. Mass. 2017), (Counsel is mindful of deficiencies within the Juvenile
Court System, however, state-wide crisis can be resolved by focusing on the Executive Branch
only without any interference with the Judicial Branch functions; federalism issues are avoided).
[62] *See* Pub. L. 115-123, February 9, 2018.

partnerships to Pay for Results).  These Titles amend the Social Security Act at various places.[63]

B.    Family First Prevention Services Act ("FFPSA")

195.      FFPSA promulgated under Subtitle A in Title VII of BBA; reshaping the expectations for use of federal funds in Prevention and Supporting Families.  "The purpose of this subtitle is to enable States to use Federal funds available under parts B and E of title IV of the Social Security Act to provide enhanced support to children and families and prevent foster care placements through the provision of mental health and substance abuse prevention and treatment services, in-home parent skill-based programs, and kinship navigator services."[64]

196.      State plan for foster care and adoption is assistance[65] is amended to require States to maintain a prevention plan that shall; (I) identify the foster care prevention strategy for the child so that the child may remain safely at home, live temporarily with a kin caregiver until reunification can be safely achieved, or live permanently with a kin caregiver; (II) list the services or programs to be provided to or on behalf of the child to ensure the success of that prevention strategy; and (III) comply with such other requirements as the Secretary shall establish (catch all provision are inserted through the

---

[63] No amount of thanks can ever be expressed for the gratitude we have for Congress and the President, for promulgating into Law provisions necessary to "spell out", what has always been guaranteed by the U.S. Constitution, requirement for Child Welfare System to provide reasonable efforts in maintenance of intact familial unit first and foremost; this law saves our lives and our sanity.

[64] *See* Pub. L. 115-123, at § 50702. PURPOSE.

[65] *See* 42 U.S.C. §§ 671 et seq.

act that grant more power to the Secretary to regulate lack of compliance with the Family First Directive in manner it feels is most appropriate).

197.     Only services and programs provided in Accordance with Promising, Supported, or Well-Supported Practiced Permitted (placing strict requirements on the state if they chose to utilize federal benefits). Specific guidance to the States will be provided no later than October 1, 2018.

198.     Section 431(a)(7) of the Social Security Act is amended to eliminate time limit for family reunification services while the child is in foster care, and to encourage families having their own autonomy without government's intrusion, there is no a a time-limit on family reunification services when the child is returned home.[66] There are also enhancements to grants that improve well-being of families affected by substance abuse.[67]

199.     The Act does allow time for the State to transition, and will not be deemed "failure" during the transition.  However, amendments made by the following three (3) sections shall take effect on the date of enactment of this Act (*see* FFPSA § 50734); 1) 50711(d), facilitates use of best practice that will prevent child abuse and neglect and reduce the likelihood of foster care placement by supporting birth families and kinship families and improving targeted supports for pregnant and parenting youth and their children; 2) 50731, reviewing current licensing practice of foster home so that quicker placement of children with relatives can occur; and 3) 50733, the heading for Part E of

---

[66] *See* 42 U.S.C. § 629a(a)(7)
[67] *See* 42 U.S.C. § 629g(f)(Changing subsection of SSA to "Implement IV-E Prevention Services, and Improve the Well-Being of, and Improve Permanency outcomes for, Children and Families Affected by Heroin, Opioids, and Other".)

Title IV of the SSA is amended to, "Part E- Federal Payments for Foster Care, Prevention, and Permanency".

200.        BBA amended section 425 of the SSA to extend funding to Stephanie Tubbs Jones Child Welfare Services Program through 2021,[68] and amended section 436(a) of such Act to extend funding to Promoting Safe and Stable Families Program Authorizations through 2021.[69]

C.    Child and Family Services Improvement and Innovation Act of 2011 ("CFSA")

201.        CFSA[70] amended section 425 of SSA by extending Stephanie Tubbs Jones Child Welfare Services Program through 2016.[71] It requires States to coordinate necessary evaluation and treatment of emotional trauma associated with a child's maltreatment and removal from home,[72] appropriate use and monitoring of psychotropic medications,[73] and address developmental needs of young children.[74]More importantly, it extending funding authorization for the Section 436(a) of the Social Security Act Safe and Stable Families Program.[75]

202.        Promoting Safe & Stable Families (PSSF) program is designed to assist children and families resolve crises, connect with necessary and appropriate services, and remain safely together in their own homes whenever possible.

---

[68] *See* 42 U.S.C. § 625
[69] *See* 42 U.S.C. § 629(a)
[70] *See* Pub. L. 112-34
[71] *See* 42 U.S.C. § 625
[72] *See* 42 U.S.C. § 622(b)(15)(A)(ii)
[73] *See* 42 U.S.C. § 622(b)(15)(A)(v)
[74] *See* 42 U.S.C. § 622(b)
[75] *See* 42 U.S.C. § 629f(a)

203.        CFSA revised purposes of Family Support Services and Time-Limited Family

Reunification Services.  Section 431(a)(2) of the SSA is amended to define family

support services as  community-based services designed to; (i) To promote the safety and

well-being of children and families; (ii) To increase the strength and stability of families

(including adoptive, foster, and extended families); (iii) To increase parents' confidence

and competence in their parenting abilities; (iv) To afford children a safe, stable, and

supportive family environment; (v) To strengthen parental relationships and promote

healthy marriages; (vi) To enhance child development, including through mentoring (as

defined in section 439(b)(2) of the SSA). [76]

204.        It also amended the Time-Limited Family Reunification Services in section

431(a)(7)(B) of SSA by requiring peer-to-peer mentoring and support groups for parents

and primary caregivers, and services and activities designed to facilitate access to and

visitation of children by parents and siblings.[77] (Note: DCF has failed to incorporate this.)

D.        Fostering Connections to Success and Increasing Adoptions Act of 2008 (" FCSAA")

205.        The Act contains Six Titles (Title I-VI) containing twenty-two (22) Sections

numbered as Sections 1 to 601. Title I and Title II, which amend section 471(a) of the

SSA, are pertinent to this Parents' Class Action Civil Action.[78]

206.        Specifically, and very important to this Class Action Complaint, SSA is amended

to state; "reasonable efforts shall be made to preserve and reunify families—(i) prior to

the placement of a child in foster care, to prevent or eliminate the need for removing the

---

[76] *See* 42 U.S.C. § 629a(a)(2)
[77] *See* 42 U.S.C. § 629a(a)(7)(B)
[78] *See* Pub. L. 110-351

child from the child's home; and (ii) to make it possible for a child to safely return to the child's home".[79] These efforts are required to be maintained until a court of competent jurisdiction has determined that the efforts no longer have to be maintained.[80]

207.     Furthermore, pertinent to this Class Action Complaint, the act amends SSA's Part E - Federal Payments for Foster Care and Adoption Assistance Definitions; "foster care maintenance payments" are amended, *inter alia*, require the state to cover reasonable travel to the child's home for visitation, and reasonable travel for the child to remain the school in which the child is enrolled at the time of placement;[81] and "administrative review", which DCF refers to Foster Care Review ("FCR") hearings, require to be a panel of persons and at least one disinterested party.[82]

208.     There is also a requirement placed on the state to use federal funds to address the needs of keeping siblings of opposite sex in the same home; amending SSA by adding the text, "such son or daughter."[83]

209.     To help connect and support relative caregivers, *inter alia,* Title I Subpart 1 Sec. 103, of  FCSAA, titled "Stephanie Tubbs Jones Child Welfare Services Program", places

---

[79] *See* 42 U.S.C. § 671(a)(15)(B) (Making it a requirement for the state to avoid removing children and if the child must be removed to provide reasonable efforts of reunification and maintenance of intact family unit)

[80] *See* 42 U.S.C. § 671(a)(15)(D)(iii), "...reasonable efforts shall not be required to be made with respect to a parent of a child if a court of competent jurisdiction has determined that...the parental rights of the parent to a sibling have been terminated involuntarily[.]"

[81] *See* 42 U.S.C. § 675(4)(A)

[82] *See* 42 U.S.C. § 675(6), " The term "administrative review" means a review open to the participation of the parents of the child, conducted by a panel of appropriate persons at least one of whom is not responsible for the case management of, or the delivery of services to, either the child or the parents who are the subject of the review."

[83] *See* 42 U.S.C. § 674(4)(B)(ii)

requirements on the state to notify and provide information/options, to relatives of children within 30 days of removing a child from a home.[84]

210.        To help improve outcomes for children in foster care, *inter alia*, Title II Se. 206, titled "Sibling Placement", mandates the state; "provides that reasonable efforts shall be made; (A) to place siblings removed from their home in the same foster care, kinship guardianship, or adoptive placement, unless the State documents that such a joint placement would be contrary to the safety or well-being of any of the siblings; and (B) in the case of siblings removed from their home who are not so jointly placed, to provide for frequent visitation or other ongoing interaction between the siblings, unless that State documents that frequent visitation or other ongoing interaction would be contrary to the safety or well-being of any of the siblings."[85] Congress recognized the extra expense it takes to keep siblings together and provided states with incentive payments to encourage the placement of children in foster care with siblings. *See Preventing Sex Trafficking and Strengthening Families Act*, Pub. L. 113-183 at § 209. (Becoming effective September 29, 2014.)

E.        Adoption Assistance and Child Welfare Act of 1980 ("AACWA")

211.        DCF receives substantial federal funds pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, amendments codified within 42 U.S.C. §§ 670-679 and 42 U.S.C. §§ 620-627.[86] This Act, and the State plans submitted to and approved by the Secretary of the United States Department of Health and Human

---

[84] *See* 42 U.S.C. § 671(a)(29)
[85] *See* 42 U.S.C. § 671(a)(31)
[86] *See* Pub. L. 96-272.

Services in order for DCF to obtain funding pursuant to this Act, confer various rights upon parents whose children are in foster care or other out-of home placements, or who are at risk of entering such placements.

212.     The federal Adoption Assistance and Child Welfare Act of 1980 requires that reasonable efforts be made by the defendants to provide services to enable children to remain with their families or to be returned to their families whenever possible; that all children in foster care be provided written case plans developed and reviewed within specified time periods; that these plans contain certain specified components; that appropriate services be provided to children, their parents, and their foster parents to address each child's needs and to assure each child's permanent placement; that each child receive proper care; that the homes or institutions in which children are placed conform to national standards and that foster care payments are appropriate; that children be placed in the least restrictive, most family-like setting; that children receive periodic judicial or administrative reviews; and that children receive dispositional reviews to determine their future status no later than eighteen months after placement.

213.     The federal Adoption Assistance and Child Welfare Act provides the State with foster care maintenance payments, include payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which

the child is enrolled at the time of placement, and reasonable costs of administration and operation of as necessarily required of the aforementioned.[87]

214.        AACWA requires the state to provide, in each case, reasonable efforts (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home.

215.        The federal Adoption Assistance and Child Welfare Act requires state compliance with the federal Child Abuse Act.

F.        <u>Child Abuse Prevention and Treatment and Adoption Reform Act ("CAPTA")</u>

216.        DCF receives federal funding pursuant to the federal Child Abuse Prevention and Treatment and Adoption Reform Act, codified in 42 U.S.C. §§ 5101-5106, and 42 U.S.C. §§ 5116 et seq..[88]

217.        The federal Child Abuse Act confers various rights upon children who, by virtue of reports of abuse or neglect, are or should be known to state agencies which receive funds pursuant to that Act.  The Act requires defendants to institute "prompt investigations' into all reports of known or suspected instances of child abuse and neglect to substantiate the accuracy of the report and, if substantiated, to take immediate steps to protect the child who is the subject of the substantiated referral, as well as all other children who are at risk by being under the care of the same custodians.  The Act also requires defendant Linda Spears to have administrative procedures, trained and qualified personnel, and facilities adequate to deal effectively with child abuse and neglect cases.

---

[87] *See* 42 U.S.C. § 675(4)(A) Definition of the term "foster care maintenance payments"
[88] *See* Pub. L. 95-266

218.          Federal funding is granted to DCF for; "developing, operating, expanding, and

enhancing community-based and prevention-focused programs and activities designed to

strengthen and support families to prevent child abuse and neglect that are accessible,

effective, culturally appropriate, and build upon existing strengths that; offer assistance to

families; provide early, comprehensive support for parents; promote the development of

parenting skills, especially in young parents and parents with very young children;

increase family stability; improve family access to other formal and informal resources

and opportunities for assistance available within communities, including access to such

resources and opportunities for unaccompanied homeless youth; support the additional

needs of families with children with disabilities through respite care and other services;

demonstrate a commitment to involving parents in the planning and program

implementation of the lead agency and entities carrying out local programs funded under

this title, including involvement of parents of children with disabilities, parents who are

individuals with disabilities, racial and ethnic minorities, and members of other

underrepresented or underserved groups; and provide referrals to early health and

developmental services."[89]

219.          The Commonwealth has established written policies to implement the federal and

state statutory mandates for protective services investigations, which include specific

time periods within which investigations must be initiated and completed.

---

[89] *See* 42 U.S.C. §§ 5116(b)(1)(A)-(H) (alphanumeric characters omitted)

G.      Social Security Act ("SSA")

220.        Social Security Act was first passed in 1935.  It contained twenty-one (21) Titles

which are written as Subchapters in U.S. Code Title 42 under Chapter 7 (Social Security

Chapter)[90].  The sections contained therein have been amended many times and continue

to be amended by Congress by subsequent ACTs; e.g. FFPSA,CFSA,

FCSAA, AACWA, CAPTA, ASFA.

221.        DCF receives federal funding under Titles IV-B and IV-E of the Social Security

Act, as administered by the United States Department of Health and Human Services

("U.S. HHS").

222.        Pursuant to Title II-A, of the Social Security Act Amendments of 1994, the

federal government requires States' accountability for placement of children in foster

care.[91]

223.        Pursuant to Title IV-B, Subpart 1, of the Social Security Act, the federal

government requires States' development and expansion of a coordinated child and

family services program that utilizes community-based agencies to support at-risk

families through services which allow children to remain safely with their families or

return to their families in a timely manner.[92]

224.        Pursuant to Title IV-B, Subpart 2, of the Social Security Act, the federal

government requires States to develop and establish, or expand, and to operate

coordinated programs of community-based family support services, family preservation

services, time-limited family reunification services with the objective to preserve intact

---

[90] *See* 42 U.S.C. §§ 301-1397mm
[91] *See* Pub. L. 103-432
[92] *See* 42 U.S.C. §§ 621(3) & (5)

families, and encourage reunification in a safe and stable manner in accordance with the Adoption and Safe Families Act of 1997 ("ASFA").[93]

225.        Pursuant to Title IV-E of the Social Security Act, the federal government provides matching funds to all state-managed foster care systems to reimburse a portion of the costs of maintaining abused and neglected children in foster care.[94]

226.        The Child and Family Services Reviews (CFSRs), authorized by the 1994 Amendments to the Social Security Act (SSA), are administered by the Children's Bureau, Administration for Children and Families, U.S. Department of Health and Human Services. The goals of the CFSR are to:  Ensure substantial conformity with title IV-B and IV-E child welfare requirements using a framework focused on assessing seven safety, permanency, and well-being outcomes and seven systemic factors;  Determine what is happening to children and families as they are engaged in child welfare services; and Assist states in helping children and families achieve positive outcomes.[95]

227.        Title XX of the Social Security Act provides states with block grants for social services.[96] The DCF commissioner is mandated to coordinate the overall service planning of the department with the planning under the Title XX of the Social Security Act.[97] Federal assistance to the State is granted for purposes of encouraging the State to furnish services directed at the goals of preserving, rehabilitating or reuniting families.[98]

---

[93] *See* 42 U.S.C. §§ 629(2) & (3)
[94] *See* 42 U.S.C. §§ 670 et seq.,
[95] *See* U.S. Department of Health and Human Services Administration for Children & Families
[96] *See* 42 U.S.C. § 1397 et seq.
[97] *See* M.G.L.c. 18B, § 7(g)
[98] *See* 42 U.S.C. § 1397(3)

H.     Adoption and Safe Families Act of 1997 ("ASFA")

228.        ASFA[99], was enacted in response to concerns that many children were remaining

in foster care for long periods or experiencing multiple placements.  This landmark

legislation requires timely permanency panning for children, clarifies meaning of

reasonable efforts by requiring child protective services agencies, *inter alia*, to return a

child to parents and provide services to prevent re-entry, for goals to be established in a

timely manner, assure child is placed close enough for a parent to have ongoing contact,

trial home visits and continuous exploration of family reunification.

229.        ASFA amended section 471(a)(15) of the Social Security Act, *inter alia*, pertinent

to this class action requiring the State to provide; "reasonable efforts shall be made to

preserve and reunify families— (i) prior to the placement of a child in foster care, to

prevent or eliminate the need for removing the child from the child's home; and (ii) to

make it possible for a child to safely return to the child's home."[100]

I.     Rehabilitation Act of 1973 ("Section 504")

230.        Rehabilitation Act of 1973 ("Section 504") promulgates rules and regulations by

stating; "No otherwise qualified individual with a disability in the United States... shall,

solely by reason of her or his disability, be excluded from the participation in, be denied

the benefits of, or be subjected to discrimination under any program or activity receiving

Federal financial assistance or under any program or activity conducted by any Executive

agency or by the United States Postal Service. The head of each such agency shall

---

[99] *See* Pub. L. 105-89, Dec 22, 2017, H.R. 867: Adoption and Safe Families Act of 1997; 45
C.F.R. Parts 1355-1357
[100] *See* 42 U.S.C. § 671(a)(15)(B)(i)-(ii).

promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978."[101]

231.        "Program or activity, means all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government; or the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government."[102]

J.    Americans with Disability Act of 1990 ("ADA")

232.        ADA[103], is a civil rights law that prohibits discrimination based on disability with similar protections afforded by the Civil Rights Act.  ADA protects from discrimination, individuals with physical or mental impairment that substantially limits one or more major life activities of such individual; or there is documentation thereof;  or  individuals that have been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.[104]

233.        ADA require the Department to render services that accommodate the parents' special needs through their services, program or activates.  However, Supreme Judicial Court of the Commonwealth of Massachusetts concluded that: (1) proceedings to

---

[101] *See* 29 U.S.C. § 794(a) - Nondiscrimination under Federal grants and programs
[102] *See* 29 U.S.C. § 794(b)(1)(A) & (B)
[103] *See* 42 U.S.C. § 12101 et seq.
[104] *See* 42 U.S.C. §§ 12102(1)(A)-(C) & (3)(A); 42 U.S.C. § 12132

terminate parental rights under[M.G.L. c. 210, § 3], do not qualify as "services,

programs, or activities" under the ADA, and thus, the ADA may not be raised as a

defense to such proceedings; and (2) the ADA, as well as Massachusetts

antidiscrimination laws, regulations, and its Constitution require the Department to render

services that accommodate the parents' special needs prior to [M.G.L.c. 210, § 3],

proceedings.[105]


K.    Helping Families Save Their Homes Act of 2009

234.        The Helping Families Save Their Homes Act of 2009[106] incorporates provisions

from the The Homeless Emergency Assistance and Rapid Transition to Housing Act of

2009 (HEARTH Act)[107], which amended the McKinney-Vento Homeless Assistance Act

of 1987[108], with major revisions to what is now titled the Emergency Solutions Grant

(ESG) program. The Emergency Solutions Grant assists homeless households and

households at risk of homelessness by supporting the services necessary to help them

quickly regain stable housing after experiencing a housing crisis and/or homelessness.

Any person or family in need of emergency shelter is potentially eligible for ESG funded

shelter services. Massachusetts Department of Housing and Community Development

---

[105] *See In re Adoption of Gregory*, 434 Mass. 117, 747 N.E.2d 120, (2001)("ADA, as well as
Massachusetts anti-discrimination laws, regulations, and our Constitution all require the
department to accommodate the parents' special needs in its provision of services *prior* to a
[M.G.L. c. 210, § 3], termination proceeding".); This ruling has been applied similarly to
Juvenile Court C&P, as seen most recently in summary decision of Appeals Court in *Adoption of
Yolane*, 92 Mass.App.Ct.1116 (2017) (Note: summary decisions, pursuant to Rule 1:28, are cited
for persuasive value and are not binding precedent).  *See Chace v. Curran,* 71 Mass. App. Ct.
258, 260 n.4 (2008)
[106] *See* Pub. L. 111-22, May 20, 2009, S. 896: Helping Families Save Their Homes Act of 2009
[107] Provisions of the bill were incorporated into Helping Families Save Their Homes Act of
2009. *See Ibid*.
[108] *See* Pub. L. 100-77, July 22, 1987, 101 Stat. 482; 42 U.S.C. § 11301 et seq.

("DHCD") administers the ESG program with funding received from the U.S. Department of Housing and Urban Development (HUD). The federal ESG program provides grant funding to (1) engage homeless individuals and families living on the street, (2) rapidly re-house homeless individuals and families, (3) help operate and provide essential services in emergency shelters for homeless individuals and families, and (4) prevent individuals and families from becoming homeless.

L.      Comprehensive Addiction and Recovery Act of 2016

235.        United States Surgeon General's Report on Alcohol, Drugs, and Health of November 2016, tackling drug addiction, we know that "[i]n 2015, over 27 million people in the United States reported current use of illicit drugs or misuse of prescription drugs" from which "[i]t is estimated that the yearly economic impact of substance misuse and substance use disorders is ... $193 billion."[109]

236.        Congress overwhelmingly enacted the Comprehensive Addiction and Recovery Act of 2016 ("Act of 2016"),[110] noting, among other things in doing so, that "[t]here were more than 47,000 U.S. drug abuse fatalities in 2014 – double the death rate in 2000....The bill authorizes $181 million in new spending [to deliver life-saving prevention and treatment services], ... [a]t a time when drug overdoses claim 129 American lives every day." [111]

---

[109] *See* Executive Summary at ES-1
[110] *See* Pub. L. 114-198, July 22, 2016
[111] *See* Associated Press, Congress Passes Opioid Abuse Bill, NBCNews.com (July 13, 2016) https://www.nbcnews.com/health/health-news/congress-passes-opioid-abuse-bill-n608946 (last visited Dec. 29, 2017)

237.         Act of 2016 amended the Public Health Act at several places, including, relevant

to this case; Part D of title V of the Public Health Service Act, by incorporating at the end

of §547 Building communities of recovery,[112] and requiring the State to use the funds to

develop, expand, and enhance community and statewide recovery support services.[113]

238.         The 2016 Act, which is part of the Public Health Act, grants use of Federal funds,

and directs the State to build connections between recovery networks, between recovery

community organizations, and with other recovery support services, including child

welfare agencies, reduce stigma associated with substance use disorder, and provide

resources available to individuals struggling with addiction and to families with family

member struggling with, or being treated for, addiction, and provide support services for

family members with children.[114]


M.    Protection and Advocacy For Individuals with Mental Illness Act

239.         Subsequent to the determination that individuals with mental illnesses are

vulnerable to abuse and serious injury, Congress enacted the Protection and Advocacy for

Individuals with Mental Illnesses Act; to ensure that their rights are protected, and to

assist States to establish and operate a protection and advocacy system for individuals

with mental illness which will protect and advocate the rights of such individuals through

activities to ensure the enforcement of the Constitution and Federal and State statues, and

investigate incidents of abuse and neglect of individuals with mental illness if the

---

[112] *See* 42 U.S.C. § 290ee-2
[113] *See* 42 U.S.C. § 290ee-2(d)(1)
[114] *Ibid*.

incidents are reported to the system or if there is probable cause to believe that the incidents occurred.[115]

240.     The term "individual with mental illness" means, except as provided in section 10804(d) of this title, an individual—

(A) who has a significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of the State; and

(B)(i)(I) who is an inpatient or resident in a facility rendering care or treatment, even if the whereabouts of such inpatient or resident are unknown;

(II) who is in the process of being admitted t o a facility rendering care or treatment, including persons being transported to such a facility; or";[2]

(III) who is involuntarily confined in a municipal detention facility for reasons other than serving a sentence resulting from conviction for a criminal offense; or

(ii) who satisfies the requirements of subparagraph (A) and lives in a community setting, including their own home.[116]

N.     Civil Rights Act of 1964

241.     An act to enforce the constitutional right to vote, to confer jurisdiction upon the district courts of the United States of America to provide injunctive relief against discrimination in public accommodations, to authorize the Attorney General to institute suits to protect constitutional rights in public facilities and public education, to extend the

---

[115] *See* 42 U.S.C. § 10801 et seq.
[116] *See* 42 U.S.C. § 10804

Commission on Civil Rights, to prevent discrimination in federally assisted programs, to establish a Commission on Equal Employment Opportunity, and for other purposes.[117]

## IV.   MASSACHUSETTS DCF LANDSCAPE

A.   Department of Children and Families ("DCF")

242.         DCF shall provide and administer a comprehensive child welfare program for children and families, including the following services: (1) casework or counseling, including services to families, foster families or individuals; (2) protective services for children; (3) legal services for families, children or individuals who are clients of the department; (4) adoption services; (5) information and referral services; (6) foster family care for children and specialized foster family care for children with special needs; (7) residential care for children with special needs who are not suited for foster family care or specialized foster family care; (8) informal education and group activities; (9) training in parenthood and home management for parents, foster parents and prospective parents; (10) family services intended to prevent the need for foster care and services to children in foster care; (11) temporary residential programs providing counseling and supportive assistance for families in transition and their children who, because of domestic violence, homelessness, or other situations, require temporary shelter and assistance; (12) camping services; (13) information and referral services; (14) services for families and individuals in emergency and transitional housing; (15) comprehensive youth development services; (16) access to and coordination of medical, dental and mental health services for children in foster care whose families are receiving services from other state agencies; and (17)

---

[117] *See* Civil Rights Act of 1964, Pub. L. 88–352, 78 Stat. 241, (1964)

child care placements for children whose families have an open case with the department.[118]

243.        It is hereby declared to be the policy of this commonwealth to direct its efforts, first, to the strengthening and encouragement of family life for the care and protection of children; to assist and encourage the use by any family of all available resources to this end; and to provide substitute care of children only when the family itself or the resources available to the family are unable to provide the necessary care and protection to insure the rights of any child to sound health and normal physical, mental, spiritual and moral development.[119]

244.        To fulfill this public policy, DCF recognize that substitute care is a temporary solution, and require the Department and the parent(s) to direct their efforts toward reunification of children and parents. The Department recognizes that it operates not in isolation but in partnership with families. The Department seeks to assist parents in meeting their parental responsibilities, among which are: to maintain meaningful contact with the children; to seek and utilize appropriate services to assist family reunification and to make good faith efforts to participate with the Department in developing and implementing a service plan. [120]

245.        Foster children in custody of DCF, as result of care and protection adjudication, have property interest protected under Due Process Clause, in right to early and periodic screening, diagnostic, and treatment standards, individualized health care plans, medical

---

[118] *See* M.G.L.c. 18B, 2, Services enumerated.
[119] *See* M.G.L.c. 119, § 1, Declaration of policy; *See also* 110 CMR 1.01, Statement of Philosophy.
[120] *See* 110 CMR 1.02(4)-(7)

passports, private family placement, sibling visitation, and placement with relatives, other

adult persons who played significant positive roles in children's lives, and any minor

siblings or half-siblings, as set forth in Massachusetts laws mandating DCF's compliance,

even though laws conditioned several rights on DCF's determination that action was in

children's best interests, since laws limited DCF's discretion so that property interests

were legitimate claims of entitlement rather than abstract needs or desires.[121]

246.        DCF maintains Four regional offices that oversee day-to-day operations at 29

Area Offices located throughout the state.  Leadership and administrative duties for DCF

are guided by its Central Office, located in Boston.

B.      Care and Protection Proceedings ("C&P")

247.        State Courts, pursuant to M.G.L.c. 119 et seq. , have authority to hear petitions for

a child requiring assistance (formerly child-in-need-of-services "CHINS"), and

termination-of-parental-rights ("TPR") cases.[122]  However, it is important to keep in mind

that this litigation focuses on erroneous removal of children (which is done by DCF

without a prior court order) and failure to provide parents with meaningful services for

reunification subsequent State Courts' temporary transfer of custody to DCF.[123]

248.        In statutory context, care and protection proceedings refer to those proceedings

commenced in the Juvenile Court Department, or in the juvenile sessions of the District

Court Department,[1] the purpose of which is to ensure that a child under the age of

eighteen is protected against physical, mental or emotional injury resulting from absence,

neglect, or abuse on the part of the person who is responsible for the child's welfare, or

---

[121] *See Connor B. ex rel. Vigurs v. Patrick*, 771 F.Supp.2d 142, (D.Mass.2011.)
[122] Analogous to Petition for Adoption in Probate and Family Court.  *See* M.G.L.c. 210, § 3
[123] *See* M.G.L.c. 119, §§ 1, 24-26

resulting from the inability of that person to provide the parental upbringing necessary for the normal physical, mental and moral development of the child.[124]

249.         The object of Care and Protection proceedings, is to determine whether a child is in need of care and protection and, if so, to enter an appropriate order for the care and custody of the child.[125]  State intervention in the form of a care and protection proceeding is justified when a child is "endangered".[126]

250.         DCF initiates Care and Protection by filling a petition with the Juvenile Court alleging that a child: "(*a*) is without necessary and proper physical or educational care and discipline; (*b*) is growing up under conditions or circumstances damaging to the child's sound character development; (*c*) lacks proper attention of the parent, guardian with care and custody or custodian; or (*d*) has a parent, guardian or custodian who is unwilling, incompetent or unavailable to provide any such care, discipline or attention...."[127]

251.         The Department of Children and Families (department) may take a child into immediate temporary custody in the absence of a care and protection proceeding provided that the department has reasonable cause to believe that the removal is

---

[124] *See* M.G.L.c. 119, §§ 1, 24-26

[125] *See Care and Protection of Benjamin*, 403 Mass. 24, 25, 525 N.E.2d 418, 419 (1988).

[126] *See Custody of a Minor*, 389 Mass. 755, 766, 452 N.E.2d 483, 490 (1983) ("'It is not the quality or character of parental conduct per se that justifies State intervention on behalf of an abused, neglected, or otherwise endangered child. Rather, it is the fact of the endangerment itself. As parens patriae the State does not act to punish misbehaving parents; rather it acts to protect endangered children'"); *Custody of a Minor*, 383 Mass. 595, 600, 421 N.E.2d 63, 66 (1981) (same); *Custody of a Minor* (No. 2), 378 Mass. 712, 722, 393 N.E.2d 379, 385 (1979) ("… The crucial questions are: From what shortcomings or handicaps does the parent suffer that would endanger the wellbeing of this child if exposed, and has the necessity of permanently removing the child from its parent persuasively been shown?").

[127] *See* M.G.L.c. 119, § 24

necessary to protect the child from abuse or neglect. In such cases, the department shall make a written report stating the reasons for such removal and shall file a care and protection petition the next court day." [128]

252.        DCF may seek *ex parte* order from the Court for emergency removal by show of reasonable cause to believe the child is suffering from abuse or neglect; however, there has to be a 72-hour hearing held thereafter to contemplate temporary transfer of custody to DCF, which will require a heightened showing by fair preponderance of the evidence that the child is suffering from abuse or neglect. [129]

253.        DCF will retain temporary custody until trial on the merits, during which the department bears the burden of proving, by clear and convincing evidence, that a parent is currently unfit to further the best interests of a child and, therefore, the child is in need of care and protection. [130] DCF will need to make a showing that continuation of the child in his home is contrary to his best interests and the department has made reasonable efforts prior to the placement of a child with the department to prevent or eliminate the need for removal from the home. [131]

254.        Trial on the Merits is very frightening for parents.  If the Judge rules in DCF's favor, the parent may go from one day a visit, to never being able to see their child again. Thus, pursuant to the advice of their CPCS attorney, many parents will waive their right

---

[128] *See* M.G.L. c. 119, § 51B(*c*).  *See also* C.P. Kindregan, Jr., & M.L. Inker, Family Law and Practice § 65:1, at 294 (3d ed. 2002).

[129] *See In re Lilian*, 445 Mass. 333, 837 N.E.2d 269 (2005); *see also* M.G.L.c. 119, § 24

[130] *See Care & Protection of Stephen*, 401 Mass. 144, 514 N.E.2d 1087 (1987); *see Santosky v. Kramer*; 455 U.S. 745 (1982) (termination of parental rights requires allegations proven by at least clear and convincing evidence).

[131] M.G.L.c. 119, § 29C

to a trial on the merits and enter into a permanency agreement, with the right to future

Review and Redetermination hearings.[132]

255.       Unless the court enters written findings setting forth specific extraordinary

circumstances that require continued intervention by the court, the court shall enter a final

order of adjudication and permanent disposition, not later than 15 months after the date

the case was first filed in court.  The date by which a final order of adjudication and

permanent disposition shall be entered may be extended once for a period not to exceed

three (3) months [133]

256.       The State's ability to assemble its case dwarfs the parents' ability to mount a

defense because the child is already in agency custody.  The State even has the power to

shape the historical events that form the basis for termination of parental rights.

257.       Every 12 months, DCF prepares a permanency plan which shall address whether

and, if applicable, when: (i) the child will be returned to the parent; (ii) the child will be

placed for adoption and the steps the department will take to free the child for adoption;

(iii) the child will be referred for legal guardianship; (iv) the child will be placed in

permanent care with relatives; or (v) the child will be placed in another permanent

planned living arrangement. The department shall file a permanency plan prior to a

permanency hearing held in Juvenile Court.[134]   The hearing is used to review DCF's

---

[132] "Although the department retains the ultimate burden of showing that the child is still in need of care and protection, we conclude that the party filing a petition for review and redetermination has an initial burden of production that must be met in order to trigger the department's burden. The party filing the petition must present some credible evidence that circumstances have changed since the initial determination such that the child may no longer be in need of care and protection." *See Care and Protection of Erin*, 443 Mass. 567, 823 N.E.2d 356 at 362 (2005).
[133] *See* M.G.L.c. 119, § 26(c)
[134] *See* M.G.L.c. 119, § 29B

permanency plan and determine whether the department or its agent, has made reasonable efforts to safely return the child to his parents or guardian.[135]

258.         The department shall file a petition or a motion to amend a petition to dispense with parental consent to adoption, custody, guardianship or other disposition of the child if the child has been in foster care in the custody of the state for 15 of the immediately preceding 22 months.[136]   However, DCF has authority, based on their determination of best interest of the child or other compelling reasons, to extend the Permanency plan.[137]

259.         To  dispense with the need for parental consent to adoption, DCF will need to show by clear and convincing evidence that the natural parent is currently unfit to further the welfare and best interest of the child.[138]

260.         Parental unfitness, as developed in the case law, means more than ineptitude, handicap,  character flaw, conviction of a crime, unusual life style, or inability to do as good a job as the child's foster parent.  Rather, the idea of "parental unfitness" means "grievous shortcomings or handicaps" that put the child's welfare "much at hazard.[139]

261.         Care and protection proceedings in Juvenile Court closely resemble Probate and Family Court proceedings to dispense with the need for consent to adoption. [140] They are both concerned with parental unfitness and the best interests of the child.[141]

---

[135] *See* M.G.L.c. 119, § 29C
[136] *See* M.G.L.c. 119, § 26(b)(4)(iii)
[137] *See* M.G.L.c. 119, § 26(b)(4)
[138] *See Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 421 N.E.2d 28 (1981)
[139] *See Adoption of Katharine*, 42 Mass.App.Ct.25, 674 N.E.2d 256 (1997).
[140] *See* M.G.L.c. 210, § 3 (1993 amendment extends to District and Juvenile Court judges the power to hold these proceedings).
[141] *See Adoption of Gregory*, 23 Mass. App. Ct. 948, 501 N.E.2d 1179 (1986).

262.          At the core of the inquiry is the question of what is in the best interests of the

child, although the answer to that question in any given case is bound up with the

determination of unfitness. The child's best interests may bear on how much parental

deficiency is tolerable, or, conversely, the degree of parental deficiency may determine

the child's best interests.[142]

263.          DCF's failure to timely provide reasonable efforts for reunification leads to longer

separation time and reduced likelihood of reunification because the child becomes

accustomed to his placement home.[143]

264.          If parental consent to; adoption, custody or guardianship, has not been terminated

parents can readjudicate the custody order via Motion for Review & Redetermination

every six months.[144]  In review and redetermination hearings, Juvenile Court will build

on findings established in the preceding stages.[145]  Stipulations at all stages, including

stipulations to being unavailable to parent a child, are valid admissions of parental

unfitness, even if there were no finding of fact of being unfit to parent.[146]

---

[142] *See Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 328 N.E.2d 854 (1975) ("the tests are not separate and distinct but cognate and connected").
[143] *See In re Care and Protection of Amalie*, 69 Mass. App. Ct. 813, 872 N.E.2d 741 (2007), review denied,450 Mass. 1101, 875 N.E.2d 862 (2007) (expert evidence that showed removal of child from preadoptive family would have a traumatizing effect on the child, was used as one of the reasons to support termination of parental rights)
[144] *See* M.G.L.c. 119, § 26(c)
[145] *See Custody of a Minor (No. 2),* 22 Mass.App.Ct. 91, 491 N.E.2d 283 (1986).
[146] *See In Re Erin*, 443 Mass. 567, N.E.2d 356 (2005)

265.         Although the ultimate question of parental unfitness has to be shown by clear and

convincing evidence, the judge's subsidiary findings need only be supported by a

preponderance of the evidence.[147]

266.         DCF creates services plans that are difficult for parents to accomplish.  Service

plans require parents to complete tasks that are not necessary for parents to be fit

caretakers.  Nevertheless, unless these tasks are complete parents will be denied the

ability to see their children and their failure to comply with the service plan can be used

to terminate their parental rights.[148]

267.         Although parents have options to appeal DCF's decision at any stage,[149] social

workers play paramount role in progression of reunification; they create documentation

subsequent to visits that will ultimately be used for or against the parents.  DCF does not

comply with parents' request for change of social worker.  Seeking administrative appeal

or judicial review (a lengthy endeavor in itself) naturally creates discontent between the

social worker and the parent; a risk that may jeopardize , the progression  and likelihood

of reunification.

---

[147] *See Care and Protection of Laura*, 414 Mass. 788, 610 N.E.2d 934, (1993).

[148] *See In re Adoption of Nancy*, 443 Mass. 512, 516, 822 N.E.2d 1179, 1182 (2005) (affirming termination of parental rights where detailed and specific findings concerning father unable/unwilling to attend alcohol treatment shows current and future unfitness even though court did not state specific reasons; termination in best interest of children).

[149] *See* M.G.L.c. 231, § 118 (Appeals Court Single Justice review);

C.      Grandparent Visitation Rights

268.            Massachusetts has two grandparent visitation statutes that grant visitation rights to

grandparents in Massachusetts.[150] Many parents involved with DCF rely on the assistance

of their parents (grandparents); however, if a child is taken from a parent and placed with

the grandparent, the grandparent will be prohibited from allowing their children (parent)

to see the grandchildren, creating a divide in the family.

269.            Whenever a child is placed in family foster care, the court and the department

shall ensure that a grandparent of a child who is in the department's care or is the subject

of a petition under this chapter shall, upon that grandparent's request, have access to

reasonable visitation and that the department establish a schedule for that visitation,

unless it is determined by the court or the department that grandparent visitation is not in

the child's best interests.  In determining the best interests of the child, the court or the

department shall consider the goal of the service plan and the relationship between the

grandparent and the child's parents or legal guardian.[151]

270.            Grandparents have visitation rights in Massachusetts pursuant to the so-called

grandparent visitation statute, which provides, in part: "[i]f the parents of an unmarried

minor child are divorced, married but living apart, under a temporary order or judgment

of separate support, or if either or both parents are deceased, or if said unmarried minor

child was born out of wedlock whose paternity has been adjudicated by a court of

competent jurisdiction or whose father has signed an acknowledgement of paternity, and

---

[150] *See* M.G.L. c. 119, § 26B (*a*); the other is codified at G.L. c. 119, § 39D. *See also Blixt v. Blixt*, 437 Mass. 649, 774 N.E.2d 1052 (2002) cert. denied, 537 U.S. 1189, 123 S.Ct. 1259, 154 L.Ed.2d 1022 (2003), contemplates the latter provision.
[151] *See* M.G.L.c. 119, § 26B(a) (governs grandparents visitation)

the parents do not reside together, the grandparents of such minor child may be granted reasonable visitation rights to the minor child during his minority by the probate and family court department of the trial court upon a written finding that such visitation rights would be in the best interest of the said minor child." [152]

271.        Parental decisions about the propriety of visitation between children and their grandparents must be afforded a presumption of validity; to rebut this presumption, a grandparent seeking visitation with their grandchildren must demonstrate, by a preponderance of the credible evidence, that a denial of visitation will cause the grandchild significant harm.  However, presumption of validity afforded parents' judgments as to the best interests of their children with respect to grandparent visitation does not apply to C&P; grandparents need to only demonstrate by a fair preponderance of the evidence that visitation would serve the best interest of the child in question. [153] (Of note: typically presumption of validity is applied to cases where there is disagreement between the parent and the grandparent on issue of visitation. In the this class action, Christina fully supports Joanne's request for visitation; DCF is completely disregarding that Joanne has played a significant role in raising the children)

---

[152] *See* M.G.L.c. 119, § 39D, as appearing in St.1991, c. 292

[153] *See In re Jamison*, 4 N.E.3d 889, 467 Mass. 269 (2014) (judge correctly declined to require a showing that a denial of visitation would harm the children, and correctly required a child petitioning for sibling visitation  to demonstrate by a fair preponderance of the evidence that visitation would serve the best interests of the three siblings in question); see M.G.L. c. 119, § 26B(*b*) (governs sibling visitation)

D.    Massachusetts Anti-Discrimination Laws and Regulations

272.        Prior to any termination of parental rights proceedings, Massachusetts anti-

discrimination laws, regulations and Constitution, require that DCF accommodate the

parents' special needs in its provision of services.[154]

273.        The Department is required to make reasonable accommodations to ensure that its

services are accessible to all handicapped persons. The Department shall be responsive to

issues of handicapping conditions by utilizing social workers who are attuned to the

special needs of handicapped persons.[155]

274.        No applicant for or recipient of Department services shall, on the ground of

disability be excluded from participation in, be denied the benefits of, or otherwise be

subjected to discrimination in connection with any service, program, or activity

administered or provided by the Department.[156]

E.    Foster Care Review Unit

275.        The Foster Care Review Unit (FCRU) is an independent unit within the

Department of Children and Families. The FCRU conducts case reviews for families

within six months after a child is placed out of the home and every six months thereafter

when a child, up to age 22, remains out of the home and in the care of the Department. A

Foster Care Review (FCR) is conducted by a three member panel consisting of a case

reviewer from the FCRU who convenes the meeting, a manager or supervisor from the

DCF area office who is not directly responsible for the case under review, and a volunteer

---

[154] *See supra* note 42. (*In re Adoption of Gregory*, 434 Mass. 117, 747 N.E.2d 120, (2001)).
[155] *See* 110 CMR 1.08
[156] *See* 110 CMR 1.09 *See also* art. 114 of the Amendments to the Massachusetts Constitution

case reviewer from the community who is trained by the FCRU.  The statewide FCR unit

is currently staffed with 38 case reviewers, who are configured into seven teams, and four

volunteer coordinators, who supervise the FCR volunteer case reviewers. There were

18,253 children in the care of the department or its agents during the previous fiscal year;

13,584 children who were in its care for more than 6 months. The FCRU is currently

updating policy and procedures as it prepares to transition to iFamilynet.[157]

276.        Fair Hearings at the Department of Children and Families provide an opportunity

for consumers to appeal certain decisions made by the agency. The process is governed

by M.G.L. c. 30A, similar to administrative appeals within other state agencies, and also

by 110 CMR 10.00 et seq. of the Department's regulations.

277.        A Fair Hearing must be held by an impartial hearing officer within 60 days of an

applicant or other eligible individual's request for a review of a determination made by

the Commission unless informal resolution or a mediation agreement is achieved prior to

the 60th day or both parties agree to a specific extension of time.  *See* 107 CMR 1.03(1)

278.        The number of Fair Hearing requests filed on an annual basis increased

significantly from 1,344 in 2013, to 1,947 in 2014, and continues to remain elevated;

1,984 in 2016.  67% of the Fair Hearings are overdue.[158]

279.        Family Resource Centers (FRCs) provide a wide variety of services, support and

programs to children, adults and families in their local communities; individual & family

---

[157] *See* Annual Report on Foster Care Review, pursuant to M.G.L.c. 18B, §6A (February 2017); http://www.mass.gov/eohhs/docs/dcf/legislative-reports/fy2017-foster-care-review-annual-report.pdf

[158] *See* Legislative Report on Fair Hearings in the Department of Children and Families (January 2017); http://www.mass.gov/eohhs/docs/dcf/legislative-reports/fy2017-report-on-fair-hearings.pdf

support, CRA-related services, school supports & liaison, housing services, equipment &

materials.  Families with children/youth with CRA-related issues might be referred by

courts, schools, or other agencies as a prevention or early intervention effort.  FRCs are

community-based, culturally competent programs that offer a wide array of services to

children and families, ranging from evidence-based parent education, parent and youth

mutual self-help support groups, information and referral, grandparent support groups,

mentoring, and educational support to cultural and arts-related events and other

opportunities. The purpose of the FRCs is to support families so that their children may

continue residing at home and attending their community schools, "strengthen the

relationships between children and their families," and "provide coordinated,

comprehensive, community-based services for children who are at risk of dropping out of

school, committing delinquent acts or otherwise engaging in behaviors that may reduce

their chances of leading healthy, productive lives."[159] Providing services and supports to

families with a child or children designated as a Child Requiring Assistance (CRA)[160] or

potentially at risk of being a CRA, is a significant component of FRC activities.[161]

280.        The FRCs are operated by community-based social service agencies across the

state and are overseen by the Massachusetts Department of Children and Families (DCF).

---

[159] *See* Chapter 240 of the Acts of 2012 as codified at Mass. General Laws Ch. 6A, §16U (2012)
[160] A "Child Requiring Assistance," is a child between the ages of 6 and 18 who: (i) repeatedly runs away from the home of the child's parent, legal guardian or custodian; (ii) repeatedly fails to obey the lawful and reasonable commands of the child's parent, legal guardian or custodian, thereby interfering with their ability to adequately care for and protect the child; (iii) repeatedly fails to obey the lawful and reasonable regulations of the child's school; (iv) is habitually truant; or (v) is a sexually exploited child. *See Ibid.*
[161] *See* Family Resource Center Program Evaluation Report (March 2017);
http://www.mass.gov/eohhs/docs/dcf/legislative-reports/fy2016-family-resource-center-annual-report.pdf

FRCs began operation in early 2015; there are a total of 18 FRCs, with at least one in each of Massachusetts' 14 counties. There are two distinct FRC program models: Full-service Family Resource Centers (n=12) and Micro Family Resource Centers (n=6). Full-service FRCs provide all mandated services, including, but not limited to, information and referral, evidence-based parenting groups, grandparent support groups, assessment, service planning, and mentoring. Full-service FRCs are located in Amherst, Barnstable, Boston, Brockton, Greenfield, Lawrence, Lowell, New Bedford, Pittsfield, Quincy, Springfield, and Worcester. Micro-FRCs also provide all mandated services, but at a reduced staffing and service delivery level. Micro FRCs operate in Fall River, Fitchburg, Lynn, Martha's Vineyard, Nantucket, and North Adams.[162]

281.      In 2016, FRCs provided services to 7,504 families, including over 6,700 new families. From January to December 2016, FRCs provided services to over 12,000 individuals; 59% of those served were adults and 41% were children.  Most (87%) were birth or adoptive parents.   Only 19% of the referrals came from DCF.[163]

F.      Other DCF Statistics

282.      DCF administered its services from a central office in Boston and four regional offices administered by regional directors who oversee 29 local area offices. In fiscal years 2014 and 2015, DCF served an average of 44,919 and 51,822 children under 18 years old each month, respectively. DCF had an annual appropriation of approximately

---

[162] *Ibid.*at p.6
[163] *Ibid,*at p.22

$827 million for fiscal year 2015 and an annual appropriation of approximately $908 million for fiscal year 2016.[164]

283.         Breakdown of Massachusetts 2017 Demographic shows population makeup of predominantly 81.8% White, 11.5% Hispanic/Latino, and 8.6% Black.[165]

284.         As of, 06/3/2017, it was reported that out of 47,414 DCF cases, there were 9,597 children, were in foster care or congregate care placement (more than 20% increase from 2015).  Sixty percent of those children have been in continuous placement for over a year; thirty-three percent beyond two years (25% increase since 2014).   Of which 3704 (39%) children had a goal of reunification.  The demographic of children were disproportionate to Massachusetts's demographics, with 43% white, 28% Hispanic/Latino, and 14% Black (a significant disparity from Massachusetts Demographic). [166]

285.         Through the Title IV-E Waiver Demonstration, the Commonwealth of Massachusetts Executive Office of Health and Human Services (EOHHS), the Department of Children and Families (DCF) and the Department of Mental Health (DMH) embarked on a joint undertaking to create an integrated service delivery system for children and families. Caring Together (CT), the Title IV-E Waiver Demonstration, is a joint purchasing model for congregate care and community based services system that offers children, young adults and families continuity of services, care and treatment

---

[164] *See* Suzanne M. Bump, Office of the State Auditor Audit No. 2016-1058-3S (December 7, 2017); https://www.mass.gov/files/documents/2017/12/07/201610583s.pdf.pdf
[165] *See* U.S. Department of Commerce, Census Bureau, Quick Facts of Massachusetts (2016); https://www.census.gov/quickfacts/fact/table/MA/PST045216
[166] *See* Statewide Area Profile For Year 2017 Fourth Quarter; https://www.mass.gov/lists/dcf-commonly-requested-documents

teams, regardless of whether youth receive congregate care or community-based services. Caring Together services are designed to support youth during transitions in and out of the community and to strengthen child and caretaker capacity, thereby enabling more youth to remain in the community through increased home-based services.[167]

286.         However, the target population for the Massachusetts Title IV-E Waiver study consists of youth at risk of or in congregate care placement in DCF's child welfare system; children are not included.[168]

287.         DCF employs or contracts  29.4 Medical and Psychiatric Personnel (e.g., 1.4 MD, 7 RN,  9 MSW, LICSW, and 11 MSW, LCSW) and  a total of 3,258 Social Workers; of which 2,973 are licensed by the state (146 LICSW, 459 LCSW, 676 LSW, 1,692 LSWA).[169]

## V.   STATUE AUDITOR'S OFFICIAL AUDIT REPORT OF 2017

288.         The Office of the State Auditor has conducted a performance audit of the Department of Children and Families (DCF) for the period January 1, 2014 through December 31, 2015.[170]

---

[167] *See* Child Welfare Title IV-E Waiver Demonstration Interim Evaluation Report Executive Summary
[168] *Id.*
[169] *See* Annual Report on Staffing (March 2017);
http://www.mass.gov/eohhs/docs/dcf/legislative-reports/annual-report-on-staffing-march-2017.pdf
[170] *See* M.G.L.c. 11, §12 (grants state auditor to inspect, review or audit; programs, departments, commissions, institutions, officers, employees, accounts, funds, books, vouchers, records, activities, and all functions related directly or indirectly to the aforementioned)

289.        We commend Suzanne M. Bump, Auditor of the Commonwealth , and her staff,

for their  efforts in compiling December 7, 2017, performance audit of the Department of

Children and Families; it partially unmasks the propaganda perpetuated by DCF.[171]

290.        However, the report completely failed to acknowledge, or even attempt to collect

any data, on the ongoing mistreatment and violations of constitutional rights parents are

exposed to on a daily basis; a state-wide crisis that needs immediate recourse to prevent

further permanent damage to the familial unit.  It is also of note; the current system in

place has sky rocketed, as supported by the numbers, of erroneous parent-child

separations and erroneous lack of efforts for reunification.   It is now not uncommon

place, in Massachusetts, to have professionals, such as medical providers, attorneys, law

enforcement agents, and many others, have their children erroneously removed, under the

guise of alleged "best interest of the children"; new generation of children are raised

without the biological parents' love, and grow up with PTSD and other related mental and

behavior issues, subsequent to lengthy separation.

A.    DCF Does Not Effectively Identify and Investigate Serious Bodily Injury to Children

291.        The Department of Children and Families (DCF) does not ensure that it is aware

of all incidents of abuse, neglect, and injury involving children that it serves. If DCF does

not effectively monitor the medical services provided to children in its care, unreported

critical incidents may go undetected. This can put children at risk of further abuse,

neglect, and bodily injury.[172]

---

[171] *See* Suzanne M. Bump, Office of the State Auditor Audit No. 2016-1058-3S (December 7, 2017); https://www.mass.gov/files/documents/2017/12/07/201610583s.pdf.pdf
[172] *Ibid*, at p.13

292.        A sample of 566 children in DCF care had their medical records analyzed for

serious bodily injury; 617 occurrences were found, for which 260 of these occurrences

DCF had no record of it ever being reported.  Examples of these occurrences include a

15-year-old with brain damage from a firearm injury, a 1-year-old with first- and second-

degree burns on multiple body parts, and a 12-year-old with multiple head contusions that

the treating physician determined were a result of an assault.[173]

293.        When a child in the care of the Department of Children and Families (DCF) is

involved in an incident with another child in DCF care, DCF typically only documents

the incident in the victim's i-FamilyNet case file, not the perpetrator's.  Thus DCF is not

maintaining a complete and accurate record of each perpetrator's behavior. That may

limit its ability to effectively assess the risk associated with placing children in the same

residence as a perpetrator, whether within DCF or in programs run by other agencies.[174]

294.        Not only are parents in C&P not notified of such incidents, but DCF is also

oblivious to this ongoing neglect & abuse in their care.


B.        DCF Does Not Report All Critical Incidents To OCA

295.        DCF does not always report critical incidents to the Office of the Child Advocate

(OCA).  Without proper reporting by DCF, OCA cannot perform its oversight function to

ensure that children receiving DCF services are appropriately cared for.[175]

296.        DCF does not consider sexual abuse to rise to the level of a critical incident and

therefore did not report to the Office of the Child Advocate (OCA) any of the 118

---

[173] *Ibid,*
[174] *Ibid*, at p.22 (Explains why Class Plaintiff Valerie's daughter Thilee was placed again with the same perpetrator.)
[175] *Ibid*, at p.16

validated9 cases of sexual abuse that affected children in DCF care during the audit

period. These instances included two male employees at different DCF-contracted

residential facilities who sexually abused three girls each; a 10-year-old who was raped

by his father; a 4-year-old who was sexually abused by her mother; and a 17-year-old

who was gang-raped by five assailants. In one case, a male who had sexually abused one

child abused the child's sibling less than one year later. The Office of the State Auditor

(OSA) believes that the lack of notification to OCA significantly inhibits OCA's ability

to advocate effectively for children in DCF care.[176]

297.        Unnoticed serious bodily injury such as sexual abuse, suicide attempts, and

physical assaults, will affect the outcome of visitations with parents, and erroneously

interpreted by social workers as lack of bonding, leading to negative notations of the

visit.


C.      DCF Does Not Report All Abuse, Neglect, and Sexual Abuse to DA Offices

298.        During our audit period, 19 incidents of sexual abuse, physical abuse, and/or

neglect that DCF determined had happened to children in its care were not formally

reported to and received by district attorneys (DAs). A number of DAs told us that they

would have performed detailed investigations of many of the unreported cases if DCF

had properly reported them to the DAs' offices. These 19 incidents affected 22 children

and included forcible rape, sexual abuse by a DCF-contracted employee at a residential

facility, multiple sexual abuses of children by family members, and various assaults on

children. By not ensuring that all substantiated cases of sexual abuse are reported to the

---

[176] *Ibid*, at p.22 (explains why Class Plaintiff Valerie's daughter T.M. did not receive adequate
treatment.)

appropriate DA's office, DCF may be preventing alleged abusers from being prosecuted.[177]

D.    DCF Does Not Timely Complete and Submit Fatality Review Report to OCA

299.    Of the 73 fatality investigations performed by DCF during our audit period, none was completed and submitted to OCA within the established 30-day or 60-day timeframe. Specifically, the reports for 68 of these 73 investigations had not been completed and submitted to OCA; 31 (46%) of the 68 were instances where DCF had been aware of a child's death for more than 365 days. Two of the remaining five reports were completed an average of 316 days late. 8 These five reports were ultimately submitted to OCA for review.[178]

VI.    **DCF VIOLATION CAUSE IRREPARABLE HARM TO PARENTS**

A.    Child Welfare and Office of the Child Advocate Outcomes

300.    In 2016 the number of children in out-of-home placements, residential placement, group care placement, foster care has increased. [179]  the number of children served by Supervised Visitation Centers has increased from prior years.[180]  Kinship Guardianships accounted for more than 80% of all Guardianship Subsidies in 2015.  Kinship Guardianship Subsidy Title IV-E Claiming for accounts for Federal Share of half of

---

[177] *Ibid*, at p.19
[178] *Ibid*, at p.20
[179] *See* Caseload Report Fiscal Year 2016 Quarter 2, (March 2016), at p.1-4
http://www.mass.gov/eohhs/docs/dcf/legislative-reports/2016-caseload-report-fy2016-q2.pdf
[180] *Ibid*, at p.5

Gross Expenditures Claimed.  Federal Share for the first two quarters in 2016 was $1,960,274 compared to $589,483 of the first two quarters in 2014.[181]

301.        The Children's Bureau of the HHS issued Child Welfare outcomes between 2010 and 2014, *inter alia*, confirmed there was a decline in performance on the measure related to timeliness of reunification without increasing reentry.[182]

302.        In 2016, The total complaints made to the Office of the Child Advocate (OCA) has increased by 290% since 2015.

303.        The Office of the Child Advocate (OCA) represents the commitment of the Governor and the members of the Legislature to improve services provided by state agencies to children and families in Massachusetts. Originally created by Executive Order 494, the OCA is an independent office that reports directly to the Governor. A law establishing the responsibilities of the OCA was passed by the Legislature in 2008 and appears in the Massachusetts General Laws as Chapter 18C. The mission of OCA is to ensure all children in the Commonwealth receive appropriate, timely and quality services with full respect for their human rights. Through collaboration with public and private stakeholders, the OCA examines services to children to identify gaps and trends, and makes recommendations to improve the quality of those services. The OCA also serves as a resource for families who are receiving, or are eligible to receive, services from the Commonwealth.[183]

---

[181] *Ibid.*
[182] *See* Child Welfare outcomes 2010-2014, Report by Children's Bureau of HHS to Congress; https://www.acf.hhs.gov/sites/default/files/cb/cwo10_14.pdf
[183] *See* M.G.L.c. 18C, & Office of the Child Advocate Annual Report Fiscal Year 2016; http://www.mass.gov/childadvocate/docs/office-of-the-child-advocate-annual-report-fy16.pdf

304.        The total complaints made to OCA has drastically increased; in 2016 it had more complaints than 2014 and 2015 combined.[184]        Most of the complaints were made by biological parents and grandparents, with specific concerns of: failure to place a child with a relative or sibling when a child is taken into state custody; perceived lack of responsiveness by DCF social workers to calls from biological parents regarding reunification planning; objections to the removal of children from parents or relatives.[185] These complaints were primarily caused due to issues with DCF case practice & Placement.[186]

305.        OCA reported 829 supported allegations of neglect and abuse, of which sexual abuse represents 5%.[187]

B.        DCF Misappropriates Federal Funding for Foster Care and Other Services

306.        States that receive Federal Funding must abide by their requirements, *inter alia*, to provide reasonable efforts of reunification and preservation of the familial unit.

307.        DCF, by failing to provide necessary services and reasonable efforts for familial reunification, keeps children in Foster Care and other services for longer than necessary time.  Federal finding is being drained for care that could otherwise be provided by biological parents.

308.        DCF erroneously utilizes social workers that lack the necessary training and professional judgment in position of emergency removals and investigative functions.

---

[184] *See* Office of the Child Advocate Annual Report (2016), at p. 14;
http://www.mass.gov/childadvocate/docs/office-of-the-child-advocate-annual-report-fy16.pdf
[185] *Ibid*, at p.16
[186] *Ibid*, at p. 17
[187] *Ibid*, at p. 19

Some of the DCF social workers responsible for removing children under emergency basis do not know DCF's policies, regulations and basic definitions.

309.     Neglect means failure by a caretaker, either deliberately or through negligence or inability, to take those actions necessary to provide a child with minimally adequate food, clothing, shelter, medical care, supervision, emotional stability and growth, or other essential care; provided, however, that such inability is not due solely to inadequate economic resources or solely to the existence of a handicapping condition. This definition is not dependent upon location (i.e., neglect can occur while the child is in an out-of home or in-home setting.)[188]

310.     Emotional Injury means an impairment to or disorder of the intellectual or psychological capacity of a child as evidenced by observable and substantial reduction in the child's ability to function within a normal range of performance and behavior.

311.     Physical Injury means (a) death; or (b) fracture of a bone, a subdural hematoma, burns, impairment of any organ, and any other such nontrivial injury; or (c) soft tissue swelling or skin bruising depending upon such factors as the child's age, circumstances under which the injury occurred, and the number and location of bruises; or (d) addiction to drug at birth; or (e) failure to thrive.[189]

312.     Emergency means a situation where the failure to take immediate action would place a family and/or child at substantial risk of serious and imminent family disruption, or death, or serious emotional or physical injury. [190]  Children are being removed under erroneous emergency basis without prior court approval, and are placed in immediate

---

[188] *See* 110 CMR 2.00; *See* M.G.L.c. 18B et seq.
[189] *Id.*
[190] *Id.*

Foster Care supported by Federal Funding.  Such actions are in violation of AACWA,

CAPTA & SSA acts' reunification and goal of keeping familial unit in tact provisions.

C.      There Are Lack Of Services in Place To Prevent Child Removal

313.          In Massachusetts, there is no specialized training for DCF Social Workers or their

agent to become "investigators".  DCF social workers with no graduate training, and no

actual training in investigative function, are able to investigate alleged 51A reports, issue

their own 51B reports, and take children under emergency basis with no prior court

approval.[191]

314.          Social worker responsible for taking Valerie's daughter, T.M., out of her home

under emergency basis did not have any specialized training and could not come up with

any valid reason that she could justify why the child was taken upon cross examination in

the pending Care and Protection matter in Lowell Juvenile Court.[192]

315.          DCF erroneously utilizes social workers for emergency removals and

investigative functions; this services require special attention to detail and training as to

collecting, analyzing and processing relevant and irrelevant evidence at the scene.  Even

if such action is overturned by subsequent court hearing or administrative appeal, the

---

[191] *See* M.G.L.c. 51A (state requiring certain professionals to report suspected neglect or abuse to
DCF); *See* M.G.L.c. 51B(upon receipt of a 51A report DCF is required to investigate and file a
formal 51B report).
[192] *See In Re: Care & Protection of T.M.*, Docket No. 15CP0107LO

damage has already been done.  Current untrained DCF Social Workers functioning as

"investigators" can remove children which result in permanent damages.[193]

316.       Redress through State Courts, although can result in vindication, can take time

and results in parents choosing between opposing DCF and winning down the road, or

complying with DCF by stipulations and being reunited with their children.  In essence a

lot of the erroneous child removal by DCF goes unnoticed because it is never gets "far"

enough in the Court system to be addressed.  Parents separated from their children are

desperate to sign any paper or document, including waiver of their rights, simply to be

reunited with their child.[194]

317.       The "untrained" social worker that takes on the investigative functions harms

parents in other ways as well because their 51B reports become admissible at all stages of

Court proceedings.  Procedurally, it may be financially impossible to properly oppose

51B reports, which can quickly add up.  The State has superior funding to quickly create

thick files against parents which neither do they nor the single appointed attorney has the

resources to fight against.[195]  It is also of note, opposition to social workers leads to

---

[193] *See Care and Protection of Walt*, 478 Mass. 212, 84 N.E.3d 803 (2017) (It took seventeen
(17) months for parents to prove in Court, that DCF erroneously took custody of their child
under emergency basis in the first place, this case did not help them because by this time the
decision of this case came out, to be able to see their child, parents agreed to a guardianship
decree; it is also of note, the father who attempted to "protest" such erroneous emergency taking
of his child in the first place, and attempted to save his child from being placed in foster care by
attempting to flee down the stairs with him, prior to exiting the building he was told by the
government child is now with the department and if he didn't comply he would be arrested for
parental kidnapping, this almost became another "Amber Alert" situation) DCF is taking children
from fit parents of lower socioeconomic class, and forces them to comply with their requests or
in the alternative be separated from their child great lengths of time; please help us!
[194] *Id.*
[195] While 51 A reports are admitted only to set the stage, 51B reports are admissible for the
purpose of providing background information and primary facts. *See* Mass. G. Evid. §

discontent which then results in negative reports incorporated in 51B reports; parents

don't have social workers to advocate for them.

318.         Once a child is taken, reunification in Massachusetts takes the longest amount of

time for reunification.  Although this works great for parents who truly do need

additional time to rehabilitate, for most parents, this "one approach fits all" call of action,

leads to unnecessarily prolonged separations.


D.      DCF Discriminates Against Parents with Disabilities and Prior Involvements

319.         DCF focuses on "protecting children", and parents come second.  There is lack of

services or accommodations for parents.  It is very common that 51A and 51B reports are

filled with allegations, *inter alia*, behavioral and mental illnesses.

320.         "The Department recognizes the special needs of handicapped clients. The

Department shall make reasonable accommodations to ensure that its services, facilities,

communications, and meetings are accessible to all handicapped persons. The

Department shall make reasonable accommodations to clients who have impaired sensory

(i.e. visual, auditory) skills, including but not limited to sign language, Braille, large print

type, and TTD (telephonic telecommunication device). The Department shall be

responsive to issues of handicapping conditions by utilizing social workers who are

attuned to the special needs of handicapped persons."[196]

321.         However, for purposes of accommodation, DCF has no adequate policy or

procedure for requesting verification of disability or handicap.  In other words, already

1115(b)(2)(A) & (B) (2016). Hearsay statements contained in a 51B report may be admitted
substantively if they are statements of primary fact. *See Adoption of George*, 27 Mass. App. Ct.
265, 274 (1989), Mass. G. Evid. § 1115(b)(2)(B) Note, at 441 (2016).
[196] *See* 110 CMR 1.08

confused, afraid and bewildered parents, are left to fend for themselves to raise such issues.  When parents raise these issues, DCF fails to provide any services or accommodations.  DCF does not communicate with other departments on this issues.

322.      Valerie was perceived to have mental illness from the beginning of her Care and Protection of T.M.; this places DCF on notice.  However no ever asked for verification of her mental illnesses or even bothered what, if any, services can be offered to accommodate her to help reunification.  Presently DCF attempted to terminate Valerie's parental rights; this counsel was able to show at trial on the merits that such decision is based on arbitrary, capricious and whimsical evidence; Valerie is another example of In Re Care and Protection of Walt, except Valerie was not even given a chance based on perceived mental illness disability and her daughter was repeatedly sexually assaulted under DCF's care.

323.      DCF also discriminate against parents that had prior involvement with DCF.  As previously described, 51A and 51B reports can quickly add up, and the file quickly becomes very thick.  Once a case comes in of alleged abuse or neglect, prior DCF involvement with other children is used unfairly to determine present parental fitness. DCF has no adequate policy or regulation, that allows it to properly rule in or rule out prior involvement with DCF.  Even if some 51A/51B allegations are proved to be blatantly false, there is no policy in place that redacts or "removes" other parts of the record that mentions it (i.e. false allegation can come up in other ways down the road that will be used against the parent). Valerie's prior involvement was used erroneously in DCF's erroneous determination of her present parental unfitness.

324.        Once DCF makes a decision to place the child with one or other side of the family (maternal vs. paternal), it will be easier for DCF to pick that side to advocate and ultimately favor throughout the Care and Protection proceedings.  Initial placement of the child usually determines the outcome of the case; all the more reasons the 51B investigator should be better trained.

E.        DCF violate Parents Privacy/HIPPA Rights

325.        DCF is consistently interacting with health professionals within the hospital, medical clinic and other health related settings.  Because of such professional relationship, DCF is able to access parents' medical records without their consent or a court order.  Although such action is not criminal in nature, it is a breach of parent's right to privacy and can be used erroneously without having opposing side being able to provide a reason or other explanation relating to such records.

326.        Commonwealth currently does not have an adequate policy or regulations, that creates a record from a third (3rd) party, such as DCF gains access to parents medical records.

327.        Medical information acquired via phone, from third parties is routinely used as justification for parent-child separation without any firsthand knowledge of alleged medical information or written confirmation thereof (e.g. by fax or email).

328.        Parents are routinely forced, *exempli gratia*, vitro injection[197] as their choice of treatment for parents with alleged alcohol issues.

---

[197] Vivitrol (Naltrexone) has recently been approved by the U.S. Food & Drug Administration for use in treatment of alcohol dependence. See
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2006/021897_toc_Vivitrol.cfm

329.        Parents with history of alleged alcohol abuse, prior to being able to see their

children for more than one hour supervised visit per week, are forced to subject

themselves to chemical treatment (Vivitrol intramuscular injection).  This can easily be

avoided, inter alia, taking a daily urine screen, or installing a breathalyzer apparatus as

seen in OUI cases; however, no such services are available.


## VII.   DEFENDANTS FAILED TO IMPLEMENT AND EXECUTE THEIR OWN POLICIES & REGULATIONS

330.        DCF Policies and Code of Massachusetts Regulations, are well written; however,

they are not being implement or executed in accordance with their provisions.

331.        DCF does not offer minorities with different cultural backgrounds an option to

switch case workers.  Valerie consistently requested a different case worker and she was

not provided with any options.  This is a clear violation of DCF's special provision

relating to linguistic and cultural minorities.  Furthermore, DCF does not implement or

execute special provisions relating to; handicapping conditions, nondiscrimination,

homeless families, and others. [198]

332.        DCF consistently violates their own Statement of Philosophy and Agency policy

by not providing parent services and reasonable efforts for reunification. It is state-wide

norm to place parents, from which there was an emergency removal of a child, in a one

hour supervised visit per week.  Even when the parent states (if it is alcohol or drug

related) that they will subject themselves to daily drug screens, DCF does not accept such

terms and does not offer reunification efforts; parents are subjected to unnecessarily

prolonged separation when there are other, less expansive, solutions available (another

---

[198] *See* 110 CMR 1.06 & 1.08-1.11

example, for domestic violence cases can have random visits to home to monitor on the alleged victim).

333.        Foster Care Reviews (FCR) consistently lack the required quorum of three-member panel.[199]  Named plaintiffs did not have all three members present at her FCR reviews, and the volunteer was either missing or not properly advised of their role in the hearing.[200] Valerie who is culturally different from her case worker, has a chance to be vindicated by a volunteer, *inter alia*, should represent her racial and ethnic Cambodian background, such volunteer was absent.[201]  Similarly, other Named Plaintiffs did not have access to such volunteer that is designed to advice the review panel where they have made a misstep or error in their evaluation.  Again, the policy and regulations are well written, but they are not being implemented or executed.

334.        Most of the volunteers, are from "higher" socioeconomic class that "look down" on people from poverty.  It is human nature to know which socioeconomic class you get along with and which you do not.  In some of the hearings, volunteers did not even speak, take any part in the review, and did not participate in any meaningful way.  For most Named Plaintiffs, the director would run the show and make his/her decision prior to even making an inquiry from the volunteer.

335.        Fair Hearing and Grievance Procedure, designed to review administrative decisions rarely get a different result.  They simply review the same erroneous facts and see if they fit the standard of "neglect" or "abuse" to support or unsupported the

---

[199] *See* 110 CMR 6.10(3)(FCR shall be conducted by a three member panel.)
[200] *See* 110 CMR 6.10(3)(c) (1)-(6)
[201] *See* 110 CMR 6.10(3)(c)(1)([T]he volunteer shall represent to the maximum extent feasible the various socio-economic, racial and ethnic groups served by the panel.)

decisions.  In other words, there is no way to actually discredit or review the findings of the social worker or other agent, involved in collecting the data collected (i.e. 51B report is reviewed to see if the findings support alleged neglect or abuse, however, there is really no way to challenge the investigator's perceived "facts").

336.         Unfortunately DCF agents do not know even the basic definitions of; neglect, abuse, parental fitness, etc.[202]  During Valerie's trial on the merits, the investigator that erroneously removed T.M. out of her home under emergency basis could not properly define even the most basic terms such as neglect.

337.         DCF continuously discriminates against the parents based on their past indiscretions, and fails to apply the Courts' directed standard of "present finesses" in determining placement of children.  Parents that are presently fit to parent, are still denied reunification because there is lack of policy to look at parents ability to parent in the present sense.

338.         DCF fails to abide with its own policy of keeping the family unit intact.  Once the family is separated, the likelihood of reunification is very unlikely.  Typically the child is reshuffled to a different family member's household or alternatively, parents sign some sort of an agreement or stipulation, with DCF through the Court, to end C&P in violation of Parental Rights.

339.         There is a huge discrepancy between the socioeconomic class of DCF agents and the parents they tend to interact with.  Parents involved with DCF are usually minorities and/or parents that come from lower socioeconomic backgrounds that DCF agents don't fully understand.  This includes also the way and manner the group communicates.

---

[202] *See* 110 CMR 2.00 (Glossary provides meaning of terms as used throughout 110 CMR)

Although some of the lower socioeconomic class's' communication may seem crass, nevertheless it is a form of expression that is protected by the first amendment and DCF illegally encroaches on it.

340.     Furthermore, there is a difference in the way and manner different cultures communicate.  Some cultures may "seem" like there is yelling and fighting involved when it is nothing more than the accustomed form of communication.

341.     DCF is in violation of their own policies and regulations, by failing to either implement or execute provision relating to linguistic and cultural minorities; "[t]he Department shall be responsive to issues of ethnic and cultural diversity by utilizing social workers who are attuned to ethnic and cultural values and traditions. The Department shall ensure that both the services it provides directly and those it provides through providers or contracts are culturally sensitive to the various minority groups in the client population. In addition, the Department shall make all reasonable efforts to ensure that communications with every client, whether written or oral, are made in a language, or in a manner, that the client can understand."[203]

342.     Valerie asked for a social worker that can either speak her language or is culturally similar so that she can be better understood.  When her requests were not complied with, she asked for just a different social worker, her request was again denied. Moreover, the social worker whom she tried to replace, became resentful and reunification became even more difficult.  Valerie, like most parents state-wide, has to call the day before her visit to confirm; when she was late confirming, the visit would be canceled even though the social worker was aware of the confirmation and the foster

---

[203] *See* 110 CMR 1.06

parent has not been notified yet, a state-wide abuse of power. (I.e. social worker could have just not contacted the foster parent and let Valerie have her visit, but chose to penalize Valerie instead).  Even more shocking are instances social workers would penalize parents for not confirming timely, and forgetting to notify the foster parents of the cancelation; foster parents would try to get a hold of the social worker at the time of the visit without any knowledge the visit has been canceled.

343.　　　DCF, in violation of their own policies, does not offer in home services.  More shockingly, DCF routinely requires Parents to complete tasks but does not offer assistance in completing them.  For example, DCF will ask parents to do drug tests, sometimes even on demand.  However, DCF does not offer such drug test.  Plaintiffs have gone to take the drug tests at medical facilities and were denied because MassHealth doesn't pay for them.  Parents, who are already financially strapped, cannot afford to pay for these tests.  Thus, such requests are used as a "set up" that will result with non compliance and loss of parent rights (i.e. if you pay money out of your pocket you will not be able to pay rent , without a home you won't have a right to parent child, but if you don't pay for such services, you will be non compliant and will also not have the right to parent your child).  DCF fails to document such requests and record what if any actions were done pursuant to their own policies and regulations.[204]

---

[204] *See* 110 CMR 3.02

## VIII.   DCF SOCIAL WORKERS DO NOT ADVOCATE FOR PARENTS

A.      DCF Social Workers are Unsuitable to Help Parents

344.            DCF social workers directly, as agents, represent DCF's interests.  By the fact that

parents enter C&P, DCF social workers are opposing parties to them.  Thus, DCF social

workers are unsuitable to work with parents, and ultimately harm and not help parents.

For example, when DCF social worker becomes aware that a child was sexually assaulted

in foster care, he/she does not communicate the potential of a lawsuit the parent may have

against the Department; DCF does not release its internal special investigations results to

parents.  Moreover, parents' attorneys cannot communicate to DCF without their attorney

being present; this makes it almost impractical to ever communicate with the ongoing

social worker because DCF's attorneys are in court and rarely will have time to address

issues.

345.            Every parent has good qualities and bad qualities, DCF social workers focus on

the bad qualities in hopes of "eradicated" such qualities to offer a child a "better" home.

There is a lot of character assassination; parents are required to keep their natural

tendency in check in hopes of having their parental rights returned.  Adoption workers

evaluations and recommendations are based on Ongoing Social Workers' evaluations

which are; summaries of allegations in reports that have not been verified, Case Dictation

Notes of supervised visits that the worker can edit and back-date any time.  Opinions of

mental issues will rarely be confirmed by actually ordering or physically seeing the

medical notes.  Once DCF decides to terminate parents' parental rights, they ceise

providing parents with resonable efforts; Case Dictation Notes for supervised visitations

and evaluations start to be filled with only negative observations (character assassination) without taking the time to make note of positive interactions.

346.         A lot of families hide a lot of things from DCF for fear of being punished by having children removed.  Named grandparents had their children removed simply because they allowed the "unfit" parent into their home without DCF'S permission.

347.         Valerie's daughter T.M. was placed with Valerie's sister, however, the sister allowed Valerie to take her daughter without DCF's knowledge because they knew if they would tell their social worker T.M. would be taken away.  When DCF found out that Valerie has been providing care to T.M. "behind their back", DCF took T.M. from both Valerie and her sister.  T.M. was placed in foster care where she has been exposed to violence, police, and other inappropriate behavior she has never seen before.

348.         DCF social workers do not follow social workers' core values.  They do not offer assistance or emotional support that a social worker should.  Massachusetts parents fear DCF social workers; the social worker is perceived as a DCF enforcer vs. a helper.  As soon as parents find themselves in C&P, they will immediately be talked down to and treated as if they are bad people.  Parents are told that they need to be able to have a job and income to provide for their children, but at the same time they will have to complete services that they have very little control over and these services will interfere with seeking gainful employment.

349.         DCF social workers do not comply with the state granted license requirements.  Valerie's social worker did not have the requisite hours of oversight.  Because they are overworked and understaffed, they don't have the necessary supervision; their work goes unchecked.

350.      DCF social workers also do not offer transportation vouchers, financial support to parents or other services that would help reunification; most of the emphasis goes to providing for children and foster care parents (who get weekly allowances and vouchers).

B.      Parents are Separated From Their Children Unnecessarily

351.      DCF social workers have direct control of how long to keep parents separated from their children, and are unnecessarily keeping them separated.  Most current cases, reunification can occur without risk for children with simple application of daily urine screening. Similarly, if under emergency screening, there are concern of drug abuse, requiring to take random drug screening would work better for keeping familial unit intact versus ripping the child (who is well fed, bathed, cared for, without any marks) out of the home.

352.      DCF Social workers fail to advocate for reunification.  Reunification decisions occur at specific times surrounding either Foster Care Review or Trial dates, with very little reunification in the interim.  Moreover, they are free to modify the service plan indefinitely simply because they don't like the parent or "nit-picking" about parent's character; such dislike which can be personal in nature, will result in FCR finding of insufficient thereby halting efforts for reunification.  For example, if they don't like your behavior (e.g. your expression of concern, dislike, or unhappiness with the process), they can order drug test even though, *arguendo*, the whole C&P was initiated for DV and no involvement of drugs (i.e. service plan can be modified to anything they like simply on basis of suspicion or dislike of the parent; an indefinite taking of the child).

353.       DCF Social workers uses prolonged separation as a form of punishment or coercive tactic to force parents into submission or get the parents to comply to their every request even if such request is unwarranted.

354.       DCF does not utilize alternative services prior to separation (e.g. daily urine screen, random home-visits, ankle bracelet to track parents that are suspected of domestic violence to their partners).

355.       It is an unfortunate side-effect, that long separation times lead to a less likelihood of reunification, thus unless a quick reunification is established, there will probably be a change of custody or other decree entered by the parents who face the possibility losing all ties to their children. Furthermore, parents are no longer perceived as "parents" by both children and DCF social workers involved.

356.       Long separation times, that may be also affected by distance from the parent, will not have to deal with a new hurdle of having to re-implant a child to a new school, providers, and other resources that the child has become accustomed to.

C.    DCF Utilizes Unconstitutional Supervised Parenting

357.       Once there is a removal of the child, the parent is placed in a Supervised Parenting room which allow parents to see their children for one hour a week, or two hours bi-weekly. Parents no longer can be parents in these rooms.  Parents are not allowed to speak to their children in their foreign language (Valerie was not allowed to speak to T.M. in Khmi[205]).  Parents are not allowed to say anything about the possibility of reunification (Named Plaintiffs were told not to talk about the future), parents could

---

[205] Khmi is the dialect spoken in Cambodia.

not discipline their children, parents could not talk to children in way in manner they wanted to.  Children are also instructed to limit what they can say or inquire during this visit.  Parents, during their visit with their children in supervised settings are  consistently humiliated, abused, and admonished in front of their children by the social workers (e.g. Valerie was not allowed, pursuant to her culture, to be upset at the fact that her child's hair was maintained by an adult male, have discussions about her child's vagina being touched inappropriately, say things like "they are corrupting you", or make her child upset when she would try to educate her about table manners.)

358.        These supervised visits deprive parents of meaningful contact.  This services creates a situation where the children lose touch with parents, develop resentment, change in personality, and sometimes act out against the parents.  Because the social workers and the parents come from different socio-economic class, parents are looked down at, and instead of working with parents, punish them in front of their children.  Notes during visits are memorialized in electronic Case Dictation Notes which will be used against parents to support termination of parental rights.  There is substantial departure from accepted professional judgment as to ability to provide minimally necessary parental environment and ongoing "character assassination" due to cultural and background differences.

359.        These type of supervised parenting services are a one solution fits all approach; parents which have their children taken under emergency basis will find themselves in these type of sessions that could otherwise be avoided.  During these sessions, social workers tend to focus on negative versus positive interactions; documentation of such visits are typically filled with character assassinating descriptions. Moreover, the

environment is usually very unnatural and confusing to both children and parents; it is hard for them to act normal.  This type of service can easily be replaced with allowing group session in the park where a social worker can observe several families interacting.

360.        Parents that would otherwise be willing to be weekend parents (probate and family equitable powers usually awards one parent full physical custody and the other parent weekends), are forced to appear for one hour mid week which directly conflicts with their work schedule.  Parents are routinely faced to chose losing their job or losing their right to be a parent.  Moreover, parents have to comply with very strict requirements, such as confirming the prior day.  Parents that fail to call by a certain time the day prior to their supervised visit, even if the voice mail is not checked by social worker till the day of the visit, are canceled to punish the parent and make record of their lack of stability and reliability.  No efforts are made to call (contact) the parent to see if they are reachable prior canceling the appointment.  No make-up days are offered, or other services that would help with punctuation.

361.        DCF and their agents greatly deviate from professional judgment to keep parents in such settings that are otherwise not dangerous to children, and can independently take the children, *exempli gratia*, to the park, restaurants, social outings, group activities or any type of out-door field trips.


D.        DCF Required Therapists are Used Against Parents

362.        Valerie spoke to the DCF therapist in hopes of getting help.  However, her disclosure of being hit by her child's father led to her child being taken from her.  Thereafter Valerie was scared to speak to future medical providers.

363.         DCF required therapists, who are supposed to help, during C&P will help DCF to

build their case against Parents.  Parents are not advised of the repercussions of full

disclosure to therapists.  DCF collects negative communications and fails to

counterbalance with positive communications.

364.         DCF required therapists, because of their mandated requirement to report back to

DCF prior "neglect" and "abuse", are counteractive to treatment and only make things

worse for parents.  DCF thus uses the therapists against parents instead of using them for

their benefit in hopes of "addressing" issues.


E.       DCF Does Not Offer Beneficial Services to Parents

365.         DCF does not actually offer services that will improve parenting.  Although

parents are offered third-party parenting classes, these are general parenting classes.  For

example, there is no services to actually teach parents how to do laundry, cook, change

dippers, and deal with children. There is no courses available to teach nutrition and

behaviors that can be detrimental to our health. "Children in the United States fare less

well across a broad range of health outcomes if their parents are poor, less well educated,

or in poor health."[206] DCF's harsh policy of removing children from families are

perceived as punishment in communities and deter parents from getting help. DCF would

serve parents better if they offered; gym memberships, free daily drug screens,

vocational training programs (e.g. HVAC technician, dental/medical assistant, electrician,

plumber, pharmacy technician etc.).  DCF does not foster a relationship with their

parents; offering courses that will give parents ability to help other parents or even join

---

[206] *See* A. Case and C. Paxson, "Parental Behavior and Child Health" *Health Affairs* 21, no.2
(2002) 164-178

DCF (e.g., youth care worker, victim services coordination, psychology or addiction counselor etc.,)  would strengthen DCF's image in the community.

366.        DCF does not offer parent child psychology classes.  Parents are told to not be abusive, but there are no classes to actually teach parents how to actual deal with children alternatively.  Furthermore, while there may be some classes, there are actually no in-home services to actually show some of these techniques in a home setting.  Parents, after doing what DCF requires them to do, simply become more careful from having the Government find out what is going on in their household.

367.        DCF does not have Parent Advocates.  Parents do not have access to social workers that actually will help them in achieving reunification.  Social workers do not attempt to help parents meet their goals, do not provide assistance or alternative solutions to getting to their visits, and ultimately leave it to the parents to be able to complete the service plan requirements without any assistance from the social workers (i.e. parents that lack financial ability to make it to supervised visits are guaranteed to have their parental rights terminated.)

368.        DCF does not allow grandparents visitation that are not otherwise foster parents or caretakers of children during C&P.  Furthermore, grandparents are not allowed to let their children see their children; DCF builds a "rift" between parents and grandparents without just cause.  DCF does not comply with State's Grandparents Visitation Rights.

## IX.    COMMONWEALTH IS NOT PROPERLY IMPLEMENTING AND EXECUTING THEIR POLICY OF REUNIFICATION

369.         There is insufficient amount of Juvenile Court Judges to handle the current case

load.  The state would save substantially more money currently being allocated

unnecessarily to foster care, by instead appointing more Juvenile Court Judges who

would be able to assist in resolving the current high case load

370.         Juvenile Court Judges now have authority to be more involved in C&P and direct

DCF to comply with their own policies and regulations.[207]

371.         Parents who are primarily of lower socioeconomic class, are completely ignored

by the executive government of Massachusetts.  The growing state-wide crisis of parents

being abused and treated unconstitutionally by DCF is put a side simply because it is a

class the "Commonwealth" has no incentive to protect.  Most of these parents, because of

their criminal background, disabilities, or other ailments, are not suitable for employment

or partake in voting; thus becoming an unrepresented class that is easily abused with no

recourse; this class of parents do not have funds to hire attorneys or the necessary level of

education to formulate any formidable advocacy against the State who hold all the

power.[208]

372.         Executive branch has failed to provide any Executive Order or other assistance to

help investigate the mistreatment parents are being subjected to.  Including the current

state-wide crisis of lack of reunification efforts; parents are literally waiting on the

---

[207] *See Care and Protection of Walt*, 478 Mass. 212, 84 N.E.3d 803 (2017)(Promulgating, by case law, authority to Juvenile Court Judges and Single Justices of Appeals Court, inter alia, to order DCF to provide parents with services, financial help, and other accommodations necessary for reunification).

[208] Lead counsel of this action, who took on a lot of pro bono matters, had his child taken by DCF, his constitutional rights stripped, and his right to be a parent taken away based on false allegations, character assassination and lack of financial resources. Unfortunately, finances are now a big drive in determining parental fitness.

sidelines to be reunified with their children. Executive branch continues to favor allocating funds to foster care instead of in-home services designed to keep children with their parents.

373.        Executive branch has failed to provide necessary resources to facilitate proper implementation and execution of state-wide DCF policies and regulations.  Children are kept in temporary placement longer than necessary.  As a result, federal funding is being utilized unnecessarily for foster care when there are biologic parents that ready and able to resume caretaking functions.

374.        DCF is primarily focused with protecting children; parents' rights are violated routinely.  Executive branch failed to see the abuse of power (geared to protecting children) targeting the parents unfairly.  Parents need their own department with their own social workers.  The policy of reunification cannot be executed without a real support group for the parents.

## X.   CPCS AND ITS CAFL DIVISION DOES NOT IMPLEMENT AND EXECUTE POLICY TO PROVIDE COMPETENT REPRESENTATION TO PARENTS

A.    Role of CPCS

375.        Committee for Public Counsel Services ("CPCS" or "Committee") is a statutorily established  statewide agency.[209]  CPCS provides legal representation in Massachusetts for those unable to afford an attorney in all matters in which the law requires the appointment of counsel. This includes representation in criminal, delinquency, youthful offender, child welfare, mental health, sexually dangerous person and sex offender registry cases, as well as related appeals and post-conviction matters.

---

[209] *See* M.G.L.c. 211D, § 1

376.          CPCS's Children and Family Law division ("CAFL") is statutorily established statewide agency that provides attorneys to represent children and parents in C&P.[210] CAFL also provides lawyers to children and parents in child requiring assistance ("CRA") cases (e.g. parents asking the Juvenile Court for help with; challenges at home, children who are truant from school, or children who are run-away from home ). CAFL also represent children and parents in contested guardianship cases.  However, majority of the representation occurs in C&P cases in Juvenile Court.

377.          Most CAFL lawyers are private attorneys, and as part of their appointment to the CAFL trial panel, must submit a CPCS Attorney Certification Form[211] and proof of professional liability insurance with minimum limits of $100,000/$300,000 or $250,000/$250,000 and with a maximum deductible of $10,000.[212]

378.          CPCS is statutorily responsible with establishing standards for the public defender division and the private counsel division which shall include but not limited to:

(a) "vertical or continuous representation at the pre-trial and trial stages by the attorney either assigned or appointed, whenever possible;

(b) required participation by each attorney in an approved course of training in the fundamentals of criminal trial practice, unless the attorney has a level of ability which makes such participation unnecessary;

(c) specified caseload limitation levels;

---

[210] *See* M.G.L.c. 211D, §§ 6A, & 12

[211] Application titled Attorney Certification Form, *inter alia*, lists Current Certifications and prior experience of being a panel member.  *See* https://www.publiccounsel.net/cfo/wp-content/uploads/sites/8/2014/10/Attorney-Certification-Form.pdf

[212] *See* https://www.publiccounsel.net/cfo/wp-content/uploads/sites/8/2014/10/Liability-Insurance-Letter.pdf

(d) investigative services;

(e) a method for the provision of social services or social service referrals;

(f) availability of expert witnesses to participating counsel;

(g) clerical assistance, interview facilities, and the availability of a law library and model forms to participating counsel; and

(h) adequate supervision provided by experienced attorneys who shall be available to less experienced attorneys.

(i) qualifications for vendors for the services provided in clauses (d), (e) and (f) and a range of rates payable for said services, taking into consideration the rates, qualifications and history of performance;"[213]

379.       "The [C]committee shall monitor and evaluate compliance with the standards and the performance of counsel in its divisions in order to insure competent representation of defendants in all courts of the commonwealth and shall establish a procedure for the review and disposition of client complaints. The committee shall also establish procedures whereby comments on the standard of performance of counsel in its divisions may be submitted by the justice hearing a particular matter.[214]

380.       "CAFL's legal advocacy plays a critical role in cases that affect families.  For a parent involved in a C&P case, having a skilled CAFL lawyer may mean the difference

---

[213] *See* M.G.L.c. 211D, § 9
[214] *See* M.G.L.c. 211D, § 10

between the family's reunification and the termination of parental rights – the *death penalty of family law*."[215]

B.   CAFL Failed to Provide Competent Legal Representation for Parents

381.        CAFL has failed to identify and acknowledge the prevalence of "culture" within the Juvenile Court that is biased toward parents.  Termination of parental rights has become so common, that attorneys are forcing their clients to stipulate and sign their rights away without a fight.

382.        Because there are privacy interests that belong to the children involved, court proceedings are not open to the public.  This is a huge problem, because without outside scrutiny and input, the "culture" can deviate substantially from what the population at large would agree with.  Moreover, the same attorneys represent both parents and children, and the same attorneys represent DCF (who calls all the shots), there is a lot of negotiating going on behind closed doors without actual advocacy for the parents.  It has become a non-adversarial system of justice.  As a result of lack of a "adversary" and zealous advocacy that opposes DCF, a lot of the underlying issues go unnoticed (e.g. social worker's competence is not questioned).[216]

383.        C&P, as written in the policy and regulations, is the stage which provides, inter alia, rehabilitative services to parents and there should be reasonable efforts for

---

[215] *See* https://www.publiccounsel.net/cafl/

[216] The Judges and attorneys were consistently shocked the line of questioning this counsel posed to DCF agents, even though they are common questions seen in Superior Court (e.g. asking social workers about their education, training, knowledge of the material, what if any areas of expertise, their views on how the particular case was handled, their criminal background, personal experience with children, etc.)  The court was insulted that I "tore apart" Valerie's social worker and made sure to go out of her way to thank the social worker for her appearance (with all due respect Valerie's social worker should be retrained, what she is doing is inhumane).

reunification; this is farther from the truth.  Both, appointed attorneys and DCF are very much against the parents; parents are treated as criminals.  As a reminder, some parents have handicaps, disabilities, lack of training, education and experience, to be parents.

384.         CAFL attorneys do not listen to parents.  Parents' opinions and their position on the type of care they have been providing, is irrelevant; attorney's advise parents to do specific things, even if parents don't agree with them, and to "put up and shut up" pursuant to DCF's request or lose rights to their children. Service plans, which have all the elements as required by regulations, are rarely contested of necessity of the tasks there in.[217]  For example, Valerie is a "loud mouth", and she had to interact with a social worker who is on the opposite end of the spectrum when it comes to communication (e.g. different in education, socioeconomic class, the addition of "ghetto" talk to the conversation etc.), she was required to continue to see domestic violence groups and other requirements to address past concerns that are no longer applicable.  Valerie is required to take services beyond what is necessary simply because she is "ghetto" compared to the social worker.  Her attorney not only failed to advocate for her on this matter. but he told her that she needed to sign her parental rights away and agree to an open adoption so that she can at least have some sort of contact with her daughter (this is analogous to an innocent man/woman taking a bad plea deal that involves pleading guilty).

385.         72-hour hearings are rarely held; parents are advised to waive their right to a hearing.  However, this hearing can be used to discredit DCF's initial determination, and show how the parent has provided adequate parenting in other ways, and can continue to

---

[217] *See* 10 CMR 6:00 et seq. (regulation of service plans)

do so with in-home services.  A waiver (stipulation) is an admission of present parental

unfitness. Valerie was not advised of her 72-hour hearing rights and the consequences of

stipulating.  More importantly, this counsel was successful in having her parental rights

saved (not terminated), with simple questions, that would only take a one hour course to

teach.

386.        Parents are not given an opportunity to make their own decisions.  Parents are

afraid, bewildered, and are forced, by their own attorneys, to comply. Valerie did not

know she could have had a 72-hour hearing and regain custody of her daughter

immediately.  Nicole G. could not even access her attorney.  Ashley was not aware that

she stipulated to DCF having permanent custody and she was not properly informed of

the repercussions and deleterious effects of time working against her (child's attorney did

not recommend pulling the child out of his current placement during review and

redetermination hearing).  Christina's attorney advised her to agree to open adoption

because there was nothing that can be done for her.  Culture directs parents, by their

attorneys who were appointed to represent them, to agree to a decree to guardianship,

open adoption or permanency plan; rarely maters are taken to trial on the merits.


C.        Failed to Advocate for System improvements

387.        There has to be a separation of power.  It is clear, based on the vulnerability of the

children class, everyone veers toward defending the children; parents are left fighting for

themselves.  CAFL should have separate attorneys for parents and children, parents are

not provided with adequate representation because the conflicting views of parent and

child are not adequately represented; there is lack of adversarial advocacy .  Even if the

parent is a "bad parent", they still need, analogous to criminal court, competent and zealous defense (i.e. parents' court appointed attorneys also get appointed to represent children; this would be analogous to court appointed defense attorneys representing criminals one day, and functioning as prosecutors another.)

388.        CAFL failed to realize that the Judges have become accustomed to accepting DCF's (social workers') finding and it is a hard task to discredit.  A right to a jury trial should have been invoked long time ago to help swing the "fairness" pendulum back toward the parents side; presently parents do not have access to Jury Trial in C&P[218].  It "takes a village to raise a child"; but, I never heard of villages banishing parents, *inter alia*, because they can't wake up in the morning and consistently yell at their significant partners.[219]

389.        CAFL does not advocate for continuous trials.  The child is continually developing, with needs that can change from week to week.  New issues arise at subsequent court dates; there has to be advocacy to continuity of trial.  CAFL also failed at advocating for speedy trials (lack of motion for speedy trials). Time, unfortunately

---

[218] *See Care and Protection of Minor*, 476 Mass. 1015 (2017) (Petition titled "petition for jury trials" not answered.) *See Ilya Liviz v. Supreme Judicial Court of the Commonwealth of Massachusetts et al.,* 1:17-cv-12345 (2017) (Alleging, *inter alia*, court does not want to "promulgate" access to jury trials in an already burdened by high case-load Juvenile Court system), *See In Re: Care & Protection of Child,* docket SJC-12403, SJ-2017-0103.  *See also In Re: Care & Protection of T.M.*, docket No. SJ-2017-0379 (Petition for Jury Trial, pursuant to M.G.L.c. 211, § 3 to Single Justice of Supreme Judicial Court Suffolk County denied); *See also In Re Care and Protection of J.P.& others*, docket No. SJ-2017-0400 (Petition for Jury trial, pursuant to M.G.L.c. 211, §3 to Single Justice of Supreme Judicial Court Suffolk County denied).  Aforementioned filling were drafted by this counsel.

[219] Missing school, and exposing a child to domestic violence, is harmful to their well being; however, once the parents are separated, why would the parent have to be in a one hour supervised visit for undetermined amount of time that can last a year (such is the case in Massachusetts).

works against parents, children become accustomed to their placement, and now the

courts will have to consider the effect on the child to have to rip them out from their

placement home to a new home (possibility of additional PTSD).

390.     CAFL does not, by way of petition or complaint, advocate for grandparents'

visitation rights (rights that typically the parent is asking to help enforce; the current

standard is to file a motion for abuse of discretion (i.e. there should be some sort of

advocacy to establish, pursuant to state law, grandparents rights to be a party to the

hearing (currently they are not a party to C&P at any stage, unless DCF or the Court

places the child in their temporary care (foster parent like rights).

391.     CAFL failed to advocate to gain access to CORI of the social workers (not

permitted at the moment), ability to make inquiries as to their personal family and

children background (not permitted at the moment).  CAFL instead of focusing on how to

comply with all of the DCF requests, should refocus on discrediting the highly untrained

and unskilled DCF staff.

392.     There is lack of advocacy for sanctions against DCF.  DCF always has to make

reasonable efforts, and failure to do so should warrant sanctions; not only should CAFL

focus on advocating for the parent, it should also be mindful to improve the system for

parents as a whole.

393.     It is shocking that DCF can request parents to submit to random drug screens, but

DCF does not provide such services.  Failure to comply with DCF to do the screen will

result in possible termination of parental rights.  MassHealth does not cover these tests,

and parents are struggling to get to visitation centers that are usually scheduled during

work week hours.  Parents need CAFL to better advocate on the lack of services to

parents (a prerequisite for reasonable efforts).

394.           CAFL failed to address the constitutionality of the supervised one hour visits per

week.  Such visitations, which take many months, are deprivations of rights and in most

cases are simply unjustified.

395.           CAFL should add-on to their current policies the necessity of attacking the

veracity of DCF agents and advocating for parents and children, when beneficial,

including the children's wishes.  Parents should have more avenues to advocate for

themselves, including bringing as much as possible to the Court's attention to facilitate a

favorable ruling.[220]

396.           All CAFL attorneys should have a compiled list of proposed alternative services

they can reference to.  Services in this list, should be those that are not offered by DCF;

but these services are excellent alternative options that can address parents' condition

without separating the family.  This list of alternative services is a great way to easily

discredit DCF, who at trial on the merits, by clear and convincing evidence, must make a

showing of DCF has provided parents with reasonable efforts.  In other words, DCF does

not offer reasonable efforts for reunification; there are many less destructive options to

families that DCF simply does not employ (examples to follow).

---

[220] *See In re Adoption of Nancy*, 443 Mass. 512, 822 N.E. 2d 1179 (2005) ("There is nothing in the Committee for Public Counsel Services (CPCS) standards, or in our cases, recommending that children be asked to express an opinion on what is in their best interests, as that is essentially a legal judgment.. The failure of the girls' trial counsel to elicit, or the failure of the judge to make a precise finding on, the girls' views with respect to the termination decrees was not error.")

397.        Parents with issues of substance abuse, instead of being separated from their children, could have in-home services to monitor their sobriety; it could be something simple as a daily urine test or, as seen for repeat OUI offenders, analogous to the ignition interlock device, use of handheld breath-alcohol monitoring device or other electronic detection system placed within their home (a lot cheaper than paying for Foster Care).

398.        For parents with issues of domestic violence with their partners/significant others, a bracelet monitoring can be placed on both of them to make sure, through GPS monitoring, they don't come into contact (also, a lot cheaper than paying for Foster Care).

399.        Parents that are unable to get their kids to school resulting in many unexcused absences, a phone call reminder system may be put in place, working to both, alert the parent of an important appointment and to also monitor confirmation thereof (again, a lot cheaper than paying for Foster Care).

400.        The Public Defender Division of CPCS who represent criminal defendants, have plethora of recourses on how to effectively advocate their clients through trial; however CAFL division, while competently teaches the "ins and outs" of the C&P, do not offer adequate, training, tools or resources, for their attorneys to become competent trial advocates.

D.      Deficient Appellate Efforts

401.        Across the board, CAFL fails to argue ineffective assistance of counsel; it is rarely discussed or effectively argued.  As a result of this failure to advocate for parents by pointing out flaws in legal representation, there is lack of adequate case law on the topic in C&P.  Appeals are basically looking at the facts and seeing if they are applied

correctly; there is really no adequate way of "testing" the credibility and accuracy of the

facts.  Ineffective assistance of counsel, may lead to new arguments in favor of *de novo*

review, with possible opportunity to supplement the record with additional or new

evidence.

402.        There is lack of appellate advocacy (which can lead to promulgation of helpful

court rules) on issues of "unfair trials" and the huge advantage DCF has as the party that

controls the design of the service plan and the timely completion thereof.  The social

worker that the parent is supposed to "work" with, is the same worker that will end up

testifying against the parent. Statements and observations made through out, will now be

used against the parent; parents need their own social workers to help them have a fair

chance.

403.        There is lack of advocacy on questioning the DCF procedure, *exempli gratia*,

whether removal of the child from a home should be avoided even if there is perpetuating

abuse or neglect; *arguendo*, it may be more  harmful to the child to be ripped out of their

home and bounced around until permanent home is found, than to just leave him in a

neglectful home filled with domestic violence (obviously in-home services should be

initiated immediately).

404.        There is lack of advocacy (at all stages) of pointing out how to expose "lack of

services" which is necessary to show by clear and convincing evidence "reasonable

efforts" were made.  For example, there will be a discussion that the parent is late, but no

one ever asked if they tried a different type of alarm clock; house would be a mess, but

no one would inquire if the parent knows how to vacuum, or clean dishes; there will be

discussion that the child is not clean and smelled like urine, but there will be no

discussion if an inquiry was made to determine if the parent knows how to change and properly put on a diaper, and knows how to properly bathe the child.

405.　　　　A lot of parent rights are terminated based on "character assassination" and not actual lack of ability to parent (i.e. they can learn these lacking parental techniques and requirements, that DCF never teaches them (e.g. importance of having rhythmic schedule for the child, how to communicate to a child effectively, how to handle a child that will not listen, importance of being a nurturing and loving parent, etc.).

406.　　　　CAFL Appellate advocacy fails to address counsels' (ineffective assistance) lack of attack on proponents credibility, veracity, knowledge, experience and consistently relying on multiple hearsay pole when the evidence was not acquired by direct observation or impression.  Example, for a 51B report, DCF investigator will speak to a nurse over the phone regarding a parent; nurse will pull a chart and release concerns of mental illnesses (parent may have been acting out during or after child birth, as did Valerie when she gave birth and as a result had a 51A/51B written up on her), this now will develop into a huge "mental illness" snowball that never should have even started (i.e. a concern is not an actual diagnosis or proof thereof.[221]  Finally, parents conduct outside of their children's' presence does not paint their conduct that occurs in their presence; a loud and belligerent parent may be very loving and helpful to their child's development when they are alone together (classic example of this is how people's attitude and demeanor changes when their significant other steps into the room).

---

[221] Counsel was not allowed to make inquiries whether the workers have experienced parenting or child birth of their own; but, it is very relevant, because only a trained person or someone going through child birth themselves, would know that there may be "temporary insanity" during child birth that plays no role on their true character.

407.          There is no "Daubert motion" like arguments made.  Instead of focusing on what

the parents "missed" or "didn't do", the focus should be on what the parents "are not able

to do".  In other words, DCF is focusing on protecting children (very important), but what

about protecting parents from becoming childless?  What rehabilitative services were

provided?  Observations do not prove inability to parents.  Again, there is a gray area

between parental "unfitness" and character "assassination".

E.          Adoption of Jenny[222]

408.          In reviewing the appeal cases, it seems similar arguments are missed or not made;

however, specific appeal case that was bothersome to this counsel that I will use as an

example to better picture of the state-wide crisis.  A mother, who's child suffers from

seizures, on the way to the hospital in the ambulance with her child would not allow the

emergency personnel to buckle her or the child; "During the ride, the mother did not have

a firm hold on the child due to her constant turning around to yell at the paramedic, and

the other paramedic had to repeatedly ask the mother to pay attention to the child. At one

point the mother became upset and "tossed" the child away from her, forcing the

paramedic to catch her before she hit the floor or any equipment. As a result of this

incident, the mother was later arrested and charged with assault and battery on the child."

[223] This incident was utilized, inter alia, to paint the mother as unfit parent.  But, let look

into the Memorandum and Order further.

---

[222] *See Adoption of Jenny*, 477 Mass. 1108, 91 Mass. App.Ct.1128, 86 N.E.3d 511
(Table)(2017)(Supreme Judicial Court appellate review denied)
[223] *Ibid.*

409.        First, the mother "lived in Honduras until her early adult years."  Honduras is

located in Central America and it remains one of the poorest countries in the western

hemisphere, with GDP (PPP) of $5,492 per capita, and GDP (nominal) of $2,623 per

capita.[224]  They don't use seatbelts there because motorized vehicles are not a common

mean of transportation.  Moreover, the level of education is substantially lower than here;

I am confident the mother did not know the safety concerns surrounding lack of seatbelt

use (people from third world countries don't know the potential of injury and reduction

thereof by use of a "seatbelt" safety belt).  Counsel should have addressed this issue!

410.        Moreover, her primary language is Spanish, which means her "arguing" could

have easily been "miscommunication".  She is in a different "world" (country), with

different culture and means of communication; she just observed her child suffer from a

"seizure" and is in a state of panic.  She, as a good parent would, appropriately called

911.  She may have not fully understood that the emergency personal were trying to help.

In all likely hood, seeing her child in a state of seizure elevated her concerns.  But, if we

look closer, the most important part of the ambulance ride is; "During the ambulance

ride, the mother held the child on her lap in order to comfort her, rather than having the

child restrained."  Again, while the court is focusing on her not having her child

restrained, (something that no one asked if she knew the importance of), she was holding

her child on her lap to comfort her.  Having a motherly loving instinct is difficult to teach

(it is something that is genetically ingrained in us), but teaching the value of seatbelts for

safety is something that can be taught.  This would be very different if DCF, *exempli

gratia*, attempted to teach her the value and importance of using the safety belt and she

---

[224] *See "*Honduras", International Monetary Fund (2017)

failed to understand and incorporate such American policy.  There is no such mention of it because it is never done.  DCF, as they in most of the cases, observes facts that do not "comport" to a fit parent, documents the facts, and uses the facts to take custody of the child.  It is further shocking that "The mother dos not contend that any of these findings of fact lack support in the evidence that was before the judge".  The facts are being convoluted (I recall from my art class in college, my fellow students looked at the same painting; one saw a stormy ocean and another saw stormy clouds, all in the same painting). Another argument that can be presented is simply saying, "You know, parents traveling with their children on buses, don't strap their kids in, because public buses don't have seat-belts!"[225]  These facts as entered into evidence are erroneous; what should have been argued is that DCF failed to provide services (teaching her the American way, or the benefits of using seatbelts) and no reasonable efforts were made to see if she can learn to abide by these requirements. Of most importance to the interest of the child;

> "When the child was approximately two years old, she was diagnosed with nephrotic syndrome, which is a chronic kidney condition characterized by relapse and remission, and requires constant monitoring. Left untreated, nephrotic syndrome can cause severe harm to the kidneys and can, in certain cases, become fatal. Caring for a child with nephrotic syndrome requires close attention to her symptoms, as well as "dipstick" testing of urine to monitor protein levels. The dipstick testing must be carefully done and charted to ensure accurate monitoring of the child's condition. If a caregiver misses signs of relapse, it will take longer to achieve remission, and could require a hospital stay. Thus, a caregiver needs to be vigilant to any signs of illness, be able to administer medications correctly, and be able to schedule multiple medical appointments with medical professionals."[226]

---

[225] It is ironic that most of us would laugh, or not know how to interpret, a scenario where a parent would bring her/his own seat-belt to strap their child into a seat on a public bus; safety first!

[226] *See Adoption of Jenny*, at note 176, 91 Mass. App.Ct.1128, 86 N.E.3d 511 (2017).

Memorandum identifies the child suffering from a medical condition that requires special care.  There are no allegations that the mother was inapt or unable to provide the child with this care! It sounds to me like she KNEW VERY WELL what her child's needs were, and it is possible, that the emergency personnel, without their fault, did not know how to possibly handle the child, and the mom being under state of emergency was trying to communicate in the best way she knows how; primary language is Spanish, she comes from a different cultural background, and the emergency personnel could have been handling the child in a manner that could have caused more injury without their knowledge as the mother perceived).  Did she hit anyone, or spit at anyone, or use an inanimate object to strike someone (no)? She just observed her child have a severe enough seizure that cause bleeding around the face (confirmed in Memorandum); the mother is in the state of panic; unlike the emergency personnel she is not accustomed to seeing  injuries, let alone injury to her child.  What reasonable efforts were made to fix any of the alleged issues?  The old saying is; "if you want your employee out, start documenting"  (soon enough you will have enough document to fire your employee without worry of a lawsuit).  You just crushed the soul of this poor mother; shame on you.

## SUMMATION

411.　　　The State has failed to follow professional recommendations to address various issues with state-wide foster care crisis.  It has failed to implement and execute state-wide policies to achieve the Federals Acts' mandated reasonable efforts for reunification requirements.  The knowing actions and inactions of the defendant officials of the State

of Massachusetts, as herein set forth, are causing Massachusetts Parents permanent and irreversible harm, by misrepresenting the actual abuse/neglect of children that were removed from their homes, and failing to provide reasonable efforts for reunification and maintenance of intact familial unit.  Parents are being separated from their children for long periods of time, continue to suffer irreparable injury for which there is no adequate remedy at law.  Bad and imperfect parents, still have constitutionally protected right to parent their children.

## FIRST CAUSE OF ACTION

(Substantive Due Process Violation under the U.S. Constitution)

412.   Each of the foregoing and ensuing allegations are incorporated as if fully set forth herein.

413.        Plaintiffs have a fundamental right to parent.  A state that takes temporary custody of parents children assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect that interest by providing parents with necessary services for timely reunification and reasonable efforts to maintain the familial unit intact.  Every moment of separation both the parent and the children are permanently harmed.

414.        The foregoing actions and inactions of Defendants Charlie Baker, Linda Spears, Marylou Sudders, and Anthony J. Benedetti, in their official capacities, constitute a failure to meet their affirmative duty to protect from harm all Named Plaintiffs, which is a substantial factor leading to, and proximate cause of, the violation of the constitutionally protected liberty and privacy interests of all Named Plaintiffs.

415.        The forgoing actions and inactions of Defendants Charlie Baker, Linda Spears,

Marylou Sudders, and Anthony J. Benedetti, in their official capacities, constitute a

policy, pattern, practice or custom that is inconsistent with the exercise of professional

judgment and amounts to deliberate indifference to the constitutionally-protected rights

and liberty and privacy interests of all Named Plaintiffs and class members.

416.        As a result, all Named Plaintiffs and class members have been, and are at risk of

being, deprived of the substantive due process rights conferred upon them by the

Fourteenth Amendment to the United States Constitution.

417.   These substantive due process rights include, but are not limited to:

> a. the right to protection from unnecessary ridicule, coercive tactics,
> oppressive requests, and treatment of parents by DCF that is
> psychologically and emotionally damaging
> b. the right to protection from unreasonable, unnecessary or impossible
> requests;
> c. the right to services necessary to prevent prolonged separation,
> including but not limited to; providing drug screens at DCF's expense
> when such tests are requested, appropriate monitoring and supervision,
> appropriate planning and services directed toward goal of reunification,
> offer services to cater to parents' specific needs and have alternative
> services as options for parents to chose from, assistance with
> transportation,.

d. the right to having a service plan be consistent with the purpose of the assumption of custody by DCF;

e. the right to not have children be maintained in custody longer than is necessary to accomplish the purposes to be served by taking the child into custody;

f. the right to receive care, treatment and services determined and provided through the exercise of accepted professional judgment;

g. the right to have immediate determination of the "threat" of abuse or neglect of the  child can be cured or controlled by any means; and

h. the right to have children be placed in the least restrictive placement according to the ongoing need of protecting the child, with option of immediate or shortly thereafter placement of child back with the parents during the ongoing C&P if the posed "threat" of abuse or neglect to the child can be controlled;

i. the right to have meaningful visitation with their children; and

j. the right to have a social worker that will provide services to parents in accordance with the established social worker core values.

## SECOND CAUSE OF ACTION

(Violations of FFPSA, CFSA,  FCSAA, AACWA, CAPTA, ASFA, SSA and other Federal Law Mandating the State to Provide Parents with Reunification Efforts and Maintenance of Intact Familial Unit)[227]

---

[227] *See e.g.*; 42 U.S.C. §§ 621(3) & (5); 42 U.S.C. §§ 629(2) & (3); 42 U.S.C. § 629a(a)(2); 42 U.S.C. § 671(a)(15); 42 U.S.C. § 1397(3); 42 U.S.C. § 5116(b)(1). (Federal law addressing reunification efforts.)

418.   Each of the foregoing and ensuing allegations are incorporated as if fully set forth herein.

419.        Defendants' actions and knowing inactions have deprived plaintiffs and the members of their class of the rights conferred upon them by the Federal Acts; FFPSA, CFSA, FCSAA, AACWA, CAPTA, ASFA, SSA & others, including their rights to:

a. DCF providing reasonable efforts to prevent plaintiffs' children removal from their homes and to prevent unnecessary separation from their parents;

b. DCF provide services to parents necessary for prompt reunification;

c. DCF provide timely and appropriate services to prevent and remedy neglect, abuse, and dependency which may result in out-of home placement;

d. DCF provide individualized written case plans accordance with reasonable professional judgment developed in that contain specified elements; timely and complete implementation of said plans by the provision of necessary and appropriate services; and timely and complete review of those plans; that is reunification goal centered; without reliance on time costly appeal thereof;

e. placement in foster homes or other out-of-home placements which are appropriate for plaintiffs' needs and which conform to nationally-recommended standards, and appropriate foster care payments;

f. appropriate services for plaintiffs, their parents, and their foster parents to address each child's needs and to assure each child's permanent placement;

g. placements in the least restrictive, most family like settings;

h. proper care and treatment;

i. periodic judicial or administrative reviews;

j. dispositional reviews to determine future status within eighteen months after placement, and periodically thereafter;

k. services in a child welfare system with an adequate information system;

l. failing to coordinate strategy, pursuant to 42 U.S.C. § 622(b)(15)(A)(ii), to identify and respond to emotional trauma of removing children from their home.

m. defendants' compliance with the FFPSA,  FCSAA, CFSA, AACWA, CAPTA, ASFA, SSA & other Acts.

### THIRD CAUSE OF ACTION

("Fundamental Fairness" Due Process Clause under the U.S. Constitution)

420. Each of the foregoing and ensuing allegations are incorporated as if fully set forth herein.

421.     Defendants have failed to establish an appropriate department that would address state-wide lack of preventative and rehabilitative services to parents; Defendants presently are placed in predicament in which  bias, prejudice and/or conflict of interests make it impossible to offer fair service plans to parents necessary for reasonable efforts as mandated by Federal Law.

422.     Defendants, did not place necessary safe guards to protect parents fundamental right to rear their children, and right to have reasonable visitations; service plans did not

take into account financial, travel and other limitation that prevented compliance and resulted in avoidable state-wide termination of parental rights.

423.    Defendants failed to recognize the rampant abuse of power state-wide which was a byproduct of placing duty on DCF and their social workers to handle matters that have conflict of interest.  Because DCF errs on the side of caution of protecting our most vulnerable citizens, the children, parents were left as a "second-class" citizen without adequate representation or reasonable efforts of reunification in violation of federal law.

## FOURTH CAUSE OF ACTION

(Violation of First, Fourth, Fifth and Ninth, Eleventh, and Fourteenth Amendment to the U.S. Constitution - Right to Privacy)

424.    Each of the foregoing and ensuing allegations are incorporated as if fully set forth herein.

425.    Defendants have denied plaintiffs and members of their class their rights to privacy of the person and possession as guaranteed to them by the of First, Fourth, Fifth and Ninth, Eleventh, and Fourteenth Amendment to the United States Constitution by: failing place necessary safe guards to protect parents privacy and parenting rights.  Once a child is removed for a particular reason, Parents immediately lost their right to privacy; Defendant are able to look at all aspects of parents lives and privacy, even areas which were completely unrelated to the initiation of care and protection, thereby allowing Defendants to create allegation stacking (finding new reasons to stack upon prior reasons to substantiate parental unfitness) subjecting parents to character assassination.

426.    Defendants, did not place necessary safe guards to protect parents privacy and parenting rights.  Parents were forced to disclose personal information that would be used

for character assignation.  At all steps parents were forced to present evidence that would subsequently be used against them at trial on the merits by the same people that were supposed to help them.  Parents were never warned or informed how, *exampli gratia*, social workers and therapists would use parents' statements to terminate parents' parental rights; and they were not given an option for the right to remain silent.

## FIFTH CAUSE OF ACTION

(First, Ninth, and Fourteenth Amendments to the United States Constitution
Right to Freedom of Association and to Family Integrity)

427.   Each of the foregoing and ensuing allegations are incorporated as if fully set forth herein.

428.   Defendants have denied plaintiffs and members of their class their rights to freedom of association and to family integrity as guaranteed to them by the First, Ninth, and Fourteenth Amendments to the United States Constitution by: failing to place children in DCF care in close proximity to their parents; failing to provide services necessary to enable children in DCF care to remain together or to be reunified whenever appropriate; failing to place siblings in need of out of- home placements in the same placements; and failing to facilitate visitation between children and parents, and children and their siblings and Grandparents.

429.   The foregoing actions and inactions of the Defendants Charlie Baker, Linda Spears, Marylou Sudders, and Anthony J. Benedetti, in their official capacities, amount to a policy, pattern, practice, or custom of failure to exercise professional judgment and of deliberate indifference to Plaintiffs' constitutional rights, and are the cause of the violation of such rights. As a result of Defendants' conduct, all Named Plaintiffs have

been, and are at further risk of being, harmed and deprived of the liberty interests, privacy interests and associational rights conferred on them by the First, Ninth, and Fourteenth Amendments to the United States Constitution.

## SIXTH CAUSE OF ACTION

Department of Children and Families of the Commonwealth
(Violation of Rehabilitation Act and the Americans with Disability Act)

430.     Each of the foregoing and ensuing allegations are incorporated as if fully set forth herein.

431.        Parents with disabilities, perceived disabilities or handicaps, or other qualified individuals, are not given the same services, access to some of the DCF's services, and lack of offered options for reunification..

432.        Most parents that find themselves involved with DCF are from lower socioeconomic class express themselves with tone and speech them seems crass to the higher socioeconomic class.  Parents from such class may be less educated, present themselves as loud, rude, and even perceived as individuals with mental illness.

433.        Defendants have failed to implement and execute their own governmental policy on addressing needs of the handicap or disabled.  The plaintiff class is subjected to ongoing discrimination with no services in place to address their special needs; absence of such services results in lack of reasonable efforts.

434.        DCF erroneous evaluations for this group of parents results in their parental rights terminated simply based on reasons of how they are perceived as individuals even though they are able to provide the basic necessities to their children as required for parental fitness.

435.     DCF fails to acknowledge that ""qualified individuals" under the ADA include those individuals: who have been successfully rehabilitated and who are no longer engaged in the illegal use of drugs; who are currently participating in a rehabilitation program and are no longer engaging in the illegal use of drugs; and who are regarded, erroneously, as illegally using drugs.  Moreover, a former *drug addict* may be protected under the ADA because the addiction may be considered a substantially limiting impairment.

436.     There is state-wide lack of accommodations and state-wide discrimination against parents who have or are perceived to have, disabilities.  State's own policy on disabilities are not being implemented and executed.  Parents do not fit the "norm", have a much higher chance of having their parental rights terminated or limited simply because they are "different".

## SEVENTH CAUSE OF ACTION

### Department of Children and Families of the Commonwealth
### (Procedural Due Process Violation under the U.S. Constitution)

437.     Each of the foregoing and ensuing allegations are incorporated as if fully set forth herein.

438.     Defendants' actions and inactions have resulted and are continuing to result in the deprivation of the following state-law entitlements to which each Plaintiff Parent has a constitutionally protected interest, without offering the Plaintiff Parent adequate and meaningful opportunity to be heard:

439.     State administrative review and appeal process are not followed, nor do Defendants abide by their own rules and regulations.  Foster Care Reviews lacked

meaningful opportunities to review.  Fair hearings are backed up; parents are unable to timely get a hearing to review DCF's conduct and decision making.

440.      Failing to provide parents with alternative social worker when there are is a difference of; cultural background, socioeconomic status, personality clash, adversarial C&P proceedings, break-down in communications

441.      Forcing parents to continue to work with and abide by, the social worker who is in part, responsible for the ensuing termination of parental rights; parents are forced to comply with social worker's requests even though the same social worker will be testifying that the parent's parental rights should be terminated.

442.      Failing to provide parents with access to independent non-employee of DCF social worker when DCF seeks to terminate parental rights; forcing parents to work with social workers who will be testifying against the parent.  responsible for DCF's position to terminate their rights.

443.      Failing to accommodate parents by having a fill-in DCF attorney for court dates to mark up motions (e.g. motion for abuse of discretion), thereby creating a substantial avoidable delay for the court to rule on Parents' motions.  Failing to make decision that relate to placement of child back with parent prior to court hearing, thereby using the Court date as coercive means to strategically attain more favorable negotiation position.


## EIGHT CAUSE OF ACTION

(Deprivation of Equal Rights Under the Law)

444.  Each of the foregoing and ensuing allegations are incorporated as if fully set forth herein.

445.       Defendants discriminated against parents, on the basis of their disability and/or perceived disabilities, and denied them in the full and equal enjoyment of its services, facilities, privileges, advantages, and accommodations, in violation of 42 U.S.C. § 1981

446.       Defendants also discriminated against parents, on the basis of their history or association, with substance abuse, prior involvement with DCF, prior involvement with CHINS, and denied them in the full and equal enjoyment of its services, facilities, privileges, advantages, and accommodations, in violation of 42 U.S.C. § 1981.

## NINTH CAUSE OF ACTION

(Violation of Comprehensive Addiction and Recovery Act of 2016)

447.   Each of the foregoing and ensuing allegations are incorporated as if fully set forth herein.

448.       DCF failed to provide reasonable efforts to parents with addiction issues, and discriminated against them based on their past or current drug use.

449.       Addicts represents a specific group of people that fall into a recognizable class, which right now has been declared by the President as part of a growing epidemic that requires attention from everyone in position to help within the State and Federal System; and has also recently been accepted as a form of disability.

450.       Parents with history of addictions warrant protection.  By their persona, mannerism, and/or symptomatology of drug seeking behavior, have been discriminated against, either by being compared to a "group" of addicts or erroneously being stigmatized as being part of that "group", even when they can provide a clean urine at any time.

451.        Such discrimination leads to preconceived judgment without giving parents with

history of addiction an opportunity for a fresh start and reasonable efforts for

reunification.

452.        Defendants have failed to utilize the benefit of the Comprehensive Addiction and

Recovery Act, including and not limited to improving treatment for pregnant and

postpartum women, building communities of recovery, and state-wide lack of inquiry if

parents are family members of veterans who would have additional benefits under the act.

453.        Defendants have failed to utilize funds available though the Act of 2016, to help

parents have access to statewide recovery support services that specifically address

substance abuse and other services available through the act.


**TENTH CAUSE OF ACTION**

(Legal Mal Practice against Gene Rauhala, Tameka Grantham O'brien. Alan Levine individually
and on Behalf of All Others Similarly Situated)

454.    Each of the foregoing and ensuing allegations are incorporated as if fully set forth herein.

455.        Defendants, (and each of them if such Class shall become feasible), had a duty to

use such skill, prudence, and diligence as members of the legal profession commonly

possess and exercise, in providing legal services to Plaintiffs herein.

456.        Defendants erroneously advised their clients to waive their 72-hour hearings.

These hearings, even if futile, can be used as a discovery tool to help their clients better

gage the issues surrounding their case and the weakness and strengths of the DCF case

against them.   Defendants routinely advise their clients to stipulate into adoptions instead

of going to trial on the merits.   As result of his advice, she has lost her parental rights and has not been able to see her son since.

457.        Defendants failed to discuss all of the options available to their clients. Defendants failed to inform their clients that if they lose the 72-hour hearing they can file an interlocutory appeal to a single justice of the appeals court for immediate review pursuant to M.G.L.c. 231, §118.  They failed to discuss the possibility of a jury trial, speedy trial, nor motions for abuse of discretion

458.        There is lack of advocacy and competent representation for Parents in Juvenile Court that is a state-wide crisis.  CAFL juvenile court appointed attorneys represent both parents and children.  These attorneys have their own bias toward what is considered a fit parent.  Almost always, instead of listening to the clients and their concerns, lawyers work with DCF to bully the parents into stipulations; in essence contributing to the coercion that is ongoing in juvenile court.

459.        Failing to provide parents with access to independent non-employee of DCF social worker when DCF seeks to terminate parental rights; forcing parents to work with social workers who are in part, responsible for DCF's position to terminate their rights.

460.        Juvenile court attorneys congregate together and fail to recognize and improve system wide deficiencies within the courts.  Instead of listening to parents stating that "these allegations are false", they all advise the parents to try to "work" it out with the DCF.  Parents don't have anyone that is actually advocating for them; it is really a system to rehabilitate or terminate, without an option to "test" or "fight" the allegations.   Motion for abuse of discretion are rarely filed, and to have several in one case is almost unheard

of.  However, if everyone would start filling, the Judges would take notice, and start ordering DCF to make changes.

461.        Failing to advocate for; 1) the right to a jury trial; 2) the right to a speedy trial; 3) the right to a fair trial; 4) the right to a trial open to the public (pseudonym to be used for children); and 5) the right to a competent attorney if they can't afford one.

## ELEVENTH CAUSE OF ACTION

**(Breach of Fiduciary Duty against Gene Rauhala, Tameka Grantham O'brien. Alan Levine individually and on Behalf of All Others Similarly Situated)**

462.  Each of the foregoing and ensuing allegations are incorporated as if fully set forth herein.

463.        Defendants would continually advise their clients against client's wishes, even though their wishes could be fulfilled.  For example, Attorney Rauhala wanted Valerie to stipulate to adoption, but successor counsel (this counsel) was able to prove at trial on the merits that DCF does not have any good reason to keep her away from her child and that DCF was literally denying her to be a mother without any good reason.  What was alleged on paper was literally not true and this is the same for most parents.  Attorney Grantham was teaming up with the child's attorney stating that Jennifer was an unfit parent and that she could not help her.  When this counsel attempted to question this and asked why were there reasonable efforts of reunification, they replied that she did not provide drug tests that were asked by DCF.  I quickly responded that she was happy to take these tests but could not afford to get them, and repeatedly asked for these tests and was not provided; a strong reason to show that DCF will not be able to show by clear and

convincing evidence at trial on the merits that DCF provided her with reasonable efforts

of reunification (pre-requisite for terminating parental rights).  Alan Levine did not give

an opportunity for his client, Nicole, to present any evidence to counteract DCF's

allegations; the court was free to rule on the matter without any opposition.

464.        Furthermore, Defendants failed to notify their superiors or authorities, of the

issues that are prevalent with the court, and appeased the system instead of their client in

violation of their ethical duty to provide zealous representation to the client they were

appointed to represent.

## TWELFTH CAUSE OF ACTION

(M.G.L.c. 93A violation against Gene Rauhala, Tameka Grantham O'brien. Alan Levine
individually and on Behalf of All Others Similarly Situated)

465.    Each of the foregoing and ensuing allegations are incorporated as if fully set forth herein.

466.        Defendants are a business in the State of Massachusetts, offering consumers legal

services.  As a business he is in violation of the Consumer Protection Laws, *inter alia*,

make it a violation to conduct a business unfairly or with deception.

467.        Defendants failed to disclose all of their options available to their clients;

including options for motions and other interlocutory appeal efforts that would be time

costly to counsel, but possibly very valuable to their clients.  Lack of disclosure of these

options is deceptive and is a consumer violation.

## THIRTEENTH CAUSE OF ACTION

(Breach of Fiduciary Duty/Professional Judgment by Social-Workers)

468.   Each of the foregoing and ensuing allegations are incorporated as if fully set forth herein.

469.     Defendants fail to fully inform parents; of pertinent events concerning their children in foster care (e.g. sexual assault, serious bodily injury, allegations of abuse or neglect, medical or behavioral issues and other concerns surrounding their children), likelihood of reunification, likelihood of termination of their parental rights, DCF policies, lack of visits between siblings, results of special investigations; and fail to fully investigate the case (i.e. relying on other worker's opinions without fully investigating its veracity.)

470.     After C&P has been initiated, and parents have been appointed attorneys, DCF would acquire information from represented parents which DCF knew was going to be used against them without their attorney being present.

## FOURTEENTH CAUSE OF ACTION

### (Abuse of Process)

471.   Each of the foregoing and ensuing allegations are incorporated as if fully set forth herein.

472.     Defendants utilize social workers that lack the requisite license or training to submit affidavits in support of initiating C&P Petitions against parents in Juvenile Court.

473.     Defendants fail to fully and properly investigate the allegations; the affidavit are submitted as if they have firsthand knowledge without disclosure which source it actually came from.

474.     Defendant fail to provide in-home services and reasonable efforts to maintain familial unit without involving the courts.

## FIVTEENTH CAUSE OF ACTION

### (Malicious Prosecution)

475.   Each of the foregoing and ensuing allegations are incorporated as if fully set forth herein.

476.       Defendants unjustly and effectively utilize the threat of terminating parental rights to effectuate stipulations for guardianship decrees.

477.       Defendants maintain C&P even when they are aware there is no reason to do so. Moreover, if it became apparent that the removal of the child was unnecessary or even erroneous, there will be continuation of character assassination from prior opinions made and new documentation with reference thereto; C&P will be maintained because admitting to fault is in essence an invite to a law-suit.

## SIXTEENTH CAUSE OF ACTION

### (Gender Discrimination)

478.   Each of the foregoing and ensuing allegations are incorporated as if fully set forth herein.

479.       Defendants treat fathers differently than mothers.  Fathers are not given the same opportunity of reunifications. Placement of children with mothers are substantially favored over fathers.

480.       When there are allegations of domestic abuse, defendants automatically see fathers as  perpetrators of abuse; fathers have to "climb a hill" to overcome such erroneous perception.

481.        Even when domestic violence is not an issue that is being investigated, fathers are

still treated as less of a parent and are not given the same time, attention, and opportunity

to parent.

## SEVENTEENTH CAUSE OF ACTION

(Discrimination Against Parents With Prior Substance Abuse) [228]

482.   Each of the foregoing and ensuing allegations are incorporated as if fully set forth herein.

483.        Defendants routinely confuse peoples "culture", "disabilities" and just typical

behaviors of the lower socio economic class as drug abuse.  Parents that have been

labeled as  former drug addicts will be subjected to drug test request without actually

being provided with these tests (parents have to pay for it themselves).  Because this

group of people are already strapped for money, they are unable to comply even though

they are drug free.  When they do comply, they don't have enough recourses to maintain

other things such as being able to acquire a vehicle, driving license, quality housing, and

other non-necessary luxury items readily available to higher socio-economic class.

---

[228] American Disability Act (with ADA Amendments of 2008), *inter alia*, protect the disabled by offering not only protections for people with disabilities, but to also protect people that can have complete resolve of the disability (e.g. by use of medication or corrective lenses), and also protect people that do not have a disability but may be *perceived* to have a disabilities.  *See* 42 U.S.C. 12101 et seq.  ADA Amendments of 2008 overturned several U.S. Supreme Court decisions.  *See e.g.*, *Sutton v. United Air Lines, Inc*., 527 U.S. 471 (1999) (Which previously held corrective lenses resulting in normal vision invalidated ADA.)  Furthermore, "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation or denied the benefits of the services, programs or activities of a public entity." *See* 42 U.S.C. § 12132.  Moreover, Disability applies to individuals that previously had a physical or mental impairment that substantially limited one or more major life activates of such individual (may be in remission) or is *perceived as having such impairment*; or there is a record of such an impairment; *inter alia*, concentrating is listed as one of many major life activities. *See* 42 U.S.C. §§ 12102 (1)-(3) (Emphasis added.)

484.         Initiation of C&P is more likely to occur when the parent has a prior history of

substance abuse.  Supervised visitations limited to one hour a week are maintained for

longer periods of time for parents that have history of substance abuse even if they can

prove that they are drug free.  Parents with prior substance abuse history are

discriminated against by the erroneous perception that their past behaviors make them

presently inapt to provide for their children, and have their parental rights terminated by

not helping them with visitations and other obstacles that are created by lack of finances

and not ability to parent.  There is a cultural perception within the Department that these

"type of parents" do not deserve to be parents and do not receive equal services or

resonable efforts compared to other parents that the Department works with.

## EIGHTTEENTH CAUSE OF ACTION

(Discrimination Against Parents in Poverty/Lower Socio-Economic Class)
(Reserved for Appeal)[229]

485.    Each of the foregoing and ensuing allegations are incorporated as if fully set forth herein.

486.         Defendants treat parents differently based on their financial status.  Being

homeless or without a job is not sufficient to determine parental fitness alone; yet DCF

will prevent parents from being able to take their children to shelters.  When parents fix

one issue, DCF comes up with another issue, without reunification.  A parent who had

substance abuse, may address it, provide proof of ascendance, but would still not have

reunification because now DCF would focus on their lack of resources (even though

government offers food and housing to the poor).

---

[229] A class that is not recognized, but should be, as the discrimination against the poor (lower
socioeconomic class) is real and prevalent.

487.     Emergency removal is more likely in a lower socio-economic neighborhood
simply because of the stigma associated with it, and because culturally "these people" are
more aggressive, less educated, and behave in manner that is "different" to what the DCF
workers are accustomed to.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Parents respectfully request that this Honorable Court:

a. Assert jurisdiction over this action;

b. Order that Plaintiff Parents may maintain this action as a class action pursuant to
Fed. R. Civ. P. Rule 23(b)(2).

c. Declare unconstitutional and unlawful pursuant to Fed. R. Civ. P. Rule 57

i. Defendants' violation of Plaintiff Parents' substantive right to be free from harm
under the due process clause of the Fourteenth Amendment to the United States
Constitution;

ii. Defendants' violation of Plaintiff Parents' Due Process rights under the First,
Ninth, and Fourteenth Amendments to the United States Constitution;

iii. Defendants' violation of Plaintiff Parents' rights under the FFPSA,CFSA,
FCSAA, AACWA, CAPTA, ASFA, SSA & others; and

iv. Defendants' violation of Plaintiff Parents' right for equal protections under the
law.

v. Defendant's violation of Plaintiff Parents' fundamental right to rear their child
as long as basic necessities can be provided, and with government assistance
when necessary and available.

vi. Defendants' violation of Plaintiff Parents' right to privacy under the First,
Fourth, Fifth and Ninth, Eleventh, and Fourteenth Amendment to the United
States Constitution;

vi. Defendants' violation of Plaintiff Parents' right from being compelled to self-
incrimination under the Fifth Amendment to the United States Constitution;

d. Permanently enjoin Defendants from subjecting Plaintiff Parents to practices that violates their rights.

e. Provide federal definition of reasonable efforts for reunification, and parental fitness, to which DCF, a federal funding/grant recipient, should adhere to.

g. Order appropriate remedial relief to ensure Defendants' future compliance with their legal obligations to Plaintiff Parents, including, but not limited to, the following:

    i. **Escrow Account**.  Establishment of Commonwealth Funded Escrow Account, maintained by Court Appointed Receiver

    ii. **Separation of Power**.  Executive branch shall issue an order immediately establishing the Office of the Parent Advocate ("OPA"), which shall be placed in charge of collecting data on behalf of the parents, including establishing an online intake system for parents to file complaints.  OPA should assist legislature to promulgate Department of Parents Services ("DPS").  This department shall train and make available parent social workers, whose primary goal is to help and advocate for parents.  CPCS should direct its CAFL division to further research the benefits of separating its division further into Children's Division and Parents Division, so that representation for each could be made in furtherance of that class without being biased of representing the other (zealous advocacy).

    iii. **Education/Training.** DCF shall develop and implement educational qualifications and a mandatory comprehensive pre-service and in-service training program for caseworkers and supervisors based on standards for acceptable management of a child welfare system with amendments reflecting the new data collected by [proposed] OPA and OCA recently released data.

    iv. **Availability of Necessary Resources for the Placement of Children and Services for Children and Parents.** An assessment shall be conducted by qualified professionals to determine the need for additional services for parents to facilitate goal of reunification, including the need for family preservation services (including in-home services to helps parents with disabilities or other mental or behavioral needs), wraparound services, reunification services, and independent living services. Defendants shall take the steps necessary to develop these services and placements according to the assessment and the time frames it provides;

    iv. **Implement Reunification Efforts** DCF workers shall visit parents frequently in their home, and make on the spot decisions whether the child can immediately be placed with the parent to avoid prolonged separation (analogous to emergency removal), and initiate in-home services to prevent future separation.

v. **Child-Parent, Grandparent and Sibling Visitation.** DCF shall develop and implement policies providing for adequate visitation between parents and children, grandparents and children, and siblings of children whom have been removed into foster care; Defendants shall develop and implement policies, which adequately track reasonable efforts made to preserve visitation rights intact.

vi. **Case and Service Planning.** DCF shall take necessary action to provide adequate and timely case plans parents, with the goal to be refocused on reunification.

vii. **Quality Assurance/Data.** DCF shall ensure that it has a quality assurance ("QA") system consistent with the standards of the COA and CWLA that is capable of measuring the quality of services provided to parents that have children in DCF custody;

viii. **Contract Monitoring and Performance-Based Monitoring.** DCF shall ensure that an adequately staffed and trained contract monitoring unit is created within the state's central office for purposes of overseeing and managing the purchased services for parents until DPA is established; DCF shall develop and implement a performance-based contracting scheme with its private vendors to ensure necessary services are being provided to parents in line with reunification goals;

ix. **Monitoring/Enforcement.** The provisions of the Court order entered pursuant to Fed. R. Civ. P. Rule 65(d) shall be monitored by a neutral expert monitor appointed by the Court. In addition, the Court shall have continuing jurisdiction to oversee compliance with that order.

h. Award to Plaintiff Parents the reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees, pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988, and Federal Rules of Civil Procedure 23(e) and (h); and

i. Consider establishing a Task Force to investigate cases in which parents have fought to keep their parental rights and lost them.  Specifically looking to see if the allegations were in fact accurate, and apply the federal standard to see if there were adequate services and reasonable efforts for reunification.

j. Grant such other and/or further equitable relief as the Court deems just, necessary and proper to protect Plaintiff Parents from further harm by

Respectfully Submitted,
By:

_____

Ilya Liviz, *Esq.*
JURYRIGHTSFORPARENTS.com

Dated: 03/20/2018                200 Central St., No.1
Lowell, MA 01852
1-(978)-606-5326
ilya.liviz@gmail.com
B.B.O.# 686409

**ADDENDUM**

*Adoption of Jenny*, 477 Mass. 1108, 91 Mass. App.Ct.1128, 86 N.E.3d 511
(Table)(2017)(Supreme Judicial Court Appellate Review Denied)

(Pgs. 182-186.)

91 Mass.App.Ct. 1128
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
Appeals Court of Massachusetts.

ADOPTION OF JENNY.[1]

16-P-1330
|
Entered: June 16, 2017.

By the Court (Agnes, Massing & Lemire, JJ.[2])

MEMORANDUM AND ORDER PURSUANT TO RULE 1:28

**\*1**  The mother appeals from a decision by a judge of the Juvenile Court, which found her unfit to parent the subject child and terminated her parental rights.[3] Specifically, the mother contends that the trial judge's findings do not support his conclusion of parental unfitness, and that the termination of the mother's parental rights was not in the child's best interests. We affirm.

Background. After trial, the judge issued 724 individual findings of fact, and an additional 121 findings after a subsequent hearing. The mother does not contend that any of these findings of fact lack support in the evidence that was before the judge. Here, we summarize and relate only those facts pertinent to the mother's claims, reserving certain facts for further discussion below.

1. The mother. The mother was born in Florida and lived in Honduras until her early adult years. She moved to Massachusetts sometime in 2004. She primarily speaks Spanish and has a limited understanding of English. She has been married once previously but is now divorced. She currently resides in Somerville.

The mother has been diagnosed with a number of mental health problems, including major depressive disorder, borderline personality disorder, and posttraumatic stress disorder. She was hospitalized at least three times in relation to these conditions. At least twice, the hospitalizations occurred after the mother had undergone a period of stress.[4]

The mother also has a history of relationships involving severe conflict, including domestic violence, with the people in her life. She has had at least five restraining orders issued against her, two of which were still in effect at the time of the trial. Several of these restraining orders were obtained by persons who the mother was initially friends with, until the friendships soured.[5] One such incident occurred when the mother and a friend attempted to follow the father after he left the mother's apartment. The mother brought the child, who was seven months old at the time, in the friend's car without a car seat. A physical fight ensued between the mother and the friend, in the child's presence, until the mother took the child and exited the car. See note 4, supra.

**\*2**  2. The child. The child was born in 2010. Shortly after her birth, the child began to have seizures. She was initially diagnosed with a seizure disorder and prescribed medication. When the child was approximately two years old, she was diagnosed with nephrotic syndrome, which is a chronic kidney condition characterized by relapse and remission, and requires constant monitoring. Left untreated, nephrotic syndrome can cause severe harm to the kidneys and can, in

certain cases, become fatal. Caring for a child with nephrotic syndrome requires close attention to her symptoms, as well as "dipstick" testing of urine to monitor protein levels. The dipstick testing must be carefully done and charted to ensure accurate monitoring of the child's condition. If a caregiver misses signs of relapse, it will take longer to achieve remission, and could require a hospital stay. Thus, a caregiver needs to be vigilant to any signs of illness, be able to administer medications correctly, and be able to schedule multiple medical appointments with medical professionals.

3. Involvement of Department of Children and Families (DCF). There have been approximately sixteen G. L. c. 119, § 51A, reports (51A reports) filed since 2010 with respect to the mother and the child, twelve of which were screened-in by DCF. Two of the 51A reports were filed in response to the incident detailed above, when the mother brought the child into a car without a proper car seat and fought with the driver. Most of the remaining reports were filed either as a result of reports of loud arguing between the mother and the father at the mother's apartment, or in response to the mother calling the police or 911 in relation to the child's medical condition.

Two 51A reports were also filed in response to an incident that occurred in April, 2011. An ambulance and paramedics were dispatched to the mother's apartment in response to the mother's 911 call that the child was not breathing. Upon arriving, a paramedic observed the child with blood on her face and shirt, and exhibiting what the paramedic believed to be postseizure symptoms. The mother was very angry, yelling at the paramedics and refusing to allow them to examine the child. The mother continued to yell and swear at the paramedics as she accompanied the child into the ambulance. During the ambulance ride, the mother held the child on her lap in order to comfort her, rather than having the child restrained. The mother continued to argue with one of the paramedics, apparently over the decision to transport the child to Massachusetts General Hospital in Boston instead of a hospital in Everett. During the ride, the mother did not have a firm hold on the child due to her constant turning around to yell at the paramedic, and the other paramedic had to repeatedly ask the mother to pay attention to the child. At one point the mother became upset and "tossed" the child away from her, forcing the paramedic to catch her before she hit the floor or any equipment. As a result of this incident, the mother was later arrested and charged with assault and battery on the child.

The child has been removed from the mother's care by DCF three times: the first time in May, 2010; the second time in March, 2011; and the third time in April, 2011, after the ambulance incident. The child has remained in DCF custody since April, 2011, and first lived with a foster parent before being placed with the preadoptive parents.

Discussion. We review the decision of the trial judge to determine whether there was any abuse of discretion or error of law. Adoption of Hugo, 428 Mass. 219, 225 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999). We also review findings of fact under the familiar "clearly erroneous" standard. See Adoption of Adam, 23 Mass. App. Ct. 922, 924 (1986). In doing so, we grant substantial deference to the judge's decision, because a "judge who hears the evidence, observes the parties, and is most familiar with the circumstances remains in the best position to make the judgment [regarding fitness]." Guardianship of Estelle, 70 Mass. App. Ct. 575, 579 (2007).

 **3** 1. Unfitness. "The interest of parents in their relationship with their children is fundamental, and constitutionally protected." Petition of the Dept. of Public Welfare to Dispense with Consent to Adoption, 383 Mass. 573, 587 (1981) (Department of Pub. Welfare). A State's intervention into a family is only justified if the parents "have grievous shortcomings or handicaps that would put the child's welfare in the family milieu much at hazard." Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 646 (1975) (New England Home).

"[T]he term 'unfitness' signifies something more than a standard by which we measure the limits of acceptable parental conduct"; it is a standard that we use "to measure the circumstances within a family as [those circumstances] affect the child's welfare." Department of Pub. Welfare, supra at 589. It requires careful consideration, reflecting the unique facts present in each case, of the capacity of the parents to care for the child. See Freeman v. Chaplic, 388 Mass. 398, 404-405

(1983). DCF has the burden of proving parental unfitness by clear and convincing evidence. [6] Adoption of Lorna, 46 Mass. App. Ct. 134, 139 (1999).

The welfare of the child is the most important consideration when determining parental fitness. Department of Pub. Welfare, supra. "[T]he critical question is whether the [biological] parents are currently fit to further the welfare and best interests of the child." Bezio v. Patenaude, 381 Mass. 563, 576 (1980). The parental unfitness test and the best interests of the child test are not mutually exclusive, but rather "reflect different degrees of emphasis on the same factors." New England Home, supra at 641.

"A mental disorder is relevant where 'it affects the parents' capacity to assume parental responsibility, and ability to deal with a child's special needs.' " Adoption of Rhona, 63 Mass. App. Ct. 117, 125 (2005), quoting from Adoption of Frederick, 405 Mass. 1, 9 (1989). Consideration of a parent's mental condition is also a statutory factor in termination cases. See G. L. c. 210, § 3(c)(xii). A parent's mental illness may support a finding of unfitness when there is evidence that the mental illness interferes with the parent's ability to provide care for the child. See Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption, 392 Mass. 696, 701 (1984); Adoption of Eduardo, 57 Mass. App. Ct. 278, 282-283 (2003).

The mother maintains that the judge's findings of fact do not support his determination that she is unfit, [7] and that the judge's determination that her mental illness created a significant risk of harm to the child was not sufficient to support a determination of unfitness. Specifically, the judge found that "[t]here is no dispute that [the mother] suffers from a serious, long-standing mental disorder" that "interferes with her ability to keep [the child] safe and to work with professionals who provide necessary services to [the child]." He found that uncontrolled, the mother's mental illness led to "impulsive, unnecessary confrontations, including confrontations with persons who are involved in caring for [the child] or who respond to requests for assistance, such as her DCF caseworkers, emergency medical technicians, police officers, and medical providers." Specifically, the judge concluded that the mother's mental illness and the attendant confrontations led to a serious risk of harm to the child on two occasions: the 2010 incident where the child was placed in a car without a proper car seat and was present when the mother engaged in a physical confrontation with the driver, and the 2011 ambulance ride where the mother failed to pay proper attention to the child, failed to securely hold the child in her lap, and "either recklessly or intentionally caused [the child] to be tossed away from her."

**\*4** The judge also determined that the mother's mental illness "caused her to have grave problems in her personal life." These problems included "highly dysfunctional" personal relationships, multiple restraining orders filed against her, multiple arrests and incarcerations, and multiple hospital stays. The judge initially believed that with proper diagnosis and treatment, the mother's mental condition would improve to a point where she would be able to effectively parent the child. However, after being treated for nearly a year, the judge found that despite some improvement, the mother continued to exhibit the same tendencies as she had before her treatment changed. This led the judge to conclude that the mother's mental illness caused her to be unfit and unable to care for the child. We discern no error in this conclusion.

Contrary to the mother's assertions, the record is replete with findings that support the judge's unfitness determination. The judge's findings are detailed, thorough, and show that he gave the case his close attention. [8] See Custody of a Minor (No. 1), 377 Mass. 876, 886 (1979). The mother's argument that the judge's findings are insufficient to support his conclusions is belied by the record and is largely based on the fact that the mother weighs the judge's findings differently than the judge did. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Care & Protection of Olga, 57 Mass. App. Ct. 821, 824 n.3 (2003), quoting from Anderson v. Bessemer City, 470 U.S. 564, 573-574 (1985). The judge is not required to view the evidence from the mother's perspective. [9] See Care & Protection of Three Minors, 392 Mass. 704, 711 (1984).

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2. Termination. After a finding of unfitness, a "judge must determine whether the parent's unfitness is such that it would be in the child's best interests to end all legal relations between parent and child." Adoption of Nancy, 443 Mass. 512, 515 (2005). In order to dispense with a parent's consent to adoption, the unfitness element must be so probative and persuasive that it can serve as a predicate for finding that the unfitness will continue undiminished into the future, affecting the welfare of the child. See Adoption of Carlos, 413 Mass. 339, 350 (1992). While consideration of the reasonable likelihood that a parent's unfitness at the time of trial may only be temporary is appropriate, such a prediction must rely "upon credible evidence rather than mere hypothesis or faint hope." Adoption of Serge, 52 Mass. App. Ct. 1, 7 (2001) (quotation omitted). See Adoption of Carlos, supra.

 **5**  As noted above, the judge found that the evidence presented during the original trial clearly and convincingly supported the determination that the mother was currently unfit. At the subsequent hearing, the judge found that despite a revised diagnosis and further treatment, the mother "continues to struggle unsuccessfully to control her mental disorder." The judge noted the similarities between the mother's 2012 psychiatric hospitalization and her most recent hospitalization in 2014, and concluded that "despite ongoing treatment [the mother] has not stabilized to the point that [the child] safely may be returned to her care and custody." Based on this finding, the judge determined that the mother remains unfit to care for the child and that her unfitness is likely to continue indefinitely into the future. There was no error in the judge's conclusions.

In this case, the record contains numerous findings in which the mother's mental illness presented a substantial risk of harm to the child, especially when the mother was under severe stress. The supplemental findings of fact demonstrate clearly and convincingly that that risk has not abated despite the mother's further treatment. In addition, the judge noted in his findings that the preadoptive parents have managed the child's medical condition well enough to the point where her condition is monitored largely via electronic mail messages with the child's doctor. The judge found that the mother was not capable of such organization and management, which risked disruption to the child's life, as poor management of her condition would lead to frequent medical appointments, emergency room visits, and hospitalizations. It has now been more than six years since the child was placed in DCF custody. At some point, the judge must say "enough," and act in the best interests of the child. Adoption of Carlos, supra at 242. See Adoption of Ilona, 459 Mass. 53, 60 (2011) ("Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period"). Therefore, there was no error in the termination of the mother's parental rights. [10]

Decree affirmed.

All Citations

91 Mass.App.Ct. 1128, 86 N.E.3d 511 (Table), 2017 WL 2605616

Footnotes

1    A pseudonym.
2    The panelists are listed in order of seniority.
3    The father has not appealed from the termination of his parental rights.
4    In 2012, the mother alleged that she was "locked in a basement" and that the child's foster parents were trying to kill the child; however, the hospital's admission notes stated that "[i]t is possible that [the mother's] distress and degree of delusion is worsening, possibly in relation to the approaching date at which her daughter may become available for adoption." In 2014, the mother was hospitalized to undergo a competency evaluation prior to a trial for criminal charges related to incidents with the father, and made similar claims about being kidnapped and raped before her hospitalization.
5    The mother's friendship with a former roommate deteriorated when the mother accused her of wanting to buy the child from the mother and sell the child. A physical altercation later occurred in the friend's car that led to criminal charges against the mother.

6    Clear and convincing evidence is evidence that is "strong, positive and free from doubt." <u>Stone</u> v. <u>Essex County Newspapers</u>, 367 Mass. 849, 871 (1975) (quotation omitted).

7    Despite the moral overtones of the statutory term "unfit," the judge's decision is not a moral judgment; nor is it a determination that the mother does not love the child. The question for the judge is "whether the parent's deficiencies 'place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child.' " <u>Adoption of Olivette</u>, 79 Mass. App. Ct. 141, 157 (2011), quoting from <u>Care & Protection of Bruce</u>, 44 Mass. App. Ct. 758, 761 (1998).

8    Indeed, the judge is to be commended not only for his effort in producing the lengthy and detailed decisions, which included some 845 findings of fact and extensive rulings of law, but also for his willingness to provide the mother with additional time to correct her issues and an additional opportunity to be heard prior to his ultimate determination that the mother is unfit.

9    Nor it is erroneous, as the mother contends, for the judge to find that she was generally able to meet the child's medical needs while also concluding that she was unable to provide proper care for the child when her mental condition deteriorated. The record demonstrates that the mother, while able to provide adequate care for the child during stress-free periods, would quickly deteriorate in stressful situations, and it was then that the judge found the child was at the greatest risk of harm. This finding is supported by the evidence. In addition, the child's nephrotic syndrome was diagnosed after her removal from the mother's care, and the judge found that the mother was not organized or attentive enough to manage the child's medical condition without significant disruption to the child's life.

10   In a footnote to her brief, the child asks us to remand this matter in order for the judge's visitation order to be reviewed, pursuant to the adoptive parents' motion to intervene. As no appeal was taken from the denial of that motion, the issue is not properly before us, and we make no determination on it here. To the extent that the child and the adoptive parents take issue with the judge's visitation order, that matter is best revisited in the Juvenile Court in the future.

---

**End of Document**                          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   5